PAUL, HASTINGS, JANOFSKY & WALKER LLP
BRADFORD K. NEWMAN (SB# 178902) bradfordnewman@paulhastings.com
STEPHEN N. YANG (SB# 142474) stephenyang@paulhastings.com
SARJU A. NARAN (SB# 215410) sarjunaran@paulhastings.com
SHANNON S. SEVEY (SB# 229319) shannonsevey@paulhastings.com
1117 S. California Avenue
Palo Alto, CA 94304-1106
Telephone: (650) 320-1800
Facsimile: (650) 320-1900

Attorneys for Plaintiffs
Arthur J. Gallagher & Co., Inc. & Arthur J. Gallagher & Co., Insurance Brokers of California, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ARTHUR J. GALLAGHER & CO., INC., a Delaware Corporation, ARTHUR J. GALLAGHER & CO., INSURANCE BROKERS OF CALIFORNIA, INC., a California Corporation,<br><br>    Plaintiffs,<br><br>    vs.<br><br>EDGEWOOD PARTNERS INSURANCE CENTER, a California corporation; DAN R. FRANCIS; JOHN G. HAHN; ANDREW ("WALLY") BROWN, JR.; BRIAN F. QUINN; NEIL. R. COHN; CAROLANN COHN; MICHAEL J. BROWN; STEPHEN HAUSE; LAURA J. WICK; JAMES C. HALBLEIB; LAURINDA ("LAURIE") A. MARTIN; ERIC CHUA; GEORGE J. PETTY; LINDA SOO HOO; ROBERT E. DUTTO; SUSAN M. ENGLISH; DON J. JOHNSON; ALLEN L. AMOS; WILLIAM ("BILL") PHILLIPS, JR.; DIRCK ("RICK") R. STINSON; ROBERT ("BOB") D. ELLSWORTH; ROBERT H. WATKINS; PAUL H. WAGENER; SHANDRANETTE MIDDLETON,<br><br>    Defendants. | CASE NO.<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**<br><br>1. VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. §1030 ET SEQ.,<br>2. VIOLATION OF CALIFORNIA PENAL CODE § 502<br>3. MISAPPROPRIATION OF TRADE SECRETS, CAL. CIV. CODE §3426 ET SEQ.,<br>4. CONVERSION<br>5. MISAPPROPRIATION OF EMPLOYER PROPERTY, CAL. LABOR CODE §2860,<br>6. BREACH OF WRITTEN CONTRACT<br>7. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING<br>8. BREACH OF FIDUCIARY DUTY<br>9. BREACH OF THE DUTY OF LOYALTY,<br>10. VIOLATIONS OF THE CALIFORNIA LABOR CODE, CAL. LABOR CODE §§ 2853 AND 2863,<br>11. TORTIOUS INTERFERENCE WITH CONTRACT<br>12. TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE<br>13. UNFAIR COMPETITION, CAL. BUS. & PROF. CODE §17200 ET SEQ.,<br>14. UNJUST ENRICHMENT, AND<br>15. FRAUD.<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT OF A.J. GALLAGHER & CO., INC.; DEMAND FOR JURY TRIAL

Case No.

1    Plaintiffs Arthur J. Gallagher & Co., a Delaware corporation, and Arthur J. Gallagher &

2    Co. Insurance Brokers of California, Inc., a California corporation (collectively, "Gallagher" or

3    the "Company"), for its Complaint against Defendants Edgewood Partners Insurance Center

4    ("EPIC"), Dan R. Francis, John G. Hahn, Andrew ("Wally") Brown, Jr., Brian F. Quinn, Neil R.

5    Cohn, CarolAnn Cohn, Michael J. Brown, Stephen Hause, Laura J. Wick, George J. Petty, James

6    C. Halbleib, Laurinda ("Laurie") A. Martin, Eric Chua, Linda Soo Hoo, Robert E. Dutto, Susan

7    M. English, Don J. Johnson, Allen L. Amos, Shandranette Middleton (also known as

8    Shandranette Pulliam), William ("Bill") Phillips, Jr., Dirck ("Rick") R. Stinson, Robert ("Bob")

9    D. Ellsworth, Robert H. Watkins, and Paul H. Wagener, (collectively, the "Individual

10    Defendants") (collectively with EPIC, the "Defendants") states as follows:

11                          I.      **NATURE OF ACTION**

12    1.        This action stems from EPIC's illegal raiding of more than 45 Gallagher

13    employees and the associated theft and use of confidential Gallagher data to unfairly compete and

14    steal millions of dollars of business.  EPIC's actions are ongoing.  This Complaint seeks

15    remedies, including injunctive and monetary relief, for violation of the Computer Fraud and

16    Abuse Act, 18 U.S.C. §1030 et seq., California Penal Code §502, misappropriation of trade

17    secrets, Cal. Civ. Code §3426 et seq., misappropriation of employer property, Cal. Civ. Code

18    §2860, conversion, breach of written contract, breach of the covenant of good faith and fair

19    dealing, breach of fiduciary duty and breach of the duty of loyalty, violations of the California

20    Labor Code, Cal. Labor Code §§2853 and 2863, tortious interference with contract, tortious

21    interference with prospective business advantage, unfair competition, Cal. Bus. & Prof. Code

22    §17200 et seq., unjust enrichment, and fraud.

23    2.        A fundamental premise of the competitive marketplace is that companies must

24    compete in a fair and ethical manner, working to develop their own products, clients, business

25    strategies, revenues and profits using their own efforts and employees, rather than

26    misappropriating proprietary and trade secret data of others and illegally raiding another

27    company's workforce.

28    3.        To the outside world, including its potential clients and partners, Defendant

Case No.                                      -1-          COMPLAINT OF A.J. GALLAGHER & CO.,
                                                           INC.; DEMAND FOR JURY TRIAL

1    EPIC touts its purported beliefs in these ethical principles. But EPIC's actions in this case tell a
2    story of a much different company.

3        4.        As a new insurance brokerage firm, EPIC was not content to build its new
4    business the legal way, through proper capitalization of an office, with significant effort placed
5    into hiring lawfully and having its new hires spend the time and effort necessary to build client
6    relationships and client business in an ethical and legal manner. Instead, EPIC and its two most
7    senior executives, Defendants John G. Hahn and Dan R. Francis, proceeded in a manner that
8    violated EPIC's own Code of Ethics which EPIC advertises to the world that it believes in and to
9    which it claims to adhere.

10        5.        The relationship between employer and employee implicitly contains an
11    agreement that the employee will act in good faith and will not act to the detriment of his or her
12    employer. Dishonesty and disloyalty by the employee to his or her employer does great violence
13    to this relationship, and among other harm, deprives the employer of the benefits to which it is
14    entitled in exchange for paying the employee his or her agreed-upon compensation for those
15    periods in which the employee was disloyal.

16        6.        While active Gallagher officers, senior executives, fiduciaries and/or
17    employees, Individual Defendants and former Gallagher employees Wally Brown, Brian Quinn,
18    Michael Brown and Neil Cohn, in concert with EPIC executives Francis and Hahn, surreptitiously
19    carried out their illegal actions in a conscious way so as to cause the utmost damage to Gallagher.
20    Among other things, over a period of months and while still actively employed by Gallagher,
21    these Defendants – working in close concert with Francis and Hahn – secretly leased space and
22    set up EPIC's office in the same complex where Gallagher's office is located, used their insider
23    knowledge of employee skills and salaries to illegally solicit and recruit their direct reports away
24    from Gallagher and into jobs with Gallagher's competitor, and orchestrated the mass theft and use
25    of Gallagher data to unfairly compete.

26        7.        Defendants purposely chose to announce the first wave of their resignations
27    from Gallagher and leave en masse and with no prior notice on Friday, December 7. They knew
28    that by waiting until the end of the year to resign without notice, they would catch Gallagher off-

1    guard, cause the most disruption to Gallagher, and inflict the maximum damage to Gallagher's

2    business goodwill and client relationships.  It was a calculated ploy to damage Gallagher, steal its

3    trade secrets, ruin its business, and profit from Gallagher's customers.

4           8.       Within minutes of walking out, the Individual Defendants, working in concert

5    with each other, arrived at the EPIC office, and on information and belief, through the use of

6    Gallagher confidential and proprietary information, started contacting Gallagher clients and

7    partners.  Using deceit, misrepresentation and other unlawful methods, Defendants engaged in

8    unfair competition by, among other things, on information and belief, attempting to persuade

9    Gallagher customers and clients to switch their business from Gallagher to EPIC by falsely

10   representing that EPIC had "purchased" the client's account from Gallagher and that Gallagher

11   was going to close its San Ramon office in response to the mass departures.

12          9.       At the same time, they actively concealed their actions from Gallagher's

13   regional and corporate-level management.  Their illicit actions and deceit in concealing the

14   conspiracy made detection impossible for Gallagher until after the conspiracy was executed.

15   While Gallagher has yet to discover all of the facts, the remaining Individual Defendants (along

16   with the group identified above) committed various illegal acts as alleged herein, including theft

17   and use of property and data, unauthorized access to Gallagher's servers and computer media,

18   breach of the duty of loyalty, breach of their employment agreements, and unfair competition.

