1  PAUL, HASTINGS, JANOFSKY & WALKER LLP
   BRADFORD K. NEWMAN (SB# 178902) bradfordnewman@paulhastings.com
2  STEPHEN N. YANG (SB# 142474) stephenyang@paulhastings.com
   SARJU A. NARAN (SB# 215410) sarjunaran@paulhastings.com
3  SHANNON S. SEVEY (SB# 229319) shannonsevey@paulhastings.com
   1117 S. California Avenue
4  Palo Alto, CA 94304-1106
   Telephone: (650) 320-1800
5  Facsimile: (650) 320-1900

6  Attorneys for Plaintiffs
   Arthur J. Gallagher & Co., Inc. & Arthur J. Gallagher & Co., Insurance Brokers of California, Inc.
7

8                       UNITED STATES DISTRICT COURT

9                     NORTHERN DISTRICT OF CALIFORNIA

10                         SAN FRANCISCO DIVISION

11  ARTHUR J. GALLAGHER & CO., INC.,        CASE NO.
    a Delaware Corporation, ARTHUR J.
12  GALLAGHER & CO., INSURANCE
    BROKERS OF CALIFORNIA, INC., a          **DECLARATION OF LYNN TU**
13  California Corporation,

14                  Plaintiffs,

15          vs.

16  EDGEWOOD PARTNERS INSURANCE
    CENTER, a California corporation; DAN
17  R. FRANCIS; JOHN G. HAHN;
    ANDREW ("WALLY") BROWN,
18  JR.; BRIAN F. QUINN; NEIL R. COHN;
    CAROLANN COHN; MICHAEL J.
19  BROWN; STEPHEN HAUSE; LAURA J.
    WICK; JAMES C. HALBLEIB;
20  LAURINDA ("LAURIE") A. MARTIN ;
21  ERIC CHUA; GEORGE J. PETTY;
    LINDA SOO HOO; ROBERT E. DUTTO;
22  SUSAN M. ENGLISH; DON J.
    JOHNSON; ALLEN L.
23  AMOS; WILLIAM ("BILL") PHILLIPS,
24  JR.; DIRCK ("RICK") R. STINSON;
    ROBERT ("BOB") D. ELLSWORTH;
25  ROBERT H. WATKINS; PAUL H.
26  WAGENER; SHANDRANETTE
    MIDDLETON;
27
                    Defendants.
28

**REDACTED**

DECLARATION OF LYNN TU

1  I, Lynn M. Tu, declare:

2      1.    I am currently employed as an Area Executive Vice President, also known as a Producer (i.e. a sales executive responsible for procuring business for the company), for Arthur J. Gallagher Risk Management Services, a division of A.J. Gallagher & Co. ("Gallagher"). I have worked for Gallagher since September 6, 2006 and am based out of Gallagher's San Jose office. I have personal knowledge of the facts set forth in this Declaration, and if called as a witness, I would and could testify to the facts stated herein.

    2.    I have worked in the insurance industry for 17 years. Prior to working for Gallagher, I worked for Aon Risk Services and Jardin Insurance.

    3.    On November 27, 2007, Brian Quinn, the Area President of Gallagher's San Ramon office, sent an email to me and other Area Vice Presidents stating that the "All Hands" sales meeting scheduled for December 4, 2007 had been rescheduled to December 7, 2007, and that our attendance was mandatory. Attached hereto as Exhibit A is a true and correct copy of the email I received from Mr. Quinn on November 27, 2007 and my response to that email (in which I indicated I would not attend due to a family emergency).

    4.    On December 3, 2007, I received a second email from Mr. Quinn reminding me about the mandatory December 7, 2007 sales meeting. I replied, again stating that I would not be able to attend the meeting. Attached hereto as Exhibit B is a true and correct copy of my response to Mr. Quinn's December 3, 2007 email.

    5.    After I responded to Mr. Quinn's December 3, 2007 email, Mr. Quinn left me a voicemail that day stating that he "really wanted" me to attend the All Hands sales meeting, that it was "important," and that I should call him. Since I work out of Gallagher's San Jose office and do not normally attend sales meetings in San Ramon, this surprised me. I therefore called Mr. Quinn and explained that I was traveling to Los Angeles to prepare for my father's funeral. When I explained that I would be out of town for several days, Mr. Quinn appeared disappointed and asked me to try to attend the meeting.

