1    PAUL, HASTINGS, JANOFSKY & WALKER LLP
     BRADFORD K. NEWMAN (SB# 178902) bradfordnewman@paulhastings.com
2    STEPHEN N. YANG (SB# 142474) stephenyang@paulhastings.com
     SARJU A. NARAN (SB# 215410) sarjunaran@paulhastings.com
3    SHANNON S. SEVEY (SB# 229319) shannonsevey@paulhastings.com
     1117 S. California Avenue
4    Palo Alto, CA 94304-1106
     Telephone: (650) 320-1800
5    Facsimile: (650) 320-1900

6    Attorneys for Plaintiffs
     Arthur J. Gallagher & Co., Inc. & Arthur J. Gallagher & Co., Insurance Brokers of California, Inc.
7

8                          UNITED STATES DISTRICT COURT

9                        NORTHERN DISTRICT OF CALIFORNIA

10                          SAN FRANCISCO DIVISION

11

12   ARTHUR J. GALLAGHER & CO., Inc., a          CASE NO.
     Delaware Corporation, ARTHUR J.
13   GALLAGHER & CO., INSURANCE                  **PLAINTIFFS' MEMORANDUM OF**
     BROKERS OF CALIFORNIA, INC., a              **POINTS AND AUTHORITIES IN**
14   California Corporation,                      **SUPPORT OF *EX PARTE* MOTION FOR**
                                                 **TEMPORARY RESTRAINING ORDER,**
15              Plaintiffs,                       **EVIDENCE PRESERVATION ORDER,**
                                                 **EXPEDITED DISCOVERY ORDER, AND**
16        vs.                                    **ORDER TO SHOW CAUSE RE ISSUANCE**
                                                 **OF PRELIMINARY INJUNCTION**
17   EDGEWOOD PARTNERS INSURANCE
     CENTER, a California corporation; DAN
18   R. FRANCIS; JOHN G. HAHN;
     ANDREW ("WALLY") BROWN, JR.;
19   BRIAN F. QUINN; NEIL, R. COHN;
     CAROLANN COHN; MICHAEL J.
20   BROWN; STEPHEN HAUSE; LAURA J.
     WICK; JAMES C. HALBLEIB;
21   LAURINDA ("LAURIE") A. MARTIN;
     ERIC CHUA; GEORGE J. PETTY;
22   LINDA SOO HOO; ROBERT E. DUTTO;
     SUSAN M. ENGLISH; DON J.
23   JOHNSON; ALLEN L. AMOS;
     WILLIAM ("BILL") PHILLIPS, JR.;
24   DIRCK ("RICK") R. STINSON; ROBERT          REDACTED
     ("BOB") D. ELLSWORTH; ROBERT H.
25   WATKINS; PAUL H. WAGENER;
     SHANDRANETTE MIDDLETON,
26
                Defendants.
27

28

1  **I.**     **INTRODUCTION**

2         **A.     Why Injunctive Relief Is Needed Immediately**

3         Where a party misappropriates confidential and/or proprietary information and uses the

4  information to recruit away key employees for the purpose of taking away the competitor's

5  clients, injunctive relief is appropriate.  See, e.g. GAB Bus. Services, Inc. v. Lindsey & Newsom

6  Claim Services, Inc., 83 Cal. App. 4th 409 (2000).  In GAB Business Services, a regional vice

7  president, prior to resigning, orchestrated a mass employee departure consisting of the company's

8  top managers and "producers."  The court issued a temporary restraining order and preliminary

9  injunction against the executive and the executive's new employer prohibiting the use of stolen

10  confidential and proprietary information, and against any interference with existing customer or

11  employment relationships.  GAB Bus. Services, Inc., 83 Cal. App. 4th at 415.

12         Plaintiffs Arthur J. Gallagher & Co., Inc. and Arthur J. Gallagher & Co. Insurance

13  Brokers of California, Inc. (collectively "Gallagher") seek relief from this Court because, like the

14  plaintiff in GAB Business Services, Inc., Gallagher is under siege as a result of a well-planned,

15  but unlawful raid on its employees and business.  Within the past two weeks, a newly formed

16  competitor, Defendant Edgewood Partners Insurance Center ("EPIC"), has conspired with

17  Gallagher's most senior regional executives and key employees ("Individual Defendants") [1], to

18  open a nearby office.  In only a matter of days, EPIC and the Individual Defendants (several of

19  whom carried out the unlawful acts while still current officers of Gallagher) illegally pilfered

20  nearly 50 employees, identified Gallagher's top revenue-generating clients and, using Gallagher's

21  own confidential and proprietary data, diverted millions of dollars of Gallagher's business, all the

22  while using elaborate measures to cover their tracks.

23         In light of the evidence received from clients and current employees, Defendants' use of

24  Gallagher's misappropriated information and interference with Gallagher's employment and

25  client relationships continues as this Motion is being considered.  Among the overwhelming

---

26  [1] Individual Defendants include former Gallagher executives and employees Andrew ("Wally")
Brown, Jr., Brian Quinn, Neil Cohn, Michael Brown, Stephen Hause, Laura Wick, George Petty,
27  James Halbleib, Laurie Martin, Eric Chua, Linda Soo Hoo, Robert Dutto, Susan English, Don
Johnson, Allen Amos, Carolann Cohn, Shandranette Middleton (aka Shandranette Pulliam), Bill
28  Phillips, Dirck ("Rick") Stinson, Bob Ellsworth, Robert Watkins, and Paul Wagener.

1  evidence Gallagher submits in support of this Motion is the fact that, as recently as two days ago,

2  EPIC and the Individual Defendants were using the stolen data (the theft of which they believed

3  they had successfully concealed) to solicit business from Gallagher's clients.  While Plaintiff is

4  still conducting its internal investigation, based on the evidence already uncovered – the amount

5  of data taken, the lengths Defendants went to conceal their wrongdoing, and the ongoing nature of

6  the illegal conduct – Gallagher cannot afford to wait any longer to seek emergency relief.  The

7  future of Gallagher's Northern California operations is at stake.

