1   PAUL, HASTINGS, JANOFSKY & WALKER LLP
    BRADFORD K. NEWMAN (SB# 178902) bradfordnewman@paulhastings.com
2   STEPHEN N. YANG (SB# 142474) stephenyang@paulhastings.com
    SARJU A. NARAN (SB# 215410) sarjunaran@paulhastings.com
3   SHANNON S. SEVEY (SB# 229319) shannonsevey@paulhastings.com
    1117 S. California Avenue
4   Palo Alto, CA 94304-1106
    Telephone: (650) 320-1800
5   Facsimile: (650) 320-1900

6   Attorneys for Plaintiffs
    Arthur J. Gallagher & Co., Inc. & Arthur J. Gallagher & Co., Insurance Brokers of California, Inc.

7

8                          UNITED STATES DISTRICT COURT

9                        NORTHERN DISTRICT OF CALIFORNIA

10                           SAN FRANCISCO DIVISION

11  ARTHUR J. GALLAGHER & CO., INC.,          CASE NO.
    a Delaware Corporation, ARTHUR J.
12  GALLAGHER & CO., INSURANCE
    BROKERS OF CALIFORNIA, INC., a           **DECLARATION OF JAMES G.**
13  California Corporation,                    **MCFARLANE**

14                 Plaintiffs,

15          vs.

16  EDGEWOOD PARTNERS INSURANCE
    CENTER, a California corporation; DAN
17  R. FRANCIS; JOHN G. HAHN;
    ANDREW ("WALLY") BROWN, JR.;
18  BRIAN F. QUINN; NEIL, R. COHN;
    CAROLANN COHN; MICHAEL J.
19  BROWN; STEPHEN HAUSE; LAURA J.
    WICK; JAMES C. HALBLEIB;
20  LAURINDA ("LAURIE") A. MARTIN;
    ERIC CHUA; GEORGE J. PETTY;
21  LINDA SOO HOO; ROBERT E. DUTTO;
    SUSAN M. ENGLISH; DON J.
22  JOHNSON; ALLEN L. AMOS;
    WILLIAM ("BILL") PHILLIPS, JR.;
23  DIRCK ("RICK") R. STINSON; ROBERT
    ("BOB") D. ELLSWORTH; ROBERT H.
24  WATKINS; PAUL H. WAGENER;
    SHANDRANETTE MIDDLETON,
25
                   Defendants.
26

27                                            REDACTED

28
                                             **DECLARATION OF JAMES G.**
                                                            **MCFARLANE**
    Case No.

1  I, James G. McFarlane, declare:

2      1.    I am currently employed as the Chairman, Western Region of Arthur J. Gallagher

3  Risk Management Services and Arthur J. Gallagher & Co. Insurance Brokers of California, Inc.,

4  which are divisions of A.J. Gallagher & Co. ("Gallagher"). I have worked for Gallagher since

5  1991. I have personal knowledge of the facts set forth in this Declaration, and if called as a

6  witness, I would and could testify to the facts stated herein.

7      2.    I have been in the insurance brokerage industry since 1980. From 1980 until

8  December 1984, I was an Account Executive and Producer, terms explained below, at Frank B.

9  Hall, Inc. Thereafter, I founded, owned, and operated Camden Insurance Brokers until I sold this

10  business to Gallagher in 1991.

11      **The Insurance Brokerage Industry, Generally**

12      3.    In the insurance industry, companies who seek to obtain commercial insurance

13  policies frequently interact with insurance carriers through insurance brokerage firms. Insurance

14  brokerage firms typically represent the insured, meaning the company seeking to obtain

15  commercial insurance, and perform a variety of services for that client, including the following.

16      **Negotiation of New and Renewed Commercial Insurance Policies**

17      (a)    In assisting clients to obtain the amounts and types of insurance needed to

18  meet their business needs, Gallagher acts as a liaison between insurance companies and potential

19  insured companies. At the outset of Gallagher's relationship with the client, and again in the

20  months leading up to the renewal of the policies of existing clients, Gallagher works closely with

21  clients to prepare a "Submission," which is the information Gallagher sends out to insurance

22  companies to procure bids for insurance policies. Gallagher prepares this Submission by

23  gathering from the client, and then performing a detailed analysis of, the proprietary information

24  set forth below.

25      (b)    After compiling this information into a Submission, which in some cases

26  can be hundreds of pages in length, Gallagher sends the Submission to those insurance companies

27  with which it has Appointments and with which it is licensed to do business. After the insurance

28  company performs its own analysis and investigation, Gallagher proceeds to negotiate with each

-1-

DECLARATION OF JAMES G. MCFARLANE

1    insurance company to obtain the most favorable bids from each insurance company, negotiating

2    such items as the amount of premium to be paid by the insured, level of deductible, exclusions to

3    the policy coverage, coverage limits, and more.

4            (c)    Gallagher then creates and provides to the insured a comprehensive analysis

5    of the bids it negotiated, and works with the insured to select the most suitable insurance policies.

6    After the client chooses the insurance it wishes to purchase, Gallagher performs all of the

7    necessary steps to complete the purchasing process, placing purchase orders, issuing certificates

8    of insurance to any persons or entities for whom the insured must submit proof of insurance, and,

9    after receiving and confirming the accuracy of the policies, providing the insurance policies to the

10    client.

11            (d)    After securing these initial or renewal policies, Gallagher also assists clients

12    throughout the length of the policy to make any necessary additions or changes in response to

13    changes in the client's business, such as the purchase or sale of property, the addition of new

14    employees, etc.

