reason other than death or permanent disability during such period cease to constitute a majority thereof.

4.    A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

C.    The term "Business Combination" shall mean (i) any merger or consolidation of the Corporation or a subsidiary of the Corporation with or into a Related Person, (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets either of the Corporation (including without limitation any voting securities of a subsidiary) or of a subsidiary, to a Related Person, (iii) any merger or consolidation of a Related Person with or into the Corporation or a subsidiary of the Corporation, (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Corporation or a subsidiary of the Corporation, (v) the issuance of any securities of the Corporation or a subsidiary of the Corporation to a Related person, (vi) the acquisition by the Corporation or a subsidiary of the Corporation of any securities issued by a Related Person, (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of the Corporation's voting securities remaining, if there is a Related Person, and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

D.    The term "Related Person" shall mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of the Corporation, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person shall not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of the Corporation on November 1, 1983. Without limitation, any shares of voting stock of the Corporation that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, shall be deemed beneficially owned by the Related Person.

E.    The term "Substantial Part" shall mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

F.    The term "other consideration to be received" shall include, without limitation, capital stock of the Corporation retained by its existing public stockholders in the event of a Business Combination in which the Corporation is the surviving corporation.

6

G.    The term "Continuing Director" shall mean a director who was a member of the board of directors of the Corporation immediately prior to the time that the Related Person involved in a Business Combination became a Related Person, and the term "Outside Director" shall mean a director who is not (a) an officer or employee of the Corporation or any relative of an officer or employee or (b) a Related Person or an officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

## ENFORCEMENT

**Paragraph Fifteen.** The Executive and the Company understand and agree that any breach or evasion of any term of this Agreement will give rise to an action for breach of contract, which may be brought in any court of competent jurisdiction.

**Paragraph Sixteen.** The Executive recognizes that the rights and privileges granted to him by this Agreement, his services and his corresponding covenants to the Company, are of a special, unique and extraordinary character, the loss of which cannot reasonably or adequately be compensated for in damages in any action at law or through the offset or withholding of any monies to which he otherwise might be entitled from the Company. Accordingly, the Executive understands and agrees that the Company shall be entitled to equitable relief, including a temporary restraining order and preliminary and permanent injunctive relief, to prevent a breach of this Agreement.

**Paragraph Seventeen.** This Agreement shall be governed by and construed in accordance with the laws of the State of California.

**Paragraph Eighteen.** The provisions of this Agreement are intended to be interpreted and construed in a manner which makes such provisions valid, legal and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render such provision valid, legal and enforceable. It is expressly understood and agreed between the parties that this modification or restriction may be accomplished by mutual accord between the parties or, alternatively, by disposition of a court of law. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any remaining provisions.

**Paragraph Nineteen.** The Executive understands and agrees that, in the event of his breach of this Agreement, he shall be liable for any attorneys' fees and costs incurred by the Company in enforcing its rights hereunder. The Executive further agrees that, in the event of a breach of the provisions of Paragraph Thirteen, the time period specified in such paragraph shall be extended by the number of days between the date of such breach and the date such breach is enjoined or other relief is granted the Company by a court of competent jurisdiction. It is the intention of the parties that the Company shall enjoy the faithful performance by Executive of the covenants specified in said paragraph for the full time period specified therein.

7

## MISCELLANEOUS

**Paragraph Twenty.** Except as hereinafter provided, this Agreement supersedes all existing Company policies, and all previous agreements between the parties, to the extent that such policies and agreements consider subject matters herein addressed. Any and all prior covenants entered into by Executive for the benefit of Company and relating to restrictions on Executive's business activities after termination of employment with Company remain in full force and effect. Company, however, agrees that the contingent release of Post-Employment obligations contemplated by Paragraph Fifteen shall apply with like force and effect to any such prior covenants.

**Paragraph Twenty-One.** This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company and may be enforced by any subsidiary of the Company for whom Executive has provided services hereunder.

**Paragraph Twenty-Two.** As used in this Agreement, all terms of masculine gender shall be construed, where appropriate, to be of the feminine gender.

## ACKNOWLEDGEMENT

The Executive and the Company, by its designated representative, hereby acknowledge that they have read and understand each of the provisions of this Agreement, that they have executed this Agreement voluntarily and with full knowledge of its significance, and that they intend to be fully bound by the same.

THE EXECUTIVE

_____
Don J. Johnson

Witness:

_____
Sharon LeTendre

ARTHUR J. GALLAGHER & CO.

_____
Vice President

Attest:

_____
Carl E. Fasig
Assistant Secretary

8

## EXECUTIVE AGREEMENT

This AGREEMENT is made and entered into as of the 12 day of ___APRIL___, 19 99, by and between ___LAURIE MARTIN___ (hereinafter referred to as the "Executive") and ARTHUR J. GALLAGHER & CO. ("Corporation"), its subsidiaries, divisions and affiliated and related companies (hereinafter collectively referred to as the "Company").

IN CONSIDERATION of the mutual covenants hereinafter made by each party to the other, the Executive and the Company agree as follows:

### EMPLOYMENT AND REMUNERATION

**Paragraph One.** The Company agrees to employ and to continue to employ the Executive in accordance with the terms of this Agreement. Such employment shall include the sales and servicing of accounts and prospective accounts of Company. Company shall provide Executive with access to the resources and data of the Company to assist Executive in such sales and servicing activities.

**Paragraph Two.** The Company agrees that the Executive shall be entitled to the semi-monthly payment of compensation, an annual paid vacation, and various employee benefit plans. It is understood and agreed that the Company may from time to time modify the specific terms and conditions of these entitlements.

**Paragraph Three.** The Company agrees that the Executive shall be entitled to reimbursement for traveling, entertainment and other expenses reasonably incurred by the Executive in the performance of his employment obligations and responsibilities. It is understood and agreed that the Company's liability in this regard shall be limited by the terms and conditions of the Company policy in effect on the date that the expense is incurred.

### FIDUCIARY OBLIGATIONS
### OF THE EXECUTIVE

**Paragraph Four.** The Executive agrees to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities. The Executive further agrees that he will not engage in any activity which conflicts or interferes with, or in any way compromises, his performance of those obligations and responsibilities.

**Paragraph Five.** The Executive recognizes that, by virtue of his employment by the Company and to assist him in the solicitation, production and servicing of accounts, he will be granted otherwise prohibited access to confidential and proprietary data of the Company which is not known either to its competitors or within the insurance agency and brokerage business generally and which has independent economic value to the Company. This information (hereinafter referred to as "Confidential Information") includes, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques; business, management and personnel strategies; the criteria and formulae used by the Company in pricing its insurance products and claims management, loss control and information management services;

the structure and pricing of special insurance packages that the Company has negotiated with various underwriters; lists of prospects; the identity, authority and responsibilities of key contacts at Company accounts; the composition and organization of accounts' businesses; the peculiar risks inherent in their operations; highly sensitive details concerning the structure, conditions and extent of their existing insurance coverages; policy expiration dates; premium amounts; commission rates; risk management service arrangements; loss histories; and other data showing the particularized insurance requirements and preferences of the accounts. The Executive recognizes that this Confidential Information constitutes a valuable property of the Company, developed over a long period of time and at substantial expense. Accordingly, the Executive agrees that he will not, at any time during his employment by the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

Paragraph Six. The Executive recognizes that by virtue of his employment by the Company, he will be afforded numerous and extensive resources to assist him in the solicitation, production and servicing of accounts. The Executive understands and agrees that all efforts that he expends in this regard shall be for the permanent benefit of the Company, that the Company shall secure and retain indefinitely the proprietary interest in all such accounts, and that the Executive will not undertake any action which could in any way disturb the Company's relationship with said accounts.

## TERMINATION OF
## EMPLOYMENT RELATIONSHIP

Paragraph Seven. The Executive and the Company understand and agree that each has the right, upon fourteen (14) days' written notice (hereinafter referred to as the "Notice Period"), to terminate the employment relationship for any reason whatsoever. The Company may, at its option, pay the Executive for the Notice Period in lieu of active employment during the Notice Period. It is further agreed that Company may terminate such employment without any notice in the event Executive breaches this Agreement, commits any dishonest or fraudulent act or is unable to lawfully perform his duties hereunder.

Paragraph Eight. The Company agrees to continue in effect during the Notice Period the compensation and benefits to which the Executive may be entitled under Paragraphs One, Two and Three of this Agreement. It is understood and agreed that at the expiration of the Notice Period, the Executive's entitlement to the remuneration described in the aforementioned three (3) paragraphs shall cease.

Paragraph Nine. The Executive agrees that during the Notice Period, he will cooperate fully with the Company in all matters relating to the winding up of any pending work and the orderly transfer to other Company employees of the accounts and prospective accounts for which he has most recently been responsible. The Executive further agrees that, during the Notice Period (whether or not active employment continues during the Notice Period), Executive's fiduciary duties to Company shall remain in effect.

Paragraph Ten. The Executive agrees that, prior to the expiration of the Notice Period, he will return to the Company all literature, correspondence, memoranda, reports, summaries,

2

manuals, proposals, contracts and other documents of any kind which relate in any way to the business of the Company, including specifically all materials which comprise or refer to the Company's Confidential Information. It is understood and agreed that the Executive will not retain any copy, facsimile or note intended to memorialize any such data.

Paragraph Eleven. The Executive understands and agrees that, during or at the expiration of the Notice Period, he will attend any meeting the Company may convene to: (i) review the status of accounts for which the Executive has most recently been responsible; (ii) ensure that the Executive has fully obtained his entitlements under this Agreement; and/or (iii) confirm that the Executive clearly understands the nature and scope of his post-employment obligations.

## POST-EMPLOYMENT OBLIGATIONS
## OF THE PARTIES

Paragraph Twelve. The Company agrees that the Executive, upon the termination of his employment, shall be entitled to such severance pay, if any, as may then be provided for under the Company's personnel policies. It is understood and agreed that the Company may, in its discretion, increase both the amount of severance pay due the Executive, and the time period for distributing same.

Paragraph Thirteen.

A.    The Executive recognizes the highly sensitive nature of the Confidential Information to which he will have access during his employment, and acknowledges the Company's legitimate interest in safeguarding same from disclosure. Accordingly, the Executive agrees that, for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not divulge the Company's Confidential Information or make use of it for his own purpose or the purpose of another. In addition, the Executive understands and agrees that for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not, directly or indirectly, solicit, place, accept, aid, counsel or consult in the renewal, discontinuance or replacement of any insurance by, or handle self-insurance programs, insurance claims or other insurance administrative functions for, any existing Company account or any actively solicited prospective account of the Company for which he performed any of the foregoing functions during the two-year period immediately preceding such termination, if the loyal and complete fulfillment of his duties in connection with the performance of any of the foregoing functions would likely call upon the Executive to reveal, make judgments upon, or to otherwise use or divulge any of the Confidential Information or to otherwise violate any provision of this Agreement.

B.    The Executive recognizes that employees of the Company are a valuable resource of the Company. Accordingly, the Executive agrees that, for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not, directly or indirectly, solicit, induce or recruit any employee of the Company to leave the employ of the Company.

