| | |
|---|---|
| 1 | PAUL, HASTINGS, JANOFSKY & WALKER LLP |
| | BRADFORD K. NEWMAN (SB# 178902) |
| 2 | bradfordnewman@paulhastings.com |
| | STEPHEN N. YANG (SB# 142474) |
| 3 | stephenyang@paulhastings.com |
| | SARJU A. NARAN (SB# 215410) |
| 4 | sarjunaran@paulhastings.com |
| | SHANNON S. SEVEY (SB# 229319) |
| 5 | shannonsevey@paulhastings.com |
| | 1117 S. California Avenue |
| 6 | Palo Alto, CA 94304-1106 |
| | Telephone: (650) 320-1800 |
| 7 | Facsimile: (650) 320-1900 |
| 8 | Attorneys for Plaintiffs |
| | Arthur J. Gallagher & Co., Inc. & |
| 9 | Arthur J. Gallagher & Co. Insurance Brokers of California, Inc. |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ARTHUR J. GALLAGHER & CO., Inc., a Delaware Corporation, et al., | CASE NO. 3:07-CV-06418-JSW |
| Plaintiffs, | **SUPPLEMENTAL DECLARATION OF JON A. BERRYHILL IN SUPPORT OF REPLY BRIEF RE PLAINTIFF ARTHUR J. GALLAGHER & CO., INC.'S MOTION FOR TEMPORARY RESTRAINING ORDER, EVIDENCE PRESERVATION ORDER, EXPEDITED DISCOVERY ORDER, AND ORDER TO SHOW CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION** |
| vs. | |
| EDGEWOOD PARTNERS INSURANCE CENTER, a California corporation; et al., | |
| Defendants. | |

**REDACTED**

Case No. 3:07-CV-06418-JSW      DECLARATION OF JON A. BERRYHILL

I, Jon A. Berryhill, declare:

1. The facts set forth in this declaration are based on my personal knowledge and if called as a witness I could and would testify thereto.

2. I have reviewed the Declarations of Ryan A. Pittman, George Petty, Eric Chua, Shandranette Middleton, Jim Halblieb, Laurie Martin, and Robert Harrison Watkins submitted by EPIC in this action. In my opinion as an expert forensic examiner, each of the above declarations lend further support for the position set forth in my initial declaration in this action, that it is important to gain early and immediate discovery into all computers and electronic storage devices belonging to the former Gallagher employees for whom I have conducted any forensic analysis thus far, in order to prevent further destruction of valuable evidence and to determine the full extent of the former Gallagher employees' conduct.

3. **Shandranette Middleton**

Ms. Middleton admits to the conduct described in my initial declaration based on forensic examination of her assigned computer. (See Middleton Decl., ¶ 5.) Specifically, she testifies to attaching a USB thumb drive to her computer on December 7, 2007, at approximately 7:30 am, and admits to accessing and downloading Gallagher files onto the thumb drive. Her admission is confirmation of my findings that her rapid access of 252 files from her assigned network user space within 46 minutes "is suggestive of a copy process." (See Berryhill Decl., ¶ 6(c).)

4. **George Petty**

Mr. Petty also admits to deletion of the user profiles on his assigned computer, as described in my initial declaration, and confirms his possession of the two large storage capacity external USB hard drives (a Western Digital 160 GB drive and a Western Digital 250 GB drive) that my examination revealed had been attached to both Mr. Petty's laptop and desktop computers. Mr. Petty further discloses deletion of the "Office" software program on December 11, 2007 (the date I am informed Mr. Petty resigned from Gallagher without notice).

5. Based on my experience as a forensic examiner, it is my belief that that any effort by <u>any</u> employee to alter or delete computer data in the days leading up to the employees' departure is suspicious. Accordingly, I believe the multiple affirmative measures Mr. Petty

admits to having undertaken to delete his user profiles and effectively delete his files and contacts prior to his departure from Gallagher were particularly imprudent and irresponsible for a departing IT employee. An IT employee who admittedly has full knowledge of the effects of such conduct—that deletion of his user profile and "Office" software would permanently delete data from his Gallagher-owned computer—would not engage in such conduct knowing that he was departing to join a competitor within days after several other Gallagher employees had also left to join the same competitor under suspicion by Gallagher.