19         10.      Defendants Wally Brown's and Brian Quinn's actions were particularly

20   egregious, as they accomplished and facilitated the illegal plan, including the employee raiding

21   and theft of data, while holding the most senior management positions within Gallagher's San

22   Ramon office.

23         11.      Gallagher is informed and believes, and thereupon alleges, that EPIC and the

24   Individual Defendants continue to engage in unlawful solicitation of current Gallagher

25   employees, use of the stolen Gallagher data, and unfair competition.  If Defendants are not

26   immediately restrained and ordered to identify, return and cease using the stolen Gallagher data,

27   Gallagher will be irreparably harmed.   If Defendants are not restrained from further unfair

28   competition through the acts complained of, Gallagher will continue to suffer irreparable loss of

1    its employee base, and to its goodwill, reputation and business.    Conversely, in a short amount of

2    time, Gallagher has spent significant time and effort discovering the evidence of Defendants'

3    illegal conduct thus far and therefore has demonstrated the likelihood that it will prevail on the

4    merits of its claims, while restraining Defendants from engaging in further unlawful conduct

5    through the misuse of stolen Gallagher data and related unfair competition will not cause any

6    prejudice to the Defendants.

### SUBJECT-MATTER JURISDICTION AND VENUE

7

8    12.    Jurisdiction of this Complaint is proper pursuant to 18 U.S.C. §1030(g), 28

9    U.S.C. §1331, and 28 U.S.C. §1367.

10    13.    Venue is appropriate in this Court pursuant to 28 U.S.C. §1391(a)(2) because a

11    substantial part of the events or omissions giving rise to the claim occurred in this District.

### III.    PARTIES AND PERSONAL JURISDICTION

12

13    14.    Plaintiff Arthur J. Gallagher & Co. is a Delaware corporation with its principle

14    place of business in Illinois.  Arthur J. Gallagher & Co. Insurance Brokers of California, Inc., is a

15    California corporation with its principle place of business in California.

16    15.    Defendant Edgewood Partners Insurance Center ("EPIC") is a California

17    corporation with its corporate headquarters in San Mateo, California, and three other offices in

18    San Ramon, California, Sacramento, California, and Orange, California.

19    16.    Individual Defendants Dan R. Francis and John G. Hahn are co-founders of

20    Defendant EPIC, seasoned and sophisticated industry executives, and on information and belief,

21    residents of the State of California.

22    17.    At all relevant times, Individual Defendants Wally Brown, Brian Quinn, Neil

23    Cohn, Jim Halbleib and Stephen Hause were officers and fiduciaries of Plaintiff Arthur J.

24    Gallagher & Co. Insurance Brokers of California, Inc.

25    18.    Individual Defendants are current employees of Defendant EPIC, former

26    employees of Gallagher, and on information and belief and the facts currently known, residents of

27    the State of California.  Specifically:

28

- **The Initiators Of The Conspiracy To Raid Gallagher, Misappropriate Data, And Steal Millions Of Dollars of Business:** In addition to the EPIC Defendants, <u>Wally Brown</u>, <u>Neil Cohn</u>, <u>Brian Quinn</u>, and <u>Michael Brown</u>.

- **The Individual Defendants Tasked With Carrying Out The Conspiracy:** In addition to the EPIC Defendants, Wally Brown, Neil Cohn, Brian Quinn, Michael Brown, and <u>Laura Wick</u>, and <u>George Petty</u>.

- **Individual Defendants Who Misappropriated, Used, And/Or Deleted Gallagher Confidential and Proprietary Data:** In addition to the EPIC Defendants, Wally Brown, Neil Cohn, Brian Quinn, Michael Brown, Neil Cohn, Laura Wick, George Petty, and <u>Eric Chua</u>, <u>Shandranette Middleton</u>, <u>Jim Halbleib</u>, and <u>Laurie Martin</u>.

- **Individual Defendants Who, On Information And Belief, Used Gallagher Proprietary Data To Unlawfully Solicit Gallagher Clients To Transfer Business To EPIC And Otherwise Engage In Unfair Competition:** In addition to the EPIC Defendants, Wally Brown, Neil Cohn, Brian Quinn, and Michael Brown, Neil Cohn, Laura Wick, George Petty, Eric Chua, Jim Halbleib, and Laurie Martin and <u>Allen Amos</u>, <u>Rob Dutto</u>, <u>Robert Ellsworth</u>, <u>Steve Hause</u>, <u>Don Johnson</u>, and <u>Paul Wagener</u>.

- **Individual Defendants Who Breached Their Contractual And/Or Fiduciary Obligations And/Or Duty of Loyalty To Gallagher:** <u>Wally Brown</u>, <u>Brian Quinn</u>, <u>Neil Cohn</u>, <u>CarolAnn Cohn</u>, <u>Michael Brown</u>, <u>Stephen Hause</u>, <u>Allen Amos</u>, <u>Rob Dutto</u>, <u>Susan English</u>, <u>Jim Halbleib</u>, <u>Don Johnson</u>, <u>Laurie Martin</u>, <u>William Phillips</u>, <u>Rick Stinson</u>, <u>Linda Soo Hoo</u>, <u>Paul Wagener</u>, and <u>Robert Harrison Watkins</u>.

19.     Gallagher's on-going review of the evidence is expected to reveal additional actors who engaged in unlawful conduct, and Gallagher reserves the right to amend its Complaint to add additional defendants.

20.     Each of the Defendants have willfully aided and abetted each of the other Defendants in the wrongful concerted action described herein, or acted with or in furtherance of that action, or assisted in carrying out its purposes alleged in this Complaint.

21.     Defendants, and each of them, are individually sued as co-conspirators in the wrongful conduct complained of, and the liability of each arises from the fact that each has engaged in all or part of the improper acts, plans, schemes, conspiracies, or transactions complained of herein.

22.     Defendants, and each of them, are individually sued as agents of one another, and in doing the things alleged herein, each of the Defendants acted within the course and scope of their agency, and with the permission and consent of each of the other Defendants.

COMPLAINT OF A.J. GALLAGHER & CO., INC.; DEMAND FOR JURY TRIAL

1                    IV.    **FACTUAL ALLEGATIONS**

2        23.        The Individual Defendants, who left *en masse* to join EPIC, consisted of the

3    San Ramon Office Heads, the HR Manager/ Office Manager, the Head of Technology, Producers

4    and key support staff:

5                    (a)        <u>Office Heads, Wally Brown and Brian Quinn</u>, the Area Chairman and

6    Area President of Gallagher's San Ramon office, respectively, were responsible for leading

7    Gallagher's San Ramon office.  As the heads of the office, Brown and Quinn not only functioned

8    as Producers, maintaining their own client accounts, but also managed and supported the other

9    Gallagher San Ramon sales groups and made executive management decisions on behalf of

10   Gallagher's San Ramon office.

11                   (b)        <u>Human Resource and Office Manager, Laura Wick</u>, was an

12   approximately twelve-year Gallagher employee.  As a long standing employee, Wick had

13   developed relationships with Gallagher employees in the San Ramon office and knowledge of

14   confidential Gallagher HR information, including sensitive data regarding employee skills,

15   responsibilities, and compensation.

16                   (c)        <u>Systems Administrator, George Petty</u> was a six-year employee of

17   Gallagher and managed all of Gallagher's San Ramon technology systems, network, and

18   computers.

19                   (d)        <u>Other Management: Linda Soo Hoo</u>, Area VP – Managerial, was a

20   sixteen-year employee and member of Gallagher's San Ramon management team.

21                   (e)        <u>Producers (some of whom were also Officers of Plaintiff)</u>:  Producers

22   <u>Allen Amos, Neil Cohn, Rob Dutto, Robert Ellsworth, Susan English, Jim Halbleib, Steve Hause,</u>

23   <u>Don Johnson, Bill Phillips, Paul Wagener</u> functioned as the head of their sales group.  Producers

24   have the initial and primary contact with actual and prospective clients, and are responsible for

25   procuring and negotiating sales and maintaining client relationships.

26                   (f) <u>Account Executives</u>: Account Executives, such as <u>Michael Brown (son of</u>

27   <u>Wally Brown), Eric Chua, Laurie Martin, Rick Stinson, Robert Watkins</u>, assisted Producers in

28

1    maintaining the client relationship, attended meetings with actual and prospective clients, and

2    oversaw the performance of work performed on client accounts.

3    **As A Leading Provider Of Insurance Products And Services, Gallagher Maintains And**
**Diligently Protects Its Proprietary Information And Employee And Customer Relationships**

4

5         24.      Arthur J. Gallagher & Co., Inc. the parent company of the Gallagher entities,

6    was founded in 1927 to provide services worldwide in the area of risk management and general

7    insurance brokerage services, managing the assets of companies, providing insurance, and

8    furnishing similar services in areas of risk management.