    6.    That same day, I called Wally Brown, who had left me a message approximately one week earlier asking me to contact him. During this call, I asked Mr. Brown why Mr. Quinn

-1-

was pushing me to attend a sales meeting I would not normally attend. In response, Mr. Brown stated that Chuck Griswold, the other Gallagher San Jose Producer, was scheduled to give a presentation regarding the San Jose office, and that Mr. Brown wanted me to attend as well. Since this matter seemed important, I changed my travel schedule to allow me to attend the meeting. (Notably, I asked Mr. Griswold the following week whether he had planned to give an update regarding the San Jose office, and he stated that he had not.)

7. On December 5, 2007, I wrote to Mr. Quinn and Mr. Brown to inform them that I had rescheduled my trip to Los Angeles to be able to attend the All Hands sales meeting. Attached hereto as Exhibit C is a true and correct copy of the email I sent to Mr. Quinn and Mr. Brown on December 5, 2007.

8. In response to this email, Mr. Brown called me and asked me to arrive at the San Ramon office 15 minutes prior to the meeting so that he could update me on "what's going on."

9. On December 7, 2007, per Mr. Brown's instructions, I arrived at Gallagher's San Ramon office at approximately 8:40, although the All Hands meeting was not scheduled to begin until 9:00a.m. As I arrived at the lobby of the San Ramon office, Mr. Brown called my cellular phone asking where I was. I informed him that I was in the lobby of the building and proceeded to go to his office.

10. When I arrived on the fifth floor (where Mr. Brown's office is located), Mr. Quinn greeted me. He appeared nervous but stated that he was glad that I was able to make it to the meeting.

11. Mr. Brown then brought me into his office, shut the door, and informed me that he, his son (Michael Brown), and Mr. Quinn planned to resign after the All Hands sales meeting. Mr. Quinn then joined us, and both Mr. Quinn and Mr. Brown apologized for not being able to tell me about their resignation plans earlier.

12. Mr. Brown then asked Mr. Quinn to leave so that he and I could speak alone. When we were alone, I asked who was leaving, and Mr. Brown stated that he, Michael Brown, and Mr. Quinn were leaving. When I asked "Is that all?," Mr. Brown replied "Well, there will be more people resigning today after I announce my resignation," which led me to believe that he

was actively involved in discussions with several Gallagher employees and was very much in control of selecting those specific individuals who he wanted to hire at his new company.

13. Mr. Brown then told me that he, his son, and Mr. Quinn had accepted employment with Edgewood Partners Insurance Center ("EPIC") and proceeded to tell me about the new company. Mr. Brown stated that he had been talking with EPIC since approximately June 2007, that EPIC had an office only a few blocks away from Gallagher's San Ramon office and had already raised $100 million in financing, and that, since I was in town that day, I should contact Laura Wick at EPIC that day so that she could arrange for me to meet with EPIC's managing partners – Dan Francis and John Hahn – regarding employment with EPIC. Mr. Brown stated that Ms. Wick was already working for EPIC and "really liked" both EPIC and its employees.

14. I was surprised by Mr. Brown's instruction that I call Ms. Wick about employment with EPIC for several reasons, including that at the time, I was under the impression (based on statements to me and others by Mr. Brown and Mr. Quinn) that Ms. Wick was on a leave of absence from Gallagher but intended to return to Gallagher. When I expressed surprise that Ms. Wick was already at EPIC, Mr. Brown appeared embarrassed and stated he was not "supposed" to tell me she was at EPIC. This conversation with Mr. Brown revealed not only that Ms. Wick was working for EPIC and apparently had been for some time, but that there was close coordination between Mr. Brown and Mr. Quinn – and Ms. Wick – regarding their decision to resign from Gallagher.

15. During our conversation, Mr. Brown also stated that I should accept employment with EPIC. Mr. Brown then proceeded to try to "sell" me on why I should leave Gallagher's employ and accept employment with EPIC. In support of his efforts to convince me to leave Gallagher to join EPIC, Mr. Brown stated, among other things, that EPIC would "make me rich." Mr. Brown also stated that Gallagher intended to outsource jobs to India and lay off existing Gallagher employees. This surprised me, since I have never heard anything which suggests that this would be true.