8       Defendants must be enjoined because their ongoing conduct violates the Uniform Trade

9  Secrets Act, Computer Fraud and Abuse Act, California Penal Code Section 502, the Individual

10 Defendant's fiduciary and contractual obligations, and California Business and Professions Code

11 Section 17200.  The sole focus of this motion is to obtain a Temporary Restraining Order to

12 protect Gallagher from further irreparable harm pending the outcome of this litigation.

13       **B.    What Specific And Immediate Relief Is Needed**

14       As more specifically described in the accompanying Ex Parte Motion and Proposed Order,

15 Gallagher seeks an Order which requires Defendants to:

16       (1)   refrain from accessing, using, or disclosing any of Gallagher's data,
             documents or property;
17

18       (2)   refrain from retrieving, copying, transmitting or disseminating any copies of
             Gallagher's data, documents or property;

19       (3)   refrain from destroying, erasing, or otherwise modifying, or causing or
             permitting anyone else to destroy, erase, or otherwise modify, any Gallagher's
20           data, documents or property relating to this action;

21       (4)   refrain from interfering with Gallagher's existing customer contracts or
             employment relationships, including but not limited to seeking to or actually
22           transacting business with any current Gallagher customer whose data or
             information Defendants obtained or removed from Gallagher; and
23

24       (5)   refrain from soliciting any current employees of Gallagher.

25       In conjunction with the injunctive relief, Gallagher respectfully requests that the Court

26 issue an evidence preservation Order requiring Defendants to identify (or provide) under oath:

27       (1)   all files and electronic data accessed, removed or copied off of Gallagher's
             computers;
28

(2)  the location of all files, and copies of files, accessed and removed from Gallagher's computers or network;

(3)  the program used to delete data off of Gallagher's computer or network;

(4)  all computer media EPIC issued to the Individual Defendants that have been accessed or used at any time that contain or incorporate any Gallagher data;

(5)  an accounting of all Gallagher data or data incorporating Gallagher data in their possession, custody and control, including the location of such data;

(6)  all Electronic Storage Devices in their possession, custody and control, for purposes of allowing a third party expert to forensically image and preserve the data on these ESDs; and

(7)  all persons or entities who have been given access to any Gallagher data, documents or property, and what use has been made of the Gallagher data.

Gallagher respectfully submits that this relief is necessary and reasonable in light of the forensic evidence of misappropriation already obtained, the declarations of computer forensic experts explaining the data sources to which they need access, the importance of preserving the evidence in Defendants' possession, and the fragile nature of the stolen data.

## II.    STATEMENT OF FACTS

### A.    Gallagher And EPIC Are Direct Competitors In The Insurance Brokerage Industry

Established in 1927, Gallagher employs upwards of 7,000 employees around the world and provides brokerage and risk management services to its corporate and institutional clients to help them obtain commercial coverage and employee-benefit related insurance to fit their needs. Gallagher also provides claims and information management services, risk control consulting, and data consulting services to help its clients reduce their cost of risk.  McFarlane Decl., ¶ 3(e)-(h).

EPIC, a nascent insurance brokerage launched in June 2007 by co-founders Defendants John Hahn and Dan Francis, competes against Gallagher by providing retail property/casualty and employee benefits insurance services in California.

### B.    Gallagher Maintains And Protects Proprietary Data Needed To Perform Brokerage Services And Which, If Stolen, Enables Defendants To Directly Solicit Customers And Steal Business From Gallagher

To perform brokerage services and to procure optimal insurance packages, Gallagher gathers and maintains precise, proprietary information regarding its clients, including data needed

1
2
3
4
5                                            See McFarlane Decl., ¶ 5.  Gallagher protects this

6   data through such reasonable measures as requiring employees to agree, through contracts and

7   company policies, to protect the data and physically securing sensitive data at its premises.

8   McFarlane Decl., ¶ 6.  The contracts Gallagher employees execute contain, *inter alia*, an express

9   acknowledgement that the theft or misuse of proprietary data, solicitation of employees, or use of

10  confidential data to improperly solicit Gallagher customers, warrant immediate injunctive relief.

11  McFarlane Decl., ¶ 6(a), Ex. A.

12        As set forth in detail in the McFarlane Declaration, which discusses both Gallagher's

13  proprietary data in general and the specific import of the files stolen by Individual Defendants, if

14  a former employee retained Gallagher's proprietary data post-termination, he or she would have

15  the precise information, which Gallagher developed at substantial expense and effort, that would

16  be needed to steal business from Gallagher.  McFarlane Decl., ¶ 9.

17        **C.    Gallagher's Investigation Reveals That Defendants Engaged In A Conspiracy
18              To Steal Gallagher's Confidential/Proprietary Information And Raid Its
              Employees And Customers**

19              **1.    The Conspiracy Starts With The Breach of Fiduciary Duty And Duty
                      Of Loyalty**
20

21        At all relevant times, Individual Defendants Wally Brown and Brian Quinn – the two

22  highest-ranking executives in Gallagher's San Ramon office, as well as Neil Cohn, Jim Halbleib

23  and Steve Hause were officers and fiduciaries of Plaintiff Arthur J. Gallagher & Co., Insurance

24  Brokers of California, Inc., and thus had a duty to refrain from, report, and take measures to cease

25  any conspiracy to harm Gallagher.  McFarlane Decl., ¶ 31.

26        Gallagher had no reason to suspect a conspiracy was afoot.  None of the officers,

27  fiduciaries, and executives indicated they were considering leaving, and in fact, even on the day

28  before the beginning of the mass resignations, Quinn falsely implied that his relationship with

MPA ISO TRO, OSC RE PRELIM. INJUNC.,
EVID. PRESERV., EXPEDITED DISCOVERY

Case No.