15                          **Claims and Loss Control Services**

16            (e)    In addition to procuring and renewing insurance policies, Gallagher also

17    provides account servicing throughout the year.  This account servicing falls primarily into two

18    categories: claims service and loss prevention.

19            (f)    Claims Service: Gallagher helps its clients file claims when losses have

20    occurred.  In particular, when a client needs to file a property damage (i.e. fire, theft, etc.) claim,

21    general liability, or automobile claim, Gallagher assists the client by gathering the information

22    necessary to file and resolve the claim, filing the claim on behalf of the insured, and acting as an

23    interface between the insured and insurance company as the insurance company investigates and

24    resolves the claim.

25            (g)    In the case of Workers' Compensation claims, Gallagher performs the

26    important function of monitoring the level of reserves that are applied to the claim.  Reserves are

27    the amounts, projected in advance, that the insurance company anticipates will be needed to

28    provide medical and compensation to the injured employee and allow him or her be rehabilitated

-2-

**DECLARATION OF JAMES G.
MCFARLANE**

1   and return to work.  Gallagher works as an intermediary to assess the appropriateness of the level

2   of reserves set by the insurance company.

3            (h)    Loss Prevention Services: Gallagher monitors the types of claims being

4   filed by the client so that it can identify trends and, based on those trends, help the client identify

5   and implement training, safety procedures, and other measures designed to reduce the number of

6   future claims and therefore negotiate favorable renewal rates in the future.

7       4.    In exchange for these services, brokerage firms can receive commissions/fees from

8   the insurance companies or insureds.  These commissions are calculated as a percentage of the

9   total premium paid on new or renewed policies.

10  **Proprietary Data Gallagher Maintains To Perform Brokerage Services**

11      5.    To perform brokerage services for its clients, and to enable it to procure the most

12  optimal insurance packages for clients, Gallagher develops and maintains highly confidential and

13  proprietary information, including:

14           (a)    Highly Sensitive Account Details regarding existing Gallagher clients,

15  including business records, customer file documents, pricing information, sales plans, and other

16  data, and Gallagher's analysis of data, such as the type of business the client operates, the types

17  and amounts of property, vehicles, and employees for whom insurance coverage is needed,

18  estimated sales, revenue data and cost data, premiums, and deductibles.  Gallagher analyzes this

19  data and compiles it into the Submission, which enables authorized Gallagher employees to have

20  at their fingertips what would otherwise be an unmanageable amount of data and to quickly and

21  accurately recall detailed client information, which is essential in a business such as ours, where

22  time – and the ability to quickly meet client insurance needs – is of the essence;

23           (b)    Client Lists, and lists of prospective clients, including special customer

24  matters like their risk factors, customer purchasing patterns, the structure, conditions and extent

25  of customers' existing insurance coverages and future insurance needs, customer renewal or

26  expiration data, customer concerns, customer's history of claims, and key contacts;

27           (c)    Special Business Relationships with vendors, agents and brokers,

28           (d)    Gallagher Financial Matters, including pricing and profit margins,

-3-

**DECLARATION OF JAMES G. MCFARLANE**

Case No.

1    commissions and/or fees;

2    (e)    Particularized Insurance Requirements And Account Preferences, including

3    the existence of any premium accounts, commission rates, and risk management service

4    arrangements, claims and loss histories, loss runs, which compare the premiums paid versus the

5    amounts paid on insurance claims, and other data showing the particularized insurance

6    requirements and preferences of the accounts;

7    (f)    Prospect Lists, And Personnel Strategies, including strategies regarding

8    which business and clients to pursue, the products and services to be offered to clients, and

9    strategies regarding the hiring, training, performance, and retention of Gallagher employees;

10    (g)    Revenue Information, including criteria and formulae used by Gallagher in

11    calculating its revenues;

12    (h)    Data Regarding Insurance Policies, including the structure and pricing of

13    insurance policies and products that Gallagher has negotiated with various underwriters;

14    (i)    Marketing and Product Development Data, including confidential strategies

15    and business plans to market Gallagher's services, create new products, and bring value to its

16    clients; and

17    (j)    Selective Personnel Information And Data, including compensation

18    structure, performances, relative strengths and weaknesses, assigned customer accounts, and

19    related employee information.

20    **Gallagher Protects Its Proprietary Data From Unauthorized Access And Use**

21    6.    Gallagher considers the information described above to be sensitive, highly

22    confidential, and proprietary.  Gallagher actively seeks to protect this information through

23    measures including the following.

24    (a)    Gallagher requires employees to sign executive agreements which require

25    the employees, in part, to contractually agree to protect Gallagher's confidential and proprietary

26    information, and not to use, retain, or disclose such information following the termination of their

27    employment.  Attached hereto as Exhibit A are true and correct copies of the Executive

28    Agreements executed by Defendants Allen Amos, Wally Brown, Michael Brown, Neil Cohn,

DECLARATION OF JAMES G.
MCFARLANE

Case No.

1    Robert Dutto, Susan English, Jim Halbleib, Don Johnson, Laurie Martin, Bill Phillips, Brian

2    Quinn, Rick Stinson, Paul Wagener, and Robert Watkins, which contain such a contractual

3    obligation.

4            (b)      Gallagher also maintains, and requires producers and other employees to

5    acknowledge in writing their agreement to abide by, Gallagher's Code of Ethics, which requires

6    that employees not take any action to compete with or harm Gallagher and to "maintain the

7    confidentiality of all information entrusted to them by [Gallagher], [its] clients or suppliers, or

8    others with whom [Gallagher] may conduct business, except when disclosure of such information

9    is specifically authorized by [Gallagher's] Legal Department or required as a matter of law.