3

Paragraph Fourteen. Notwithstanding anything contained herein to the contrary, the Post-Employment obligations of the Executive contained in Paragraph Thirteen shall become null and void and have no further effect immediately upon a Hostile Change in Control of the Corporation as defined herein. The Company shall send written notice to the Executive within ten (10) days of a Hostile Change in Control of the Corporation, notifying the Executive that such event has taken place. Failure of the Company to send such notice shall not preclude the release of the Executive from the Post-Employment Obligations contained in Paragraph Thirteen. For the purposes of this Paragraph Fourteen, the following definitions apply:

A.      The term "Hostile Change in Control" means a transaction, event or election constituting a Change in Control, which was not approved by, or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of the Corporation in office immediately prior to the Change in Control who have not died or become permanently disabled.

B.      The term "Change in Control" of the Corporation means and includes each and all of the following occurrences:

1.      A Business Combination, unless:

(a)      the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of the Corporation and the affirmative vote of the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

(b)      the Continuing Directors of the Corporation by a two-thirds vote (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person, or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

(c)      the Business Combination is solely between this corporation and another corporation, 50% or more of the voting stock of which is owned by the Corporation and none of which is owned by the Related Person; or

(d)      all of the following conditions are satisfied:

(i)      The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in the Corporation in the Business Combination is not less than the higher of:

4

        (A)     the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of the Corporation's common stock, or

        (B)     an amount that bears that same percentage relationship to the market price of the Corporation's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in (A) above bears to the market price of the Corporation's common stock immediately prior to the commencement of the acquisition of the Corporation's voting stock that caused such Related Person to become a Related Person, or

        (C)     an amount calculated by multiplying the earnings per share of the Corporation's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings multiple of the Related Person as of the record date as customarily computed and reported in the financial press.

Appropriate adjustments shall be made with respect to (A), (B) and (C) above for recapitalizations and for stock splits, stock dividends, and like distributions; and

        (ii)    A timely mailing shall have been made to the stockholders of the Corporation containing in a prominent place (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors, and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to the fairness from the financial point of view of the terms of the Business Combination to the stockholders of the Corporation other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by the Corporation upon receipt of such opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

2.     The acquisition of outstanding shares of the Corporation's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

3.     Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Corporation shall for any

reason other than death or permanent disability during such period cease to constitute a majority thereof.

4.    A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

C.    The term "Business Combination" shall mean (i) any merger or consolidation of the Corporation or a subsidiary of the Corporation with or into a Related Person, (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets either of the Corporation (including without limitation any voting securities of a subsidiary) or of a subsidiary, to a Related Person, (iii) any merger or consolidation of a Related Person with or into the Corporation or a subsidiary of the Corporation, (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Corporation or a subsidiary of the Corporation, (v) the issuance of any securities of the Corporation or a subsidiary of the Corporation to a Related person, (vi) the acquisition by the Corporation or a subsidiary of the Corporation of any securities issued by a Related Person, (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of the Corporation's voting securities remaining, if there is a Related Person, and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

D.    The term "Related Person" shall mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of the Corporation, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person shall not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of the Corporation on November 1, 1983. Without limitation, any shares of voting stock of the Corporation that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, shall be deemed beneficially owned by the Related Person.

E.    The term "Substantial Part" shall mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

F.    The term "other consideration to be received" shall include, without limitation, capital stock of the Corporation retained by its existing public stockholders in the event of a Business Combination in which the Corporation is the surviving corporation.

G.    The term "Continuing Director" shall mean a director who was a member of the board of directors of the Corporation immediately prior to the time that the Related Person

6

involved in a Business Combination became a Related Person, and the term "Outside Director" shall mean a director who is not (a) an officer or employee of the Corporation or any relative of an officer or employee or (b) a Related Person or an officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

## ENFORCEMENT

**Paragraph Fifteen.** The Executive and the Company understand and agree that any breach or evasion of any term of this Agreement will give rise to an action for breach of contract, which may be brought in any court of competent jurisdiction.

**Paragraph Sixteen.** The Executive recognizes that the services provided by him pursuant to this Agreement are of a special, unique and extraordinary character. The Executive further recognizes that a breach of the covenants of Executive set forth in Paragraph Thirteen (A) hereof will result in losses that cannot be reasonably estimated or easily calculated by either Executive or Company and may further result in future losses which cannot be adequately compensated for by damages. In recognition of the foregoing, the Executive agrees that:

A.     In the event of a breach of the covenants of Executive referred to above which results in the loss of a customer or account that produced commission or fee revenues to the Company, Executive shall pay Company, as liquidated damages for, and as a reasonable forecast of, such loss, an amount equal to one hundred thirty-five percent (135%) of such revenues derived by Company attributable to such lost customer or account in the one year immediately preceding the date of breach, payable upon demand by Company;

B.     In the event of a breach of the covenants of Executive referred to above which results in Executive or any person, corporation or other entity affiliated with Executive ("Executive's Affiliates") receiving commission or fee revenues attributable to an actively solicited prospective account of the Company, Executive shall pay Company, as liquidated damages and as received, forty-five percent (45%) of such revenues received by Executive or by Executive's Affiliates during the three (3) year period following the date of the first receipt of such revenues attributable to such prospective account of the Company; and

C.     In the event of a breach or threatened breach of the covenants of Executive referred to above, the Company shall be entitled to equitable relief, including a temporary restraining order and preliminary and permanent injunctive relief to prevent a future breach of such covenants.

**Paragraph Seventeen.** This Agreement shall be governed by and construed in accordance with the laws of the State of California.

**Paragraph Eighteen.** The provisions of this Agreement are intended to be interpreted and construed in a manner which makes such provisions valid, legal and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render

7

such provision valid, legal and enforceable. It is expressly understood and agreed between the parties that this modification or restriction may be accomplished by mutual accord between the parties or, alternatively, by disposition of a court of law. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any remaining provisions.

Paragraph Nineteen. The Executive understands and agrees that, in the event of his breach of this Agreement, he shall be liable for any attorneys' fees and costs incurred by the Company in enforcing its rights hereunder. The Executive further agrees that, in the event of a breach of the provisions of Paragraph Thirteen, the time period specified in such paragraph shall be extended by the number of days between the date of such breach and the date such breach is enjoined or other relief is granted the Company by a court of competent jurisdiction. It is the intention of the parties that the Company shall enjoy the faithful performance by Executive of the covenants specified in said paragraph for the full time period specified therein.

## MISCELLANEOUS

Paragraph Twenty. Except as hereinafter provided, this Agreement supersedes all existing Company policies, and all previous agreements between the parties, to the extent that such policies and agreements consider subject matters herein addressed. Any and all prior covenants entered into by Executive for the benefit of Company and relating to restrictions on Executive's business activities after termination of employment with Company remain in full force and effect. Company, however, agrees that the contingent release of Post-Employment obligations contemplated by Paragraph Fourteen shall apply with like force and effect to any such prior covenants.

Paragraph Twenty-One. This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company and may be enforced by any subsidiary of the Company for whom Executive has provided services hereunder.

Paragraph Twenty-Two. As used in this Agreement, all terms of masculine gender shall be construed, where appropriate, to be of the feminine gender.

## ACKNOWLEDGEMENT

The Executive and the Company, by its designated representative, hereby acknowledge that they have read and understand each of the provisions of this Agreement, that they have executed

his Agreement voluntarily and with full knowledge of its significance, and that they intend to be fully bound by the same.

THE EXECUTIVE

*Laurie Martin*

Witness:

_____

ARTHUR J. GALLAGHER & CO.

*Walter F. M'Clure*

Vice President

Attest:

*Christine D. Greb*

~~Carl E. Fasig~~

Asst. Secretary

## EXECUTIVE AGREEMENT

This AGREEMENT is made and entered into as of the 14ᵗʰ day of August , 2006, by and between William Phillips, Jr. (hereinafter referred to as the "Executive") and ARTHUR J. GALLAGHER & CO. ("Corporation"), its subsidiaries, divisions and affiliated and related companies (hereinafter collectively referred to as the "Company").

IN CONSIDERATION of the mutual covenants hereinafter made by each party to the other, the Executive and the Company agree as follows:

### EMPLOYMENT AND REMUNERATION

**Paragraph One.** The Company agrees to employ and to continue to employ the Executive in accordance with the terms of this Agreement. Such employment shall include the sales and servicing of accounts and prospective accounts of Company. Company shall provide Executive with access to the resources and data of the Company to assist Executive in such sales and servicing activities.

**Paragraph Two.** The Company agrees that the Executive shall be entitled to the semi-monthly payment of compensation and, to the extent provided for in accordance with Company policy, the following: an annual paid vacation, and various employee benefit plans. It is understood and agreed that the Company may from time to time modify the specific terms and conditions of these entitlements.

**Paragraph Three.** The Company agrees that the Executive shall be entitled to reimbursement for traveling, entertainment and other expenses reasonably incurred by the Executive in the performance of his employment obligations and responsibilities. It is understood and agreed that the Company's liability in this regard shall be limited by the terms and conditions of the Company policy in effect on the date that the expense is incurred.

### FIDUCIARY OBLIGATIONS
### OF THE EXECUTIVE

**Paragraph Four.** The Executive agrees to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities. The Executive further agrees that he will not engage in any activity which conflicts or interferes with, or in any way compromises, his performance of those obligations and responsibilities.

**Paragraph Five.** The Executive recognizes that, by virtue of his employment by the Company and to assist him in the solicitation, production and servicing of accounts, he will be granted otherwise prohibited access to confidential and proprietary data of the Company which is not known either to its competitors or within the insurance agency, consulting and brokerage business generally and which has independent economic value to the Company. This information (hereinafter referred to as "Confidential Information") includes, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques; retirement plan consulting, variable annuities, and fund investment business and related products and services; business, management and personnel strategies; the criteria and formulae used by the Company in pricing its insurance and

CAL 04/02

benefits products and claims management, loss control and information management services; the structure and pricing of special insurance packages that the Company has negotiated with various underwriters; lists of prospects; the identity, authority and responsibilities of key contacts at Company accounts; the composition and organization of accounts' businesses; the peculiar risks inherent in their operations; highly sensitive details concerning the structure, conditions and extent of their existing insurance coverages; policy expiration dates; premium amounts; commission rates; risk management service arrangements; loss histories; candidate and placement lists; and other data showing the particularized insurance or consulting requirements and preferences of the accounts. The Executive recognizes that this Confidential Information constitutes a valuable property of the Company, developed over a long period of time and at substantial expense. Accordingly, the Executive agrees that he will not, at any time during his employment by the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

Paragraph Six. The Executive recognizes that by virtue of his employment by the Company, he will be afforded numerous and extensive resources to assist him in the solicitation, production and servicing of accounts. The Executive understands and agrees that all efforts that he expends in this regard shall be for the permanent benefit of the Company, that the Company shall secure and retain indefinitely the proprietary interest in all such accounts, and that the Executive will not undertake any action which could in any way disturb the Company's relationship with said accounts. The Executive agrees that all intellectual property such as computer programs, systems or software developed during his employment or as a result of his employment is work for hire performed by the Executive in the scope of his employment. The Company shall retain all proprietary rights to any and all such intellectual property. Executive agrees to execute any documents necessary to perfect Company's interest in such intellectual property upon Company's request.