6.   **Eric Chua**

Mr. Chua also admits to retaining Gallagher files on a thumb drive and his personal computer following his resignation. (See Chua Decl., ¶ 14.) Mr. Chua testifies that on December 18, 2007 (8 days after I am informed that he resigned from Gallagher), he copied work-related files from an existing thumb drive to a "clean" thumb drive, and he also searched his home computer and found Gallagher-work files there, and copied those files to the "clean" thumb drive for the purpose of returning the data to Gallagher. I have performed a computer forensic analysis of what I have been informed is the "clean" thumb drive returned to Gallagher, described in Mr. Chua's declaration. Based on my analysis, I see at least three problems with what Mr. Chua did with the Gallagher data on his personal storage media and what he says in his declaration:

(a)   First and foremost, Mr. Chua's admitted act of deleting the Gallagher data off of the first memory stick after transferring it to the "clean" memory stick, and deleting Gallagher data off of his personal computer after transferring it to the "clean" memory stick is a well-established way to destroy metadata that would otherwise reflect when data was originally placed on the first memory stick and the personal computer. Notwithstanding Mr. Chua's deletion of this data, an immediate forensic inspection of Mr. Chua's home computer and the first thumb drive might enable Gallagher to recover some or all of the data Mr. Chua deleted from those devices, if Mr. Chua has not permanently destroyed and overwritten the Gallagher data with new data.

(b)   Mr. Chua describes moving content from two devices to the "clean" memory stick. This means there should have been at least two distinct copy sessions identified on

the thumb drive on December 18, 2007. There are not. My analysis of the thumb drive revealed that there is only one data transfer session, which lasted 12 seconds. This discrepancy suggests that Mr. Chua did not, in fact, transfer data from both his personal computer and the first memory stick, which further indicates that Gallagher data may continue to exist on one of the devices.

(c)     The "clean" thumb drive certainly is not new, as Mr. Chua represents. To the contrary, the thumb drive contains files from at least February 2007. In fact, I located two files written to the thumb drive on February 9, 2007 that were already within the "\AJG\" directory structure where the recently transferred data is stored, and which I am informed relate to a Gallagher client,                . A true and correct copy of the file directory from the thumb drive I examined is attached hereto as Exhibit G. This discrepancy suggests Gallagher data was stored on more devices than Mr. Chua mentions in his declaration.

7.    **Robert Harrison Watkins**

I have been asked to assume as true that Robert Harrison Watkins resigned from his employment with A.J. Gallagher effective at 8:33 am on December 12, 2007. Since the execution of my initial declaration, I have conducted a forensic examination of the laptop computer assigned to Robert Harrison Watkins, designated item number 528-45, which I am informed that Mr. Watkins returned to Gallagher on December 20, 2007. I have also been provided and had the opportunity to conduct a preliminary forensic examination of a set of 7 CDs, which I am informed were burned by Mr. Watkins and returned to Gallagher along with his assigned computer on December 20, 2007. Many of the findings based on my analysis of Mr. Watkins' laptop and Gallagher's network storage space that had been assigned to Mr. Watkins were later confirmed based on my analysis of the 7 CDs, however, my analysis of the CDs raise a separate set of important questions, which cannot be adequately addressed without examination of Mr. Watkins' personal storage media.

8.    My examination of Mr. Watkins' laptop computer revealed the following data:

(a)     On November 27, 2007, in the 26 minutes between 3:37 and 4:03 p.m., 689 Gallagher-related files and folders were rapidly accessed on Mr. Watkins' laptop in a manner that suggests the files were copied off of the laptop to external storage media.

Specifically, the desktop space of the "RHWatkins" user profile on the laptop contains a folder named "MASTERS." A mirror copy of that folder structure also exists on Gallagher's server, in Mr. Watkins' network storage space. My examination of the files and folders in that directory structure stored on Mr. Watkins' network storage space revealed that although the last access date and time information was the same for several hundred files accessed on Mr. Watkins' laptop prior to November 27, 2007 (which is indicative of synchronization), the last accessed date and time information was not the same for the files and folders accessed on Mr. Watkins' laptop on November 27, 2007. A true and correct copy of the list of 689 files and folders accessed on Mr. Watkins' laptop on November 27, 2007 is attached hereto as Exhibit H.

      (b)      On December 5, 2007:

           (i)      Between 7:31 and 8:51 a.m., 3 Microsoft Word documents were created and saved in the root directory of Mr. Watkins' laptop hard drive, containing lists of approximately 370 email addresses. True and correct copies of these 3 documents, which the user named, "general industry.doc", "email.doc" and "construction.doc," are attached hereto as Exhibits I, J, and K, respectively. Attached hereto as Exhibit L is a screenshot displaying the creation and last accessed dates and times of the 3 Microsoft Word documents.

           (ii)      Between 8:54:11 and 8:55:39 a.m. (1 minute 28 seconds), 173 Gallagher-related files were rapidly accessed on Mr. Watkins' network storage space, but there was no correlating activity on his laptop, which—as described above with respect to the files and folders accessed on his laptop on November 27, 2007—suggest that the data was moved off the server to some other storage media. A true and correct copy of the list of files and folders accessed on Mr. Watkins' network storage space on December 5, 2007 is attached as Exhibit M hereto.