9         25.      Gallagher's breadth and depth of experience in selling insurance products sets

10   it apart from its competitors.  Gallagher provides a national platform for carriers, which is unique

11   because of its size, expertise, proven track record and accumulated goodwill.  Through its own

12   efforts, Gallagher has invested substantial time and money in developing, maintaining, and

13   protecting substantial confidential, proprietary, and/or trade secret information about the

14   insurance brokerage and risk management industry, including, but not limited to:

15   •   lists of clients and prospective clients, including special customer matters like their

16       interests, needs, risk factors, customer purchasing patterns, the structure, conditions and

17       extent of customers' existing insurance coverages, customer renewal or expiration data,

18       customer concerns, customer's history of claims, and key contacts;

19   •   highly sensitive account details regarding existing Gallagher clients, including business

20       records, customer file documents, pricing information, and sales plans;

21   •   special business relationships with vendors, agents and brokers,

22   •   Gallagher financial matters, including pricing and profit margins, commissions and/or

23       fees;

24   •   The existence of any premium accounts, commission rates, and risk management service

25       arrangements, their loss histories, and other data showing the particularized insurance

26       requirements and preferences of the accounts;

27   •   business, management and personnel strategies;

28

1      • criteria and formulae used by Gallagher in pricing its insurance products and claims

2         management, loss control, and information management services;

3      • the structure and pricing of insurance packages and products that Gallagher has negotiated

4         with various underwriters;

5      • confidential strategies and business plans to market Gallagher's services, create new

6         products and bring value to its clients; and

7      • selective personnel information and data, including compensation structure, performances,

8         relative strengths and weaknesses, assigned customer accounts, and related employee

9         information.

10      26.    Gallagher's non-public confidential and proprietary information has

11 independent economic value because it is not known to either its competitors or within the

12 insurance agency and brokerage business.  This information is provided to Gallagher, developed

13 by Gallagher and utilized by Gallagher for the purpose of allowing Gallagher employees to

14 effectively and efficiently sell, deliver and manage its services and products.

15      27.    Gallagher has spent many years and has invested substantial resources

16 developing its confidential and commercially valuable information and has invested considerable

17 amounts of time, money and effort in developing and maintaining solid relationships with, and

18 the goodwill of, each of its employees, participating clients and its potential clients.  Gallagher

19 enjoys long-standing, prosperous relationships with its clients. If, as happened in this case,

20 Gallagher's data was misappropriated and used by a competitor, it would provide the competitor

21 with value and an unfair advantage that would allow the competitor to unfairly raid Gallagher's

22 specific employees, immediately identify actual and potential customers and know the history and

23 specific details of the customers' business relationship with Gallagher, unfairly bid for business

24 against Gallagher, unfairly move business away from Gallagher and unfairly gain knowledge of

25 the procedures which result in Gallagher's delivery of excellent services and products.

26      28.    In the course of serving Gallagher's clients, the Individual Defendants gained

27 access to Gallagher's most confidential, proprietary and trade secret information.  In fact, in his

28 resignation letter, Defendant Neil Cohn conceded what was true for him and the other Individual

Defendants – that they were exposed and provided access to Gallagher confidential and proprietary information.

29.     Gallagher takes reasonable and appropriate measures to safeguard its non-public commercially valuable information. For example, through its Handbook, Code for Business Conduct and Ethics, Executive Agreements, Stockholder Agreements, and other corporate policies, Gallagher requires that its confidential, proprietary, and trade secret information be kept strictly confidential by its current and former employees.

- Code for Business Conduct and Ethics: For the purposes of protecting its confidential, proprietary, and trade secret information, Gallagher required all employees, including the Individual Defendants, to acknowledge its Code for Business Conduct and Ethics Agreement, which contained, among others, the following provisions: protection of its confidential, proprietary, and trade secret information; protection and proper use of company assets; prohibition against conflicts of interest with Gallagher; and prohibition against the theft of corporate opportunities.

- Executive Agreements: For the purposes of protecting its confidential, proprietary, and trade secret information, Gallagher required substantially all of its executives, including Defendants Brian Quinn, Neil Cohn, Michael Brown, Jim Halbleib, Laurie Martin, Robert Dutto, Rick Stinson, Allen Amos, Don Johnson, Robert Watkins, Susan English, William Phillips, Jr., and Paul Wagener, to sign an Executive Agreement, which contained, among others, the following provisions: an express acknowledgement of their fiduciary obligations, protection of confidential, proprietary, and/or trade secret information, a fourteen-day notice period upon termination of employment (for the purpose of ensuring a smooth transition and the protection of trade secret information), an obligation to return data upon termination of employment, and a post-employment agreement not to solicit Gallagher employees and clients.

- Non-Competition Agreement (Pursuant To A Sale of Business): For the purposes of protecting its confidential, proprietary, and trade secret information and as a part of a sale of business, in acquiring Defendant Wally Brown's former company, Gallagher entered into a non-competition agreement with Wally Brown, which included, among others, an agreement not to engage in post-employment competition or solicitation for a period of time necessary to protect Gallagher's trade secrets.

- Stockholder Agreement: For the purposes of protecting its confidential, proprietary, and trade secret information and for the purposes of retaining key employees, Gallagher entered into Stockholder Agreements with key employees, including Wally Brown, Brian Quinn, Neil Cohn, CarolAnn Cohn, Laura Wick, Jim Halbleib, Steve Hause, Carol Cohn, Linda Soo Hoo, and George Petty. The grants were expressly conditioned on Gallagher's employees faithfully and loyally carrying out their duties, and not engaging in acts "harmful to the interests of the Company." Such harmful acts defined in the Stock Option Plan included soliciting existing and prospective Gallagher clients for whom the employees performed work on behalf of Gallagher within the two-year period preceding the employees' termination, if doing so would require the employees to "reveal, make judgments upon, or to otherwise use or divulge any confidential information or trade secrets of the Company." The Plan further defines "harmful acts" to include the solicitation and recruitment of Gallagher's employees.

COMPLAINT OF A.J. GALLAGHER & CO., INC.; DEMAND FOR JURY TRIAL

Case No.

**EPIC Requires Its Employees To Execute Producer Agreements Containing Substantially The Same Prohibitions In the Gallagher Agreements That EPIC Induced The Individual Defendants To Violate**

30.    Gallagher is informed and believes, and thereupon alleges, that in hiring Producers from Gallagher, EPIC required them to execute EPIC Producer Agreements as a term and condition of their employment.  Through its own Agreements, EPIC concedes that:  (a) when it comes to EPIC data, EPIC defines and considers the very same categories of data that Defendants misappropriated from Gallagher and used to unfairly compete to constitute EPIC proprietary, trade secret information; (b) EPIC holds its own employees to the same contractual non-solicitation of employee covenants as Gallagher; (c) EPIC contractually requires its employees to owe their undivided loyalty and efforts to EPIC while employed by EPIC, just as Gallagher did for the Individual Defendants at issue; (d) EPIC contractually binds its own employees to the identical post-employment restrictions on soliciting customers of EPIC as Gallagher does – because such restrictions are necessary and critical to protecting both companies' confidential and proprietary data post-employment; and (e) where these provisions are violated by EPIC employees, EPIC agrees that immediate injunctive relief is warranted.

**Newly-Established EPIC Seeks To Become A Direct Competitor Of Gallagher**

31.    In or around June 2007, Trident IV, L.P., a private equity fund managed by Stone Point Capital, invested $100 million dollars to establish EPIC as an insurance brokerage providing retail property, casualty, and employee benefits products and services.

32.    In July 2007, EPIC acquired Calco Insurance Brokers & Agents Inc. ("Calco") to serve as its statewide base of operations.  With this acquisition, EPIC acquired some of the business relationships with insurance companies it needed to begin functioning as an active brokerage.  In this regard, EPIC seeks to compete, and is already directly competing with, Gallagher.

33.    Ironically, in June of 2007, EPIC issued a press release announcing it would acquire Calco in July ("Edgewood Partners, a new California Insurance Brokerage Firm Announces Agreement To Acquire Calco Insurance Agents and Brokers, Inc." – June 20, 2007,

COMPLAINT OF A.J. GALLAGHER & CO., INC.; DEMAND FOR JURY TRIAL

1    available at www.calco.com). The Press Release notes that Defendant Dan Francis, who now

2    runs EPIC, spent nearly 10 years at Calco. On Calco's Website, Calco advertises that "Calco

3    shares the Ethics of Michael Josephson, Founder of the Josephson Institutes of Ethics." This

4    Webpage begins with the following quote from Warren Buffet:

5         **In looking for people to hire, look for three qualities: integrity, intelligence and**

6         **energy. And if they don't have the first, the other two will kill you.**

7    The cited commentary from Josephson notes that "Some people do believe that business is

8    basically an amoral survival-of-the-fittest enterprise where traditional ideas of right and wrong

9    are irrelevant and all that really matters is what works....."