16. Mr. Brown also stated that when he hired me at Gallagher, he had done "the best thing for [me]" by hiring me without requiring me to sign Gallagher's Executive Agreement, so

1  that I was free to leave Gallagher at any time without fear of litigation. Mr. Brown also urged me
2  to speak with Dan Francis," a co-Founder (and one of the Partners) of EPIC, about accepting
3  employment with EPIC.

4      17.    My conversation with Mr. Brown lasted for more than 20 minutes. Since Mr.
5  Brown and I were still talking at 9:00 a.m., when the All Hands sales meeting was scheduled to
6  begin, Mr. Brown postponed the meeting until 9:30 a.m.

7      18.    Although I was not interested in leaving Gallagher, I decided to contact EPIC to
8  get more information. Accordingly, at approximately 9:05 or 9:10 a.m., and in the presence of
9  Mr. Brown, I contacted Laura Wick at EPIC and told her that Mr. Brown had instructed me to
10 contact her. Ms. Wick stated words to the effect of, "Give me five minutes and call me back." I
11 did so, at which point Ms. Wick stated that I should come over within the next hour to meet with
12 Mr. Francis at EPIC.

13     19.    After ending my call with Ms. Wick, I attended a meeting for the San Ramon
14 Producers, during which Mr. Brown and Mr. Quinn announced their resignation. As Mr. Brown
15 and Mr. Quinn were making this announcement, I looked around the room and noticed that no
16 one appeared surprised by the announcement, which signaled to me that all of the Producers
17 already knew about Mr. Brown's and Mr. Quinn's plans. In particular, I noticed that Rob Dutto,
18 Steve Hause, Dennis Rodriguez, and others appeared to already know this information.

19     20.    After that meeting Mr. Brown convened the All Hands meeting (which included
20 both Producers and service employees) and announced his and Mr. Quinn's resignation to the
21 larger group of employees.

22     21.    After this meeting, I met with Mr. Brown again. Shortly after we reconvened our
23 meeting, Mr. Quinn returned to Mr. Brown's office and informed Mr. Brown in my presence that
24 between fifteen and twenty people had asked about EPIC, and that he had responded to these
25 employees by telling them to call Mary Smith in EPIC's Human Resources department.

26     22.    I then ran into Rob Dutto, a Producer in the San Ramon office, and asked him if he
27 knew anything about Mr. Brown and Mr. Quinn's resignation (since he did not appear to have
28

been surprised by their announcement). After giving me a look which indicated he had already known about the resignations, Mr. Dutto stated words to the effect of "I can't tell you anything."

23. I then met with Allen Amos, another Producer in the San Ramon office. I asked whether he had known anything about Mr. Brown and Mr. Quinn's resignations prior to the announcement. Mr. Amos replied that he did not. When I informed Mr. Amos that I was going over to EPIC's San Ramon office later that day, he asked if I had time to get a cup of coffee. We went to a delicatessen nearby, at which point Mr. Amos told me what he knew about the up-front pay structure at EPIC (giving the same information Mr. Brown had previously given to me) and stated that he was going to meet with EPIC at 2:00 p.m. that day to discuss his potential employment with EPIC. Mr. Amos then asked whether I was going to join EPIC and offered to speak with me about EPIC again after my meeting with Dan Francis.

24. During my meeting with Allen Amos, Laura Wick called me on my cellular phone, asking where I was and noting that she was concerned I had not yet arrived at EPIC's office. I responded that I was on my way over to EPIC and then proceeded to leave Gallagher's office.

25. As I was leaving Gallagher, I saw Neil Cohn in the parking lot. Mr. Cohn was packing his car with materials from his office and acknowledged that he had submitted the resignation letter he had typed up that morning and had accepted employment with EPIC. Mr. Cohn also told me to call him soon so that we could have lunch after his transition to EPIC.