1    Gallagher would continue for the near future. Id. at ¶ 19.

2        Unbeknownst to Gallagher, however, a conspiracy dating back to June 2007 was well

3    afoot. During the months before their mass resignation, the Individual Defendants and the EPIC

4    Defendants (EPIC, Francis, and Hahn):

5    • **Solicit Gallagher employees**: Dating back at least to mid-October 2007, EPIC, by and
     through officers, executives, fiduciaries, and current Gallagher employees Wally
6    Brown and Quinn, actively solicited Gallagher employees to leave Gallagher and join
     EPIC. See McFarlane Decl., Ex. F (noting that, although Defendant Laura Wick did
7    not formally accept employment with EPIC until November, 2007, she was "on
     board" by October 24, 2007); see also Declaration of Lynn Tu, ¶¶ 3-17, 21, 25-41,
8    detailing Defendants Wally Brown's, Brian Quinn's, and EPIC managing partners
     Francis' and Hahn's ongoing efforts – lasting for several weeks and occurring while
9    Brown and Quinn were still employed with Gallagher and thereafter– to convince
     Lynn to join EPIC and bring her entire sales team and book of business to EPIC;
10
     • **Set Up Operations For The 49 Gallagher Employees Ultimately Hired**: Engage
11   Gallagher Human Resources employee Laura Wick to establish operations and process
     the new-hire paper work for the 49 Gallagher employees who would ultimately join
12   EPIC in a matter of days. See McFarlane Decl., Ex. G, wherein on November 5, 2007,
     Defendant Laura Wick's husband notes that Wick has decided to join a "competitor"
13   of Gallagher, and that:

14       her job is to start the new branch office and set up the computers, facilities, and
         manage HR issues before the rest of the team quits and joins her. That week of
15       Thanksgiving is when she needs to start her new job….

16   • **Use Gallagher Funds To Develop Relationships With Gallagher Clients For
     EPIC**: Between November and December 2007, officers, executives, fiduciaries, and
17   current Gallagher employees Quinn, Wally Brown, Michael Brown, Carol Cohn, and
     Neil Cohn began courting Gallagher clients at Gallagher's expense and at rates
18   exponential to prior months, thereby capitalizing upon the time and resources
     Gallagher provides to its employees to prepare to port Gallagher clients to EPIC. See
19   McFarlane Decl., ¶ FF (employee expense reports).

20   • **Obtain Legal Advice To Support Their Collective Plot**: As Quinn expressed shortly
     after resigning, he and the other former Gallagher employees obtained legal advice
21   falsely stating that their contractual notice periods – designed in part to help Gallagher
     prevent the destruction inflicted upon it by Defendants – were invalid, and that they
22   need not provide any advanced notice of their resignations. McFarlane Decl., ¶ 20.

23   • **Purposefully Delay Announcing The Resignations To Inflict More Damage Upon
     Gallagher**: Although their collective plot was formulated as of at least November 5,
24   2007, Defendants delayed announcing the resignations of 49 Gallagher employees
     until December 7-19, 2007 – at a time when Defendants' departure would enable them
25   to transfer significant amounts of Gallagher business to EPIC, and in an orchestrated,
     "sneak attack" manner designed to overwhelm Gallagher and prevent it from
26   uncovering Defendants' conduct and preventing the harm Gallagher suffered. See
     McFarlane Decl., ¶ 34, Exs. G, H:

27

28

1   [Written by Defendant Laura Wick's husband on November 5, 2007:]

2   Laura's job situation has changed and will make it hard for her to come. **Her boss and the rest of the sales people are leaving**

3   **Gallagher to go to a competitor.**

4   The conspiracy culminated on Friday, December 7, 2007 when Gallagher received the

5   resignations of Wally Brown, Michael Brown, Brian Quinn, and Neil Cohn, who left to join

6   EPIC, refused to honor their contractual obligation to provide two weeks' notice of their

7   resignations to Gallagher, and left Gallagher's San Ramon office with virtually no senior

8   management. McFarlane Decl., ¶ 18, Ex. H.

9   **2.    The Departure Of The Former Gallagher Officers Is Followed**
    **Immediately By A Mass Exodus Of Employees, All Leaving With**

10  **Little Or No Notice**

11  Two days later, between December 9 and December 17, 2007, Gallagher received an

12  additional 42 resignations of employees all of whom announced their intention to join the same

13  company - EPIC. Specifically, 20 employees resigned in mass on December 10, 2007, 5

14  employees resigned on December 11, 2007, 3 employees resigned on December 12, 2007, 1

15  employee resigned on December 13, 2007, 4 employees resigned on December 14, 2007, 1

16  employee resigned on December 17, 2007, and 1 employee resigned on December 18, 2007.

17  McFarlane Decl., ¶ 28, Ex. H. Of these employees, only 3 provided prior notice of their

18  intention to leave Gallagher and join EPIC. McFarlane Decl., ¶ 28(e), (f).

19  **In total, 49 employees from Gallagher's San Ramon and San Francisco offices have**

20  **resigned to join EPIC, 47 of whom resigned in 11 days.** McFarlane Decl., ¶ 29, Ex. H. In

21  Gallagher's San Ramon office alone, EPIC hired more than two-thirds of Gallagher's personnel.

22  In hiring Gallagher employees *en masse*, EPIC took entire sales groups and other divisions, and

23  essentially gutted Gallagher's San Ramon operations. McFarlane Decl., ¶ 30.

24  **3.    Contemporaneous With Their Departures, Defendants Steal Large**
    **Quantities Of Gallagher Proprietary Data And Take Great Measures**

25  **To Conceal Their Theft**

26  Although, due to Gallagher's urgent need to seek injunctive relief to prevent further

27  irreparable harm, Gallagher has not yet examined every source of forensic evidence of unlawful

28

1   conduct by Defendants, its forensic investigation to date has already established that:

2   •   Multiple former Gallagher employee **Individual Defendants connected USB**

3   **flash drives to their Gallagher computers** shortly before resigning, and at times at which

4   activity indicating mass copying of data occurred.  See Berryhill Decl., ¶¶ 6(a)-(e); Kruse Decl.,

5   ¶ 16(a)-(b).

6   •   After Defendant and former Gallagher Systems Administrator George Petty

7   purchased CD-burning software at Gallagher's expense, **Defendant Neil Cohn used a CD-**

8   **ROM drive to burn data** from his Gallagher computer to blank CDs.  Kruse Decl., ¶ 16(b)(i).