10    Confidential information includes all non-public information that might be of use to competitors,

11    or harmful to us or our clients, if disclosed." This Code also requires employees to protect

12    Gallagher assets, which include "intellectual property such as the Gallagher name, logos,

13    trademarks, patents, copyrights, confidential information, ideas, plans and strategies."

14            (c)      Attached hereto as Exhibit B is a true and correct copy of this Code.

15    Attached hereto as Exhibit C are true and correct copies of the acknowledgements of Allen Amos,

16    Michael Brown, Wally Brown, Carol Cohn, Neil Cohn, Eric Chua, Elkie Craven, Robert Dutto,

17    Robert Ellsworth, Susan English, Jim Halbleib, Olga Harvison, Barbara Hilgen, Don Johnson,

18    Lisa Lucas, George Petty, Brian Quinn, Dennis Rodriguez, Linda Soo Hoo, Rick Stinson, Colleen

19    Varnica, Sharon Voth, Paul Wagener, Robert Watkins, and Laura Wick to abide by this Code.

20    Gallagher requires its employees to confirm their commitment to this Code annually.

21            (d)      Gallagher also enters into Stockholder Agreements with employees which

22    prohibit employees from soliciting Gallagher employees or using Gallagher confidential

23    information to solicit Gallagher customers. Attached hereto as Exhibit D are true and correct

24    copies of the Stockholder Agreements of Wally Brown, Brian Quinn, Neil Cohn, Laura Wick,

25    Jim Halbleib, Steve Hause, Carol Cohn, Linda Soo Hoo, and George Petty.

26            (e)      Gallagher protects the data maintained on its computer systems by

27    requiring all employees to maintain unique passwords which must be used to access Gallagher

28    electronic data. Gallagher also instructs its employees to store sensitive electronic client data and

DECLARATION OF JAMES G.
MCFARLANE

Case No.

1  other proprietary data on local computer drives, so that only a small universe of employees,

2  usually the sales group assigned to that client's account, has access to this sensitive information.

3  Gallagher further provides a segregated area of its computer systems to departments such as

4  accounting, who also maintain sensitive client revenue data, to again ensure that only employees

5  who need and are authorized to access sensitive financial data can gain access.

6      (f)    Gallagher further protects its proprietary data through the use of security

7  measures designed to protect its physical premises.  In particular, all work areas where

8  proprietary data is processed and used are secured by an electronic keycard system, so that only

9  employees with authorized access badges can access those portions of Gallagher's offices.  For

10  more sensitive areas, such as the room in which Gallagher stores its computer servers, additional

11  security measures are implemented, including provided restricted key access to only those

12  employees with a legitimate business need to access the server room.

13      (g)    As a further security measure, Gallagher obtains, through the executive

14  agreements described above, the agreement of certain employees to provide two weeks' notice of

15  their intention to resign from Gallagher.  Gallagher uses this time period to ensure that departing

16  employees do not steal Gallagher's proprietary data or attempt to use it in any manner, including

17  by stealing business from Gallagher to ensure a smooth transition of client files and to maintain

18  uninterrupted client service.

19      7.    Gallagher does not disclose its proprietary data to anyone who does not have a

20  direct and substantial need for the information, and does not under any circumstances authorize

21  its employees to disclose it to competitors or retain it following the termination of their

22  employment.  In fact, Gallagher does not even disclose its complete analysis of client data to its

23  clients, since it considers this data to be its proprietary work product.

24      8.    If another brokerage firm, such as EPIC, were to obtain this information, it could

25  use this information to unfairly compete with Gallagher through means such as soliciting bids

26  from insurance companies – without either Gallagher's or the client's permission – and then

27  attempting to undercut Gallagher's relationship with the client by offering it lower insurance

28  rates.

DECLARATION OF JAMES G.
MCFARLANE

-6-

9.    Furthermore, if a former employee retained Gallagher's proprietary client data compilations and analyses and other proprietary information following the termination of his or her employment, they could use this data to unfairly take business away from Gallagher. With this information, the former employees could transfer client accounts with no interruption in service. Without it, the former employees would be forced to re-collect all of each client's past and current insurance data and spend days – if not weeks – compiling this information into a distilled and usable format, all of which would deny the former employees the ability to negotiate and receive commissions on upcoming policy renewals, and which would otherwise prevent the former employee from being to provide the uninterrupted account servicing that clients expect and which, if clients do not receive, will lead to clients to take their business elsewhere.

**The Structure Of Sales Groups In The Insurance Brokerage Industry**

10.    In the insurance brokerage industry, brokerage sales personnel work in defined groups. These groups include, at the head of the group, one or more Producers, which are the employees who have the initial and primary contact with actual and prospective clients, and who are responsible for procuring and negotiating sales and maintaining client relationships. Each group also contains what are informally referred to as "service employees," which are the employees who are responsible for implementing the deals obtained by the Producers. Service employees include:

(a)    Account Executives: Account Executives assist Producers in maintaining the client relationship, attending meetings with actual and prospective clients, and overseeing the performance of work performed on client accounts, such as the analysis of client data, preparation of Submissions, and procurement of policies, etc.

(b)    Account Managers: Account Managers also support Producers, and on larger accounts, Account Executives by gathering and processing client data and preparing documents needed to service the client account, such as Submissions, summaries prepared for clients of the insurance options available to them, etc.

(c)    Commercial Lines Managers and Assistants: Commercial Lines managers provide a second layer of management of the account managers, freeing Account Executives to

-7-    DECLARATION OF JAMES G. MCFARLANE

Case No.