## TERMINATION OF
## EMPLOYMENT RELATIONSHIP

Paragraph Seven. The Executive and the Company understand and agree that each has the right, upon fourteen (14) days' written notice (hereinafter referred to as the "Notice Period"), to terminate the employment relationship for any reason whatsoever. The Company may, at its option, pay the Executive for the Notice Period in lieu of active employment during the Notice Period. It is further agreed that Company may terminate such employment without any notice in the event Executive breaches this Agreement, commits any dishonest or fraudulent act or is unable to lawfully perform his duties hereunder.

Paragraph Eight. The Company agrees to continue in effect during the Notice Period the compensation and benefits to which the Executive may be entitled under Paragraphs One, Two and Three of this Agreement. It is understood and agreed that at the expiration of the Notice Period, the Executive's entitlement to the remuneration described in the aforementioned three (3) paragraphs shall cease.

Paragraph Nine. The Executive agrees that during the Notice Period, he will cooperate fully with the Company in all matters relating to the winding up of any pending work and the orderly transfer to other Company employees of the accounts and prospective accounts for which he has most recently been responsible. The Executive further agrees that, during the Notice Period (whether or

2

not active employment continues during the Notice Period), Executive's fiduciary duties to Company shall remain in effect.

Paragraph Ten. The Executive agrees that, prior to the expiration of the Notice Period, he will return to the Company all literature, correspondence, memoranda, reports, summaries, manuals, proposals, contracts and other documents of any kind which relate in any way to the business of the Company, including specifically all materials which comprise or refer to the Company's Confidential Information. It is understood and agreed that the Executive will not retain any copy, facsimile or note intended to memorialize any such data.

Paragraph Eleven. The Executive understands and agrees that, during or at the expiration of the Notice Period, he will attend any meeting the Company may convene to: (i) review the status of accounts for which the Executive has most recently been responsible; (ii) ensure that the Executive has fully obtained his entitlements under this Agreement; and/or (iii) confirm that the Executive clearly understands the nature and scope of his post-employment obligations.

## POST-EMPLOYMENT OBLIGATIONS
## OF THE PARTIES

Paragraph Twelve. The Company agrees that the Executive, upon the termination of his employment, shall be entitled to such severance pay, if any, as may then be provided for under the Company's personnel policies. It is understood and agreed that the Company may, in its discretion, increase both the amount of severance pay due the Executive, and the time period for distributing same.

Paragraph Thirteen.

A.    The Executive recognizes the highly sensitive nature of the Confidential Information to which he will have access during his employment, and acknowledges the Company's legitimate interest in safeguarding same from disclosure. Accordingly, the Executive agrees that, for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not divulge the Company's Confidential Information or make use of it for his own purpose or the purpose of another. In addition, the Executive understands and agrees that for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not (i) directly or indirectly, solicit, place, accept, aid, counsel or consult in the renewal, discontinuance or replacement of any insurance or reinsurance by, or handle self-insurance programs, insurance claims or other insurance administrative functions ("insurance services") for, any existing Company account or any actively solicited prospective account of the Company for which he performed any of the foregoing functions during the two-year period immediately preceding such termination or (ii) provide any employee benefit brokerage, consulting, or administration services, in the areas of group insurance, defined benefit and defined contribution pension plans, human resources and staffing services, individual life, disability and capital accumulation products, and all other employee benefit areas ("benefit services") the Company is involved with, for any existing Company account or any actively solicited prospective account of the Company for which he performed any of the foregoing functions during the two-year period immediately preceding such termination, if the loyal and complete fulfillment of his duties in connection with the performance of any

3

of the foregoing functions would likely call upon the Executive to reveal, make judgments upon, or to otherwise use or divulge any of the Confidential Information or to otherwise violate any provision of this Agreement.. The term Company account as used in this paragraph shall be construed broadly to include all users of insurance services or benefit services including commercial and individual consumers, risk managers, carriers, agents and other insurance intermediaries.

B.     The Executive recognizes that employees of the Company are a valuable resource of the Company. Accordingly, the Executive agrees that, for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not, directly or indirectly, solicit, induce or recruit any employee of the Company to leave the employ of the Company.

Paragraph Fourteen. Notwithstanding anything contained herein to the contrary, the Post-Employment obligations of the Executive contained in Paragraph Thirteen shall become null and void and have no further effect immediately upon a Hostile Change in Control of the Corporation as defined herein. The Company shall send written notice to the Executive within ten (10) days of a Hostile Change in Control of the Corporation, notifying the Executive that such event has taken place. Failure of the Company to send such notice shall not preclude the release of the Executive from the Post-Employment Obligations contained in Paragraph Thirteen. For the purposes of this Paragraph Fourteen, the following definitions apply:

A.     The term "Hostile Change in Control" means a transaction, event or election constituting a Change in Control, which was not approved by, or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of the Corporation in office immediately prior to the Change in Control who have not died or become permanently disabled.

B.     The term "Change in Control" of the Corporation means and includes each and all of the following occurrences:

1.     A Business Combination, unless:

(a)     the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of the Corporation and the affirmative vote of the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

(b)     the Continuing Directors of the Corporation by a two-thirds vote (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person, or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

4

(c)     the Business Combination is solely between this corporation and another corporation, 50% or more of the voting stock of which is owned by the Corporation and none of which is owned by the Related Person; or

(d)     all of the following conditions are satisfied:

(i)     The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in the Corporation in the Business Combination is not less than the higher of:

(A)     the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of the Corporation's common stock, or

(B)     an amount that bears that same percentage relationship to the market price of the Corporation's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in (A) above bears to the market price of the Corporation's common stock immediately prior to the commencement of the acquisition of the Corporation's voting stock that caused such Related Person to become a Related Person, or

(C)     an amount calculated by multiplying the earnings per share of the Corporation's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings multiple of the Related Person as of the record date as customarily computed and reported in the financial press.

Appropriate adjustments shall be made with respect to (A), (B) and (C) above for recapitalizations and for stock splits, stock dividends, and like distributions; and

(ii)     A timely mailing shall have been made to the stockholders of the Corporation containing in a prominent place (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors, and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to the fairness from the financial point of view of the terms of the Business Combination to the stockholders of the Corporation other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by the Corporation upon receipt of such opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

5

2.    The acquisition of outstanding shares of the Corporation's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

3.    Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Corporation shall for any reason other than death or permanent disability during such period cease to constitute a majority thereof.

4.    A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

C.    The term "Business Combination" shall mean (i) any merger or consolidation of the Corporation or a subsidiary of the Corporation with or into a Related Person, (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets either of the Corporation (including without limitation any voting securities of a subsidiary) or of a subsidiary, to a Related Person, (iii) any merger or consolidation of a Related Person with or into the Corporation or a subsidiary of the Corporation, (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Corporation or a subsidiary of the Corporation, (v) the issuance of any securities of the Corporation or a subsidiary of the Corporation to a Related person, (vi) the acquisition by the Corporation or a subsidiary of the Corporation of any securities issued by a Related Person, (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of the Corporation's voting securities remaining, if there is a Related Person, and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

D.    The term "Related Person" shall mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of the Corporation, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person shall not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of the Corporation on November 1, 1983. Without limitation, any shares of voting stock of the Corporation that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, shall be deemed beneficially owned by the Related Person.

E.    The term "Substantial Part" shall mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

F.    The term "other consideration to be received" shall include, without limitation, capital stock of the Corporation retained by its existing public stockholders in the event of a Business Combination in which the Corporation is the surviving corporation.

6

G.    The term "Continuing Director" shall mean a director who was a member of the board of directors of the Corporation immediately prior to the time that the Related Person involved in a Business Combination became a Related Person, and the term "Outside Director" shall mean a director who is not (a) an officer or employee of the Corporation or any relative of an officer or employee or (b) a Related Person or an officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

## ENFORCEMENT

Paragraph Fifteen. The Executive and the Company understand and agree that any breach or evasion of any term of this Agreement will give rise to an action for breach of contract, which may be brought in any court of competent jurisdiction.

Paragraph Sixteen. The Executive recognizes that the services provided by him pursuant to this Agreement are of a special, unique and extraordinary character. The Executive further recognizes that a breach of the covenants of Executive set forth in Paragraph Thirteen (A) hereof will result in losses that cannot be reasonably estimated or easily calculated by either Executive or Company and may further result in future losses which cannot be adequately compensated for by damages. In recognition of the foregoing, the Executive agrees that:

A.    In the event of a breach of the covenants of Executive referred to above which results in the loss of a customer or account that produced commission or fee revenues to the Company, Executive shall pay Company, as liquidated damages for, and as a reasonable forecast of, such loss, an amount equal to one hundred thirty-five percent (135%) of such revenues derived by Company attributable to such lost customer or account in the one year immediately preceding the date of breach, payable upon demand by Company;

B.    In the event of a breach of the covenants of Executive referred to above which results in Executive or any person, corporation or other entity affiliated with Executive ("Executive's Affiliates") receiving commission or fee revenues attributable to an actively solicited prospective account of the Company, Executive shall pay Company, as liquidated damages and as received, forty-five percent (45%) of such revenues received by Executive or by Executive's Affiliates during the three (3) year period following the date of the first receipt of such revenues attributable to such prospective account of the Company; and

C.    In the event of a breach or threatened breach of the covenants of Executive referred to above, the Company shall be entitled to equitable relief, including a temporary restraining order and preliminary and permanent injunctive relief to prevent a future breach of such covenants.

Paragraph Seventeen. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

Paragraph Eighteen. The provisions of this Agreement are intended to be interpreted and construed in a manner which makes such provisions valid, legal and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render such provision valid, legal and enforceable. It is expressly understood and agreed between the parties that this modification or restriction may be accomplished by mutual accord between the parties or, alternatively, by disposition of a court of law. If such provision cannot under any circumstances be

7

so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any remaining provisions.

Paragraph Nineteen. The Executive understands and agrees that, in the event of his breach of this Agreement, he shall be liable for any attorneys' fees and costs incurred by the Company in enforcing its rights hereunder. The Executive further agrees that, in the event of a breach of the provisions of Paragraph Thirteen, the time period specified in such paragraph shall be extended by the number of days between the date of such breach and the date such breach is enjoined or other relief is granted the Company by a court of competent jurisdiction. It is the intention of the parties that the Company shall enjoy the faithful performance by Executive of the covenants specified in said paragraph for the full time period specified therein.

## MISCELLANEOUS

Paragraph Twenty. Except as hereinafter provided, this Agreement supersedes all existing Company policies, and all previous agreements between the parties, to the extent that such policies and agreements consider subject matters herein addressed. Any and all prior covenants entered into by Executive for the benefit of Company and relating to restrictions on Executive's business activities after termination of employment with Company remain in full force and effect. Company, however, agrees that the contingent release of Post-Employment obligations contemplated by Paragraph Fourteen shall apply with like force and effect to any such prior covenants.

Paragraph Twenty-One. This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company and may be enforced by any subsidiary of the Company for whom Executive has provided services hereunder.

Paragraph Twenty-Two. As used in this Agreement, all terms of masculine gender shall be construed, where appropriate, to be of the feminine gender.

## ACKNOWLEDGEMENT

The Executive and the Company, by its designated representative, hereby acknowledge that they have read and understand each of the provisions of this Agreement, that they have executed this Agreement voluntarily and with full knowledge of its significance, and that they intend to be fully bound by the same.

THE EXECUTIVE

ARTHUR J. GALLAGHER & CO.