           (iii)      At 8:56 a.m., the 3 Microsoft Word documents containing approximately 370 email addresses, described above, were rapidly accessed in the same minute. See Exhibit L hereto.

1                (c)     On December 12, 2007:

2                      (i)     At 8:33 a.m., Mr. Watkins sent Gallagher an e-mail—from a Comcast email address—notifying Gallagher of his resignation "effective immediately." Attached hereto as Exhibit N is a true and correct copy of the e-mail resignation notice I reviewed.

                    (ii)     At 10:26 a.m., there is evidence that Mr. Watkins' laptop was connected to a computer network other than Gallagher's, which suggests that Mr. Watkins was accessing the Internet through a foreign network. Specifically, examination of the Windows registry file on Mr. Watkins' laptop shows that the IP address, "47.81.2.10," was assigned to the laptop at that time. That IP address is assigned to the Internet Service Provider, Nortel Networks.

                    (iii)     From 10:26 to 10:58 am (32 minutes), 621 files and folders were accessed on Mr. Watkins' laptop in rapid fashion. A true and correct copy of the list of files and folders accessed that morning is attached hereto as Exhibit O.

                    (iv)     At 10:32 a.m., a CD burning project appears to have been initiated on Mr. Watkins' laptop, called "Harrison Pics 071001." There is a folder by this same name in Mr. Watkins' "My Pictures" folder on his laptop, but that folder contains only 2 small JPG files. The time from the creation of this CD burning project (10:32 a.m.) to the last access of this project folder (10:46 a.m.) is approximately 14 minutes. This length of time would not account for only 2 files being burned to a CD. It is my opinion that this CD burning project contained additional files at some point in time. Attached hereto as Exhibit P is a true and correct copy of a screenshot displaying the creation and last accessed date and time of this CD burning project. The folder for this CD burning project had been deleted (likely automatically by the burning software) but was recoverable.

                    (v)     At 10:36 a.m., there is evidence on Mr. Watkins' laptop that Citrix—a commonly used remote log-in program that enables employees to access their employers' computer systems remotely—was accessed on Mr. Watkins' laptop, presumably through the foreign network he accessed at 10:26 a.m. Attached hereto as Exhibit Q is a true and

1 | correct copy of a screenshot displaying access of the Citrix application at 10:36 a.m. on December 12, 2007.

        (vi)    Just before 11:30 a.m., Mr. Watkins' laptop was shut down, and has not been accessed since.

9.    Based on my forensic analysis of Mr. Watkins' laptop and assigned network storage space, it is my opinion that the work-related user-created files that were accessed on Mr. Watkins' laptop on November 27, 2007 and network storage space on December 5, 2007 were copied to some external location. As described below, I believe this copying was likely done by burning CDs or transferring the files directly from the laptop computer to another computer via a network connection.

10.    Attached hereto as Exhibit R is a true and correct list of the contents of each of the 7 CDs I examined—sorted by CD and file path—which I am informed were returned to Gallagher on December 20, 2007 (the date this action was filed). The CDs were burned on the following dates and contain the following data:

        (a)    CD #1 was burned on September 18, 2007, and contains a single file, titled, "          - September 18, 2007.ppt."

        (b)    CD #2 was burned on December 12, 2007, at 7:00 p.m. (after his laptop was last accessed at 11:30 a.m. that morning). The CD contains 265 files within a folder titled "LC." Those files include every single file accessed from the "LC" folder within the "MASTERS" directory on Mr. Watkins' laptop on November 27, 2007. This indicates copying of the files last accessed on Mr. Watkins' laptop on November 27, 2007. More importantly, however, because the CD was burned two weeks after they were last accessed on his laptop, and almost 8 hours after his laptop was used for the last time, the evidence strongly suggests that the CDs were burned from another computer. That fact further supports my conclusion that files reside on another computer that Mr. Watkins has not disclosed.

        (c)    CD #3 was burned on October 9, 2007. The CD contains 27 JPG image files from within a folder titled, "          Photos."

1          (d)    CD # 4 was burned on December 12, 2007, at 6:28 pm (after Mr.
2  Watkins 'laptop was last accessed at 11:30 a.m. that morning). The CD contains 32 files that
3  appear to be Gallagher-related, but several of which cannot be located on Mr. Watkins' assigned
4  laptop or on Gallagher's server, such as "        ," "ajg checklist.doc," "        - June 06.doc."
5  Metadata regarding the "Owner" of at least one of the files further indicates that files on this CD
6  were created on a non-Gallagher registered computer.