10        34.    Ironically, EPIC's newly-established website, available at

11   http://www.edgewoodins.com, accurately describes its business practices: "**Introducing**

12   **Edgewood Partners Insurance Center (E.P.I.C.). We put no limit on how far, how fast, how**

13   **close to the edge we go to identify your insurance requirements and secure the coverage you**

14   **need.**"

15               **Stage One of the Conspiracy: June – October 2007:**
     **Within Days Of Its Establishment, EPIC Enters Plot To Raid Gallagher Employees And**
16   **Customers And Enters Into a Conspiracy With Wally Brown, Michael Brown, Brian**
                         **Quinn, Neil Cohn and Others**
17

18        35.    Gallagher is informed and believes, and thereupon alleges, that in or around mid-

19   June 2007, EPIC, by and through Defendants Francis and Hahn, began communicating with

20   certain Individual Defendants, including Gallagher Officers and Area Presidents Wally Brown

21   and Brian Quinn, and also Michael Brown, regarding employment with EPIC of not only the

22   Browns and Quinn, but also their direct reports at Gallagher who, Gallagher is informed and

23   believes up to this point, had never expressed interest in seeking employment with EPIC and/or

24   leaving Gallagher's employ.

25        36.    Gallagher is informed and believes, and thereupon alleges, that EPIC entered into

26   an agreement with Defendants Wally Brown, Michael Brown, Brian Quinn and Neil Cohn – and

27   over time additional Individual Defendants including Wick and Petty – that they would secretly

28   accept employment with EPIC, with the goal being to wait to announce their resignation for

1    several months.   During this period, working in concert with each other and certain of the other

2    Individual Defendants, they would actively compete against Gallagher, while continuing to work

3    for Gallager, through several actions that included: convincing several current Gallagher

4    employees to join the conspiracy, setting up an EPIC office and infrastructure in San Ramon to

5    directly compete with Gallagher's San Ramon office and throughout Northern California, and

6    over the ensuing months,  planning and plotting to steal as many of Gallagher's clients as

7    possible. Another key aspect of the conspiracy was that for several important strategic reasons,

8    the Defendants would carefully coordinate the timing of the resignations, and then announce

9    these resignations en masse in waves (with certain conspirators announcing on different days for

10   specific tactical reasons), and simultaneously walk out of Gallagher.

11         37.     During this period, they would use their insider's knowledge of employee skills,

12   salaries and other Gallagher proprietary information to recruit their most valued employees away

13   from Gallagher and into directly competing jobs with what would become EPIC's newly

14   established San Ramon office.  Among other things, they would need to convince the targeted

15   Gallagher employees to leave Gallagher's employ while accounting for employee compensation,

16   earning cycles and employees' specific relationships with Gallagher and Gallagher clients,

17   physically lease space for EPIC, set up its IT systems, Human Resources and other functions, lay

18   the groundwork with Gallagher's best clients to convince them to switch their business to EPIC,

19   and steal Gallagher data.  Defendants also decided to wait to carry out the mass resignations and

20   walk-outs until the period in the year when these experienced industry executives believed they

21   would inflict the most damage on Gallagher and maximize their chances to convince Gallagher

22   clients to switch to EPIC.

23         38.     Gallagher is informed and believes that thereafter, Wally Brown, Michael Brown,

24   Brian Quinn and Neil Cohn, with the knowledge, encouragement from and assistance of EPIC

25   executives Francis and Hahn, began to bring other of the Individual Defendants into the plan and

26   conspiracy.  This included soliciting specific members of Gallagher's San Francisco, San Ramon,

27   and San Jose Sales, IT, Human Resources, and support functions to resign their employment with

28   Gallagher and join EPIC, and using their knowledge of their skills and salaries – as well as other

1   non-public information about Gallagher's business operations – to convince the Individual

2   Defendants to leave Gallagher's employ.

## Anatomy of Illegal Employee Raiding:
### The Case Study of Gallagher Employee Laura Wick Is Instructive

5       39.    Since 1985, Defendant Laura Wick worked for Gallagher.   For the last ten years,

6   she worked out of the San Ramon office, most recently serving as the functioning HR and office

7   manager for that office.

8       40.    Prior to October 17, 2007, Gallagher is informed and believes, and thereupon

9   alleges, that Defendant Wally Brown, while still actively employed by Gallagher, approached

10  longstanding current employee Wick, told her that he, Quinn and the other members of Gallagher

11  sales staff, along with support employees, were planning to leave Gallagher's employ for EPIC,

12  that he wanted her to be his office manager at EPIC and resign from Gallagher for the purpose of

13  setting up the office in advance of the mass resignations that were going to follow, and offered

14  her a compensation package on behalf of EPIC that he knew exceeded her current salary level at

15  Gallagher and would have the intended effect of convincing her to leave Gallagher's employ.  As

16  an experienced Gallagher employee with over twenty years at the company, Wick clearly

17  understood the end goal of this plan and scheme was to inflict the maximum damage on

18  Gallagher in several ways, with the prize being to steal as much Gallagher business as quickly as

19  possible once the resignations were announced.

20      41.    Thereafter, Wick – while still employed by Gallagher – met with certain EPIC

21  employees, and obtained more specific information about the conspiracy that Wally Brown

22  brought her into.  She also discussed with Brian Quinn the fact that several current Gallagher

23  employees had secretly signed on to leave with Wally Brown, Brian Quinn, Neil Cohn and the

24  others.  Together, Wick, Wally Brown and Brian Quinn concocted a cover story and plan

25  designed to avoid raising Gallagher's suspicions as to why Wick, a longstanding and valued

26  Gallagher employee, would simply quit.  Part of the plan was that Wick would resign directly to

27  Wally Brown and Brian Quinn – her co-conspirators and the two Gallagher executives in charge

28  of the San Ramon office and operations.

-13-

COMPLAINT OF A.J. GALLAGHER & CO.,
INC.; DEMAND FOR JURY TRIAL

1    42.    Thus, on October 17, 2007, after prior meetings with Defendant Hahn and on

2    information and belief other EPIC executives, and pursuant to carefully planned out timing

3    agreed to after consultation with Wally Brown, Brian Quinn and EPIC, and with no prior notice

4    to Gallagher, Wick submitted a written resignation letter, addressed to Wally Brown and Brian

5    Quinn, with a false cover story as follows:

6    Dear Brian and Wally,

7    It is with great reluctance I submit my resignation to the both of you. My last day with
     Gallagher will be Friday, November 2nd. If you feel you need me longer in order to

8    transition my job duties, I will be more than willing to extend my last day until the
     following week.

9

10   **I have decided to take some time off until the first of the year to spend time with my
     family.** I am hoping if I decide to return to Gallagher in 2008 that there will be an open

11   position for me.

12   Thank you for everything that both of you have done for me. I can't tell you how
     wonderful it has been working out of the Pleasanton office for the past ten years. I wish

13   you both the best.

14   See Exhibit A hereto.

15   43.    In fact, Wick's proffered reason for resigning – that she had purportedly decided to

16   take some time off until the first of the year to spend time with her family – was a lie designed to

17   allay any suspicions and conceal the fact that she was in fact going to establish EPIC's competing

18   San Ramon office which she knew would be staffed with Wally Brown, Brian Quinn, Neil Cohn,

19   and many other Gallagher employees, all of whom were waiting for her to get the office up and

20   running.

21   44.    Thus, Wally Brown and Brian Quinn, who ran the San Ramon office, messaged up

22   the corporate chain the false excuse they concocted with Wick concerning the reasons for her

23   resignation, and succeeded in shielding from Gallagher any mention of her joining EPIC.

24   45.    Between October 17, 2007 and November 2, 2007, Wick remained an active

25   Gallagher employee, who continued to work under Wally Brown and Brian Quinn in the

26   Gallagher San Ramon office and receive her Gallagher compensation. Although she was now an

27   active part of the conspiracy, and in fact the first one out of Gallagher who was specifically

28   tasked to set up the advance operations for EPIC, at no time did she inform Gallagher of the

Case No.

COMPLAINT OF A.J. GALLAGHER & CO.,
INC.; DEMAND FOR JURY TRIAL

1  ongoing disloyalty of the Individual Defendants and the fact that they were actively working

2  against Gallagher's interests while remaining employed.  In fact, this longstanding Gallagher

3  employee and industry veteran, who clearly understood the goal of the conspiracy was to harm

4  and damage Gallagher, now shifted her loyalties from her employer Gallagher to the conspiracy,

5  faithfully carrying out her conspiratorial duties.

6       46.    On Wednesday, October 24, 2007, during work hours and while drawing a

7  Gallagher salary, Wick met with EPIC to discuss her employment with EPIC.

8       47.    Gallagher is informed and believes, and thereupon alleges, that with the

9  knowledge, consent and participation of Defendant Wally Brown, Quinn, EPIC, Francis and

10  Hahn, Wick, in connection with EPIC and her co-conspirators, secretly was involved in leasing

11  space for EPIC's San Ramon office at Bishop Shop 8 Business Center – located on Executive

12  Parkway in San Ramon – in the same complex as Gallagher's San Ramon office, which is located

13  at Bishop Shop 3.