26. As I was leaving, I also saw Mr. Quinn again, who informed me that Olga Harvison was also joining EPIC.

27. Between approximately 10:30 a.m. and 11:00 a.m., I arrived at EPIC's San Ramon office, which is located in the Bishop Shop 8 Business Center (located on Executive Parkway in San Ramon – which is in the same complex as Gallagher's San Ramon office, which is located at Bishop Shop 3).

28. Upon arriving at EPIC, I first met with Mr. Hahn, who explained that EPIC had already raised $100 million and gave me the same information Mr. Brown had already provided to me regarding EPIC's pay structure. After he finished explaining this to me, I met with Dan Francis. Mr. Francis stated that he had been told that I generate and service approximately $3

-5-

million dollars of Gallagher client business. He represented that if I agreed to join EPIC, EPIC would pay me as follows, based on what had been represented to him was my performance at Gallagher: within 30 days of employment, EPIC will pay me the equivalent of 50% of my current book of business, 50% of this amount in cash, 50% in stock. He also discussed additional aspects of EPIC's proposed compensation plan with me.

29. Based on Mr. Francis' statements, I understood that if I accepted employment with EPIC, there was a clear expectation on the part of EPIC that my compensation would be directly tied to and correlated with me immediately convincing the Gallagher clients with whom I work switch all of their business to EPIC.

30. Mr. Francis also informed me that, if Mr. Griswold and I (Gallagher's key Producers in San Jose) agreed to join EPIC, EPIC would establish an office in San Jose, but that EPIC would not establish this office if Mr. Griswold agreed to join but I did not.

31. After listening to Mr. Hahn and Mr. Francis, I informed them that I was not ready to leave Gallagher, in part, because I did not want to upset my clients. In response, Mr. Francis told me not to worry, and that once I joined EPIC, to explain to customers, as part of the pitch to get them to transfer their business to EPIC, that I was joining EPIC because it had hired a "good group of people with whom I used to work and that I wanted to follow."

32. Shortly after Mr. Francis made this remark, our meeting ended. As I was leaving EPIC's San Ramon offices, I saw several Gallagher employees who appeared to already be established at, and working for, EPIC. These employees are Michael Brown (who, earlier that day, had noted that he "hoped to work with [me] again"), Neil Cohn, Carol Cohn, Rob Dutto, Steve Hause, and Laura Wick.

33. Two days later, on Sunday, December 9, 2007, I, along with Chuck Griswold (the other Producer in Gallagher's San Jose office) met with Wally Brown in Saratoga, California at approximately 1:00 p.m. Mr. Griswold arranged this meeting, indicating that Mr. Brown would drive from Pleasanton to Saratoga if I wanted to meet with him again. Prior to this meeting, I met with Mr. Griswold so that we could discuss what had occurred thus far. Mr. Griswold told me that, like me, he had talked to Dan Francis of EPIC, and that Mr. Francis had told him that, since

his existing book of business was not sufficient to justify opening a San Jose office, EPIC would not open a San Jose office unless I agreed to join EPIC.

34. During the December 9, 2007 meeting with Mr. Brown, Mr. Brown reiterated that I (and Chuck) should resign from Gallagher and accept employment with EPIC, and again attempted to "sell" me on EPIC's up-front pay structure.

35. When I asked whether EPIC had the right relationships with insurance companies to support their business, Mr. Brown indicated that EPIC had just purchased Calco Insurance Brokers and Agents, Inc., which provided nearly all of the insurance relationships EPIC needed, and that EPIC had just acquired a relationship with the only remaining insurance company it needed, Golden Eagle. The clear indication from this comment was that Mr. Brown wanted to assure me that I would have the support I needed if I joined EPIC.

36. Mr. Brown also informed me, as Mr. Francis had done two days earlier, that, if Mr. Griswold and I agreed to join EPIC, EPIC would establish an office in San Jose, but that EPIC would not establish this office if Mr. Griswold agreed to join but I did not. Mr. Brown also stated that he had discussed the issue with EPIC, and encouraged me to bring to EPIC all of Gallagher's San Jose sales team, which consists of six staff/account managers (in addition to the two Producers with which EPIC was already speaking), and that EPIC would hire them if I wanted it to do so. Mr. Brown indicated that EPIC was agreeable to giving my entire sales team salary increases if they joined EPIC, and that I could decide how much EPIC would pay each of the San Jose sales employees. Mr. Brown also promised that, at EPIC, my car allowance for the Gallagher San Jose employees would be increased from what Gallagher currently offers and that we could spend this money in any way I wanted.