9   •   After Defendant George Petty received express instructions to secure and preserve

10  the computers of all departing employees, and after he confirmed he had already done so,

11  **computers in Petty's possession were defragmented** without Gallagher's knowledge or

12  consent – which causes files and previously-existing files to be deleted, **and additional files**

13  **were deleted.**  Kruse Decl., ¶ 16(c); Berryhill ¶ 6(a).

14  •   **Petty covered up his unlawful activity – after connecting two high capacity**

15  **hard drives to his laptop and desktop computers on the days preceding his departure – by**

16  **erasing his user profiles,** and the data contained therein, and replacing them with a single,

17  empty profile.  See Berryhill Decl., ¶ 6(a).

18  **D.**   **Defendants Stole Proprietary Data Regarding, And Charged Gallagher For**
     **Dramatically-Increased Client Develop Efforts With, The Very Clients Who,**
19   **Within Days Of The Mass Resignations, Transferred Their Business To EPIC**

20  Between December 10, 2007 and December 14, 2007, beginning only one business day

21  after the first (December 7, 2007) wave of employee departures, Gallagher received 31 Broker of

22  Record ("BOR") letters, reflecting that existing Gallagher clients had suddenly decided to transfer

23  their business to EPIC.  Through these BOR letters, EPIC obtained more than $4 million in

24  Gallagher business in a matter of days and have directly targeted Gallagher's most revenue-

25  generating accounts – a tactic which could only be accomplished through the use of Gallagher

26  proprietary revenue and client data.  McFarlane Decl., ¶¶ 54-57, 64, Exs. DD, FF.

27  When compared to the conduct of the departed employees prior to their resignations, these

28  BORs establish a striking correlation between the Gallagher clients who transferred their business

-7-

MPA ISO TRO, OSC RE PRELIM. INJUNC.,
EVID. PRESERV., EXPEDITED DISCOVERY

1    to EPIC, and the Gallagher clients about whom Individual Defendants copied Gallagher

2    proprietary data and for with the Individual Defendants socialized immediately before their

3    departures – and while still Gallagher employees:

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case No.

MPA ISO TRO, OSC RE PRELIM. INJUNC.,
EVID. PRESERV., EXPEDITED DISCOVERY

Case No.

MPA ISO TRO, OSC RE PRELIM. INJUNC.,
EVID. PRESERV., EXPEDITED DISCOVERY

**E.    Defendants' Unlawful Conduct Is Ongoing And Will Further Irreparably Harm Gallagher Absent Immediate Injunctive Relief**

Although the full extent of Defendants' unlawful conduct, and the harm resulting therefrom, is not known, and although Gallagher's forensic examination is ongoing, evidence already exists demonstrating that Defendants continue to solicit Gallagher employees, in violation of the former Gallagher employee Individual Defendants' contractual and fiduciary obligations to Gallagher, and continue to solicit Gallagher clients to transfer their business to EPIC.  In particular, Defendants EPIC's and Brown's direct solicitation of Gallagher San Jose employee Lynn Tu remained ongoing through at least four days ago – December 16, 2007.  Tu Decl., ¶¶ 39, 41.  In addition, Gallagher continues to receive BOR letters on a frequent basis indicating that the clients with whom Defendants had regular contact while at Gallagher, and whose proprietary information is either known to Defendants already, or further forensic examination will likely reveal Defendants copied and stole in surreptitious fashion as the former Gallagher employee Individual Defendants left Gallagher, have transferred or are in the process of transferring more business to EPIC.  Defendants are also engaging in blatant misrepresentations – such as that EPIC "bought" business from Gallagher with Gallagher's

-11-

1    consent, or that employee jobs at Gallagher are not secure – which are designed to continue

2    luring employees, clients, and business away from Gallagher and to EPIC.  Demaret Decl., ¶ 7;

3    Bowring Decl., ¶ 9; McFarlane Decl., ¶ 59 (discussing clients who have reported direct acts of

4    misrepresentation and attempted solicitation of Gallagher client business by Defendants, as well

5    as direct reports that Defendants have and continue to falsely assert that Gallagher employees are

6    at risk of losing their employment).

7         Absent immediate and comprehensive injunctive relief, Gallagher will suffer even greater

8    irreparable harm.

9    **III.    ARGUMENT**

10        A party seeking preliminary injunctive relief must fulfill either of two standards; the

11   "traditional" or the "alternative." Cassim v. Bowen, 824 F.2d 791, 795 (9th Cir. 1987).  Under the

12   traditional standard, the Court may issue preliminary injunctive relief if it finds that "(1) the

13   moving party will suffer irreparable injury if the relief is denied; (2) the moving party will

14   probably prevail on the merits; (3) the balance of potential harm favors the moving party; and

15   (4) the public interest favors granting relief." Id. In fact, under the alternative standard, even if

16   irreparable injury is only a mere possibility, the moving party may prevail if it can demonstrate "a

17   likelihood of success on the merits and the possibility of irreparable injury." Sega Enterprises Ltd.

18   v. Accolade, Inc., 977 F.2d 1510, 1517 (9th Cir.1992) (citations omitted).  The existence of these

19   two standards is intended to reflect a sliding scale approach, namely, that as the likelihood of

20   irreparable harm increases, the need to establish a probability of success decreases.  Roe v.

21   Anderson, 134 F.3d 1400, 1402 (9th Cir. 1998) (citation omitted).

22        **A.    There Is A Strong Likelihood That Gallagher Will Succeed On The Merits Of
         Its Complaint**

23

24        **1.    Defendants Must Be Enjoined To Prevent Further Breach Of
         Fiduciary Duty And Interference With Gallagher's Customer And
         Employee Relationships**

25

26        Where a party has misappropriated confidential and/or proprietary information, and used

27   the information to recruit away key employees for the purpose of taking away the competitor's

28   clients, injunctive relief is warranted.  GAB Bus. Services, Inc. v. Lindsey & Newsom Claim

1   Services, Inc., 83 Cal. App. 4th 409 (2000). The facts of this case are "on all fours" with GAB

2   Business Services, a case in which a regional vice president, prior to his resignation, orchestrated

3   a mass employee departure consisting of the top managers and "producers" in the company. The

4   court issued a temporary restraining order and preliminary injunction against the executive and

5   the executive's new employer prohibiting the use of stolen confidential and proprietary

6   information, and against any interference with existing customer or employment relationships.