1  provide additional support to the Producers and ensuring that Account Managers provide a

2  consistent level of service to all clients.

3      (d)    Account Assistants:  Account Assistants perform transactional work

4  associated with sales and renewals of insurance policies, such as completing Certificates of

5  Insurance needed by clients to provide proof of insurance to related entities.

6      11.    In addition to the general sales group, Producers rely on employees with

7  specialized areas of expertise.  In particular, Producers require support from employees with

8  expertise in Claims, so that Gallagher's clients can receive assistance in processing claims,

9  Workers' Compensation, through which clients receive assistance in managing reserve levels and

10  other details of Workers' Compensation claims, Safety and Loss Control, which assists clients in

11  lowering their risk of receiving claims, and Surety Bonds, which assists clients in obtaining the

12  surety bonds they need to run their business.  Producers also rely on members of Gallagher's

13  Marketing Department to maintain the relationships with insurance companies needed to sell

14  insurance policies, and to assist in the preparation of Submissions sent to insurance companies.

15      12.    Because each member of an insurance brokerage sales group, and the associated

16  departments described above, plays a unique role in the servicing of client accounts, a competitor

17  looking to hire another company's sales force, steal client accounts, or otherwise cripple a

18  competitor cannot simply hire Producers, but must also hire the Producer's entire group.  Without

19  hiring the entire sales group, a Producer would need to train a new staff to learn how to

20  implement the specific deal terms to which he or she agreed, which could significantly delay a

21  competitor's ability to get its operations running quickly and quickly obtain sales.

22      **October 17, 2007 – November 2, 2007: The Resignation of Laura Wick**

23      13.    Attached hereto as Exhibit E is a true and correct copy of the October 17, 2007

24  resignation letter of Laura Wick, the office manager of Gallagher's San Ramon facility who

25  performed Gallagher's Human Resources function for the San Ramon office.  Wick cites in her

26  letter that she is resigning, effective November 2, 2007, because she needs to spend time with her

27  family, but that she hopes that a position at Gallagher will be available for her in 2008.

28

-8-

DECLARATION OF JAMES G.
MCFARLANE

Case No.

14.    Attached hereto as Exhibit F is a true and correct copy of an email, dated October 24, 2007, which I am informed was recovered from the hard drive of the Gallagher computer assigned to Wick. In this email, Wick notes that she has agreed to join EPIC, but that she will refrain from signing any new-hire paperwork until November 2, 2007 – the same day she previously stated would be her final day of employment with Gallagher. I interpret this email to mean that EPIC instructed Wick to avoid signing any new hire paperwork before her resignation from Gallagher took effect, so as to further perpetuate the fraud that Wick was a loyal employee of Gallagher throughout her employment.

15.    Attached hereto as Exhibit G is a true and correct copy of an email sent to Wick's Gallagher email account. In this email, Wick's husband notes that, contrary to Wick's statement that she was resigning to spend time with family, her true intention was to accept employment with EPIC and to assist EPIC in its efforts to hire an entire group of Gallagher San Ramon employees at once.

16.    In the final days of her employment with Gallagher, while Wick was purporting to finish her duties and responsibilities at Gallagher but had secretly agreed to work for EPIC, Wick continued to receive compensation and benefits from Gallagher.

17.    On December 5, 2007, Brian Quinn, the head of the San Ramon office, informed me that Wick was "almost done" straightening out her personal family problems, and that she intended to return to Gallagher after the New Year. Since the email by Wick's husband notes that in addition to Wick and other employees, Wick's "boss," who at the time was Brian Quinn, had decided as of November 5, 2007 to join EPIC, I believe Quinn's statement to me was intentionally false and designed to prevent me – and Gallagher – from learning of the collective plot to leave Gallagher to join EPIC.

### December 7-8, 2007: The Conduct Of Linda Soo Hoo Following The First Wave Of Resignations

18.    On Friday, December 7, 2007, Gallagher received the resignations of four employees: Wally Brown, Michael Brown, Brian Quinn, and Neil Cohn. As of December 7, 2007, Gallagher was not aware of any resignations other than Wally Brown, Michael Brown,

DECLARATION OF JAMES G. MCFARLANE

Case No.

1  Quinn, Cohn, and Wick. True and correct copies of the resignations Gallagher received from the

2  employees who resigned to join EPIC are attached hereto as Exhibit H.

3      19.    Upon hearing of the departure of Brian Quinn, I was shocked, since the evening

4  before his resignation, Brown called me to thank me for a wine and cheese gift basket I had sent

5  to him and specifically noted that he was looking forward to having wine with me in the near

6  future. After hearing of his resignation, I felt that Quinn had made this statement to purposefully

7  mislead me and prevent me – and Gallagher – from learning his true plan to join EPIC. I was also

8  shocked at the resignation of Wally Brown, since I had seen him two days earlier and he had

9  made no mention of his intention to resign at that time.

10     20.    After learning of Quinn's resignation, I called him and, among other things,

11  requested that he comply with his contractual obligation to provide Gallagher with two weeks'

12  notice of his resignation. Quinn refused to do so, stating that "we had received a legal opinion

13  saying that the notice period is unenforceable." This confirms that Quinn – who along with

14  Wally Brown, Neil Cohn, Jim Halbleib, and Steve Hause, were officers of Arthur J. Gallagher &

15  Co. Insurance Brokers of California, Inc. – intended to not honor the notice period in connection

16  with their coordinate resignations.

17     21.    Since multiple senior employees and officers had resigned in a single day to join

18  the same company, I became concerned that there were no senior levels of management left at

19  that office, and I was also concerned that the departed employees may try to solicit Gallagher's

20  clients and/or employees in violation of their contractual and fiduciary duties to Gallagher.