Vice President

Witness:

Attest:

Christine D. Greb

~~Secretary~~/Assistant Secretary

8

# EXECUTIVE AGREEMENT

This AGREEMENT is made and entered into as of the 29th day of *June*, 19 98, by and between *BRIAN F. QUINN* (hereinafter referred to as the "Executive") and ARTHUR J. GALLAGHER & CO. ("Corporation"), its subsidiaries, divisions and affiliated and related companies (hereinafter collectively referred to as the "Company").

IN CONSIDERATION of the mutual covenants hereinafter made by each party to the other, the Executive and the Company agree as follows:

## EMPLOYMENT AND REMUNERATION

**Paragraph One.** The Company agrees to employ and to continue to employ the Executive in accordance with the terms of this Agreement. Such employment shall include the sales and servicing of accounts and prospective accounts of Company. Company shall provide Executive with access to the resources and data of the Company to assist Executive in such sales and servicing activities.

**Paragraph Two.** The Company agrees that the Executive shall be entitled to the semi-monthly payment of compensation, an annual paid vacation, and various employee benefit plans. It is understood and agreed that the Company may from time to time modify the specific terms and conditions of these entitlements.

**Paragraph Three.** The Company agrees that the Executive shall be entitled to reimbursement for traveling, entertainment and other expenses reasonably incurred by the Executive in the performance of his employment obligations and responsibilities. It is understood and agreed that the Company's liability in this regard shall be limited by the terms and conditions of the Company policy in effect on the date that the expense is incurred.

## FIDUCIARY OBLIGATIONS
## OF THE EXECUTIVE

**Paragraph Four.** The Executive agrees to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities. The Executive further agrees that he will not engage in any activity which conflicts or interferes with, or in any way compromises, his performance of those obligations and responsibilities.

**Paragraph Five.** The Executive recognizes that, by virtue of his employment by the Company and to assist him in the solicitation, production and servicing of accounts, he will be granted otherwise prohibited access to confidential and proprietary data of the Company which is not known either to its competitors or within the insurance agency and brokerage business generally and which has independent economic value to the Company. This information (hereinafter referred to as "Confidential Information") includes, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques; business, management and personnel strategies; the criteria and formulae used by the Company in pricing its insurance products and claims management, loss control and information management services;

CAL 11/97

the structure and pricing of special insurance packages that the Company has negotiated with various underwriters; lists of prospects; the identity, authority and responsibilities of key contacts at Company accounts; the composition and organization of accounts' businesses; the peculiar risks inherent in their operations; highly sensitive details concerning the structure, conditions and extent of their existing insurance coverages; policy expiration dates; premium amounts; commission rates; risk management service arrangements; loss histories; and other data showing the particularized insurance requirements and preferences of the accounts. The Executive recognizes that this Confidential Information constitutes a valuable property of the Company, developed over a long period of time and at substantial expense. Accordingly, the Executive agrees that he will not, at any time during his employment by the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

Paragraph Six. The Executive recognizes that by virtue of his employment by the Company, he will be afforded numerous and extensive resources to assist him in the solicitation, production and servicing of accounts. The Executive understands and agrees that all efforts that he expends in this regard shall be for the permanent benefit of the Company, that the Company shall secure and retain indefinitely the proprietary interest in all such accounts, and that the Executive will not undertake any action which could in any way disturb the Company's relationship with said accounts.

TERMINATION OF
EMPLOYMENT RELATIONSHIP

Paragraph Seven. The Executive and the Company understand and agree that each has the right, upon fourteen (14) days' written notice (hereinafter referred to as the "Notice Period"), to terminate the employment relationship for any reason whatsoever. The Company may, at its option, pay the Executive for the Notice Period in lieu of active employment during the Notice Period. It is further agreed that Company may terminate such employment without any notice in the event Executive breaches this Agreement, commits any dishonest or fraudulent act or is unable to lawfully perform his duties hereunder.

Paragraph Eight. The Company agrees to continue in effect during the Notice Period the compensation and benefits to which the Executive may be entitled under Paragraphs One, Two and Three of this Agreement. It is understood and agreed that at the expiration of the Notice Period, the Executive's entitlement to the remuneration described in the aforementioned three (3) paragraphs shall cease.

Paragraph Nine. The Executive agrees that during the Notice Period, he will cooperate fully with the Company in all matters relating to the winding up of any pending work and the orderly transfer to other Company employees of the accounts and prospective accounts for which he has most recently been responsible. The Executive further agrees that, during the Notice Period (whether or not active employment continues during the Notice Period), Executive's fiduciary duties to Company shall remain in effect.

Paragraph Ten. The Executive agrees that, prior to the expiration of the Notice Period, he will return to the Company all literature, correspondence, memoranda, reports, summaries,

2

manuals, proposals, contracts and other documents of any kind which relate in any way to the business of the Company, including specifically all materials which comprise or refer to the Company's Confidential Information. It is understood and agreed that the Executive will not retain any copy, facsimile or note intended to memorialize any such data.

Paragraph Eleven. The Executive understands and agrees that, during or at the expiration of the Notice Period, he will attend any meeting the Company may convene to: (i) review the status of accounts for which the Executive has most recently been responsible; (ii) ensure that the Executive has fully obtained his entitlements under this Agreement; and/or (iii) confirm that the Executive clearly understands the nature and scope of his post-employment obligations.

## POST-EMPLOYMENT OBLIGATIONS
## OF THE PARTIES

Paragraph Twelve. The Company agrees that the Executive, upon the termination of his employment, shall be entitled to such severance pay, if any, as may then be provided for under the Company's personnel policies. It is understood and agreed that the Company may, in its discretion, increase both the amount of severance pay due the Executive, and the time period for distributing same.

Paragraph Thirteen.

A.    The Executive recognizes the highly sensitive nature of the Confidential Information to which he will have access during his employment, and acknowledges the Company's legitimate interest in safeguarding same from disclosure. Accordingly, the Executive agrees that, for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not divulge the Company's Confidential Information or make use of it for his own purpose or the purpose of another. In addition, the Executive understands and agrees that for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not, directly or indirectly, solicit, place, accept, aid, counsel or consult in the renewal, discontinuance or replacement of any insurance by, or handle self-insurance programs, insurance claims or other insurance administrative functions for, any existing Company account or any actively solicited prospective account of the Company for which he performed any of the foregoing functions during the two-year period immediately preceding such termination, if the loyal and complete fulfillment of his duties in connection with the performance of any of the foregoing functions would likely call upon the Executive to reveal, make judgments upon, or to otherwise use or divulge any of the Confidential Information or to otherwise violate any provision of this Agreement.

B.    The Executive recognizes that employees of the Company are a valuable resource of the Company. Accordingly, the Executive agrees that, for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not, directly or indirectly, solicit, induce or recruit any employee of the Company to leave the employ of the Company.

3

Paragraph Fourteen. Notwithstanding anything contained herein to the contrary, the Post-Employment obligations of the Executive contained in Paragraph Thirteen shall become null and void and have no further effect immediately upon a Hostile Change in Control of the Corporation as defined herein. The Company shall send written notice to the Executive within ten (10) days of a Hostile Change in Control of the Corporation, notifying the Executive that such event has taken place. Failure of the Company to send such notice shall not preclude the release of the Executive from the Post-Employment Obligations contained in Paragraph Thirteen. For the purposes of this Paragraph Fourteen, the following definitions apply:

A.    The term "Hostile Change in Control" means a transaction, event or election constituting a Change in Control, which was not approved by, or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of the Corporation in office immediately prior to the Change in Control who have not died or become permanently disabled.

B.    The term "Change in Control" of the Corporation means and includes each and all of the following occurrences:

1.    A Business Combination, unless:

(a)    the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of the Corporation and the affirmative vote of the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

(b)    the Continuing Directors of the Corporation by a two-thirds vote (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person, or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

(c)    the Business Combination is solely between this corporation and another corporation, 50% or more of the voting stock of which is owned by the Corporation and none of which is owned by the Related Person; or

(d)    all of the following conditions are satisfied:

(i)    The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in the Corporation in the Business Combination is not less than the higher of:

4

(A)    the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of the Corporation's common stock, or

(B)    an amount that bears that same percentage relationship to the market price of the Corporation's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in (A) above bears to the market price of the Corporation's common stock immediately prior to the commencement of the acquisition of the Corporation's voting stock that caused such Related Person to become a Related Person, or

(C)    an amount calculated by multiplying the earnings per share of the Corporation's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings multiple of the Related Person as of the record date as customarily computed and reported in the financial press.

Appropriate adjustments shall be made with respect to (A), (B) and (C) above for recapitalizations and for stock splits, stock dividends, and like distributions; and

(ii)    A timely mailing shall have been made to the stockholders of the Corporation containing in a prominent place (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors, and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to the fairness from the financial point of view of the terms of the Business Combination to the stockholders of the Corporation other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by the Corporation upon receipt of such opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

2.    The acquisition of outstanding shares of the Corporation's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

3.    Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Corporation shall for any

reason other than death or permanent disability during such period cease to constitute a majority thereof.

4.    A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

C.    The term "Business Combination" shall mean (i) any merger or consolidation of the Corporation or a subsidiary of the Corporation with or into a Related Person, (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets either of the Corporation (including without limitation any voting securities of a subsidiary) or of a subsidiary, to a Related Person, (iii) any merger or consolidation of a Related Person with or into the Corporation or a subsidiary of the Corporation, (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Corporation or a subsidiary of the Corporation, (v) the issuance of any securities of the Corporation or a subsidiary of the Corporation to a Related person, (vi) the acquisition by the Corporation or a subsidiary of the Corporation of any securities issued by a Related Person, (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of the Corporation's voting securities remaining, if there is a Related Person, and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

D.    The term "Related Person" shall mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of the Corporation, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person shall not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of the Corporation on November 1, 1983. Without limitation, any shares of voting stock of the Corporation that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, shall be deemed beneficially owned by the Related Person.

E.    The term "Substantial Part" shall mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

F.    The term "other consideration to be received" shall include, without limitation, capital stock of the Corporation retained by its existing public stockholders in the event of a Business Combination in which the Corporation is the surviving corporation.

G.    The term "Continuing Director" shall mean a director who was a member of the board of directors of the Corporation immediately prior to the time that the Related Person

6

involved in a Business Combination became a Related Person, and the term "Outside Director" shall mean a director who is not (a) an officer or employee of the Corporation or any relative of an officer or employee or (b) a Related Person or an officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

## ENFORCEMENT

Paragraph Fifteen. The Executive and the Company understand and agree that any breach or evasion of any term of this Agreement will give rise to an action for breach of contract, which may be brought in any court of competent jurisdiction.

Paragraph Sixteen. The Executive recognizes that the services provided by him pursuant to this Agreement are of a special, unique and extraordinary character. The Executive further recognizes that a breach of the covenants of Executive set forth in Paragraph Thirteen (A) hereof will result in losses that cannot be reasonably estimated or easily calculated by either Executive or Company and may further result in future losses which cannot be adequately compensated for by damages. In recognition of the foregoing, the Executive agrees that:

A.    In the event of a breach of the covenants of Executive referred to above which results in the loss of a customer or account that produced commission or fee revenues to the Company, Executive shall pay Company, as liquidated damages for, and as a reasonable forecast of, such loss, an amount equal to one hundred thirty-five percent (135%) of such revenues derived by Company attributable to such lost customer or account in the one year immediately preceding the date of breach, payable upon demand by Company;

B.    In the event of a breach of the covenants of Executive referred to above which results in Executive or any person, corporation or other entity affiliated with Executive ("Executive's Affiliates") receiving commission or fee revenues attributable to an actively solicited prospective account of the Company, Executive shall pay Company, as liquidated damages and as received, forty-five percent (45%) of such revenues received by Executive or by Executive's Affiliates during the three (3) year period following the date of the first receipt of such revenues attributable to such prospective account of the Company; and

C.    In the event of a breach or threatened breach of the covenants of Executive referred to above, the Company shall be entitled to equitable relief, including a temporary restraining order and preliminary and permanent injunctive relief to prevent a future breach of such covenants.