7          (e)    CD #5 was also burned on December 12, 2007, at 7:17 pm (after
8  Mr. Watkins' laptop was last accessed at 11:30 a.m. that morning.) Examination of the 278 file
9  and folder names on this CD reveal that they are all copies of files and folders accessed on
10 December 5, 2007 from the MASTERS directory on Watkin's network storage space, discussed
11 above. For example, all 34 files within the              folder accessed on December 5, 2007
12 are stored on the CD. As with CD #2, this evidence strongly suggests file copying on December
13 5, 2007, the existence of these files on another computer from which the CD burning project was
14 conducted, and CD burning after Mr. Watkins' resignation from Gallagher.

15         (f)    CD #6 was burned on November 27, 2007, at 11:39 pm (late at
16 night, approximately 7 hours after 689 files and folders were accessed from the MASTERS
17 directory on his laptop, as described above). The CD contains 637 files, all of which are copies of
18 files and folders accessed earlier that day. The contents of this CD lend strong support for my
19 belief that the data accessed on November 27, 2007 was burned to a CD or copied to another
20 computer. In fact, based on the difference in time between his access of the files and folders that
21 afternoon and his burning of the files to a CD late that night, the evidence seems to indicate that
22 Mr. Watkins did both; first, he transferred the data to another computer, and second, he burned
23 the data to a CD.

24         (g)    CD #7 was burned on December 5, 2007, at 4:56 pm (7 hours after
25 173 files and folders were accessed on Mr. Watkins' assigned network storage space that
26 morning). The 180 files and folders contained on this CD appear to include all 173 of the files
27 and folders accessed within 1 minute 28 seconds that morning, between 8:54:11 and 8:55:39 a.m.,
28 described above. Those 180 files and folders also include the same 34           files that

were later burned onto CD #5 on December 12, 2007. As with CD #5, the evidence on this CD is highly indicative of copying data from Gallagher's server, transfer of data to another computer, and burning of the data to a CD.

11. Mr. Watkins does not testify in his declaration to any file access, copying, transferring, CD burning, post-resignation data retention, or the return of his computer and 7 CDs I have inspected, which makes the above conduct all the more suspect. Furthermore, there is no ability to confirm that Mr. Watkins has returned all CDs or made additional copies of these 7 CDs prior to returning them.

12. **Laurie Martin**

Having reviewed Ms. Martin's declaration, I am informed that file access on her Gallagher assigned computer may be relevant until at least 1:00 pm on November 26, 2007, at which time she testifies that she resigned from Gallagher. Similar to the findings set forth in my initial declaration based on my forensic examination of Ms. Martin's assigned computer, my examination further revealed rapid access of approximately **300 files and folders** on November 26, 2007 (Ms. Martin's date of resignation), in the **25 minutes** between 12:17 pm and 12:42 pm (approximately 20 minutes before she testifies to resigning). A true and correct copy of the file and folder access on Ms. Martin's computer on November 26, 2007 is attached hereto as Exhibit S.

13. **Blackberries**

I have examined 2 Blackberry PDA/phone devices received from Gallagher. I am informed these devices were returned to Gallagher from two former Gallagher employees after their departure. Those two devices have had their contents wiped so that the devices appear as if they were new and just out of the box. One of these devices (designated 528-BB-05) has phone number 925-989-6440 assigned to it. I have no information to indicate who the assigned user of this device was. The second device (designated 528-BB-02) has also been wiped of all logs, data, email and messages and appears as it would be new out of the box. I was informed this device was assigned to someone named "Ellsworth."

14. **Pittman Declaration**

I agree with Pittman's statement that link files are not, on their own, conclusive evidence of file copying, but are nevertheless a valuable part of a forensic analysis. Link files are just one piece of the puzzle. However, based on the pattern of similar evidence set forth in my initial declaration pertaining to my examination of various former Gallagher employees' computers, in addition to the forensic data discussed above, it is my belief, based on 14 years of experience in the field of computer forensics, that several individuals have engaged in copying and transferring of data, and inspection of the Gallagher employees' storage media is likely to reveal additional pieces of the puzzle.

15. I understand that Mr. Pittman has received certain computer media relative to this case, but note that he does not testify to having conducted an examination of such media in his declaration. If he has conducted such examination, he has not testified to his findings as of yet. I welcome the opportunity to learn what he has discovered from his analysis of the media received from EPIC's counsel, and await the opportunity to examine such media myself.

I declare under penalty of perjury according to the laws of the United States of America that the foregoing information is true and correct to the best of my knowledge and belief.

Executed this 6th day of January, 2008, in Benicia, California.

*Jon A. Berryhill*