14       48.    Wick left Gallagher's employ with the best wishes of Gallagher management on

15  November 2, 2007.

16       49.    On November 5, 2007, Wick's husband emailed family members from his private

17  Web email account about family Thanksgiving plans, in relevant part, as follows:

> Laura's job situation has changed and will make it hard for her to come. **Her boss and the rest of the sales people are leaving Gallagher to go to a <u>competitor</u>**.  Laura also made the decision to go, and is now home for two weeks before starting with the new company. **Essentially, her job is to start the new branch office and set up the computers, facilities, and manage HR issues <u>before the rest of the teams quits and joins her</u>**.  That week of Thanksgiving is when she needs to start her new job… It will be a stressful time for her and trying to manage a cross country trip at the same time would be difficult.

22  See Exhibit B hereto.

23       50.    Wick's mother-in-law responded with a kind email, and unaware Wick had

24  already departed Gallagher's employ, added Wick as a recipient to this email at her Gallagher

25  corporate email account.  Ironically, at the time, there was nobody working at the San Ramon

26  Gallagher office outside the conspiracy who would have seen this email and learned of the

27  conspiracy.

28

-15-

51.  These facts underscore how important timing was to the conspiracy.  It was so critical to the conspiracy that Wick start up the EPIC San Ramon office the week of Thanksgiving that Wick canceled her family plans for Thanksgiving.

52.  Upon her resignation, nobody in the San Ramon office, including co-conspirators and Defendants Wally Brown and San Ramon IT Manager George Petty, contacted Gallagher's corporate IT Department and requested that her remote access to her corporate email account be deactivated.  Nor did Petty deactivate Wick's access at the San Ramon office level.   Thus, Wick's Gallagher Lotus Notes access, enabling her to remotely log on to her corporate email account, was not disabled until November 9, 2007, despite the fact that her resignation was effective November 2, 2007.

53.  Gallagher is informed and believes, and thereupon alleges, that when Wick discovered that her mother-in-law had sent the email to her Gallagher corporate email account, she panicked, and working alone or in conjunction with other co-conspirator Defendants, gained access to her Gallagher corporate email account, and caused the email at issue to be deleted from her corporate account.  In fact, between the date that her mother-in-law sent the email to her Gallagher corporate email account on or about November 5 and November 9, the email was deleted out of Wick's Gallagher email account.

54.  On or about December 8, 2007, following the first wave of resignations and walk-outs set forth below, Wick, who had resigned from Gallagher effective November 2, 2007, was tipped off by a co-conspirator that Gallagher was looking into the December 7 resignations, and that some of her former coworkers would be present in the San Ramon Gallagher office.  Wick attempted to return to Gallagher's San Ramon office and gain access for herself and other Defendants.  For many reasons, including the fact that Wick had no reason to re-enter Gallagher's office or escort anyone else into that office, and because Wick did not contact the appropriate Gallagher management in connection with her attempt to gain access to Gallagher's, but rather tried to finesse it through a non-management employee and former coworker, Gallagher is informed and believes and thereupon alleges that she had an unlawful intent in wanting to gain access to Gallagher's San Ramon offices.

-16-

COMPLAINT OF A.J. GALLAGHER & CO.,
INC.; DEMAND FOR JURY TRIAL

### The Overall Illegal Employee Raiding

55.    Gallagher is informed and believes, and thereupon alleges, that in connection with the illegal employee raiding, the following are some of the actions that the Individual Defendants Wally Brown, Michael Brown, Cohn and Quinn,(with the knowledge, aid and encouragement of EPIC, Hahn and Francis) engaged in while they were all still active Gallagher employees:

(a)    targeted specific Gallagher employees based on their knowledge of the individuals' skills, client involvement, pending deals and current compensation;

(b)    used private Web accounts, cellular telephones and home telephones to communicate concerning the conspiracy, for the purpose of concealing their actions;

(c)    participated in private meetings, on site and outside of Gallagher's offices, to discuss various facets of the conspiracy;

(d)    met with EPIC employees to coordinate and discuss the conspiracy;

(e)    during working hours, while being paid by Gallagher, performed work for EPIC, including work related to securing office space and equipment;

(f)    misled Gallagher employees whom they wanted to join EPIC into believing their employment with Gallagher was not secure, when such was not the case;

(g)    promised to pay Gallagher's employees who left for EPIC in a manner that accounted for their current Gallagher salaries and anticipated increases;

(h)    for those employees with two week notice and other contractual provisions, which they encouraged the employees to breach, instructed them not to honor the notice and other provisions;

(i)    instructed the Gallagher employees to delay for weeks and months notifying Gallagher of their intent to join EPIC so that the Gallagher employees – including virtually Gallagher's entire San Ramon sales force – could resign *en masse*; and

(j)    represented to individual Gallagher employees that their co-workers were already "on board" and had agreed to join EPIC.

**Transformation Into Faithless Servants:**
**Having Decided To Join EPIC, But Prior To Announcing Their Resignations, The**
**Individual Defendants Engage In Acts of Dishonesty and Disloyalty**

56.     By on or about November 1, 2007, the conspiracy was in place, and Gallagher is informed and believes that Wally Brown, Michael Brown, Brian Quinn, Neil Cohn, Carolann Lewis Cohn, James Halbleib, Laura Wick, George Petty, and the other Individual Defendant knew, through careful coordination and planning, that each of them and many of the other Individual Defendants and other Gallagher employees (a group estimated at 20 and growing) would soon be leaving Gallagher's San Ramon workforce for EPIC.  Nevertheless, not only did every member of the conspiracy fail to alert Gallagher management outside the office level – which was managed entirely by the leaders of the conspiracy, but the Individual Defendants engaged in significant acts of dishonesty, disloyalty and breaches of their fiduciary duty, including, on information and belief, the following:

(a)     Wally Brown and Brian Quinn allowed Gallagher to proceed with a seven-year above-corporate-guideline deal to lease 19,703 square feet, consisting of two floors and sufficient space for 102 employees, even though the branch only had 76 current employees, for the Pleasanton/San Ramon office, and would be left with only approximately 30 employees post-conspiracy.

(b)     Wally Brown and Brian Quinn convinced corporate management to incur substantial renovation costs in the new building, including furniture, improvements, IT and Teledata, insisting on many above-standard items and costs.  On information and belief, these requests were made with malice aforethought and part of Defendants' conspiracy to harm Gallagher, by increasing costs of the move when they knew their plan to raid Gallagher's employees and customers.

(c)     Several Individual Defendants, including but not limited to, Wally Brown, his son Michael Brown, Neil Cohn, and Brian Quinn, substantially increased their expenses and car allowance expenditures during the period after deciding to join EPIC, but before tendering their resignation to Gallagher.  By way of example only:

1             (i)      Wally Brown increased client entertainment expenses in the short

2 month of November by 2.85 times what he spent in October, 2.26 times what he spent in

3 September, and 9.6 times what he spent in August; not surprisingly, these funds were expended

4 entertaining specific clients who in early December, he and his conspirators immediately

5 attempted to (and in many cases did) transfer over to EPIC following the mass resignations and

6 walk-outs;

7             (ii)     Neil Cohn increased client entertainment expenses in November by

8 12.55 times what he spent in October, 31.7 times what he spent in September and 10.5 times what

9 he spent in August.  Cohn also received maintenance and put new tires on what appears to be two

10 separate cars for a total of $3,249.38 in car maintenance expenses in August 2007 – after, upon

11 information and belief, he had begun negotiations with EPIC.  Without Gallagher's authorization,

12 Cohn also devoted substantial amounts of the business time he promised to devote to Gallagher

13 performing work, through Gallagher computer systems and during working hours, for Hannah

14 Nicole Vineyards, Inc., a family investment for which he appointed himself the President and

15 CEO;

16            (iii)    Michael Brown made sure to buy and charge Gallagher for new

17 tires (for $1,390.36) for his car on October 18, 2007, at which time, on information and belief he

18 had already decided to resign to go to EPIC in December.

19            (iv)     Brian Quinn charged Gallagher for maintenance for his car in

20 November 2007, at which time he knew he would be leaving Gallagher in a few weeks.

21     57.    The Individual Defendants continued to wine and dine the specific Gallagher

22 clientele who they planned to transfer from Gallagher to EPIC.  During this period, when they

23 had already decided to leave for EPIC, Gallagher is informed and believes that with regard to at

24 least some of the Gallagher customers, the Individual Defendants implied or directly stated that

25 they were about to depart Gallagher and counted on the client switching their business to EPIC at

26 the appropriate time.  In fact, prior to departing Gallagher, Defendant Brian Quinn expressly told

27 his top revenue-generating Gallagher clients he planned to depart for EPIC and "solicited their

28 feedback" about whether he should "join" them.

1    58.    Gallagher is informed and believes, an thereupon alleges, that Wally Brown, Brian

2    Quinn and others devised this scheme as one of several ways to communicate to top Gallagher

3    customers that they expected the customers to follow them, since, at the time these

4    communications were engaged in, the Individual Defendants who participated in these

5    conversations had in fact already finalized and accepted their employment packages with EPIC.

6    As shrewd executives, they also believed that if challenged, they could craft a cover story about

7    what they actually told their then current Gallagher clients.

**Stage Two of the Conspiracy:**
**The Former Gallagher Employees Copy, Steal, Remove, and Delete Mass Amounts Of**
**Gallagher Data, Information, And Documents – And Go To Great Lengths To Cover Up**
**Their Actions**

11    59.    To date, certain facts are known, and which give rise to the immediate need for

12    emergency injunctive relief.