37. If EPIC were to hire the entire sales team from Gallagher's San Jose office, this would cause Gallagher to lose nearly 25% of its San Jose workforce (i.e. 8 of 35 employees), and would leave Gallagher with no sales employees to manage its San Jose-based accounts.

38. During this meeting, Mr. Brown also recommended that I contact my major clients, meaning those who generate the most revenue for Gallagher, inform them that I am considering moving to EPIC, and solicit their feedback about whether I should join EPIC. Mr.

-7-

Brown noted that, if I indicated I was considered going to EPIC, and the clients supported this decision, they would likely transfer their business to EPIC when I joined EPIC, since it would be hard for them to go back on what they said to me before I made this transition. Mr. Brown noted that Brian Quinn had done the same thing (i.e. asking for his clients' advice as to whether he should join EPIC) prior to joining EPIC.

39. Mr. Brown ended our December 9, 2007 meeting by indicating that he would like to speak with me and Mr. Griswold the following Sunday, December 16, 2007. Mr. Brown also requested that I refrain from informing Gallagher that he and I were speaking about my potential employment with EPIC. In response, I stated that I would tell the truth if asked about my discussions with him.

40. On Monday, December 10, 2007, I was in the San Ramon office and noticed that George Petty was not in the office. Since I had seen Mr. Petty in Mr. Brown's office when I arrived on December 7, 2007, and since Mr. Brown had informed me at that time that Mr. Petty may be joining EPIC, I asked Jaren Thorsen, a member of Gallagher San Ramon's IT Department, if Mr. Petty had resigned.

41. On December 12, 2007, Mr. Griswold informed me that, earlier that day, Mr. Brown contacted him to ask how I was doing and to see if I would attend the meeting he requested take place on Sunday, December 16, 2007. I also received a telephone call from Mr. Brown on Friday, December 14, 2007, asking if I would attend this meeting.

42. In my 17 years of experience in the insurance industry, I have never experienced a situation where one or two senior executives leave a company to open up the office of a direct competitor, and coordinate a campaign to target for hire approximately 48 employees – all at once – from the prior employer as part of a plan to immediately move millions of dollars of business instantly to the newly formed office of the competitor while gutting the business operations of the former employer. Based on my knowledge of which Gallagher employees have announced their resignation from Gallagher to go work at EPIC, and the timing of those resignations with many announcing on the same date, and my personal conversations with Mr. Quinn and Mr. Brown, it

is clear to me that this was a coordinated effort that involved careful planning and active involvement from EPIC and the Gallagher employees at issue.

43. Because the sale of new insurance products and services is dependent on a company's ability to develop and maintain client relationships, which often takes significant time and effort, EPIC seems to be trying to obtain the benefit of Gallagher's existing client relationships, rather than working to establish its own relationships over time. Maintaining and expanding the business driven by existing clients depends on much more than simply knowing the client's identity. Among other factors, knowledge of the rates clients pay, the history of past claims, the rates charged by competitors, the needs and coverage levels of clients, and coverage specifications (i.e. detailed information regarding the client's operations, property, insurable value, etc.) are critical factors to renewing policies for existing customers and selling them the appropriate level of coverage. It would take a company like EPIC many months, if not years, to develop client relationships with the specific Gallagher clients serviced by the Gallagher employees who joined EPIC, and the ability to have immediate access to non-public information concerning the specific needs of the clients has a significant monetary value to a company like EPIC, who is relatively new to the market and who is just opening their San Ramon office.

44. In the past few days, at least one Gallagher client, ., contacted me to inform me that she heard that "the whole Gallagher San Ramon office" left Gallagher and to ask whether the service of her account would be jeopardized. Based on comments such as this, it is my belief that the employees who left Gallagher to join EPIC have significantly jeopardized Gallagher's client relationships and revenue base.

I declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge and belief.

Executed this 15th day of December, 2007, in San Jose, California.

_____
Lynn M. Tu