7   GAB Bus. Services, Inc., 83 Cal. App. 4th at 415.

8       **In important ways, Gallagher's facts are more compelling than those present in**

9   **GAB; over twice as many of its employees have been raided** (18 in GAB versus nearly 50

10  here). Id. Like GAB, the Defendants here used their knowledge of the victim's confidential

11  salary information to solicit away employees. Moreover, Defendants acted with at least as much

12  efficiency, causing great damage, leaving "some big holes" in short order. Id. In only a matter of

13  days, EPIC took two-thirds of Gallagher's San Ramon workforce, identified Gallagher's top

14  revenue-generating clients, stole more than $4 million in Gallagher revenue, and engaged in

15  dramatic measures to both steal Gallagher data and cover their tracks. In light of the evidence

16  received from clients and current employees, Defendants are continuing to interfere with

17  Gallagher's business and employee relationships. McFarlane, ¶¶ 56-60, Exs. K, U, Y, BB.

18          **2.    Defendants Must Be Immediately Enjoined To Prevent Any Further
                    Violations Of The Computer Fraud And Abuse Act**

19
    The Computer Fraud and Abuse Act ("CFAA") prohibits each of the following:
20

21      • Knowingly causing the transmission of a program, information, code, or
          command, and as a result of such conduct, intentionally causing damage without
          authorization, to a protected computer (meaning one used in interstate
22        commerce);

23      • Intentionally accessing a protected computer without authorization and, whether
          intentionally, recklessly, or otherwise, causing damage; and/or
24

25      • Knowingly and with the intent to defraud, accessing a protected computer
          without authorization, or exceeding authorized access, and by means of such
          conduct furthering the intended fraud and obtaining anything of value.
26

27  18 U.S.C. §§ 1030 (a)(4), (a)(5)(A)(i)-(iii); Pac. Aero. & Elecs., Inc. v. Taylor, 295 F. Supp. 2d

28  1188, 1195 (D. Wash. 2003). Courts have held that an employee's access to an employer's

Case No.                                    -13-     MPA ISO TRO, OSC RE PRELIM. INJUNC.,
                                                     EVID. PRESERV., EXPEDITED DISCOVERY

1    computer which exceeds the scope of the agency (e.g. acts of disloyalty) is "unauthorized access."

2    ViChip Corp. v. Lee, 438 F.Supp.2d 1087, 1100 (N.D.Cal. 2006) (granting summary judgment on

3    employer's CFAA claim where employee had destroyed electronic files before his termination

4    with permanent erasure program); Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.,

5    119 F.Supp.2d 1121 (W.D.Wash. 2000) (finding that employees acted without authorization

6    when they sent proprietary information to future employer).  Where such unlawful acts occur, the

7    victim is afforded a private right of action, and may seek compensatory damages and injunctive

8    relief.  18 U.S.C. 1030(g) ("Any person who suffers damage or loss by reason of a violation of

9    this section may maintain a civil action against the violator to obtain compensatory damages and

10   injunctive relief or other equitable relief").

11          Based on the evidence already gathered, the Defendants are engaged in an ongoing

12   unlawful conspiracy using Gallagher confidential and proprietary information in an effort to

13   interfere with Gallagher's client relationships.  The evidence gathered to date shows the following

14   pattern:

15          (1)     After employees depart, other employees continue to copy prior to their

16   resignation (see II.C.1-3, above);

17          (2)     Once data is copied, Defendants use it to target and obtain the business of

18   Gallagher's top revenue-generating accounts (see II.D, above); and

19          (3)     Defendants continue to solicit Gallagher employees who, based on Defendants'

20   past acts, Defendants will then expect to steal Gallagher proprietary data for use in soliciting

21   Gallagher business (see II.E, above).  As such, there is a strong likelihood that Defendants will

22   continue to carry out their conspiracy by unlawfully accessing Gallagher computer systems and

23   taking Gallagher data.  18 U.S.C. §§ 1030 (a)(4), (a)(5)(A)(i)-(iii); Pac. Aero. & Elecs., Inc. v.

24   Taylor, 295 F. Supp. 2d 1188, 1195 (D. Wash. 2003).

25          Furthermore, in some instances, the Individual Defendants' access may have destroyed the

26   only copy in existence of Gallagher proprietary data (absent any copies they may have made

27   before engaging in this data destruction), causing severe damage and irreparable harm to

28   Gallagher.  18 U.S.C. §§ 1030 (a)(4), (a)(5)(A)(ii), (a)(5)(A)(iii); Pac. Aero. & Elecs., Inc., 295 F.

1  Supp. 2d at 1195.  To prevent further access to Gallagher's computers, by Individual Defendants,

2  EPIC and/or any current Gallagher employees with whom they may be plotting, injunctive relief

3  under the CFAA is warranted.  Cassim, 824 F.2d at 795; Sega Enterprises Ltd., 977 F.2d at 1517;

4  Roe, 134 F.3d at 1402.

5          **3.      Defendants Must Be Immediately Enjoined, As Some Defendants, On
              Behalf Of All Conspirators, Have Already Violated California Penal
6             Code Section 502**

7          Similar to the federal CFAA, California Penal Code section 502 provides for

8  compensatory damages, injunctive relief, or any other equitable relief to any owner of a

9  computer, computer system, computer network, computer program, or computer data who suffers

10 damage or loss by reason of any of the following:

11         (1) Knowingly accessing and without permission *altering, damaging,
           deleting, destroying, or otherwise using* any data, computer, computer
12         system, or computer network in order to wrongfully control or obtain
           money, property, or data.

13         (2) Knowingly accessing and without permission *taking, copying, or
           making use of any data* from a computer, computer system, or computer
14         network, or taking or copying any supporting documentation, whether
           existing or residing internal or external to a computer, computer system, or
15         computer network.

16         (4) Knowingly accessing and without permission *adding, altering,
           damaging, deleting, or destroying* any data, computer software, or
17         computer programs which reside or exist internal or external to a computer,
           computer system, or computer network.
18

19         (7) Knowingly and without permission *accessing or causing to be accessed*
           any computer, computer system, or computer network.