21  Accordingly, the following day, Saturday, December 8, 2007, at approximately 10:30 a.m., I

22  contacted Linda Soo Hoo, Gallagher's Area Vice President - Managerial and Controller for the

23  San Ramon office, and asked her to go to the San Ramon office to generate a report regarding the

24  San Ramon office's clients, arranged in descending order of revenue, so I could identify the

25  clients who, based on the use of Gallagher proprietary data such as revenue data, the former

26  Gallagher employees would likely solicit, and so I could monitor whether EPIC and/or the newly-

27  resigned employees attempted to solicit business from any of Gallagher's customers. I also asked

28  Ms. Soo Hoo to let Doug Bowring, Area President of Gallagher San Francisco offices, and

-10-

DECLARATION OF JAMES G.
MCFARLANE

Case No.

1  Gallagher's computer experts into the building, since Gallagher intended to inspect the computers

2  of the departed employees to search for evidence of wrongdoing.

3       22.    In response, Ms. Soo Hoo stated that she could not come to the office because she

4  was traveling to San Diego that weekend and would not be near the San Ramon office. She

5  suggested that I contact Jaren Thorsen, a member of Gallagher's San Ramon IT Department, to

6  provide the assistance I needed.

7       23.    Ms. Soo Hoo and I then proceeded to call Mr. Thorsen and asked him to meet Mr.

8  Bowring and the others at the San Ramon facility. Mr. Thorsen agreed to do so.

9       24.    Approximately 40 minutes later, at 11:11 a.m., Ms. Soo Hoo logged into

10  Gallagher's computer system through the remote access Citrix program and generated the list of

11  client accounts, arranged in descending order or revenue, that I had requested. Ms. Soo Hoo then

12  emailed this report to me, telling me to "hang in there" – which I interpreted to be a response to

13  me previously sharing with her that I was concerned about the potential damage caused by mass

14  departures of employees to EPIC – and reiterating that she was about to take a trip out of town.

15  Attached hereto as Exhibit J is a true and correct copy of the email I received from Ms. Soo Hoo

16  at 11:11 a.m. on December 7, 2007.

17       25.    I am informed that, later that day, after he arrived at the San Ramon office, Mr.

18  Bowring received a call from Mr. Thorsen, who stated that Laura Wick, who had resigned nearly

19  one month earlier, called to request that she and others who had resigned be allowed into

20  Gallagher's San Ramon office that day. Since (1) Mr. Thorsen was not regularly scheduled to

21  work at the San Ramon office that Saturday, and (2) the only people who knew Mr. Thorsen was

22  at the building were Mr. Bowring, Mr. Thorsen, Ms. Soo Hoo, and me, the only way Ms. Soo Hoo

23  would have known to call Mr. Thorsen that day would be if Ms. Soo Hoo called her immediately

24  after speaking with me to warn her that Gallagher's management and computer experts were at

25  the building conducting forensic inspections. It is my opinion that, in seeking to access

26  Gallagher's office at that particular date and time, more than give weeks after she left Gallagher,

27  and after carefully plotting her exit, Ms. Wick's intent to engage in some conduct not in

28  Gallagher's best interest.

26.    After learning of Ms. Wick's telephone call, I conferred with Mr. Bowring and agreed that Ms. Wick should not be granted access to the San Ramon building.  Out of a concern that Ms. Wick and others would continue to try to improperly gain access to Gallagher's San Ramon office, I also arranged for a security guard to be posted at the San Ramon office to monitor who was attempting to enter the premises, and to deny access to anyone whom either I or Mr. Bowring did not expressly approve.

27.    On the morning of Monday, December 10, 2007, I learned that a resignation letter, signed by Ms. Soo Hoo, had been found at her desk.

### December 9-18, 2007: 42 Additional Gallagher Employees Resign *En Masse* To Join EPIC

28.    Between December 9 and December 17, 2007, Gallagher received an additional 42 resignations of employees who announced their intention to join EPIC.  Specifically:

(a)    On Monday, December 10, 2007, primarily in the early morning hours (around 7 am), Soo Hoo, Molly Armstrong, Eric Chua, Elkie Craven, Robert Ellsworth, Tammy Glaser, Steve Hause, Robin Herman, Barbara Hilgen, Don Johnson, Mary Keck, Lisa Lucas, William "Bill" Phillips, Dennis Rodriguez, Amber Ronzitti, Dirck Stinson, Colleen Varnica, Sharon Voth, Paul H. Wagener, and Carol Ward resigned without notice and walked out to work at EPIC.

(b)    On December 11, 2007, Susan English, Brett Burdock, Kristina Stubbs, Shandranette Middleton (a.k.a. Shandranette Pullian), and George Petty resigned without notice and walked out to work at EPIC.

(c)    On December 12, 2007, Robert Harrison Watkins, Carolyn ("Ruby") Johnson, and Patricia Burdock, resigned without notice and walked out to work at EPIC.

(d)    On December 13, 2007, Larry Dineen resigned without notice to work at EPIC.

(e)    On December 14, 2007, Siobhan O'Leary, Veronica Ramirez, Olga Rasmussen, and Louanne Sweeney resigned to work at EPIC.  Ramirez and Rasmussen did not provide notice; Siobhan and Sweeney provided five days of notice.

DECLARATION OF JAMES G. MCFARLANE

Case No.

1        (f)     On December 17, 2007, Tiffany Pastorius resigned, having provided six

2  days notice. See Exhibit H.