Paragraph Seventeen. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

Paragraph Eighteen. The provisions of this Agreement are intended to be interpreted and construed in a manner which makes such provisions valid, legal and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render

7

such provision valid, legal and enforceable. It is expressly understood and agreed between the parties that this modification or restriction may be accomplished by mutual accord between the parties or, alternatively, by disposition of a court of law. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any remaining provisions.

**Paragraph Nineteen.** The Executive understands and agrees that, in the event of his breach of this Agreement, he shall be liable for any attorneys' fees and costs incurred by the Company in enforcing its rights hereunder. The Executive further agrees that, in the event of a breach of the provisions of Paragraph Thirteen, the time period specified in such paragraph shall be extended by the number of days between the date of such breach and the date such breach is enjoined or other relief is granted the Company by a court of competent jurisdiction. It is the intention of the parties that the Company shall enjoy the faithful performance by Executive of the covenants specified in said paragraph for the full time period specified therein.

## MISCELLANEOUS

**Paragraph Twenty.** Except as hereinafter provided, this Agreement supersedes all existing Company policies, and all previous agreements between the parties, to the extent that such policies and agreements consider subject matters herein addressed. Any and all prior covenants entered into by Executive for the benefit of Company and relating to restrictions on Executive's business activities after termination of employment with Company remain in full force and effect. Company, however, agrees that the contingent release of Post-Employment obligations contemplated by Paragraph Fourteen shall apply with like force and effect to any such prior covenants.

**Paragraph Twenty-One.** This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company and may be enforced by any subsidiary of the Company for whom Executive has provided services hereunder.

**Paragraph Twenty-Two.** As used in this Agreement, all terms of masculine gender shall be construed, where appropriate, to be of the feminine gender.

## ACKNOWLEDGEMENT

The Executive and the Company, by its designated representative, hereby acknowledge that they have read and understand each of the provisions of this Agreement, that they have executed

8

his Agreement voluntarily and with full knowledge of its significance, and that they intend to be fully bound by the same.

THE EXECUTIVE

_Brad Chin_ 6/29/98

Witness:

_Lynn J. Wieck_ 6/29/98

ARTHUR J. GALLAGHER & CO.

_Walter J. McClure_
Vice President

Attest:

_Carl E. Fasig_
Carl E. Fasig
Secretary

9

## EXECUTIVE AGREEMENT

This AGREEMENT is made and entered into as of the _26_ day of _April_, 19 _99_, by and between _Dirck R. Stinson_ (hereinafter referred to as the "Executive") and ARTHUR J. GALLAGHER & CO. ("Corporation"), its subsidiaries, divisions and affiliated and related companies (hereinafter collectively referred to as the "Company").

IN CONSIDERATION of the mutual covenants hereinafter made by each party to the other, the Executive and the Company agree as follows:

### EMPLOYMENT AND REMUNERATION

Paragraph One.  The Company agrees to employ and to continue to employ the Executive in accordance with the terms of this Agreement.  Such employment shall include the sales and servicing of accounts and prospective accounts of Company.  Company shall provide Executive with access to the resources and data of the Company to assist Executive in such sales and servicing activities.

Paragraph Two.  The Company agrees that the Executive shall be entitled to the semi-monthly payment of compensation, an annual paid vacation, and various employee benefit plans. It is understood and agreed that the Company may from time to time modify the specific terms and conditions of these entitlements.

Paragraph Three.  The Company agrees that the Executive shall be entitled to reimbursement for traveling, entertainment and other expenses reasonably incurred by the Executive in the performance of his employment obligations and responsibilities.  It is understood and agreed that the Company's liability in this regard shall be limited by the terms and conditions of the Company policy in effect on the date that the expense is incurred.

### FIDUCIARY OBLIGATIONS
### OF THE EXECUTIVE

Paragraph Four.  The Executive agrees to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities.  The Executive further agrees that he will not engage in any activity which conflicts or interferes with, or in any way compromises, his performance of those obligations and responsibilities.

Paragraph Five.  The Executive recognizes that, by virtue of his employment by the Company and to assist him in the solicitation, production and servicing of accounts, he will be granted otherwise prohibited access to confidential and proprietary data of the Company which is not known either to its competitors or within the insurance agency and brokerage business generally and which has independent economic value to the Company.  This information (hereinafter referred to as "Confidential Information") includes, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques; business, management and personnel strategies; the criteria and formulae used by the Company in pricing its insurance products and claims management, loss control and information management services;

the structure and pricing of special insurance packages that the Company has negotiated with various underwriters; lists of prospects; the identity, authority and responsibilities of key contacts at Company accounts; the composition and organization of accounts' businesses; the peculiar risks inherent in their operations; highly sensitive details concerning the structure, conditions and extent of their existing insurance coverages; policy expiration dates; premium amounts; commission rates; risk management service arrangements; loss histories; and other data showing the particularized insurance requirements and preferences of the accounts. The Executive recognizes that this Confidential Information constitutes a valuable property of the Company, developed over a long period of time and at substantial expense. Accordingly, the Executive agrees that he will not, at any time during his employment by the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

Paragraph Six. The Executive recognizes that by virtue of his employment by the Company, he will be afforded numerous and extensive resources to assist him in the solicitation, production and servicing of accounts. The Executive understands and agrees that all efforts that he expends in this regard shall be for the permanent benefit of the Company, that the Company shall secure and retain indefinitely the proprietary interest in all such accounts, and that the Executive will not undertake any action which could in any way disturb the Company's relationship with said accounts.

## TERMINATION OF
## EMPLOYMENT RELATIONSHIP

Paragraph Seven. The Executive and the Company understand and agree that each has the right, upon fourteen (14) days' written notice (hereinafter referred to as the "Notice Period"), to terminate the employment relationship for any reason whatsoever. The Company may, at its option, pay the Executive for the Notice Period in lieu of active employment during the Notice Period. It is further agreed that Company may terminate such employment without any notice in the event Executive breaches this Agreement, commits any dishonest or fraudulent act or is unable to lawfully perform his duties hereunder.

Paragraph Eight. The Company agrees to continue in effect during the Notice Period the compensation and benefits to which the Executive may be entitled under Paragraphs One, Two and Three of this Agreement. It is understood and agreed that at the expiration of the Notice Period, the Executive's entitlement to the remuneration described in the aforementioned three (3) paragraphs shall cease.

Paragraph Nine. The Executive agrees that during the Notice Period, he will cooperate fully with the Company in all matters relating to the winding up of any pending work and the orderly transfer to other Company employees of the accounts and prospective accounts for which he has most recently been responsible. The Executive further agrees that, during the Notice Period (whether or not active employment continues during the Notice Period), Executive's fiduciary duties to Company shall remain in effect.

Paragraph Ten. The Executive agrees that, prior to the expiration of the Notice Period, he will return to the Company all literature, correspondence, memoranda, reports, summaries,

manuals, proposals, contracts and other documents of any kind which relate in any way to the business of the Company, including specifically all materials which comprise or refer to the Company's Confidential Information. It is understood and agreed that the Executive will not retain any copy, facsimile or note intended to memorialize any such data.

Paragraph Eleven. The Executive understands and agrees that, during or at the expiration of the Notice Period, he will attend any meeting the Company may convene to: (i) review the status of accounts for which the Executive has most recently been responsible; (ii) ensure that the Executive has fully obtained his entitlements under this Agreement; and/or (iii) confirm that the Executive clearly understands the nature and scope of his post-employment obligations.

## POST-EMPLOYMENT OBLIGATIONS
## OF THE PARTIES

Paragraph Twelve. The Company agrees that the Executive, upon the termination of his employment, shall be entitled to such severance pay, if any, as may then be provided for under the Company's personnel policies. It is understood and agreed that the Company may, in its discretion, increase both the amount of severance pay due the Executive, and the time period for distributing same.

Paragraph Thirteen.

A.    The Executive recognizes the highly sensitive nature of the Confidential Information to which he will have access during his employment, and acknowledges the Company's legitimate interest in safeguarding same from disclosure. Accordingly, the Executive agrees that, for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not divulge the Company's Confidential Information or make use of it for his own purpose or the purpose of another. In addition, the Executive understands and agrees that for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not, directly or indirectly, solicit, place, accept, aid, counsel or consult in the renewal, discontinuance or replacement of any insurance by, or handle self-insurance programs, insurance claims or other insurance administrative functions for, any existing Company account or any actively solicited prospective account of the Company for which he performed any of the foregoing functions during the two-year period immediately preceding such termination, if the loyal and complete fulfillment of his duties in connection with the performance of any of the foregoing functions would likely call upon the Executive to reveal, make judgments upon, or to otherwise use or divulge any of the Confidential Information or to otherwise violate any provision of this Agreement.

B.    The Executive recognizes that employees of the Company are a valuable resource of the Company. Accordingly, the Executive agrees that, for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not, directly or indirectly, solicit, induce or recruit any employee of the Company to leave the employ of the Company.

3

Paragraph Fourteen.  Notwithstanding anything contained herein to the contrary, the Post-Employment obligations of the Executive contained in Paragraph Thirteen shall become null and void and have no further effect immediately upon a Hostile Change in Control of the Corporation as defined herein.  The Company shall send written notice to the Executive within ten (10) days of a Hostile Change in Control of the Corporation, notifying the Executive that such event has taken place.  Failure of the Company to send such notice shall not preclude the release of the Executive from the Post-Employment Obligations contained in Paragraph Thirteen.  For the purposes of this Paragraph Fourteen, the following definitions apply:

A.   The term "Hostile Change in Control" means a transaction, event or election constituting a Change in Control, which was not approved by, or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of the Corporation in office immediately prior to the Change in Control who have not died or become permanently disabled.

B.   The term "Change in Control" of the Corporation means and includes each and all of the following occurrences:

1.   A Business Combination, unless:

(a)   the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of the Corporation and the affirmative vote of the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

(b)   the Continuing Directors of the Corporation by a two-thirds vote (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person, or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

(c)   the Business Combination is solely between this corporation and another corporation, 50% or more of the voting stock of which is owned by the Corporation and none of which is owned by the Related Person; or

(d)   all of the following conditions are satisfied:

(i)   The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in the Corporation in the Business Combination is not less than the higher of:

4

(A)    the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of the Corporation's common stock, or

(B)    an amount that bears that same percentage relationship to the market price of the Corporation's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in (A) above bears to the market price of the Corporation's common stock immediately prior to the commencement of the acquisition of the Corporation's voting stock that caused such Related Person to become a Related Person, or

(C)    an amount calculated by multiplying the earnings per share of the Corporation's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings multiple of the Related Person as of the record date as customarily computed and reported in the financial press.