13    60.    First, Gallagher is informed and believes, and thereupon alleges, that Defendant

14    George Petty was in charge of IT and computers systems in Gallagher's San Ramon office, and

15    on information and belief, was actively involved in the theft of data and related cover up.

16    61.    Second, Gallagher is informed and believes, and thereupon alleges, that its data

17    was stolen by several different conspirators, out of multiple Gallagher offices, through various

18    means, including:

19    (i)    data was stolen off of desktop computers through the use of stand alone

20    external storage devices;

21    (ii)    data was stolen off of desktop computers through the use of burning CDs

22    and through the use of CD-burning software; and

23    (iii)    data was stolen by scanning documents into the San Ramon office scanner,

24    which pushed the scanned files to a folder on the San Ramon server, and then the data was

25    removed off of the San Ramon servers;

26    Gallagher's investigation continues and Gallagher is informed and believes it will

27    discover additional acts of theft as soon as it can complete its review.

28

Case No.

COMPLAINT OF A.J. GALLAGHER & CO.,
INC.; DEMAND FOR JURY TRIAL

62.    To date, Gallagher is informed and believes that the following Individual Defendants accessed in a manner consistent with copying and/or downloading, and subsequently used for EPIC's benefit,1 Gallagher confidential and proprietary data without Gallagher's permission or knowledge:

| Defendant | Illicit Theft And Use Of Gallagher Data |
|---|---|
| Defendant Neil Cohn | October: Cohn, a current officer of Plaintiff, was fully participating in the conspiracy and interfacing with EPIC.

November/December 2007: Cohn obtained blank CDs on multiple occasions, on information and belief to copy to these CDs Gallagher's proprietary data although he had already agreed to join EPIC.

December 7, 2007: Cohn, in connection with his confederates, had agreed to resign from Gallagher on December 7, 2007 with no prior notice.

December 5, 2007: Cohn caused a Geek Squad USB drive to be attached to the Hard Drive of his Gallagher computer.

December 6, 2007:  A Removable Disk was accessed from Cohn's Gallahger computer.

234 files/folders accessed **early morning** on December 6, 2007:  Between 6:01:03 a.m. and 6:02:05 a.m. (1 minute 2 seconds), Cohn accessed in a manner consistent with copying approximately **228 files/folders containing Confidential and Proprietary Gallagher data within 1 minute 2 seconds**—209 accessed from A.J. Gallagher's network server, and 19 accessed from within the Hard Drive.

Throughout the rest of the day and into the late evening, there was additional removable disk drives and Gallagher proprietary files accessed in a manner consistent with copying.

Friday December 7, 2007 the day of Cohn's resignation, at approximately 2:17 p.m., a Removable Disk, was accessed on the computer.

72 files and folders accessed on December 7, 2007: Of the specific files accessed, many were Gallagher customer files and data that belonged to customers that Cohn would immediately solicit for business the next day on behalf of EPIC. |

Case No.

COMPLAINT OF A.J. GALLAGHER & CO., INC.; DEMAND FOR JURY TRIAL

| | |
|---|---|
| Defendant James Halblieb | November 20, 2007:  The date Halblieb, an officer of Plaintiff, agrees to resign without prior notice, walk out and go to work for EPIC -- knowing his direct report Martin would be resigning the next week. |
| | November 9, 2007:  Halbleib connects an external USB device (a SanDisk Cruzer U3 Micro thumb drive) to his Gallagher computer for the first time. |
| | November 12, 2007:  Halbleib rapidly accesses, in a manner consistent with copying to the SanDisk thumb drive, **222 Gallagher proprietary files** on his computer **within 5 seconds**. |
| | November 13-20 2007:  Additional access to proprietary Gallagher files occurs. |
| Defendant Laurie Martin | November 26, 2007: The date Martin resigns without prior notice, walk out and go to work for EPIC. |
| | Between November 5 and November 26, 2007:<br><br>    November 5:  accessed approximately 72 files/folders containing Gallagher proprietary data in rapid succession and in a manner consistent with copying.<br>    November 7: accessed 28 files/folder, in rapid succession and in a manner consistent with copying.<br>    November 8:  accessed in rapid succession and in a manner consistent with copying approximately 106 files/folders.<br>    November 13: accessed in rapid succession and in a manner consistent with copying approximately 143 files/folders.<br>    November 14: accessed in rapid succession and in a manner consistent with copying approximately 53 files/folders.<br>    November 20: accessed in rapid succession and in a manner consistent with copying approximately 167files/folders.<br>    November 26: accessed in rapid succession and in a manner consistent with copying several proprietary files. |
| Defendant George Petty | December 5, 2007: Petty purchases and then installs CD burning software on his Gallagher computer. Six days later, on his final day at Gallagher, Petty begins burning data to CDs using this software. |
| | Friday December 7, 2007:  Gallagher is informed and believes that Petty participated in Cohn's theft of data, and the subsequent "defragging" of Cohn's computer on the evening of December 7 – despite |

Case No.

COMPLAINT OF A.J. GALLAGHER & CO., INC.; DEMAND FOR JURY TRIAL

| | |
|---|---|
| | being specifically instructed by Gallagher corporate to preserve the computers and data stored on the computes of the Defendants who resigned earlier that day.<br><br>Monday December 11, 2007: The date Petty agrees with his co-conspirators to resign from Gallagher with no prior notice and to walk out for EPIC with several other defendants.<br><br>Sunday December 10-11, 2007: Despite being instructed that management wanted to preserve the data stored on Gallagher computers of any employee who resigned for EPIC, on the day of his resignation and the prior day, Petty attached two separate external USB flash drives to his Gallagher computer. Gallagher is informed and believes, and thereupon alleges, that Petty then engaged in the mass theft and deletion of Gallagher proprietary data off his company computers. |
| Defendant Eric Chua | December 3, 2007: Ten days before his resignation, Chua attached to his Gallagher computer for the first time an external USB flash drive and accessed in a manner consistent with copying proprietary Gallagher documents in groups.<br><br>Monday December 10: Chua agreed to resign without notice along with several of his other co-conspirators and immediately walk over to EPIC and start contacting customers.<br><br>December 10, 2007: the morning of his resignation, Chua accessed in a manner consistent with copying approximately 5 **Gallager files containing proprietary data**. Among the files and folders accessed that morning, Chua accessed and copied specific Gallagher customer files and data that belonged to customers that Chua would immediately solicit for business that same day on behalf of EPIC. The files contained highly confidential Gallagher data, including the effective dates of each clients' policy, premiums, renewal revenues, producers, account managers, types of programs, the carriers, "Specs Out" dates, and dates by which quotes are due. |
| Defendant Shandranette Middleton | Monday December 10: Middleton, who supported various Producers, agreed to resign without notice along with several of her other co-conspirators and immediately walk over to EPIC.<br><br>December 7, 2007: Two business days before her resignation, Middleton attached to her Gallagher computer for the first time an external USB thumb drive. In the approximately 53 minutes thereafter, |

-23-

|  | Middleton accessed in a manner consistent with copying multiple files containing Gallagher proprietary information. The files accessed included Gallagher customers who were subsequently solicited by the departed employees. |
|---|---|

63.    Apart from the taking of Gallagher data, Gallagher is informed and believes and thereupon alleges that Individual Defendants N. Cohn, Michael Brown and Petty intentionally deleted Gallagher data off of Gallagher computer media without Gallagher's knowledge or consent.

### Stage Three of the Conspiracy:
### The Events Leading Up To The Sneak Attack

64.    On November 20, 2007, Defendant James Halbleib, Area Executive Vice President of Sales, resigned from Gallagher's San Francisco office without notice and announced he was going to EPIC.

65.    On November 26, 2007, Laurie Martin, Account Executive who had reported directly to Halbleib, resigned from Gallagher's San Francisco office without notice and announced she was going to EPIC.

66.    Unbeknownst to Gallagher at the time, both Defendants Halbleib and Martin downloaded and copied Gallagher confidential data prior to their unannounced resignations.

67.    On November 27, 2007, Defendant Brian Quinn sent an email to various Gallagher employees, including co-conspirators, stating that the "All Hands" sales meeting scheduled for December 4, 2007 had been rescheduled to December 7, 2007 and that attendance was mandatory.

68.    During the week of December 3, 2007, EPIC, Brown, Quinn, N. Cohn, and many other Gallagher employees prepared to announce the Gallagher employees' mass resignation and intention to join EPIC.

69.    On December 3, 2007, Defendant Brian Quinn sent one of Gallagher's top Producers in Gallagher's San Jose office – who was not involved in the conspiracy – a second email, reminding the Producer of the mandatory December 7 "sales meeting." When the

COMPLAINT OF A.J. GALLAGHER & CO., INC.; DEMAND FOR JURY TRIAL

1   Producer indicated she could not attend for personal family reasons, Quinn reiterated that he

2   "really wanted" her to attend the meeting and it was "important." Defendant Wally Brown

3   further tried to persuade the Producer to attend the meeting by falsely stating that another San

4   Jose Producer was scheduled to give a presentation regarding the San Jose office, that he wanted

5   her to attend as well, and that he wanted her to arrive early so he could update her on "what's

6   going on."