20 Cal. Penal Code § 502(c)(1), (2), (4), (7); Iconix, Inc. v. Tokuda, 457 F. Supp. 2d 969, 996 (D.

21 Cal. 2006); Therapeutic Research Faculty v. NBTY, Inc., 2007 U.S. Dist. LEXIS 8147, 17-18 (D.

22 Cal. 2007).

23         As set forth above, by accessing Gallagher's computers and networks without

24 authorization and removing confidential, proprietary and trade secret data, the Individual

25 Defendants violated each of the above provisions – i.e., they accessed the computers and the

26 network, took, copied and used such data, and then deleted and destroyed hundreds, if not

27 thousands, of files.  Furthermore, the evidence is clear that EPIC and each of the Individual

28

Case No.                                    MPA ISO TRO, OSC RE PRELIM. INJUNC.,
                                            EVID. PRESERV., EXPEDITED DISCOVERY

1   Defendants engaged in this unlawful conduct for the express purpose of stealing data, personnel,

2   and customers, causing Gallagher to suffer the loss of valuable proprietary data that it now has no

3   way to recover. Id.; Berryhill Decl., ¶ 6(a).

4        Furthermore, based on the continuing stream of BOR letters indicating that Defendants are

5   using proprietary data – such as Gallagher revenue data, and data regarding the needs,

6   preferences, and current and proposed policies of Gallagher clients – to target and acquire the

7   business of Gallagher's top revenue-generating clients, Defendants' violation of Section 502 is

8   ongoing and will continue to cause Gallagher to suffer irreparable harm unless Defendants are

9   immediately enjoined from continuing to use (and, as set forth above, alter, damage, delete, and

10  destroy) Gallagher data and/or evidence of Defendants' unlawful conduct. McFarlane Decl., ¶¶

11  57-60.

**4.    Defendants Must Be Immediately Enjoined, As They Have Already Misappropriated Gallagher's Trade Secrets And Are Using Them To Compete**

**a.    The Data Taken by EPIC and the Individual Defendants Qualifies as Trade Secrets**

15       Under the Uniform Trade Secrets Act ("UTSA"), the acquisition of trade secret

16  information by improper means, including through a breach of an employee's fiduciary duties,

17  constitutes unlawful misappropriation. Civil Code § 3426.1(b)(1). The UTSA defines a "trade

18  secret" as "information, including a formula, pattern, compilation, program, device, method,

19  technique, or process, that: (1) derives independent economic value, actual or potential, from not

20  being generally known to the public or to other persons who can obtain economic value from its

21  disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to

22  maintain its secrecy." Cal. Civ. Code § 3426.1(d).

23       The proprietary compilations of client data and other proprietary revenue, client, business

24  strategy, and personnel information that Defendants have misappropriated plainly qualify as trade

25  secrets under the UTSA. State Farm Mutual Automobile Insurance Co. v. Dempster, 174 Cal.

26  App. 2d 418, 422-423 (1959) (insurance information including policyholder identities and contact

27  information, amounts and types of insurance purchased, due dates of premiums, character,

28  description and location of insured property, financial and credit standing, and renewal and

Case No.

MPA ISO TRO, OSC RE PRELIM. INJUNC., EVID. PRESERV., EXPEDITED DISCOVERY

1    expiration dates of policies in force qualify as trade secrets; "the very recital of the nature of the

2    information acquired by the salesman and unique interest of the company in the information,

3    places it in the category of the trade secret . . . ."); Whyte v. Schlage Lock Co., 101 Cal. App. 4th

4    1443, 1455-56 (2002) (cost and pricing information and strategic marketing plans qualify as trade

5    secrets).  The confidential customer contact lists that the Individual Defendants removed also

6    constitute trade secrets.  See Morlife, Inc. v. Perry, 56 Cal. App. 4th 1514 (1997) (confidential

7    contact lists are trade secrets, even those developed in whole or in part by the misappropriating

8    employee); see also Cal. Lab. Code § 2860 ("Everything which an employee acquires by virtue of

9    his employment, except the compensation which is due to him from his employer, belongs to the

10   employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of

11   his employment").

12        In State Farm Mutual Automobile Insurance Co., the court upheld an injunction

13   preventing departed insurance agents from interfering with the insurance company's existing

14   policies and policyholders.  In reaching its decision, the court expressly recognized that the agents

15   acquired the policyholder and policy information in the course of their relationship with the

16   company, "and the possession of it opened the company to competitive attack at that most

17   dangerous moment, the expiration date of the policies."  Id. at 422-23.  See also MAI Systems

18   Corp. v. Peak Computer, Inc., 991 F.2d 511, 520 (9th Cir. 1993) (affirming a permanent

19   injunction as it related to the issue of "customer databases," which prohibited the defendant from

20   "misappropriating, using in any manner in their business, including advertising connected

21   therewith, and/or disclosing to others [plaintiff]'s trade secrets, including: (1) [the plaintiff's]

22   Customer Database").

23              **b.    Defendants Misappropriated Gallagher Trade Secrets Through
                        Their Improper Acquisition Of Gallagher Data**

24        Trade secrets misappropriation occurs whenever a person: (1) acquires another's trade

25   secret with knowledge or reason to know "that the trade secret was acquired by improper means."

26   Cal. Code Civ. Proc. § 3426.1(b)(1); see also DVD Copy Control Assoc. Inc. v. Bunner, 31

27   Cal.4th 864, 874 (2003).  A cause of action for trade secret misappropriation exists at the moment

28

1   that trade secrets are taken, regardless of whether use or disclosure has occurred. <u>Cadence Design</u>

2   <u>Systems, Inc. v. Avant! Corp.</u>, 29 Cal. 4th 215 (2002). Where evidence of actual or threatened

3   misappropriation exists, the Court may issue injunctive relief. Cal. Civ. Code § 3426.2(a).