3        (g)     On December 18, 2007, Rosa Dasilva resigned without notice.

4      29.     In total, 51 employees from Gallagher's San Ramon and San Francisco offices

5  have resigned to join EPIC, including Jim Halbleib and Laurie Martin, who resigned on

6  November 20, 2007 and November 26, 2007, respectively.  See Exhibit H. In Gallagher's San

7  Ramon office alone, EPIC hired 49 of Gallagher's 75 employees, or nearly two-thirds of the

8  Gallagher San Ramon workforce.  I am also informed that EPIC and Wally Brown have contacted

9  at least two members of Gallagher's San Jose office, Chuck Griswold and Lynn Tu, and are

10  attempting to hire as many as 8 members of the San Jose office's sales staff, which amounts to

11  approximately 25% of that office's total employees.

12      30.     In hiring Gallagher employees en masse, EPIC took entire sales groups and other

13  divisions, and essentially gutted Gallagher's San Ramon operations.  In particular, out of

14  Gallagher's San Ramon office, and in a span of only days, EPIC hired:

| Job Title | Employees |
|---|---|
| **Office Heads** | |
| Area President / Area Chairman | 2 employees: Wally Brown, Brian Quinn. |
| **Sales** | |
| Producers/Area VP – Sales | 15 employees: Allen Amos, Michael Brown, Carol Cohn, Neil Cohn, Larry Dineen, Rob Dutto, Bob Ellsworth, Susan English, Jim Halbleib, Steve Hause, Don Johnson, Lisa Lucas, Bill Phillips, Paul Wagener, Robert Watkins. |
| Account Executives | 1 employees: Laurie Martin. |
| Commercial Lines Manager | 2 employees: Linda Cardinha, Tiffany Pastorius |
| Account Managers, Assistant Account Managers, and Senior Account Managers | 11 employees: Eric Chua, Sandra Daughterty-Honda, Robin Herman, Barbara Hilgen, Mark Keck, Siobhan O'Leary, Tiffany Pastorius, Olga Rasmussen, Rick Stinson, Colleen Varnica, Sharon Voth. |
| Account Assistants | 6 employees: Molly Armstrong, Tammy Glaser, Carolyn Johnson, Amber Ronzitti, Kristin Stubbs, Carol Ward. |

DECLARATION OF JAMES G. MCFARLANE

Case No.

| Commercial Lines Assistants | 1 employee: Kelly Cavagnuolo. |
| **Sales Support** | |
| Claims Managers | 1 employee: Elkie Craven. |
| Marketing Managers | 1 employee: Sharon Schweitzer. |
| **Managerial/ Administrative** | |
| Area VP – Managerial / Human Resources | 1 employee: Laura Wick. |
| Area VP – Managerial | 1 employees: Linda Soo Hoo. |
| Area VP – Professional | 1 employee: Olga Harvison. |
| **IT / Systems Administration** | |
| Systems Administrator | 1 employee: George Petty. |
| **Support Staff** | |
| Receptionist | 1 employee: Louanne Sweeney. |
| Word Processing Operator | 2 employees: Brett Burdock, Patricia Burdock. |

31.     Several of these employees – Wally Brown, Brian Quinn, Neil Cohn, Jim Halbleib, and Steve Hause – were Officers of Arthur J. Gallagher & Co. Insurance Brokers of California, Inc., a California subsidiary of Gallagher.  I am also an Officer of this subsidiary.  Attached hereto as Exhibit J is a true and correct copy of a list of Directors and Officers of Arthur J. Gallagher & Co. Insurance Brokers of California, Inc., redacted to reveal only the Officers at issue.

32.     In light of the sheer number of employees that EPIC hired, as well as from the evidence uncovered to date, which suggests the coordinated departures had been planned at least one month earlier, I believe EPIC and the former Gallagher employees resigned in mass fashion with the express intention of denying Gallagher any ability to recover from their actions. Gallagher has been severely damaged by the mass raiding of its workforce committed by EPIC and the former Gallagher employees.  If additional raiding is allowed to occur unrestrained until there are few if any current Gallagher employees left, EPIC and the other Defendants will have inflicted irreparable injury through their actions.

### The Timing Of The Mass Resignation Of Employees To EPIC Appears Calculated To Inflict The Largest Possible Damage To Gallagher

33.     I am informed that Wally Brown first began discussing his potential employment EPIC in June 2007.  This is consistent with my knowledge, since in October 2007, I began hearing rumors that Brown may be considering leaving Gallagher.  I confronted Mr. Brown

**DECLARATION OF JAMES G. MCFARLANE**

1    and Mr. Quinn, the two Gallagher officers and employees who headed the Gallagher San Ramon

2    office, about these rumors on several occasions, but each time, both Mr. Brown and Mr. Quinn

3    assured me that Mr. Brown had no intention of leaving Gallagher to join EPIC. In fact, when I

4    first confronted Mr. Brown about these rumors in or around October 2007, Mr. Brown stated

5    words to the effect of, "I have no intention of leaving Gallagher, and even if I did, I would not go

6    to a start-up, because a start-up does not have the employees I would need to manage my

7    business."

8         34.    Notwithstanding that EPIC's attempts to hire them appear to have begun in June

9    2007, the timing of the mass resignation of employees from San Ramon in December 2007

10   appears calculated to inflict the most damage on Gallagher. By joining EPIC and soliciting

11   employees and customers shortly before many renewals would become due, EPIC and the former

12   Gallagher employees have placed themselves in the position to steal a significant percentage of

13   Gallagher San Ramon's business. Moreover, these revenues will likely continue on in each

14   subsequent year in which the clients renew their insurance policies, further compounding the

15   harm to Gallagher in an amount which would be impossible to calculate.