Appropriate adjustments shall be made with respect to (A), (B) and (C) above for recapitalizations and for stock splits, stock dividends, and like distributions; and

(ii)    A timely mailing shall have been made to the stockholders of the Corporation containing in a prominent place (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors, and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to the fairness from the financial point of view of the terms of the Business Combination to the stockholders of the Corporation other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by the Corporation upon receipt of such opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

2.    The acquisition of outstanding shares of the Corporation's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

3.    Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Corporation shall for any

5

reason other than death or permanent disability during such period cease to constitute a majority thereof.

4.    A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

C.    The term "Business Combination" shall mean (i) any merger or consolidation of the Corporation or a subsidiary of the Corporation with or into a Related Person, (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets either of the Corporation (including without limitation any voting securities of a subsidiary) or of a subsidiary, to a Related Person, (iii) any merger or consolidation of a Related Person with or into the Corporation or a subsidiary of the Corporation, (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Corporation or a subsidiary of the Corporation, (v) the issuance of any securities of the Corporation or a subsidiary of the Corporation to a Related person, (vi) the acquisition by the Corporation or a subsidiary of the Corporation of any securities issued by a Related Person, (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of the Corporation's voting securities remaining, if there is a Related Person, and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

D.    The term "Related Person" shall mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of the Corporation, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person shall not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of the Corporation on November 1, 1983. Without limitation, any shares of voting stock of the Corporation that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, shall be deemed beneficially owned by the Related Person.

E.    The term "Substantial Part" shall mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

F.    The term "other consideration to be received" shall include, without limitation, capital stock of the Corporation retained by its existing public stockholders in the event of a Business Combination in which the Corporation is the surviving corporation.

G.    The term "Continuing Director" shall mean a director who was a member of the board of directors of the Corporation immediately prior to the time that the Related Person

involved in a Business Combination became a Related Person, and the term "Outside Director" shall mean a director who is not (a) an officer or employee of the Corporation or any relative of an officer or employee or (b) a Related Person or an officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

## ENFORCEMENT

Paragraph Fifteen. The Executive and the Company understand and agree that any breach or evasion of any term of this Agreement will give rise to an action for breach of contract, which may be brought in any court of competent jurisdiction.

Paragraph Sixteen. The Executive recognizes that the services provided by him pursuant to this Agreement are of a special, unique and extraordinary character. The Executive further recognizes that a breach of the covenants of Executive set forth in Paragraph Thirteen (A) hereof will result in losses that cannot be reasonably estimated or easily calculated by either Executive or Company and may further result in future losses which cannot be adequately compensated for by damages. In recognition of the foregoing, the Executive agrees that:

A.    In the event of a breach of the covenants of Executive referred to above which results in the loss of a customer or account that produced commission or fee revenues to the Company, Executive shall pay Company, as liquidated damages for, and as a reasonable forecast of, such loss, an amount equal to one hundred thirty-five percent (135%) of such revenues derived by Company attributable to such lost customer or account in the one year immediately preceding the date of breach, payable upon demand by Company;

B.    In the event of a breach of the covenants of Executive referred to above which results in Executive or any person, corporation or other entity affiliated with Executive ("Executive's Affiliates") receiving commission or fee revenues attributable to an actively solicited prospective account of the Company, Executive shall pay Company, as liquidated damages and as received, forty-five percent (45%) of such revenues received by Executive or by Executive's Affiliates during the three (3) year period following the date of the first receipt of such revenues attributable to such prospective account of the Company; and

C.    In the event of a breach or threatened breach of the covenants of Executive referred to above, the Company shall be entitled to equitable relief, including a temporary restraining order and preliminary and permanent injunctive relief to prevent a future breach of such covenants.

Paragraph Seventeen. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

Paragraph Eighteen. The provisions of this Agreement are intended to be interpreted and construed in a manner which makes such provisions valid, legal and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render

7

such provision valid, legal and enforceable. It is expressly understood and agreed between the parties that this modification or restriction may be accomplished by mutual accord between the parties or, alternatively, by disposition of a court of law. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any remaining provisions.

Paragraph Nineteen. The Executive understands and agrees that, in the event of his breach of this Agreement, he shall be liable for any attorneys' fees and costs incurred by the Company in enforcing its rights hereunder. The Executive further agrees that, in the event of a breach of the provisions of Paragraph Thirteen, the time period specified in such paragraph shall be extended by the number of days between the date of such breach and the date such breach is enjoined or other relief is granted the Company by a court of competent jurisdiction. It is the intention of the parties that the Company shall enjoy the faithful performance by Executive of the covenants specified in said paragraph for the full time period specified therein.

## MISCELLANEOUS

Paragraph Twenty. Except as hereinafter provided, this Agreement supersedes all existing Company policies, and all previous agreements between the parties, to the extent that such policies and agreements consider subject matters herein addressed. Any and all prior covenants entered into by Executive for the benefit of Company and relating to restrictions on Executive's business activities after termination of employment with Company remain in full force and effect. Company, however, agrees that the contingent release of Post-Employment obligations contemplated by Paragraph Fourteen shall apply with like force and effect to any such prior covenants.

Paragraph Twenty-One. This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company and may be enforced by any subsidiary of the Company for whom Executive has provided services hereunder.

Paragraph Twenty-Two. As used in this Agreement, all terms of masculine gender shall be construed, where appropriate, to be of the feminine gender.

## ACKNOWLEDGEMENT

The Executive and the Company, by its designated representative, hereby acknowledge that they have read and understand each of the provisions of this Agreement, that they have executed

his Agreement voluntarily and with full knowledge of its significance, and that they intend to be fully bound by the same.

THE EXECUTIVE

ARTHUR J. GALLAGHER & CO.

Vice President

Witness:

Attest:

Christine D. Greb

~~Carl E. Fasig~~

Asst. Secretary

9

## EXECUTIVE AGREEMENT

This AGREEMENT is made and entered into as of the 3ᵈ day of _April_ , 20 DL , by and between _PAUL H WAGENER_ (hereinafter referred to as the "Executive") and ARTHUR J. GALLAGHER & CO. ("Corporation"), its subsidiaries, divisions and affiliated and related companies (hereinafter collectively referred to as the "Company").

IN CONSIDERATION of the mutual covenants hereinafter made by each party to the other, the Executive and the Company agree as follows:

## EMPLOYMENT AND REMUNERATION

**Paragraph One.** The Company agrees to employ and to continue to employ the Executive in accordance with the terms of this Agreement. Such employment shall include the sales and servicing of accounts and prospective accounts of Company. Company shall provide Executive with access to the resources and data of the Company to assist Executive in such sales and servicing activities.

**Paragraph Two.** The Company agrees that the Executive shall be entitled to the semi-monthly payment of compensation and, to the extent provided for in accordance with Company policy, the following: an annual paid vacation, and various employee benefit plans. It is understood and agreed that the Company may from time to time modify the specific terms and conditions of these entitlements.

**Paragraph Three.** The Company agrees that the Executive shall be entitled to reimbursement for traveling, entertainment and other expenses reasonably incurred by the Executive in the performance of his employment obligations and responsibilities. It is understood and agreed that the Company's liability in this regard shall be limited by the terms and conditions of the Company policy in effect on the date that the expense is incurred.

## FIDUCIARY OBLIGATIONS
## OF THE EXECUTIVE

**Paragraph Four.** The Executive agrees to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities. The Executive further agrees that he will not engage in any activity which conflicts or interferes with, or in any way compromises, his performance of those obligations and responsibilities.

**Paragraph Five.** The Executive recognizes that, by virtue of his employment by the Company and to assist him in the solicitation, production and servicing of accounts, he will be granted otherwise prohibited access to confidential and proprietary data of the Company which is not known either to its competitors or within the insurance agency and brokerage business generally and which has independent economic value to the Company. This information (hereinafter referred to as "Confidential Information") includes, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques; retirement plan consulting, variable annuities, and fund investment business and related products and services; business, management and personnel strategies; the criteria and formulae used by the

Company in pricing its insurance and benefits products and claims management, loss control and information management services; the structure and pricing of special insurance packages that the Company has negotiated with various underwriters; lists of prospects; the identity, authority and responsibilities of key contacts at Company accounts; the composition and organization of accounts' businesses; the peculiar risks inherent in their operations; highly sensitive details concerning the structure, conditions and extent of their existing insurance coverages; policy expiration dates; premium amounts; commission rates; risk management service arrangements; loss histories; and other data showing the particularized insurance requirements and preferences of the accounts. The Executive recognizes that this Confidential Information constitutes a valuable property of the Company, developed over a long period of time and at substantial expense. Accordingly, the Executive agrees that he will not, at any time during his employment by the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

Paragraph Six. The Executive recognizes that by virtue of his employment by the Company, he will be afforded numerous and extensive resources to assist him in the solicitation, production and servicing of accounts. The Executive understands and agrees that all efforts that he expends in this regard shall be for the permanent benefit of the Company, that the Company shall secure and retain indefinitely the proprietary interest in all such accounts, and that the Executive will not undertake any action which could in any way disturb the Company's relationship with said accounts. The Executive agrees that all intellectual property such as computer programs, systems or software developed during his employment or as a result of his employment is work for hire performed by the Executive in the scope of his employment. The Company shall retain all proprietary rights to any and all such intellectual property. Executive agrees to execute any documents necessary to perfect Company's interest in such intellectual property upon Company's request.

## TERMINATION OF
## EMPLOYMENT RELATIONSHIP

Paragraph Seven. The Executive and the Company understand and agree that each has the right, upon fourteen (14) days' written notice (hereinafter referred to as the "Notice Period"), to terminate the employment relationship for any reason whatsoever. The Company may, at its option, pay the Executive for the Notice Period in lieu of active employment during the Notice Period. It is further agreed that Company may terminate such employment without any notice in the event Executive breaches this Agreement, commits any dishonest or fraudulent act or is unable to lawfully perform his duties hereunder.

Paragraph Eight. The Company agrees to continue in effect during the Notice Period the compensation and benefits to which the Executive may be entitled under Paragraphs One, Two and Three of this Agreement. It is understood and agreed that at the expiration of the Notice Period, the Executive's entitlement to the remuneration described in the aforementioned three (3) paragraphs shall cease.

Paragraph Nine. The Executive agrees that during the Notice Period, he will cooperate fully with the Company in all matters relating to the winding up of any pending work and the orderly transfer to other Company employees of the accounts and prospective accounts for which he has most recently been responsible. The Executive further agrees that, during the Notice Period (whether or not active

2

employment continues during the Notice Period), Executive's fiduciary duties to Company shall remain in effect.

  **Paragraph Ten.** The Executive agrees that, prior to the expiration of the Notice Period, he will return to the Company all literature, correspondence, memoranda, reports, summaries, manuals, proposals, contracts and other documents of any kind which relate in any way to the business of the Company, including specifically all materials which comprise or refer to the Company's Confidential Information. It is understood and agreed that the Executive will not retain any copy, facsimile or note intended to memorialize any such data.

  **Paragraph Eleven.** The Executive understands and agrees that, during or at the expiration of the Notice Period, he will attend any meeting the Company may convene to: (i) review the status of accounts for which the Executive has most recently been responsible; (ii) ensure that the Executive has fully obtained his entitlements under this Agreement; and/or (iii) confirm that the Executive clearly understands the nature and scope of his post-employment obligations.