7       70.   On or about several dates that week including December 5 and December 6, and

8   throughout the ensuing weekend and week of December 10, the Individual Defendants, acting in

9   concert with and as agents of each other and in furtherance of the conspiracy, stole mass amounts

10  of Gallagher data.

11      71.   On or about December 6, 2007, and on information and belief, in the days leading

12  up to December 6, 2007, Defendant Neil Cohn, through individually-retained counsel, attempted

13  to negotiate for a stronger promise of indemnification from EPIC's counsel, expressing concern

14  to EPIC that the indemnification provision in EPIC's Producer Agreement would not sufficiently

15  protect Cohn since he and EPIC knew that by accepting employment with EPIC in this fashion,

16  engaging in solicitation of employees and customers, misappropriating Gallagher data, and

17  resigning without notice, he would be violating his contractual obligations to Gallagher.

18      **Stage Four of the Conspiracy – The December 7 Sneak Attack:**
    **EPIC and Defendants Francis, Hahn, Wally Brown, Brian Quinn, Neil Cohn and Four**
19  **Confederates Select Friday December 7, 2007 To Execute Their Long Planned First Wave**
    **Attack on Gallagher**

20

21      72.   On the morning of Friday, December 7, 2007, and without any prior notice to

22  Gallagher, Defendants Wally Brown (an officer of Plaintiff), Michael Brown, Neil Cohn (an

23  office of Plaintiff), Carol Cohn, Stephen Hause (an officer of Plaintiff), Olga Harvison, and Linda

24  Cadinha submitted their resignations to Gallagher in various forms (including leaving resignation

25  letters on their desk and notifying each other of their resignations) and immediately walked out to

26  openly work at EPIC immediately and make a grab for Gallagher business using unfair

27  competition and other illegal methods.

28      73.   Gallagher is informed and believes, and thereupon alleges, that Neil Cohn, Wally

-25-

COMPLAINT OF A.J. GALLAGHER & CO.,
INC.; DEMAND FOR JURY TRIAL

Case No.

1    Brown, Michael Brown, and Brian Quinn, and like other Defendants, began performing work for

2    EPIC before formally resigning.

3        74.    As part of the conspiracy, Gallagher is informed and believes, and thereupon

4    alleges, that it was agreed upon that Defendant Petty, who managed the Gallagher San Ramon IT

5    function, would not resign until the second wave.

6        75.    As an example of the collusion and planning of the conspirators, on December 7,

7    2007, Defendant Cohn submitted a self-serving resignation letter that purported to contain an alibi

8    against any future claim that he had stolen the valuable Gallagher confidential and proprietary

9    data to which he had been exposed in connection with his job duties for Gallagher.   His alibi

10   involved enlisting co-defendant, George Petty, who was in charge of Gallagher's IT function in

11   the San Ramon office (and who waited to resign his employment and leave for EPIC until the

12   next business day after Cohn resigned), to "sign off" and "verify" that Cohn had not taken data:

13

14   

15

16

17

18

19

20

21

22

23

24

25

26

27

28

76. Gallagher is informed and believes, and thereupon alleges, that both Defendants Cohn and Petty had in fact misappropriated confidential Gallagher data.

**The Defendants' Conduct on December 7 Is Revealing**

77. What occurred in Gallagher's San Ramon office the morning of December 7, 2007 – before and after the first wave of resignations – is instructive. On December 7, 2007, per Defendant Wally Brown's instructions, the San Jose Producer arrived at Gallagher's San Ramon office at approximately 8:40 a.m., although the All Hands meeting was not scheduled to begin until 9:00 a.m. When the San Jose Producer arrived, Brown brought the San Jose Producer into his office, shut the door, and informed her that he, his son (Defendant Michael Brown), and Defendant Brian Quinn planned to resign after the All Hands sales meeting. When asked who was leaving, Brown first stated that he, his son, and Quinn were leaving. Then, when pressed, Brown stated, "Well, there will be more people resigning today after I announce my resignation."

78. Defendant Wally Brown then told the Producer that he, his son, and Brian Quinn had accepted employment with EPIC. Defendant Wally Brown stated that he had been talking with EPIC since approximately June 2007, that EPIC had set up an office only a few blocks away from Gallagher's San Ramon office and had already raised $100 million in financing, and that, since the San Jose Producer was in town that day, she should contact Defendant Wick at EPIC, who was handling Human Resources, that day so that she could arrange for her to meet with EPIC's managing partners – Defendants Dan Francis and John Hahn – regarding the San Jose Producer going to work for EPIC. When the San Jose Producer expressed surprise that Wick was working at EPIC, Brown appeared embarrassed and stated he was not "supposed" to tell the San Jose Producer that Defendant Wick was at EPIC.

79. During this conversation, Defendant Wally Brown stated that the San Jose Producer should accept employment with EPIC, and proceeded to try and "sell" her on why she should leave Gallagher's employ and accept employment with EPIC. Defendant Wally Brown also stated that when he hired her at Gallagher, he had done "the best thing for [her]" by hiring her without requiring her to sign Gallagher's Executive Agreement, so that she was free to leave Gallagher at any time without fear of litigation. Brown also urged her to speak with Dan Francis

1    a co-Founder (and one of the Partners) of EPIC, about accepting employment with EPIC.

2         80.    Although she was not interested in leaving Gallagher, she decided to contact EPIC

3    to get more information. Accordingly, at approximately 9:05 or 9:10 a.m., and in the presence of

4    Brown, she contacted Defendant Wick at EPIC and told her that Brown had instructed her to

5    contact her. Wick stated words to the effect of, "Give me five minutes and call me back." She

6    did so, at which point Wick stated that she should come over within the next hour to meet with

7    Defendant Francis at EPIC.

8         81.    After ending her call with Wick, she attended a meeting for the San Ramon

9    Producers, during which Defendants Wally Brown and Brian Quinn announced their resignations.

10    As Brown and Quinn were making this announcement, she looked around the room and noticed

11    that few appeared surprised by the announcement, which signaled to her that the Producers

12    already knew about Brown's and Quinn's plans. In particular, she noticed that Rob Dutto, Steve

13    Hause, Dennis Rodriguez, and others appeared to already know this information.

14         82.    After that meeting Defendant Wally Brown convened the All Hands meeting

15    (which included both Producers and service employees) and announced his and Quinn's

16    resignation to the larger group of employees.

17         83.    After this meeting, the San Jose Producer met with Defendant Wally Brown again.

18    Shortly after they reconvened their meeting, Quinn returned to Wally Brown's office and

19    informed Wally Brown in her presence that he had directed about fifteen to twenty people from

20    the meeting to Mary Smith in EPIC's Human Resources department.

21         84.    Thereafter, the San Jose Producer ran into Defendant Rob Dutto, a San Ramon

22    Producer, who indicated that he had prior knowledge of the mass resignations, and Defendant

23    Allen Amos, who admitted that he also had an appointment to meet with EPIC at 2:00 p.m. that

24    day to discuss his potential employment with EPIC. The San Jose Producer also saw Defendant

25    Quinn, who informed her that Olga Harvison was also joining EPIC.

26         85.    Between approximately 10:30 a.m. and 11:00 a.m., the San Jose Producer arrived

27    at EPIC's San Ramon office, which is located in the Bishop Shop 8 Business Center (on

28    Executive Parkway in San Ramon – which is in the same complex as Gallagher's San Ramon

-28-

1  office, which is located at Bishop Shop 3).

2    86.    Upon arriving at EPIC, she first met with Defendant Hahn, who explained that

3  EPIC had already raised $100 million and gave her the same information Defendant Wally Brown

4  had already provided to her regarding EPIC's pay structure.  After he finished explaining this to

5  her, she met with Defendant Dan Francis.  Francis stated that he had been told the dollar value of

6  the business she generates from Gallagher clients.  He represented that if she agreed to join EPIC

7  and move that business over to EPIC, EPIC would pay her a specific package that was unusual

8  for the industry based on her book of business.

9    87.    Francis also informed the San Jose Producer that, if she and another key producer

10  in Gallagher's San Jose office – who EPIC had been informed of the specific dollar value of his

11  book of business – agreed to join EPIC and move their Gallagher clients to EPIC, EPIC would

12  establish an office in San Jose, but that EPIC would not establish this office if the other San Jose

13  Producer agreed to join but she did not, since EPIC had been told that she had a larger book of

14  Gallagher business.

15    88.    After listening to Hahn and Francis, the San Jose Producer informed them that she

16  was not ready to leave Gallagher, in part, because she did not want to upset her Gallagher clients.

17  In response, Francis told her not to let that concern stop her from moving to EPIC.  He advised

18  her that once she joined EPIC, she should explain to customers, as part of the pitch to get them to

19  transfer their business to EPIC, that she was joining EPIC because it had hired a "good group of

20  people with whom she used to work and that she wanted to follow."