4       By accessing, downloading, and retaining proprietary customer data and policy

5   information of Gallagher before their departure, the Individual Defendants unequivocally have

6   misappropriated Gallagher's trade secrets in direct violation of both the UTSA and their fiduciary

7   duties to Gallagher. The Individual Defendants must have known the information constituted

8   trade secrets given the clandestine fashion in which they accessed and copied it. Moreover, the

9   nature of the information – highly sensitive proprietary information regarding selectively targeted

10  Gallagher high revenue clients – leaves little doubt that the Individual Defendants understood its

11  value. <u>State Farm Mutual Automobile Insurance Co.</u>, 174 Cal. App. 2d at 422-23; <u>Whyte v.</u>

12  <u>Schlage Lock Co.</u>, 101 Cal. App. 4th at 1455-56; <u>Morlife</u>, 56 Cal. App. 4th 1514.

13      The way Defendants took these documents and files indicate that the Individual

14  Defendants and EPIC wrongfully acquired Gallagher's trade secrets. It is also clear that EPIC

15  accepted these trade secrets knowing that they were wrongfully acquired. To prevent these

16  former employees from inflicting more harm to Gallagher, the Court must immediately restrain

17  Defendants from any further access to, use, or disclosure of Gallagher's trade secrets.

18      **c.**    **Absent Injunctive Relief, Defendants Will Continue To**
19          **Misappropriate Gallagher Trade Secrets By Using The Trade Secrets To Compete With Gallagher.**

20      Misappropriation also occurs when a person: (1) discloses or uses, without consent,

21  another's trade secret that the person: "[u]sed improper means to acquire knowledge of" (Cal.

22  Code Civ. Proc. § 3426.1(b)(2)(A); or (a) "[d]erived from or through a person who had utilized

23  improper means to acquire it;" (b) "[a]quired under circumstances giving rise to a duty to

24  maintain its secrecy or limit its use;" or (c) "[d]erived from or through a person who owed a duty

25  to the person seeking relief to maintain its secrecy or limit its use." Cal. Code Civ. Proc. §

26  3426.1(b)(1).

27      The facts set forth above demonstrate that the Individual Defendants and EPIC are using

28  and will continue to use Gallagher's trade secrets. The BORs sent to Gallagher along with

-18-

MPA ISO TRO, OSC RE PRELIM. INJUNC.,
EVID. PRESERV., EXPEDITED DISCOVERY

Case No.

1    several communications received from clients who are in the process of, or otherwise

2    contemplating, a switch in brokers unequivocally establishes that Defendants are already using

3    Gallagher's confidential business documents and contact lists to further EPIC's business.  This

4    falls squarely within the conduct prohibited by the UTSA.

5          **5.    Individual Defendants Who Executed Executive Agreements Must Be
               Immediately Enjoined From Violating The Covenants Contained**
6              **Therein**

7          Individual Defendants Amos, Michael Brown, Neil Cohn, Dutto, English, Halbleib,

8    Johnson, Martin, Phillips, Quinn, Stinson and Wagener executed executive agreements that

9    provide: "In the event of a breach or threatened breach of the covenants of Executive referred to

10    above, the Company shall be entitled to equitable relief, including a temporary restraining order

11    and preliminary and permanent injunctive relief to prevent a future breach of such covenants."

12    Executive Agreement, Para. 16(C). Specifically, Gallagher seeks an injunction requiring

13    executives to refrain from breaching the following covenants:

14          • The covenant to return Gallagher's property, including confidential information, at
               the termination of employment, as set forth in Paragraph 10;
15
16          • The covenant to refrain from using confidential information to compete against the
               Company, as set forth in Paragraph 13(A);

17          • The covenant to refrain from soliciting, inducing or recruiting away the
               Company's employees, as set forth in Paragraph 13(B).
18

19    See Zakaria v. Lincoln Property Co., 185 Cal. App. 3d 500, 510 (1986) (confidentiality

20    agreement authorizing injunction to prevent such conduct may be specially enforced); see also 13

21    Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 25, p. 314 ("when the contract or

22    provision sought to be enforced is negative (a promise not to do a particular thing), equity grants

23    relief by an injunction restraining the defendant from acting in violation of the agreement.")

24          **6.    Defendants Must Be Immediately Enjoined As They Have Already
               Engaged In Unfair Competition**
25

26          As a result of their violations of the CFAA, Penal Code section 502 and the UTSA, the

27    use of Gallagher's confidential and proprietary information to interfere with its contractual

28    relationships, as well as the Individual Defendants' continuing breach of their fiduciary duties by

Case No.

their ongoing solicitation of Gallagher's employees and customers, Defendants have engaged in unlawful business practices in violation of California statute prohibiting unfair competition. Cal. Bus. & Prof. Code § 17200. Section 17200 is designed to "borrow" violations of other laws and treat them independently as unlawful business practices. See Farmers Ins. Exch. v. Sup. Ct., 2 Cal. 4th 377, 383 (1992). Under Section 17200, "unfair competition" is broadly defined to include "any unlawful, unfair, or fraudulent business act or practice." As reiterated by the California Supreme Court in Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal. 4th 163 (1999), the statute's coverage is "sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law." Id. at 180 (quotation marks and citations omitted).

Acts of unfair competition in violation of Section 17200 may be enjoined by this Court. Cal. Bus. & Prof. Code § 17203 ("Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. . . ."); see also Courtesy Temporary Service, Inc. v. Camacho, 222 Cal.App.3d 1278, 1290-1291(1990) (injunctive relief under the unfair competition provisions can be obtained for unfair and deceptive practices of employees).

Here, the unlawful business practices committed by Defendants are many, and show no signs of abating, as set forth above. Immediate injunctive relief is critical to preclude further unfair competition and resulting irreparably harm.

**B.      The Balance Of Harms Tips Sharply In Gallagher's Favor**

      **1.      Gallagher Will Suffer Irreparable Harm If Defendants Are Not Immediately Enjoined**

"An intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm." Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 92-93 (3rd Cir. 1992); North Atlantic Instruments, Inc. v. Haber, 188 F.3d 38, 49 (2nd Cir. 1999) (loss of trade secrets cannot be measured in money damages).