16   **Neil Cohn Accessed Proprietary Gallagher Data Before Leaving Gallagher And With
     No Legitimate Business Purpose For Doing So**

17        35.    Attached hereto as Exhibit K is a true and correct copy of what I am informed is a

18   list of the files accessed and presumably copied by Neil Cohn in the days surrounding his

19   resignation from Gallagher, which occurred on December 7, 2007. See Exhibit H.

20        36.    Examples of the documents accessed and presumably taken by Cohn in his final

21   days of employment with Gallagher include the following:

22        (a)    "EPIC Producer Equity Program (2).lnk": The file list attached as

23   Exhibit K reveals Cohn first introduced this document, which appears to be new-hire paperwork

24   that Cohn received from EPIC, to Gallagher's computer systems on October 22, 2007 at 7:48:54

25   p.m., and last accessed it using Gallagher's computer systems the day before he left Gallagher,

26   December 6, 2007, at 6:01:44 a.m. The fact that Cohn introduced this document to his Gallagher

27   computer on October 22, 2007 signifies to me that, by late October 2007, Cohn was already in

28

-15-

**DECLARATION OF JAMES G.
MCFARLANE**

Case No.

communication with EPIC regarding his own potential employment, and was likely aware of EPIC's attempts to hire other Gallagher employees.  A true and correct copy of the document "EPIC Producer Equity Program (2).lnk," which Gallagher recovered through its forensic analysis of Cohn's Gallagher computer, is attached hereto as Exhibit  L.

Case No.

DECLARATION OF JAMES G. MCFARLANE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case No.

-17-

DECLARATION OF JAMES G.
MCFARLANE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19     37.     As an employee who had already decided to leave Gallagher, I am aware of no

20     legitimate business purpose Cohn would have for accessing documents in the manner reflected in

21     Exhibit K

22     38.     In addition, I am aware that, during his employment with Gallagher, Neil Cohn

23     used a personal laptop computer to perform Gallagher business, and on which I believe he

24     maintained Gallagher documents and data.  To my knowledge, Cohn has not returned this

25     computer to Gallagher to ensure that all Gallagher data has been returned.

26     **Jim Halbleib Accessed Proprietary Gallagher Data Before Leaving Gallagher And
       With No Legitimate Business Purpose For Doing So**

27

28     39.     Attached hereto as Exhibit R is a true and correct copy of what I am informed is a

DECLARATION OF JAMES G.
MCFARLANE

Case No.

1  list of the files accessed and presumably copied by Jim Halbleib between November 12, 2007 and

2  November 20, 2007, Halbleib's final of employment with Gallagher.  See Exhibit H.

3         40.    Examples of the documents accessed and believed to have been taken by Halbleib

4  in his final days of employment with Gallagher include the following:

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JAMES G.
MCFARLANE

Case No.

1

2

3

4

5       41.    As an employee who had already decided to leave Gallagher, I am aware of no

6  legitimate business purpose Halbleib would have for accessing documents, including documents

7  containing Gallagher proprietary data, in the manner reflected in Exhibit R.

8  **Eric Chua Accessed Proprietary Gallagher Data Before Leaving Gallagher And**

9  **With No Legitimate Business Purpose For Doing So**

10      42.    Attached hereto as Exhibit V is a true and correct copy of what I am informed is a

11  list of the files accessed and presumably copied by Eric Chua December 6, 2007 and December

12  10, 2007, Chua's final day of employment with Gallagher.  See Exhibit H.

13      43.    The documents accessed and believed to have been taken by Chua on his final day

14  of employment with Gallagher include the following.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JAMES G.
MCFARLANE

Case No.

1

2

3

4

5

6

7

8

9

10

11

12

13

14        44.    As an employee who had already decided to leave Gallagher, I am aware of no

15  legitimate business purpose would have for accessing documents in the manner reflected in

16  Exhibit V.

17  **Laurie Martin Accessed Proprietary Gallagher Data Before Leaving Gallagher And**
    **With No Legitimate Business Purpose For Doing So**

18

19        45.    Attached hereto as Exhibit Z , is a true and correct copy of what I am informed is

20  a list of the files accessed and copied by Laurie Martin between November 12, 2007 and

21  November 20, 2007.

22        46.    Laurie Martin submitted her resignation to Gallagher on November 26, 2007,

23  effective that day.  See Exhibit H.

24        47.    Examples of the documents accessed and believed to have been taken by Martin in

25  her final days of employment with Gallagher include, but are not limited to, the document entitled

26

27

28

DECLARATION OF JAMES G.
MCFARLANE

Case No.

1
2
3
4
5
6
7
8

9     49.    Notably, as set forth above, Jim Halbleib, with whom Martin worked for several

10   years, also took documents relating to this Gallagher client, as set forth above.

11     50.    As an employee who had already decided to leave Gallagher, Martin had no

12   legitimate business purpose for accessing and presumably copying Gallagher proprietary data.

13   **Shandranette Middleton Accessed Proprietary Gallagher Data Before Leaving**
     **Gallagher And With No Legitimate Business Purpose For Doing So**

14

15     51.    Attached hereto as Exhibit BB is a true and correct copy of what I am informed is

16   a list of the files accessed and copied by Shandranette Middleton between December 7, 2007 and

17   December 11, 2007, her final day of employment with Gallagher. See Exhibit H.

18     52.    In addition to documents, similar to those above, which contain proprietary

19   Gallagher analyses and data regarding client costs, insurance needs, premiums, and coverage

20   types, Middleton accessed and presumably copied Gallagher proprietary client lists containing

21   detailed information regarding the policy periods, premiums, and other details of client insurance

22   policies, the specific underwriters who write these policies, and the commissions Gallagher

23   receives from renewing these policies. An example of such a client list, accessed and presumably

24   copied by Middleton on December 7, 2007, is attached hereto as Exhibit CC.