## POST-EMPLOYMENT OBLIGATIONS
## OF THE PARTIES

  **Paragraph Twelve.** The Company agrees that the Executive, upon the termination of his employment, shall be entitled to such severance pay, if any, as may then be provided for under the Company's personnel policies. It is understood and agreed that the Company may, in its discretion, increase both the amount of severance pay due the Executive, and the time period for distributing same.

  **Paragraph Thirteen.**

  A. The Executive recognizes the highly sensitive nature of the Confidential Information to which he will have access during his employment, and acknowledges the Company's legitimate interest in safeguarding same from disclosure. Accordingly, the Executive agrees that, for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not divulge the Company's Confidential Information or make use of it for his own purpose or the purpose of another. In addition, the Executive understands and agrees that for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not (i) directly or indirectly, solicit, place, accept, aid, counsel or consult in the renewal, discontinuance or replacement of any insurance or reinsurance by, or handle self-insurance programs, insurance claims or other insurance administrative functions ("insurance services") for, any existing Company account or any actively solicited prospective account of the Company for which he performed any of the foregoing functions during the two-year period immediately preceding such termination or (ii) provide any employee benefit brokerage, consulting, or administration services, in the areas of group insurance, defined benefit and defined contribution pension plans, individual life, disability and capital accumulation products, and all other employee benefit areas ("benefit services") the Company is involved with, for any existing Company account or any actively solicited prospective account of the Company for which he performed any of the foregoing functions during the two-year period immediately preceding such termination, if the loyal and complete fulfillment of his duties in connection with the performance of any of the foregoing functions would likely call upon the

3

Executive to reveal, make judgments upon, or to otherwise use or divulge any of the Confidential Information or to otherwise violate any provision of this Agreement. The term Company account as used in this paragraph shall be construed broadly to include all users of insurance services or benefit services including commercial and individual consumers, risk managers, carriers, agents and other insurance intermediaries.

B.    The Executive recognizes that employees of the Company are a valuable resource of the Company. Accordingly, the Executive agrees that, for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not, directly or indirectly, solicit, induce or recruit any employee of the Company to leave the employ of the Company.

**Paragraph Fourteen.** Notwithstanding anything contained herein to the contrary, the Post-Employment obligations of the Executive contained in Paragraph Thirteen shall become null and void and have no further effect immediately upon a Hostile Change in Control of the Corporation as defined herein. The Company shall send written notice to the Executive within ten (10) days of a Hostile Change in Control of the Corporation, notifying the Executive that such event has taken place. Failure of the Company to send such notice shall not preclude the release of the Executive from the Post-Employment Obligations contained in Paragraph Thirteen. For the purposes of this Paragraph Fourteen, the following definitions apply:

A.    The term "Hostile Change in Control" means a transaction, event or election constituting a Change in Control, which was not approved by, or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of the Corporation in office immediately prior to the Change in Control who have not died or become permanently disabled.

B.    The term "Change in Control" of the Corporation means and includes each and all of the following occurrences:

1.    A Business Combination, unless:

(a)    the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of the Corporation and the affirmative vote of the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

(b)    the Continuing Directors of the Corporation by a two-thirds vote (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person, or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

(c)    the Business Combination is solely between this corporation and another corporation, 50% or more of the voting stock of which is owned by the Corporation and none of which is owned by the Related Person; or

4

(d)    all of the following conditions are satisfied:

(i)    The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in the Corporation in the Business Combination is not less than the higher of:

(A)    the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of the Corporation's common stock, or

(B)    an amount that bears that same percentage relationship to the market price of the Corporation's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in (A) above bears to the market price of the Corporation's common stock immediately prior to the commencement of the acquisition of the Corporation's voting stock that caused such Related Person to become a Related Person, or

(C)    an amount calculated by multiplying the earnings per share of the Corporation's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings multiple of the Related Person as of the record date as customarily computed and reported in the financial press.

Appropriate adjustments shall be made with respect to (A), (B) and (C) above for recapitalizations and for stock splits, stock dividends, and like distributions; and

(ii)    A timely mailing shall have been made to the stockholders of the Corporation containing in a prominent place (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors, and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to the fairness from the financial point of view of the terms of the Business Combination to the stockholders of the Corporation other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by the Corporation upon receipt of such opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

2.    The acquisition of outstanding shares of the Corporation's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

5

3.    Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Corporation shall for any reason other than death or permanent disability during such period cease to constitute a majority thereof.

4.    A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

C.    The term "Business Combination" shall mean (i) any merger or consolidation of the Corporation or a subsidiary of the Corporation with or into a Related Person, (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets either of the Corporation (including without limitation any voting securities of a subsidiary) or of a subsidiary, to a Related Person, (iii) any merger or consolidation of a Related Person with or into the Corporation or a subsidiary of the Corporation, (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Corporation or a subsidiary of the Corporation, (v) the issuance of any securities of the Corporation or a subsidiary of the Corporation to a Related person, (vi) the acquisition by the Corporation or a subsidiary of the Corporation of any securities issued by a Related Person, (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of the Corporation's voting securities remaining, if there is a Related Person, and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

D.    The term "Related Person" shall mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of the Corporation, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person shall not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of the Corporation on November 1, 1983. Without limitation, any shares of voting stock of the Corporation that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, shall be deemed beneficially owned by the Related Person.

E.    The term "Substantial Part" shall mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

F.    The term "other consideration to be received" shall include, without limitation, capital stock of the Corporation retained by its existing public stockholders in the event of a Business Combination in which the Corporation is the surviving corporation.

G.    The term "Continuing Director" shall mean a director who was a member of the board of directors of the Corporation immediately prior to the time that the Related Person involved in a

6

Business Combination became a Related Person, and the term "Outside Director" shall mean a director who is not (a) an officer or employee of the Corporation or any relative of an officer or employee or (b) a Related Person or an officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

## ENFORCEMENT

**Paragraph Fifteen.** The Executive and the Company understand and agree that any breach or evasion of any term of this Agreement will give rise to an action for breach of contract, which may be brought in any court of competent jurisdiction.

**Paragraph Sixteen.** The Executive recognizes that the services provided by him pursuant to this Agreement are of a special, unique and extraordinary character. The Executive further recognizes that a breach of the covenants of Executive set forth in Paragraph Thirteen (A) hereof will result in losses that cannot be reasonably estimated or easily calculated by either Executive or Company and may further result in future losses which cannot be adequately compensated for by damages. In recognition of the foregoing, the Executive agrees that:

A.     In the event of a breach of the covenants of Executive referred to above which results in the loss of a customer or account that produced commission or fee revenues to the Company, Executive shall pay Company, as liquidated damages for, and as a reasonable forecast of, such loss, an amount equal to one hundred thirty-five percent (135%) of such revenues derived by Company attributable to such lost customer or account in the one year immediately preceding the date of breach, payable upon demand by Company;

B.     In the event of a breach of the covenants of Executive referred to above which results in Executive or any person, corporation or other entity affiliated with Executive ("Executive's Affiliates") receiving commission or fee revenues attributable to an actively solicited prospective account of the Company, Executive shall pay Company, as liquidated damages and as received, forty-five percent (45%) of such revenues received by Executive or by Executive's Affiliates during the three (3) year period following the date of the first receipt of such revenues attributable to such prospective account of the Company; and

C.     In the event of a breach or threatened breach of the covenants of Executive referred to above, the Company shall be entitled to equitable relief, including a temporary restraining order and preliminary and permanent injunctive relief to prevent a future breach of such covenants.

**Paragraph Seventeen.** This Agreement shall be governed by and construed in accordance with the laws of the State of California.

**Paragraph Eighteen.** The provisions of this Agreement are intended to be interpreted and construed in a manner which makes such provisions valid, legal and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render such provision valid, legal and enforceable. It is expressly understood and agreed between the parties that this modification or restriction

7

may be accomplished by mutual accord between the parties or, alternatively, by disposition of a court of law. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any remaining provisions.

**Paragraph Nineteen.** The Executive understands and agrees that, in the event of his breach of this Agreement, he shall be liable for any attorneys' fees and costs incurred by the Company in enforcing its rights hereunder. The Executive further agrees that, in the event of a breach of the provisions of Paragraph Thirteen, the time period specified in such paragraph shall be extended by the number of days between the date of such breach and the date such breach is enjoined or other relief is granted the Company by a court of competent jurisdiction. It is the intention of the parties that the Company shall enjoy the faithful performance by Executive of the covenants specified in said paragraph for the full time period specified therein.

## MISCELLANEOUS

**Paragraph Twenty.** Except as hereinafter provided, this Agreement supersedes all existing Company policies, and all previous agreements between the parties, to the extent that such policies and agreements consider subject matters herein addressed. Any and all prior covenants entered into by Executive for the benefit of Company and relating to restrictions on Executive's business activities after termination of employment with Company remain in full force and effect. Company, however, agrees that the contingent release of Post-Employment obligations contemplated by Paragraph Fourteen shall apply with like force and effect to any such prior covenants.

**Paragraph Twenty-One.** This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company and may be enforced by any subsidiary of the Company for whom Executive has provided services hereunder.

**Paragraph Twenty-Two.** As used in this Agreement, all terms of masculine gender shall be construed, where appropriate, to be of the feminine gender.

## ACKNOWLEDGEMENT

The Executive and the Company, by its designated representative, hereby acknowledge that they have read and understand each of the provisions of this Agreement, that they have executed this Agreement voluntarily and with full knowledge of its significance, and that they intend to be fully bound by the same.

THE EXECUTIVE                                   ARTHUR J. GALLAGHER & CO.

_____                         _____
                                                Vice President

Witness:                                        Attest:

_____                         Christine D. Greb
                                                Secretary/Assistant Secretary

8

## EXECUTIVE AGREEMENT

This AGREEMENT is made and entered into as of the 21st day of June _____, 19 93 by and between ___Robert Harrison Watkins___ (hereinafter referred to as the "Executive") and ARTHUR J. GALLAGHER & CO. ("Corporation"), its subsidiaries, divisions and affiliated and related companies (hereinafter collectively referred to as the "Company").

IN CONSIDERATION of the mutual covenants hereinafter made by each party to the other, the Executive and the Company agree as follows:

### EMPLOYMENT AND REMUNERATION

**Paragraph One.** The Company agrees to employ and to continue to employ the Executive in accordance with the terms of this Agreement.

**Paragraph Two.** The Company agrees that the Executive shall be entitled to the bi-monthly payment of compensation, an annual paid vacation, health and life insurance coverage, sickness and accident benefits, coverage under a pension plan, and the opportunity to participate in a Company-sponsored profit sharing plan. It is understood and agreed that the Company may from time to time modify the specific terms and conditions of these entitlements.

**Paragraph Three.** The Company agrees that the Executive shall be entitled to reimbursement for traveling, entertainment and other expenses reasonably incurred by the Executive in the performance of his employment obligations and responsibilities. It is understood and agreed that the Company's liability in this regard shall be limited by the terms and conditions of the Company policy in effect on the date that the expense is incurred.

### FIDUCIARY OBLIGATIONS
### OF THE EXECUTIVE

**Paragraph Four.** The Executive agrees to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities. The Executive further agrees that he will not engage in any activity which conflicts or interferes with, or in any way compromises, his performance of those obligations and responsibilities.