21    89.    Shortly after Francis made this remark, as she was leaving EPIC's San Ramon

22  offices, she saw several Gallagher employees who appeared to already be established at, and

23  working for, EPIC: Defendants Michael Brown, Neil Cohn, Carol Cohn, Rob Dutto, Steve Hause,

24  and Laura Wick.

25  **Wally Brown, On Behalf of EPIC and His Co-Defendants, Continues To Immediately Solicit**
**Additional Gallagher Top Producers**

26

27    90.    Two days later, on Sunday, December 9, 2007, the San Jose Producer, along with

28  the other Producer in Gallagher's San Jose office met with Wally Brown in Saratoga, California.

1    Prior to this meeting, the other San Jose Producer told her that, like her, he had talked to Dan

2    Francis of EPIC, and that Francis had told him that he (Francis) had been informed of the dollar

3    value of the Gallagher business for which this other San Jose Producer was responsible for

4    generating, and since his existing book of business was not sufficient to justify opening a San

5    Jose office, EPIC would not open a San Jose office unless she agreed to join EPIC.

6          91.    During the December 9, 2007 meeting with Wally Brown, Brown stated that he

7    had discussed the issue with EPIC, and encouraged her to solicit and bring to EPIC a significant

8    portion of Gallagher's San Jose sales staff, which consists of six staff/account managers (in

9    addition to the two Producers with whom EPIC was already speaking), and further represented

10   that EPIC would hire them if she wanted it to do so.  Mr. Brown indicated that EPIC was

11   agreeable to giving her entire sales staff salary increases and other benefits if they joined EPIC.

12         92.    If EPIC were to hire 8 members of the Gallagher San Jose sales staff, this would

13   cause Gallagher to lose nearly 25% of its San Jose workforce and would leave Gallagher with no

14   sales employees to manage its San Jose-based accounts.

15         93.    During this meeting, Brown also recommended that the San Jose Producer contact

16   her major clients, meaning those who generate the most revenue for Gallagher, inform them that

17   she was considering moving to EPIC, and solicit their feedback about whether she should join

18   EPIC.  Brown noted that, if she indicated she was considering going to EPIC, and the clients

19   supported this decision, they would likely transfer their business to EPIC when she joined EPIC.

20         94.    Brown ended the December 9, 2007 meeting by requesting that the San Jose

21   Producer refrain from informing Gallagher that he and she were speaking about her potential

22   employment with EPIC.

23   **Stage Five of the Conspiracy– The Second Wave of Planned *En Masse* Resignations The**
     **Following Monday Morning Continuing Throughout The Week – After Additional Theft of**
24   **Data**

25         95.    Over the weekend of December 8 and 9, 2007, several of the other co-conspirators

26   planned the second wave of resignations.  Over that weekend, and knowing that they were

27   planning to resign *en masse* first thing on Monday or Tuesday the following week, several

28   Defendants continued to access Gallagher computer media, including servers.  Gallagher is

1    informed and believes, and thereupon alleges, that based on the circumstances, such access was

2    not for legitimate Gallagher business purposes.

3        96.    On Saturday, December 8, Gallagher management asked Defendant and Gallagher

4    Vice President Soo Hoo to come into the San Ramon office and help assess the status of customer

5    accounts in the wake of Friday's departures.  Soo Hoo spoke to management, and made up an

6    excuse not to come into the office.

7        97.    She made no mention of her plan to resign first thing Monday morning to leave for

8    EPIC, nor did she mention the fact that several other Gallagher employees planned to resign en

9    masse along with her on Monday.   Nor did she limit her access to Gallagher's computer systems,

10   or seek to prevent any of her co-conspirators from doing do.  Nor did she share anything about

11   what she knew of EPIC and the conspiracy with Gallagher management, despite being a current

12   Gallagher Vice President and having known earlier that both she and others were about to resign

13   for EPIC.

14       98.    On Monday, December 10, 2007, primarily in the early morning hours (around 7

15   am), Soo Hoo, Molly Armstrong, Eric Chua, Elkie Craven, Robert Ellsworth, Tammy Glaser,

16   Steve Hause, Robin Herman, Barbara Hilgen, Don Johnson, Mary Keck, Lisa Lucas, William

17   "Bill" Phillips, Dennis Rodriguez, Amber Ronzitti, Dirck Stinson, Colleen Varnica, Sharon Voth,

18   Paul H. Wagener, and Carol Ward resigned without notice and walked out too work at EPIC.

19       99.    On December 11, 2007, Susan English, Brett Burdock, Kristina Stubbs,

20   Shandranette Middleton (a.k.a. Shandranette Pullian), and George Petty resigned without notice

21   and walked out to work at EPIC.

22       100.   On December 12, 2007, Robert Harrison Watkins, Carolyn ("Ruby") Johnson, and

23   Patricia Burdock, resigned without notice and walked out to work at EPIC.

24       101.   On December 14, 2007, Siobhan O'Leary, Olga Rasmussen, and Louanne

25   Sweeney resigned to work at EPIC.  Rasmussen did not provide notice; Siobhan and Sweeney

26   provided five days of notice.

27       102.   On December 17, 2007, Tiffany Pastorius resigned, having provided six days

28   notice.

COMPLAINT OF A.J. GALLAGHER & CO.,
INC.; DEMAND FOR JURY TRIAL

1    103.    Gallagher is informed and believes, and thereupon alleges, that in order to carry

2 out their conspiracy to catch Gallagher by surprise, certain Individual Defendants and EPIC

3 agreed – after fully vetting the issue with EPIC (who agreed to pay for the legal defense of the

4 Individual Defendants), Francis and Hahn – that they would violate the provision in their

5 Executive Agreements requiring a fourteen-day Notice Period and transition period.  Rather than

6 honoring their contractual obligations and honoring this obligation, Individual Defendants Amos,

7 Cohn, Brown, Halbleib, Johnson, Martin, Phillips, Jr., Dutto, Quinn, Stinson, English, Wagener,

8 and Watkins all intentionally breached their contractual obligations to Gallagher by resigning

9 without notice.

10    104.    A total of 47 out of 76 employees in the San Ramon facility resigned over a period

11 of one week, all but three without any notice, leaving Gallagher's San Ramon essentially

12 crippled.  During the same period, two Gallagher employees (Defendants Halblieb and Martin) in

13 the San Francisco office resigned without notice.

### Stage Six of the Conspiracy:
### Using Gallagher Confidential Data and Other Illegal Tactics, EPIC and the Individual Defendants Immediately Engage in Unfair Competition and Inflict Damage on Gallagher's Business

17    105.  As of December 7 and the first resignations, and thanks to careful planning by

18 Wick and her co-conspirators, Gallagher is informed and believes and thereupon alleges that

19 EPIC's San Ramon facility was already up and running (EPIC corporate email accounts had been

20 previously created, offices assigned, corporate computer access IDs assigned, Blackberry's

21 issued, etc.) for Defendants Wally Brown, Michael Brown, Brian Quinn and the other departed

22 Gallagher employees.

23    106.   Gallagher is informed and believes that the Gallagher misappropriated data was

24 used by the former Gallagher employees and EPIC to immediately to start competing for

25 customers and that while still employed by Gallagher, some or all of the Individual Defendants

26 spent time during the working day preparing BOR letters, designating EPIC in place of Gallagher

27 as the exclusive broker of record, for the Gallagher clients that they planned to solicit and/or had

28 already begun soliciting.

107.    To date, a total of 30 clients, with business totaling several millions of dollars in revenue, signed Broker of Record ("BOR") letters designating EPIC as their exclusive insurance broker within days of the mass resignations.  Gallagher is informed and believes that the Defendants used various deceptive and unlawful practices, in addition to using Gallagher data, to convince clients to switch their business.

108.    In addition to the 30 client accounts Defendants unlawfully stole from Gallagher to date, EPIC has caused Gallagher to lose additional clients and associated business revenues, including at least one client who, while refusing to transfer business to EPIC because it believes EPIC's conduct to be "unethical – or worse," transferred its business to another insurance brokerage out of a belief, based on the optics of the mass departures, that EPIC's conduct has left Gallagher unable to service their accounts.

109.    Gallagher is informed and believes, and thereupon alleges, that through misrepresentations and misuse of misappropriated Gallagher data, Defendants are not only targeting Gallagher's California customers, but are also going after Gallagher's international accounts.

### Defendants' Solicitation Of Gallagher Employees And Customers Continues Even After Gallagher Expresses Concern

110.    When Halblieb departed for EPIC, Gallagher demanded that he honor his contractual obligations not to solicit Gallagher's employees and clients – which are the same contractual obligations EPIC has entered into with its new employees. Disregarding Gallagher's warning, Defendants have continued to solicit Gallagher employees and customers.

111.    Gallagher is informed and believes, and thereupon alleges, that Defendants are also directing recruiters and headhunters to contact Gallagher's San Ramon employees in an attempt to completely wipe out Gallagher's presence in San Ramon.  As part of this practice, Defendants, directly and through these headhunters, are falsely representing that Gallagher plans to close its San Ramon office in the wake of the employee departures and lost of business.