Here, there is overwhelming evidence that Individual Defendants copied thousands of electronic files, many of which contain detailed customer information, compiled through

1    countless hours of work. As set forth above, Gallagher has a number of measures in place to

2    protect the confidentiality of these files, including electronic, contractual, and physical

3    restrictions. While the number of stolen files is large, it by no means constitutes all Gallagher

4    clients; rather, Defendants deliberately targeted the files of the most profitable customers because

5    those files will have the highest value to EPIC in its efforts to take away Gallagher's clients.

6             **2.    EPIC And The Individual Defendants Will Suffer Little Or No Interim
                       Harm If A TRO Is Issued**

7

8             The balance of hardships weighs exclusively in favor of granting injunctive relief to

9    Gallagher. If Gallagher does not quickly determine what data was stolen, copied, and deleted,

10   and where it is now stored and who had access to it, Gallagher faces imminent and irreparable

11   harm that compensatory damages alone cannot remedy. Specifically, Gallagher must

12   immediately obtain the return of all stolen proprietary data so that it can ensure that there is no

13   further damage to customer relationships, that company information is not used or disclosed in

14   improper fashion, and that Gallagher's position as an industry is not compromised through the

15   improper use of its data. As the Individual Defendants have already demonstrated that they will

16   not hesitate to destroy data and evidence, injunctive relief is the only way to minimize or prevent

17   further irreparable harm to Gallagher.

18            By way of contrast, EPIC and the Individual Defendants have no ownership interest,

19   claim, or right to the information stolen from Gallagher, and which they presumably still possess.

20   This is especially true since the Individual Defendants agreed in writing to protect Gallagher's

21   confidential and proprietary information and not to use, disclose, or retain such information after

22   the termination of their employment with Gallagher. As EPIC and the Individual Defendants has

23   no right to possess, much less use, copy, and/or disclose, Gallagher's proprietary information,

24   they cannot be harmed by the issuance of injunctive relief requiring them to return and not access,

25   use, or disclose such information.

26   **IV.   COURT INTERVENTION IS ALSO REQUIRED TO PREVENT THE
             DESTRUCTION OF ESSENTIAL EVIDENCE**

27

28            The preservation (and ultimate search of) all computers, USB Flash Drives, external hard

1   drives, other portable storage media, emails, and other documents (electronic or otherwise) is

2   essential.  Although there is already ample evidence of the Individual Defendants' theft and

3   destruction of Gallagher property, an evidence preservation order (combined with Gallagher's

4   request for expedited discovery, below) will ensure that evidence necessary to reveal the full

5   extent of the Defendants' misconduct and resulting irreparable harm to Gallagher is not lost.

6   Moreover, Gallagher is entitled to the immediate return of – and the prevention of destruction of –

7   its valuable proprietary data.

8        Here, time is of the essence. Without a Court order forbidding them from doing so, EPIC

9   and the Individual Defendants could easily do exactly what they have already proven willing and

10   able to do – copy and erase documents (electronic and otherwise) which further prove the

11   Individual Defendants' theft and destruction of Gallagher's proprietary information, violations of

12   the CFAA and California Penal Code Section 502, and related wrongs.  Court intervention is

13   therefore necessary to ensure that EPIC and the Individual Defendants do not have the means or

14   opportunity to further destroy evidence of their wrongdoing.

15        The ease with which thousands of pages of electronic information can be permanently

16   destroyed further supports the need for Court intervention. With just a few keystrokes or clicks of

17   a mouse, a capable person seeking to hide incriminating evidence can permanently delete

18   significant amounts of information.  In view of the fragile existence of computerized data and the

19   ease with which such data can be preserved (by copying it), it is essential that the Court issue an

20   order to preserve all remaining evidence in Defendants' possession.

21        In contrast, EPIC and the Individual Defendants will suffer no harm from an evidence

22   preservation order. The Individual Defendants need only produce their computers and external

23   storage media for a short time so that Gallagher's forensic experts can make a mirror image and

24   return them. This process causes no harm to such storage media and merely maintains the status

25   quo rather than altering any data.  Thus, the only impact of issuing an evidence preservation order

26   is that EPIC and the Individual Defendants would be inconvenienced by not being able to use

27   their computers, floppy disks, USB Flash Drive, and other storage systems for a few hours. This

28   inconvenience is warranted in light of Defendants' theft and destruction of Gallagher's property.

**V.    EXPEDITED DISCOVERY IS NECESSARY TO REVEAL THE FULL EXTENT OF DEFENDANTS' UNLAWFUL CONDUCT AND THE IRREPARABLE HARM GALLAGHER SUFFERED AND CONTINUES TO SUFFER**

Gallagher requests leave of the Court to conduct expedited discovery in the form of 15 Specially Prepared Interrogatories to each Defendants, 15 Requests for Production of Documents to each Defendant, and the deposition of EPIC and each of the Individual Defendants, as set forth in the Proposed Order filed herewith. Gallagher requests that the Court authorize it to inspect the computers, electronic storage devices, and personal email accounts in Defendants' possession, custody, or control, so that Gallagher can verify the full extent to which the Individual Defendants copied, used, forwarded, and/or disclosed Gallagher's proprietary information. Following the completion of this expedited discovery, Gallagher may request reasonable follow-up discovery.

Good cause exists to allow Gallagher to conduct limited expedited discovery from EPIC and each of the Individual Defendants in order to obtain and preserve the evidence that is relevant to the preliminary and permanent injunction proceedings, and to determine the full extent of the damage it has suffered. Therefore, Gallagher respectfully requests that the Court authorize it to take the limited, expedited discovery referenced above.

**VI.    CONCLUSION**

For all the reasons stated above, Gallagher urges the Court to enter an order consistent with the Proposed Order filed herewith and to order EPIC and each of the Individual Defendants to show cause why a preliminary injunction of like effect should not be granted.

DATED:  December 20, 2007        PAUL, HASTINGS, JANOFSKY & WALKER LLP


By: _Bradford K Newman / pg_
    BRADFORD K. NEWMAN

Attorneys for Plaintiffs ARTHUR J. GALLAGHER & CO., INC. and, ARTHUR J. GALLAGHER & CO., INSURANCE BROKERS OF CALIFORNIA, INC.

Case No.                        MPA ISO TRO, OSC RE PRELIM. INJUNC., EVID. PRESERV., EXPEDITED DISCOVERY