25     53.    As an employee who would soon depart from Gallagher, Middleton had no

26   legitimate business purpose for client lists and other Gallagher proprietary information.

27

28

**DECLARATION OF JAMES G.**
**MCFARLANE**

Case No.

**Immediately After Joining EPIC, The Former Gallagher Employees Begin Soliciting Gallagher's Top Revenue-Generating Clients**

54.    Attached hereto as Exhibit DD are the 31 Broker of Record ("BOR") letters that Gallagher has received to date reflecting accounts were transferred from Gallagher to EPIC in the first week following the mass resignation of Gallagher employees.

55.    BOR letters are used in the insurance brokerage industry to obtain a client's consent to transfer their account from one brokerage firm to another, leaving the new firm as the exclusive broker of record. Once a BOR letter has been issued, the old broker of record loses its ability to act on behalf of the insured company and can only collect commissions until the expiration of the policy it brokered prior to the issuance of the BOR letter.

56.    When compared to the documents accessed by Neil Cohn, Eric Chua, Jim Halbleib, Laurie Martin, and Shandranette Middleton, there appears to be a strong correlation between the files and data the Defendants appear to have intentionally targeted, which contain data EPIC would need to immediately steal Gallagher's clients, and the clients who ultimately transferred their business to EPIC within a short time thereafter. See Exhibits K, V, Y, BB.

57.    Based on the assumption that the clients at issue have transferred all of their business to EPIC, these BOR letters represent approximately $4 million in revenue that EPIC has taken from Gallagher in a matter of only a few days. As reflected in the spreadsheet Defendant Linda Soo Hoo prepared and sent to me on the weekend of her resignation, these BOR letters represent some of Gallagher's top revenue-generating clients. In fact, based on the BOR letters received to date, it appears that EPIC has contacted virtually all Gallagher clients who generated for Gallagher annual revenues in excess of $100,000, whereas Gallagher's smaller revenue-generating accounts do not yet appear to be transferring their business. This indicates to me that the former Gallagher employees now employed by EPIC are using their knowledge of Gallagher's proprietary revenue data, to select the most profitable clients to attempt to take from Gallagher.

58.    In addition to the substantial revenues already lost, Gallagher is at risk of losing more clients through the improper actions of its former employees now employed by EPIC. As

-23-

DECLARATION OF JAMES G. MCFARLANE

Case No.

60.    With regular frequency, I am receiving reports that the former Gallagher employees now employed by EPIC are actively interfering with our customer relationships.

**EPIC And The Former Gallagher Employees Conspired In Advance And Acted In An Orchestrated And Concerted Manner**

61.    Having received the evidence of EPIC's and the former Gallagher employees' conduct, which demonstrates that, in only a matter of days, EPIC took two-thirds of Gallagher's San Ramon workforce, accessed and presumably copied Gallagher data, identified Gallagher's top revenue-generating clients and obtained more than $4 million in Gallagher revenue, EPIC's and the former Gallagher's actions could only have been accomplished through a concerted and orchestrated effort.  In my opinion, the precise damage that Defendants have inflicted upon Gallagher could not have happened by chance, but could only have happened as a result of a targeted effort accomplished by each actor knowing and precisely executing their role in a collective plot to harm Gallagher.

62.    In my 27 years in the insurance brokerage industry, I have never seen such an orchestrated and targeted attempt to destroy another business by officers of the corporation

DECLARATION OF JAMES G.
MCFARLANE

1   working in conjunction with a direct competitor. In my opinion as a long-standing insurance

2   executive, EPIC's and the former Gallagher employees' conduct was malicious, unethical, illegal,

3   and warrants significant punishment.

4   **Other Matters**

5       63.     In order develop and foster its relationships with its customers, Gallagher

6   encourages its employees to socialize with clients, and reimburses these employees for expenses

7   associated with doing so. The relationships that are developed as a result belong to Gallagher, not

8   the individual employees.

9       64.     Attached hereto as Exhibit FF· are true and correct copies of expense reports

10  submitted in November and December 2007 by former Gallagher employees Brian Quinn, Wally

11  Brown, Michael Brown, Carol Cohn, and Neil Cohn, which show that these employees were

12  socializing with Gallagher clients with an exponentially higher frequency in the weeks before

13  they resigned their employment with Gallagher. I believe that, through this increased socializing

14  activity, the former Gallagher employees, while still employed by Gallagher, were using

15  Gallagher's corporate credit card and client relationships to solicit clients to transfer their

16  business to EPIC.

17      65.     I have reviewed the above expense reports. When compared to the list of clients

18  who executed BOR letters transferring their business from Gallagher to EPIC, there appears to be

19  a strong correlation between those Gallagher clients reflected in the increased expense

20  reimbursements and those who transferred their business through BOR letters. See Exhibits Y,

21  DD.

22      66.     Gallagher maintains policies requiring employees to use corporate assets only for

23  the benefit of, and not to the detriment of, Gallagher. Attached hereto as Exhibit GG is a true and

24  correct copy of Gallagher's Corporate Credit Card Policy, which states that corporate credit cards

25  "must be used exclusively for business-related travel and entertainment expenses."

26

27

28

DECLARATION OF JAMES G.
MCFARLANE

Case No.