**Paragraph Five.** The Executive recognizes that by virtue of his employment by the Company, he will be granted otherwise prohibited access to confidential and proprietary data of the Company which is not known either to its competitors or within the insurance agency and brokerage business generally and which has independent economic value to the Company. This information (hereinafter referred to as "Confidential Information") includes, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques; business, management and personnel strategies; the criteria and formulae used by the Company in pricing its insurance products and claims management, loss control and information management services; the structure and pricing

CAL 172

of special insurance packages that the Company has negotiated with various underwriters; lists of prospects compiled by the Company's management and research staff; the identity, authority and responsibilities of key contacts at Company accounts; the composition and organization of accounts' businesses; the peculiar risks inherent in their operations; highly sensitive details concerning the structure, conditions and extent of their existing insurance coverages; policy expiration dates; premium amounts; commission rates; risk management service arrangements; loss histories; and other data showing the particularized insurance requirements and preferences of the accounts. The Executive recognizes that this Confidential Information constitutes a valuable property of the Company, developed over a long period of time and at substantial expense. Accordingly, the Executive agrees that he will not, at any time during his employment by the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

Paragraph Six. The Executive recognizes that by virtue of his employment by the Company, he will be afforded numerous and extensive resources to assist him in the solicitation, production and servicing of accounts. The Executive understands and agrees that all efforts that he expends in this regard shall be for the permanent benefit of the Company, that the Company shall secure and retain indefinitely the proprietary interest in all such accounts, and that the Executive will not undertake any action which could in any way disturb the Company's relationship with said accounts.

## TERMINATION OF
## EMPLOYMENT RELATIONSHIP

Paragraph Seven. The Executive and the Company understand and agree that each has the right, upon fourteen (14) days' written notice (hereinafter referred to as the "Notice Period"), to terminate the employment relationship for any reason whatsoever. The Company may, at its option, pay the Executive for the Notice Period in lieu of active employment during the Notice Period. It is understood and agreed that a party's exercise of its rights under this paragraph shall be without prejudice to any other right or remedy which it may have at law, in equity, or under this Agreement, including, without limitation, the Company's right to terminate such employment without notice for cause.

Paragraph Eight. The Company agrees to continue in effect during the Notice Period the compensation and benefits to which the Executive may be entitled under Paragraphs One, Two and Three of this Agreement. It is understood and agreed that at the expiration of the Notice Period, the Executive's entitlement to the remuneration described in the aforementioned three (3) paragraphs shall cease.

Paragraph Nine. The Executive agrees that during the Notice Period, he will cooperate fully with the Company in all matters relating to the winding up of any pending work and the orderly transfer to other Company employees of the accounts for which he has most recently been responsible.

Paragraph Ten. The Executive agrees that, prior to the expiration of the Notice Period, he will return to the Company all literature, correspondence, memoranda, reports, summaries, manuals, proposals, contracts and other documents of any kind which relate in

2

any way to the business of the Company, including specifically all materials which comprise or refer to the Company's Confidential Information. It is understood and agreed that the Executive will not retain any copy, facsimile or note intended to memorialize any such data.

Paragraph Eleven. The Executive understands and agrees that, at or about the expiration of the Notice Period, the Company may convene an exit interview to review the status of accounts for which the Executive has most recently been responsible; ensure that the Executive has fully obtained his entitlements under this Agreement; and/or confirm that the Executive clearly understands the nature and scope of his post-employment obligations.

## POST-EMPLOYMENT OBLIGATIONS
## OF THE PARTIES

Paragraph Twelve. The Company agrees that the Executive, upon the termination of his employment, shall be entitled to such severance pay, if any, as may then be provided for under the Company's Personnel Manual. It is understood and agreed that the Company may, in its discretion, increase both the amount of severance pay due the Executive, and the time period for distributing same.

Paragraph Thirteen.

A.    The Executive recognizes the highly sensitive nature of the Confidential Information to which he will have access during his employment, and acknowledges the Company's legitimate interest in safeguarding same from disclosure. Accordingly, the Executive agrees that, for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not divulge the Company's Confidential Information or make use of it for his own purpose or the purpose of another. In addition, the Executive understands and agrees that for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not, directly or indirectly, solicit, place, accept, aid, counsel or consult in the renewal, discontinuance or replacement of any insurance by, or handle self-insurance programs, insurance claims or other insurance administrative functions for, any existing Company account or any actively solicited prospective account of the Company for which he performed any of the foregoing functions during the two-year period immediately preceding such termination, if the loyal and complete fulfillment of his duties in connection with the performance of any of the foregoing functions would likely call upon the Executive to reveal, make judgments upon, or to otherwise use or divulge any of the Confidential Information or to otherwise violate any provision of this Agreement.

B.    The Executive recognizes that employees of the Company are a valuable resource of the Company. Accordingly, the Executive agrees that, for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not, directly or indirectly, solicit, induce or recruit any employee of the Company to leave the employ of the Company.

3

**Paragraph Fourteen.** Notwithstanding anything contained herein to the contrary, the Post-Employment obligations of the Executive contained in Paragraph Thirteen shall become null and void and have no further effect immediately upon a Hostile Change in Control of the Corporation as defined herein. The Company shall send written notice to the Executive within ten (10) days of a Hostile Change in Control of the Corporation, notifying the Executive that such event has taken place. Failure of the Company to send such notice shall not preclude the release of the Executive from the Post-Employment Obligations contained in Paragraph Thirteen. For the purposes of this Paragraph Fourteen, the following definitions apply:

A.    The term "Hostile Change in Control" means a transaction, event or election constituting a Change in Control, which was not approved by, or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of the Corporation in office immediately prior to the Change in Control who have not died or become permanently disabled.

B.    The term "Change in Control" of the Corporation means and includes each and all of the following occurrences:

1.    A Business Combination, unless:

(a)    the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of the Corporation and the affirmative vote of the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

(b)    the Continuing Directors of the Corporation by a two-thirds vote (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person, or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

(c)    the Business Combination is solely between this corporation and another corporation, 50% or more of the voting stock of which is owned by the Corporation and none of which is owned by the Related Person; or

(d)    all of the following conditions are satisfied:

(i)    The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in the Corporation in the Business Combination is not less than the higher of:

4

(A)    the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of the Corporation's common stock, or

(B)    an amount that bears that same percentage relationship to the market price of the Corporation's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in (A) above bears to the market price of the Corporation's common stock immediately prior to the commencement of the acquisition of the Corporation's voting stock that caused such Related Person to become a Related Person, or

(C)    an amount calculated by multiplying the earnings per share of the Corporation's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings multiple of the Related Person as of the record date as customarily computed and reported in the financial press.

Appropriate adjustments shall be made with respect to (A), (B) and (C) above for recapitalizations and for stock splits, stock dividends, and like distributions; and

(ii)    A timely mailing shall have been made to the stockholders of the Corporation containing in a prominent place (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors, and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to the fairness from the financial point of view of the terms of the Business Combination to the stockholders of the Corporation other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by the Corporation upon receipt of such opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

2.    The acquisition of outstanding shares of the Corporation's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

3.    Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Corporation shall for any

5

reason other than death or permanent disability during such period cease to constitute a majority thereof.

4.    A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

C.    The term "Business Combination" shall mean (i) any merger or consolidation of the Corporation or a subsidiary of the Corporation with or into a Related Person, (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets either of the Corporation (including without limitation any voting securities of a subsidiary) or of a subsidiary, to a Related Person, (iii) any merger or consolidation of a Related Person with or into the Corporation or a subsidiary of the Corporation, (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Corporation or a subsidiary of the Corporation, (v) the issuance of any securities of the Corporation or a subsidiary of the Corporation to a Related person, (vi) the acquisition by the Corporation or a subsidiary of the Corporation of any securities issued by a Related Person, (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of the Corporation's voting securities remaining, if there is a Related Person, and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

D.    The term "Related Person" shall mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of the Corporation, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person shall not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of the Corporation on November 1, 1983. Without limitation, any shares of voting stock of the Corporation that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, shall be deemed beneficially owned by the Related Person.

E.    The term "Substantial Part" shall mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

F.    The term "other consideration to be received" shall include, without limitation, capital stock of the Corporation retained by its existing public stockholders in the event of a Business Combination in which the Corporation is the surviving corporation.

6

G.    The term "Continuing Director" shall mean a director who was a member of the board of directors of the Corporation immediately prior to the time that the Related Person involved in a Business Combination became a Related Person, and the term "Outside Director" shall mean a director who is not (a) an officer or employee of the Corporation or any relative of an officer or employee or (b) a Related Person or an officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

## ENFORCEMENT

Paragraph Fifteen. The Executive and the Company understand and agree that any breach or evasion of any term of this Agreement will give rise to an action for breach of contract, which may be brought in any court of competent jurisdiction.

Paragraph Sixteen. The Executive recognizes that the rights and privileges granted to him by this Agreement, his services and his corresponding covenants to the Company, are of a special, unique and extraordinary character, the loss of which cannot reasonably or adequately be compensated for in damages in any action at law or through the offset or withholding of any monies to which he otherwise might be entitled from the Company. Accordingly, the Executive understands and agrees that the Company shall be entitled to equitable relief, including a temporary restraining order and preliminary and permanent injunctive relief, to prevent a breach of this Agreement.

Paragraph Seventeen. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

Paragraph Eighteen.    The provisions of this Agreement are intended to be interpreted and construed in a manner which makes such provisions valid, legal and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render such provision valid, legal and enforceable. It is expressly understood and agreed between the parties that this modification or restriction may be accomplished by mutual accord between the parties or, alternatively, by disposition of a court of law. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any remaining provisions.

Paragraph Nineteen. The Executive understands and agrees that, in the event of his breach of this Agreement, he shall be liable for any attorneys' fees and costs incurred by the Company in enforcing its rights hereunder. The Executive further agrees that, in the event of a breach of the provisions of Paragraph Thirteen, the time period specified in such paragraph shall be extended by the number of days between the date of such breach and the date such breach is enjoined or other relief is granted the Company by a court of competent jurisdiction. It is the intention of the parties that the Company shall enjoy the faithful performance by Executive of the covenants specified in said paragraph for the full time period specified therein.

7

## MISCELLANEOUS

**Paragraph Twenty.** Except as hereinafter provided, this Agreement supersedes all existing Company policies, and all previous agreements between the parties, to the extent that such policies and agreements consider subject matters herein addressed. Any and all prior covenants entered into by Executive for the benefit of Company and relating to restrictions on Executive's business activities after termination of employment with Company remain in full force and effect. Company, however, agrees that the contingent release of Post-Employment obligations contemplated by Paragraph Fifteen shall apply with like force and effect to any such prior covenants.

**Paragraph Twenty-One.** This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company and may be enforced by any subsidiary of the Company for whom Executive has provided services hereunder.

**Paragraph Twenty-Two.** As used in this Agreement, all terms of masculine gender shall be construed, where appropriate, to be of the feminine gender.

## ACKNOWLEDGEMENT

The Executive and the Company, by its designated representative, hereby acknowledge that they have read and understand each of the provisions of this Agreement, that they have executed this Agreement voluntarily and with full knowledge of its significance, and that they intend to be fully bound by the same.

THE EXECUTIVE                                    ARTHUR J. GALLAGHER & CO.

_____                          _____
                                                 Vice President

Witness:                                         Attest:

_____                          _____
                                                 Carl E. Fasig
                                                 Assistant Secretary

8