1  JEROME C. ROTH (SBN 159483)
   MARTIN D. BERN (SBN 153203)
2  MALCOLM A. HEINICKE (SBN 194174)
   JEFFREY E. ZINSMEISTER (SBN 235516)
3  Malcolm.Heinicke@mto.com
   MUNGER, TOLLES & OLSON LLP
4  560 Mission Street
   Twenty-Seventh Floor
5  San Francisco, CA  94105-2907
   Telephone:     (415) 512-4000
6  Facsimile:     (415) 512-4077

7  Attorneys for Defendants
   EDGEWOOD PARTNERS INSURANCE CENTER,
8  DAN R. FRANCIS & JOHN G. HAHN

9               UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                 SAN FRANCISCO DIVISION

12

13  ARTHUR J. GALLAGHER & CO., INC.,        CASE NO.  3:07-CV-06418-JSW
    a Delaware Corporation, ARTHUR J.
14  GALLAGHER & CO., INSURANCE             **DEFENDANT EDGEWOOD PARTNERS
    BROKERS OF CALIFORNIA, INC., a         INSURANCE CENTER'S MEMORANDUM
15  California Corporation,                 OF POINTS AND AUTHORITIES IN
                                            OPPOSITION TO PLAINTIFF
16                 Plaintiffs,              GALLAGHER'S MOTION FOR A
                                            TEMPORARY RESTRAINING ORDER**
17       vs.

18  EDGEWOOD PARTNERS INSURANCE            **FILED CONDITIONALLY UNDER SEAL**
    CENTER, a California corporation; DAN
19  R. FRANCIS; JOHN G. HAHN;
    ANDREW ("WALLY") BROWN, JR.;
20  BRIAN F. QUINN; NEIL R. COHN;
    CAROLANN COHN; MICHAEL J.              **Date:      January 11, 2008**
21  BROWN; STEPHEN HAUSE; LAURA J.         **Time:      9:00 a.m.**
    WICK; JAMES C. HALBLEIB;               **Dept:      Courtroom 2, 17th Floor**
22  LAURINDA ("LAURIE") A. MARTIN;
    ERIC CHUA; GEORGE J. PETTY;
23  LINDA SOO HOO; ROBERT E. DUTTO;        **The Honorable Jeffrey S. White**
    SUSAN M. ENGLISH; DON J.
24  JOHNSON; ALLEN L. AMOS;
    WILLIAM ("BILL") PHILLIPS, JR.;
25  DIRCK ("RICK") R. STINSON; ROBERT
    ("BOB") D. ELLSWORTH; ROBERT H.        **PUBLIC VERSION**
26  WATKINS; PAUL H. WAGENER;
    SHANDRANETTE MIDDLETON,
27
                   Defendants.
28

OPPOSITION TO APPLICATION FOR
                                            TEMPORARY RESTRAINING ORDER;
                                            CASE NO. 3:07-CV-06418-JSW

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.   PROCEDURAL HISTORY ........................................................................................ 3

III.  ARGUMENT ............................................................................................................ 3

    A.  A Temporary Restraining Order Is An Extraordinary Remedy That Courts Grant Sparingly, and Only Upon the Presentation of Competent Evidence ........... 3

    B.  Gallagher Has Not Demonstrated a Likelihood of Success on the Merits.............. 5

        1.  Gallagher Is Unlikely To Prevail on Its Claims for "Raiding" Because EPIC and Its Agents Never Engaged in Unlawful Solicitation and Never Used Confidential Information To Attract Talent........................................................................................................ 6

            a.  There Was No Unlawful Solicitation -- Gallagher Employees Followed Messrs. Brown and Quinn on Their Own Initiative.......................................................................................... 8

            b.  EPIC Used No Confidential Information To Attract Gallagher Employees, Who Themselves Willingly Disclosed Information About Their Salaries and Benefits .......... 12

        2.  Gallagher Cannot Establish a Likelihood of Success on Its Claims for Misappropriation of Trade Secrets ........................................................ 12

            a.  Gallagher Has Not Met Its Burden Of Establishing That Any Particular Information That Was Allegedly Taken By Its Employees To EPIC Constitutes A Trade Secret..................... 12

            b.  EPIC Brokers and Employees Did Not Misappropriate Any Confidential Gallagher Information ............................................. 14

    C.  Gallagher Has Not Established That Injunctive Relief Is Necessary To Avoid Irreparable Injury ...................................................................... 20

    D.  The Balance of Hardships Tips Sharply In Favor Of EPIC, Not Gallagher ......... 22

IV.   THE INJUNCTIVE RELIEF REQUESTED BY GALLAGHER IS UNWARRANTED AND OVERBROAD .................................................................. 23

V.    IF AN INJUNCTION ISSUES, GALLAGHER SHOULD BE REQUIRED TO POST AN APPROPRIATE BOND .......................................................................... 24

VI.   RESPONSE TO REQUEST FOR EXPEDITED DISCOVERY ..................................... 25

VII.  CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

Bayer Corp. v. Roche Molecular Sys., Inc.,
   72 F. Supp. 2d 1111 (N.D. Cal. 1999) ................................................................ 14, 21

Bracco v. Lackner,
   462 F. Supp. 436 (N.D. Cal. 1978) .............................................................................. 4

Caribbean Marine Svcs. Co., Inc. v. Baldrige,
   844 F.2d 668 (9th Cir. 1988) ...................................................................................... 20

Clear Channel Outdoor, Inc. v. City of Los Angeles,
   340 F.3d 810 (9th Cir. 2003) ........................................................................................ 3

Computer Econ., Inc. v. Gartner Group, Inc.,
   50 F. Supp. 2d 980 (S.D. Cal. 1998) ..................................................................... 13, 25

Goldie's Bookstore v. Superior Court of the State of California,
   739 F.2d 466 (9th Cir. 1984) ................................................................................. 21, 22

Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,
   174 F.3d 411 (4th Cir. 1999) ...................................................................................... 25

K-2 Ski Co. v. Head Ski Co.,
   467 F.2d 1087 (9th Cir. 1972) ...................................................................................... 5

Liberty Mut. Ins. Co. v. Arthur J. Gallagher & Co.,
   1994 WL 715613 (N.D.Cal. Dec. 19, 1994) .............................................................. 13

Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,
   634 F.2d 1197, 1202 (9th Cir. 1980) .......................................................................... 21

Mazurek v. Armstrong,
   520 U.S. 968 (1997) ................................................................................................. 3, 4

Perfect 10, Inc. v. Amazon.com, Inc.,
   487 F.3d 701 (9th Cir. 2007) ........................................................................................ 3

Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.,
   923 F. Supp. 1231 (N.D. Cal. 1995) ........................................................................... 13

Republic of the Philippines v. Marcos,
   862 F.2d 1355 (9th Cir. 1988) ...................................................................................... 5

Rita Med. Sys., Inc. v. Resect Med., Inc.,
   No. C 05-03291 WHA, 2007 WL 161049 (N.D. Cal. Jan. 17, 2007) .......................... 13

Sampson v. Murray,
   415 U.S. 61 (1974) ...................................................................................................... 21

Save Our Sonoran, Inc. v. Flowers,
   408 F.3d 1113 (9th Cir. 2005) ...................................................................................... 4

StonCor Group, Inc. v. Campton,
   2005 WL 2030832 (W.D. Wash. Aug. 22, 2005) ............................................. 21, 22, 23

Unisource Worldwide, Inc. v. South Central Ala. Supply, LLC,
   199 F. Supp. 2d 1194 (M.D. Ala. 2001) ..................................................................... 25

- ii -

**TABLE OF AUTHORITIES**
(continued)

Page(s)

United States v. Guess,
  390 F.Supp.2d 979 (S.D.Cal. 2005) .................................................................. 4

**STATE CASES**

Am. Paper & Packaging Prods., Inc. v. Kirgan,
  183 Cal.App.3d 1318 (1986)........................................................................... 13

Bancroft-Whitney Co. v. Glen,
  64 Cal.2d 327 (1966) ...................................................................................... 6

Continental Car-Na-Var Corp. v. Moseley,
  24 Cal 2d 104 (1944) ................................................................................. 6, 22

Diodes, Inc. v. Franzen,
  260 Cal.App.2d 244 (1968) ................................................................... 6, 7, 12

GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.,
  83 Cal.App.4th 409 (2000).............................................................................. 7, 8

Masonite Corp. v. County of Mendocino Air Quality Mgmt. Dist.,
  42 Cal.App.4th 436 (1996) ............................................................................. 13

Metro Traffic Control, Inc. v. Shadow Traffic Network,
  22 Cal.App.4th 853 (1994).......................................................................... 6, 7

Morlife, Inc. v. Perry,
  56 Cal.App.4th 731 (1997).............................................................................. 5

Reeves v. Hanlon,
  33 Cal.4th 1140 (2004) ................................................................................... 7

Whyte v. Schlage Lock Co.,
  101 Cal.App.4th 1443 (2002).......................................................................... 22

**STATE STATUTES**

Cal. Bus. & Prof Code § 16600 ................................................................ 6, 22

Cal. Civ. Proc. Code § 2019.210................................................................... 25

Cal. Civ. Code § 3426.2(a) ........................................................................... 14

**TREATISES**

11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948 (2d ed.
  1995) ................................................................................................... 3, 4, 5

Restatement (Third) of Agency § 8.04 (2006) ............................................... 6

OPPOSITION TO APPLICATION FOR
TEMPORARY RESTRAINING ORDER;
CASE NO. 3:07-CV-06418-JSW

1   Defendants Edgewood Partners Insurance Center ("EPIC") respectfully opposes

2   the application of Plaintiffs Arthur J. Gallagher & Co., Inc., and Arthur J. Gallagher & Co.,

3   Insurance Brokers of California, Inc. (collectively, "Gallagher") for a temporary restraining order.

4   **I.    INTRODUCTION AND SUMMARY OF ARGUMENT**

5   Gallagher, the fourth-largest insurance brokerage in the world, seeks extraordinary

6   injunctive relief because, so it claims, it is "under siege as a result of a well-planned, but unlawful

7   raid on its employees and business" by a recent start-up brokerage, EPIC. Refusing to accept that

8   its employees in San Ramon merely decided to leave Gallagher for a better employment

9   opportunity, Gallagher urges this Court to leap to the conclusion that their departure was the

10  product of a months-long, clandestine conspiracy. Distilled to its essence, Gallagher is seeking

11  extraordinary relief on the theory that: (1) dozens of employees conspired to solicit one another in

12  a mass departure from Gallagher's San Ramon office; and (2) these people then stole and used

13  confidential or proprietary information to poach clients. In reality, neither occurred.

14  What really happened is a story of entrepreneurial endeavor and personal loyalties.

15  Two well-established leaders in the insurance industry, Dan Francis and John Hahn, founded

16  EPIC on the premise of attracting talented brokers by offering them greater autonomy and equity

17  participation in the company. Francis Decl. ¶3; Hahn Decl. ¶3. Brokers are attracted to EPIC

18  because they have much greater financial upside, and are freed from the bureaucracy that has

19  sapped morale and stymied innovation at larger competitors, such as Gallagher.

20  Like the many brokers who have moved to EPIC from numerous other firms,

21  Wally Brown and Brian Quinn, the two former leaders of Gallagher's San Ramon office,

22  recognized these opportunities and decided to pursue them. They announced their resignations on

23  December 7, 2007, to the surprise of their colleagues at Gallagher. Subsequently, many others

24  followed Brown and Quinn to EPIC. The ensuing departures from Gallagher's San Ramon office

25  were not, as Gallagher posits, the result of an impossibly clandestine scheme, masterminded by

26  executive turncoats and carried out by conspiring staffers. Rather, it stemmed from three more

27  plausible causes. First, Gallagher's employees felt greater loyalty personally to Brown and Quinn

28  than they did to the Gallagher corporation. Second, many were unhappy at Gallagher, where

4150195.4

- 1 -

OPPOSITION TO APPLICATION FOR
TEMPORARY RESTRAINING ORDER;
CASE NO. 3:07-CV-06418-JSW

**REDACTED**

1

2    REDACTED had become standard.  Third, EPIC offered them a better financial deal, which these

3    employees understandably accepted.

4            When the former Gallagher brokers lawfully announced they were joining EPIC,

5    many of their clients displayed similar loyalties and followed.  The evidence submitted by EPIC -

6    - including sworn declarations from the allegedly pilfered clients themselves -- demonstrates that

7    these clients transferred their business to EPIC because of their longstanding and personal

8    relationships with these brokers, and not because they were lured using allegedly stolen trade

9    secret information.  In sum, what really happened is simple: Brown and Quinn left for a better

10    opportunity, other brokers followed out of loyalty and for the same opportunity, and their clients

11    then followed their brokers.  See Wells Decl. ¶12 (stating that Wally Brown and Brian Quinn

12    acted "properly, ethically and well within the norm for transitions within the insurance industry").

13            The evidence further establishes that Gallagher's scattered and inflammatory

14    allegations about theft and exploitation of company property are unfounded and, at times,

15    reckless.  For example, a Gallagher executive claims that Eric Chua accessed a client list the day

16    he departed Gallagher for the purpose of stealing it, when in fact, Chua accessed the document

17    because this same executive had asked him to print a copy.  Along the same lines, Gallagher's

18    computer expert opines that in their final days with Gallagher, several employees accessed

19    hundreds of files in a manner that is "indicative of mass copying." Berryhill Decl. ¶6.  In fact,

20    forensic analysis shows these suppositions to be baseless, and that Gallagher's expert failed to

21    understand how that corporation's computer systems operated.  Finally, Gallagher's allegations

22    are rebutted by dozens of sworn statements from the employees at issue and the very clients who

23    allegedly were wooed away with trade secrets.  In the few instances where Gallagher property (of

24    any kind) was inadvertently retained, it was not used, and has been returned.

25            The evidence demonstrates that EPIC lawfully competed in the marketplace for

26    talent and clients.  Gallagher's attempt to stifle competition and employee mobility with

27    insinuations of conspiracy does not satisfy the heavy evidentiary burden it must meet under

28    California law to obtain the extraordinary injunctive relief it seeks.

4150195.4

- 2 -

## II.    PROCEDURAL HISTORY

On December 20, 2007, Gallagher filed suit, seeking injunctive relief on an *ex parte* basis to restrain competition from its competitor EPIC. The Court denied that application, set the matter for hearing and granted EPIC's request for an additional week to respond (over the holiday period). EPIC is confident that Gallagher's claims are without merit. Nevertheless, in deference to this Court's admonition in its December 21, 2007 Order granting the extension, EPIC's co-founder, Dan Francis, halted the company's lawful (a) acceptance of broker of record letters from current Gallagher clients; and (b) hiring of Gallagher employees seeking employment with EPIC. Francis Decl. ¶16. Though not compelled to do so, EPIC took these measures to assure the Court that it has not attempted to exploit the short briefing extension provided. Now that the dust has settled, and the Court has had an opportunity to review a balanced record, EPIC plans to, and respectfully asks this Court to allow it, to resume its rightful place as a competitor in the market for insurance services.

## III.    ARGUMENT

### A.    A Temporary Restraining Order Is an Extraordinary Remedy That Courts Grant Sparingly, and Only Upon the Presentation of Competent Evidence

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (quoting 11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948, at 129-30 (2d ed. 1995)); Perfect 10, Inc. v. Amazon.com, Inc., 487 F.3d 701, 714 (9th Cir. 2007) (holding that the "burden is correctly placed on the [moving] party" to demonstrate its entitlement "to the extraordinary remedy of a preliminary injunction at an early stage of the litigation"). The Ninth Circuit has described a plaintiff's burden during preliminary proceedings in two different ways, both of which require this Court to balance "the plaintiff's likelihood of success against the relative hardship to the parties." Clear Channel Outdoor, Inc. v. City of Los Angeles, 340 F.3d 810, 813 (9th Cir. 2003). First, under the "traditional" test, a plaintiff must show "'(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to [the] plaintiff if preliminary relief is not granted, (3) a balance

4150195.4

OPPOSITION TO APPLICATION FOR
TEMPORARY RESTRAINING ORDER;
CASE NO. 3:07-CV-06418-JSW

1    of hardships favoring the plaintiff, and (4) advancement of the public interest.'" Save Our

2    Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1120 (9th Cir. 2005)(citation omitted). The

3    "alternative" test requires the plaintiff to demonstrate "'either a combination of probable success

4    on the merits and the possibility of irreparable injury or that serious questions are raised and the

5    balance of hardships tips sharply in his favor.'" Id. (emphasis and citation omitted).

6    Gallagher cannot meet its burden under either formulation. Despite Gallagher's

7    sensational allegations of a vast theory, the facts of the case bear resemblance to that theory. A

8    plaintiff cannot sustain its burden on a motion for injunctive relief with mere allegations

9    inferences, or with defective evidence, as Gallagher is attempting to do here. And, this Court

10   should not grant an injunction when the critical allegations of wrongdoing find their basis

11   nowhere but on the plaintiff's information and belief. See, e.g., United States v. Guess, 390

12   F.Supp.2d 979, 982-83, 988 (S.D. Cal. 2005) (temporary restraining order dissolved due to

13   "evidentiary shortcomings" in the plaintiff's case, including an "an absence of evidence" to

14   support the plaintiff's exaggerated and "speculative" claims of wrongdoing).

15   It is hornbook law that "[e]vidence that goes beyond the unverified allegations of

16   the pleadings and motion papers [must] be presented to support … a motion for a preliminary

17   injunction." Wright et al., supra, § 2949, at 214. This evidentiary "requirement" exists for a good

18   reason: a contrary rule would allow a company to restrain competition merely by setting forth

19   incendiary allegations. Mazurek, 520 U.S. at 972. Injunctive relief is appropriate only when

20   "substantial evidence," as opposed to unsubstantiated rhetoric, warrants it. Id.

21   Further, this Court must scrutinize not only the evidence offered in support of an

22   injunction, but also the manner in which the moving party has presented it. Although the

23   evidentiary rules are not as rigid as at trial or on a motion for summary judgment, the "weight to

24   be given such evidence is a matter for the Court's discretion," considering such factors as a

25   declarant's personal knowledge and competence. Bracco v. Lackner, 462 F. Supp. 436, 442 n.3

26   (N.D. Cal. 1978). Where, as here, the evidence offered in support of an injunction "consist[s]

27   largely of general assertions which are substantially controverted by counter-affidavits, a court

28   should not grant [injunctive] relief unless the moving party makes a further showing sufficient to

- 4 -

OPPOSITION TO APPLICATION FOR
TEMPORARY RESTRAINING ORDER;
CASE NO. 3:07-CV-06418-JSW

1   demonstrate that he will probably succeed on the merits." K-2 Ski Co. v. Head Ski Co., 467 F.2d

2   1087, 1089 (9th Cir. 1972). As Wright & Miller explain: "[W]hen the primary evidence

3   introduced is an affidavit made on information and belief rather than on personal knowledge, it

4   generally is considered insufficient to support a motion for a preliminary injunction. Courts

5   similarly give hearsay statements less credence than direct allegations. To the extent that the

6   affiant's lack of competence to testify at trial reflects doubt about credibility, this factor also may

7   be taken into account." Wright et al., supra, § 2949, at 218-19. Accord Republic of the

8   Philippines v. Marcos, 862 F.2d 1355, 1363 (9th Cir. 1988) (approving an injunction based on

9   hearsay testimony, but only where "[n]o affidavits countering the inference were presented").

10          Here, Gallagher's application for equitable relief rests on conclusory allegations,

11   hearsay statements, and evidence as to which the affiants are often unqualified to testify.[1] Such a

12   showing is inadequate to justify the extreme relief sought, especially in light of the fact that direct

13   testimony from the employees and clients at issues squarely rebuts Gallagher's suppositions.

14          **B.    Gallagher Has Not Demonstrated a Likelihood of Success on the Merits**

15          In evaluating the strength of Gallagher's claims, this Court must consider "the

16   delicate balance between promoting unfettered competition and protecting business from unfair

17   conduct." Morlife, Inc. v. Perry, 56 Cal.App.4th 731, 734 (1997). It is true that two Gallagher

18   employees, Wally Brown and Brian Quinn, left Gallagher to accept positions at EPIC. It is also

19   true that many other employees in Gallagher's San Ramon office followed them. Finally, some

20   clients have transferred their business from Gallagher to EPIC in order to follow the individual

21   brokers who have serviced their accounts for years. All of these events, however, are consistent

22   with exactly the sort of employee mobility and market competition that California law jealously

23   safeguards, and do not suggest any unlawful conspiracy to raid employees and clients.

24          The question on the merits is not whether EPIC's new employees may compete

25   with their former employer for its clients -- California law strenuously guarantees their right to do

26

27   [1] Specific objections to Plaintiffs' evidence are set forth in a separate pleading filed concurrently herewith. See Def. Edgewood Partners Insurance Center's Objections to Evidence Submitted by

28   Pls. in Supp. of Their Application for TRO, No. 3:07-CV-06418-JSW (N.D. Cal. Jan 4, 2008).

1   so. California law has long upheld the right of an employee "to engage in a competitive business

2   for himself, and to enter into competition with his former employer, even for the business of those

3   who had formerly been the customers of his former employer." Continental Car-Na-Var-Corp. v.

4   Moseley, 24 Cal 2d 104, 110 (1944). Further, "[t]he mere fact that [an] officer makes

5   preparations to compete before he resigns his office is not sufficient to constitute a breach of duty.

6   It is the nature of his preparations which is significant." Bancroft-Whitney Co. v. Glen, 64 Cal.2d

7   327, 346 (1966). See also Restatement (Third) of Agency § 8.04 (2006) ("[A]n agent may take

8   action, not otherwise wrongful, to prepare for competition following the termination of the

9   agency relationship.")

10          The issue presented here is whether Gallagher has provided a sufficient evidentiary

11   basis for this Court to conclude that EPIC or its employees engaged in the sort of conspiracy and

12   misappropriate that fits under very narrow exceptions to California's otherwise inviolate

13   protection of employee mobility. The evidence before the Court demonstrates that it has not.

14          1.      Gallagher Is Unlikely To Prevail on Its Claims for "Raiding" Because
                    EPIC and Its Agents Never Engaged in Unlawful Solicitation and Never
15                  Used Confidential Information To Attract Talent

16          Employees are generally free to work where they please. With rare exception,

17   businesses may not restrain the movement of their workers, and attempts to do so are typically

18   void as a matter of public policy. See, e.g., Cal. Bus. & Prof Code § 16600 ("[E]very contract by

19   which anyone is restrained from engaging in a lawful profession, trade, or business of any kinds

20   is to that extent void."); see also Metro Traffic Control, Inc. v. Shadow Traffic Network, 22

21   Cal.App.4th 853, 85960 (1994) ("every citizen shall retain the right to pursue any lawful

22   employment and enterprise of their choice"). "The interests of the employee in his own mobility

23   and betterment are deemed paramount to the competitive business interests of the employers,

24   where neither the employee nor his new employer has committed any illegal act accompanying

25   the employment change." Diodes, Inc. v. Franzen, 260 Cal.App.2d 244, 255 (1968).

26          A corollary to the employee's right of mobility is the liberty of competitors to vie

27   for talent. Without the option of a better place to go, the worker's right to choose his place of

28   employment would be hollow. As the California Supreme Court recently put it: "Where no

4150195.4                          - 6 -            OPPOSITION TO APPLICATION FOR
                                                    TEMPORARY RESTRAINING ORDER;
                                                    CASE NO. 3:07-CV-06418-JSW

1  unlawful methods are used, public policy generally supports a competitor's right to offer more

2  pay or better terms to another's employee, so long as the employee is free to leave." Reeves v.

3  Hanlon, 33 Cal.4th 1140, 1151 (2004). Thus, "no actionable wrong is committed by a competitor

4  who solicits . . . or who hires away one or more of his competitor's employees who are not under

5  contract." Diodes, 260 Cal.App.2d at 255; see also Metro Traffic Control, 22 Cal.App.4th at 860

6  (corporate defendant "not liable for inducing [its competitor's] employees to leave"). Thus, the

7  law is clear that former employees cannot be held liable for choosing to leave their place of work,

8  nor can a competitor such as EPIC be held liable for hiring them, unless a plaintiff demonstrates

9  that its competitor used "unlawful means" or engaged "in acts of unfair competition" in order to

10  accomplish the hire. Metro Traffic Control, 22 Cal.App.4th at 859.

11          Here, Gallagher alleges two types of unfair competition, neither supported by the

12  evidence. First, Gallagher contends that its former employees unlawfully conspired to, and did,

13  solicit their colleagues, in violation of both their contractual obligations and fiduciary duties.

14  Second, it contends that EPIC improperly used confidential information, and specifically

15  "insider's information" about salaries and benefits, to lure employees away from Gallagher.

16  Plaintiffs rely almost exclusively on GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs.,

17  Inc., 83 Cal.App.4th 409 (2000), which did not review the trial court's injunction.

18          Yet the differences between GAB Business Services and the facts here completely

19  undermine Gallagher's case. In GAB, an executive manager obtained an offer from a competitor

20  and then, while still on plaintiff's payroll, engaged in direct acts of competition, including: (a)

21  directly soliciting 17 of the plaintiff's employees to come with him to the competitor while

22  instructing each of them to keep the plot a secret from their employer; and (b) providing internal

23  salary information to the competitor; and (c) presenting all eighteen people to the competitor as a

24  package deal conditioned on average salary increases of thirty-five percent. Here, in stark

25  contrast, the evidence shows that (a) Brown and Quinn did not encourage the dozens of

26  employees at issue to leave, and indeed their resignation announcements were a shock to their

27

28

OPPOSITION TO APPLICATION FOR
TEMPORARY RESTRAINING ORDER;
CASE NO. 3:07-CV-06418-JSW

Gallagher colleagues;[2] (b) each employee voluntarily provided EPIC with his or her

compensation data when interviewing;[3] and (c) none of the employment offers at EPIC were

contingent on the hiring of others.[4]  GAB was the sort of collective conspiracy that the law

disallows.  As the declarations of the employees in question show, the instant case reflects the

decisions of a few employees to leave for a competitor, and the subsequent and unsolicited

decision of many surprised but loyal colleagues to follow.  As industry expert Jim Wells declares,

it is common in the highly transitory insurance industry for brokers to follow their leaders to other

firms.  See Wells Decl. ¶ 8.  Thus, there is nothing conspiratorial about such movement.

> a.    There Was No Unlawful Solicitation -- Gallagher Employees
>        Followed Messrs. Brown and Quinn on Their Own Initiative

Gallagher asserts that Defendants executed a conspiratorial "plot to raid Gallagher

employees" by soliciting "members of Gallagher's [staff] to resign their employment with

Gallagher [and] join EPIC."  Compl. ¶38.  It then imagines a grand conspiracy in which nearly

fifty employees hatched a months-long secret scheme, which Gallagher somehow never

---

[2] Amos Decl. ¶5; Armstrong Decl. ¶3; W. Brown Decl., ¶32; B. Burdock Decl. ¶3; P. Burdock Decl. ¶3; Cadinha Decl. ¶4; Cavagnuolo Decl. ¶4; Chua Decl. ¶3; Craven Decl. ¶3; Daughtry-Honda Decl. ¶2; Dutto Decl. ¶4; Ellsworth Decl. ¶4; English Decl. ¶3; Glaser Decl. ¶3; Harvison Decl. ¶3; Hause Decl. ¶7; Herman Decl. ¶4; Hilgen Decl. ¶¶3-5; D. Johnson Decl. ¶3; R. Johnson Decl. ¶3; Keck Decl. ¶4; Lucas Decl. ¶2; Middleton Decl. ¶6; O'Leary Decl. ¶4; Petty Decl. ¶3; Phillips Decl. ¶3; Quinn Decl., ¶28; Ramirez Decl. ¶4; Rasmussen Decl. ¶6; Rodriguez Decl. ¶3; Ronzitti Decl. ¶3; Schweitzer Decl. ¶3; Soo Hoo Decl. ¶3; Stinson Decl. ¶3; Stubbs Decl. ¶3; Sweeney Decl. ¶3; Varnica Decl. ¶3; Ward Decl. ¶4; Wagener Decl. ¶5; Watkins Decl. ¶3.

[3] Amos Decl. ¶6; Armstrong Decl. ¶6; Cadinha Decl. ¶7; Cavagnuolo Decl. ¶7; Craven Decl. ¶7; Daughtry-Honda Decl. ¶5; Dutto Decl. ¶5; Ellsworth Decl. ¶5; Glaser Decl. ¶6; Harvison Decl. ¶6; Hause Decl. ¶8; Herman Decl. ¶8; Ruby Johnson Decl. ¶6; Keck Decl. ¶7; Lucas Decl. ¶5; Middleton Decl. ¶7; O'Leary Decl. ¶7; Petty Decl. ¶4; Ramirez Decl. ¶6; Rodriguez Decl. ¶5; Ronzitti Decl. ¶6; Schweitzer Decl. ¶7; Stubbs Decl. ¶6; Sweeney Decl. ¶5; Ward Decl. ¶8; Wagener Decl. ¶5; Watkins Decl. ¶5.

[4] Amos Decl. ¶¶6, 7; Armstrong Decl. ¶¶4, 5; B. Burdock Decl. ¶¶5, 6; P. Burdock Decl. ¶¶5, 6; Cadinha Decl. ¶¶6, 9; Cavagnuolo Decl. ¶¶5, 6, 9, 10; Chua Decl. ¶13; Craven Decl. ¶¶5, 6, 7; Daughtry-Honda Decl. ¶¶3, 4; Dutto Decl. ¶6; Ellsworth Decl. ¶6; English Decl. ¶8; Glaser Decl. ¶¶4, 5; Harvison Decl. ¶¶4, 5; Herman Decl. ¶¶6, 7; Hilgen Decl. ¶2; Hilgen Decl. ¶7; D. Johnson Decl. ¶8; R. Johnson Decl. ¶5; Keck Decl. ¶11; Lucas Decl. ¶¶3, 4; Martin Decl. ¶¶4, 5; Middleton Decl. ¶6; O'Leary Decl. ¶¶5, 6; Petty Decl. ¶13; Phillips Decl. ¶¶4, 5, 9; Ramirez Decl. ¶¶5, 10; Rasmussen Decl. ¶8; Rodriguez Decl. ¶5; Ronzitti Decl. ¶4; Schweitzer Decl. ¶5; Soo Hoo Decl. ¶7; Stinson Decl. ¶7; Stubbs Decl. ¶4; Sweeney Decl. ¶8; Varnica Decl. ¶4; Ward Decl. ¶¶5, 6; Ward Decl. ¶10; Wagener Decl. ¶5; Watkins Decl. ¶¶4-5.

OPPOSITION TO APPLICATION FOR
TEMPORARY RESTRAINING ORDER;
CASE NO. 3:07-CV-06418-JSW

1   discovered, to resign "*en masse*." Id. ¶55.  This is not what happened.

2          In Spring 2007, Wally Brown was asked by Jim McFarlane, Gallagher's Western

3   Region Chairman, to approach Dan Francis and recruit him to join Gallagher.  W. Brown Decl.,

4   ¶16.  When Wally did so, Dan Francis declined the invitation to join, and bring other proven

5   producers to, Gallagher, and instead told Wally about EPIC.  Francis Decl. ¶11.  Because he was

6   disillusioned with Gallagher, and because he recognized the true opportunity presented by EPIC,

7   Wally expressed interest in the company.  W. Brown Decl., ¶¶13-15, 19.  Subsequently, EPIC

8   began recruiting Brian Quinn to join EPIC.  Quinn Decl., ¶¶5-7.  After reflection and negotiation,

9   Wally Brown and Brian Quinn each decided to accept a position with EPIC.

10         Contrary to Gallagher's assertions of an office-wide conspiracy, the sworn

11  declarations of 42 former Gallagher employees confirm that the resignations of Brown and Quinn

12  from Gallagher were met with "surprise," "shock," and in some cases "tears."  See n.2, *supra*.

13  Then, to the surprise of EPIC, many employees of Gallagher's San Ramon office -- from the most

14  senior brokers to the receptionists -- sought positions at EPIC.  They did so not because of some

15  conspiracy, but rather out of (1) fealty, respect, and desire to continue working with these leaders,

16  with whom many employees had worked closely for years,[5] (2) a desire to escape Gallagher's

17
                                    **REDACTED**
18

19         [6] and (3) interest in an employment package that included higher salaries, improved

20  benefits, and an opportunity for equity participation in a new and exciting business venture.[7]

21  ───────────────
    [5] See, e.g., B. Burdock Decl. ¶4; P. Burdock Decl. ¶4; Craven Decl. ¶4; Daughtry-Honda Decl.
22  ¶3; Glaser Decl. ¶4; Harvison Decl. ¶4; Hause Decl. ¶2; Hilgen Decl. ¶10; R. Johnson Decl. ¶4;
    Keck Decl. ¶5; Lucas Decl. ¶3; O'Leary Decl. ¶5; Petty Decl. ¶4; Soo Hoo Decl. ¶6; Stubbs Decl.
23  ¶2; Varnica Decl. ¶3; Ward Decl. ¶5; Wagener Decl. ¶6; Watkins Decl. ¶7.

24  [6] See, e.g., Amos Decl. ¶4; Halbleib Decl. ¶8; R. Johnson Decl. ¶7; Keck Decl. ¶4; Martin
    Decl.¶7; O'Leary Decl. ¶3; Rasmussen Decl. ¶¶5, 9; Soo Hoo Decl. ¶6; Sweeney Decl. ¶2;
25  Varnica Decl. ¶2; Wagener Decl. ¶7; Watkins Decl. ¶8.

26  [7] See, e.g., Amos Decl. ¶8; Armstrong Decl. ¶6; Cadinha Decl. ¶7; Chua Decl. ¶3; Neil Cohn
    Decl. ¶5; Craven Decl. ¶7; Daughtry-Honda Decl. ¶5; Dutto Decl. ¶7; Harvison Decl. ¶6; Hause
27  Decl. ¶8; Hilgen Decl. ¶11; Keck Decl. ¶8; Phillips Decl. ¶7; Ramirez Decl. ¶7; Rodriguez Decl.
    ¶¶5, 6; Ronzitti Decl. ¶2; Schweitzer Decl. ¶7; Stubbs Decl. ¶6; Sweeney Decl. ¶5; Varnica Decl.
28  ¶6; Ward Decl. ¶8.

                                                        OPPOSITION TO APPLICATION FOR
                                                        TEMPORARY RESTRAINING ORDER;
                                                        CASE NO. 3:07-CV-06418-JSW

1    While Gallagher portrays its former officers as pirates who looted and recruited

2   employees, the evidence again refutes these contentions.  Without exception, former employees

3   say that upon learning of Brown's and Quinn's resignation, they affirmatively reached out and

4   sought employment at EPIC.  See n.4, *supra*.  All of them have stated that their former bosses and

5   colleagues at EPIC engaged in no acts of solicitation.  See n.3, *supra*.  In fact, their testimony

6   consistently shows that, even when Gallagher staffers sought out Brown and Quinn to ask

7   whether there were job opportunities at EPIC, these brokers consistently directed all inquiries to

8   EPIC's Human Resources Department, stating that they could not and would not discuss the

9   matter with them.  See n.4, *supra*.

10    As "evidence" of its imagined conspiracy, Gallagher makes grand inferences from

11   the fact that so many employees resigned so quickly.  See, e.g., Tu Decl. ¶42; McFarlane Decl.

12   ¶32.  These assumptions of concerted misconduct are easily refuted by the sworn testimony of

13   these same employees.  First, and most importantly, these employees universally respected Brown

14   and Quinn and wanted to continue working with them.  See n.5 , *supra*.  They felt a "bond of

15   loyalty" to these two brokers, who had worked hard to foster a family-like environment in the

16   office.  See id.  Many employees had been hired by these two men; others attribute their

17   professional success to them; and all agree that they provided a spirit of collegiality and

18   community that Gallagher was eroding through its increasingly impersonal style of management.[8]

19   In sum, the workforce followed Brown and Quinn not because it was illegally solicited by them,

20   but because it wanted to have nothing to do with Gallagher without them.

21    Second, there was discontent among employees at Gallagher -- not with the San

22   Ramon office, which had flourished financially under the leadership of Brown and Quinn, but

23   with the increasingly oppressive corporate management.  In recent years, the company had

24

25                                **REDACTED**

26

27   _____

   [8] W. Brown Decl. ¶15; B. Burdock Decl. ¶2; P. Burdock Decl. ¶2; Craven Decl. ¶2; O'Leary

28   Decl. ¶2; Quinn Decl. ¶3; Rasmussen Decl. ¶3; Varnica Decl. ¶2; Ward Decl. ¶3.

1  **REDACTED**       Hilgen Decl. ¶11; Craven Decl. ¶2; Schweitzer Decl. ¶2.  In an **REDACTED**

2                                              **REDACTED**

3                                                                    See n.6, *supra*.

4  Many employees were disgruntled about the myriad rules, regulations, and other directives

5  imposed by any increasingly bureaucratic national and regional management.[9]  This corporate

6  feel of a multinational company stood in stark contrast to the atmosphere Brown and Quinn had

7  cultivated in San Ramon, and EPIC stood to continue, where many family members worked

8  together in the same office, see, e.g., B. Burdock Decl. ¶6, O'Leary Decl. ¶6, including Wally's

9  84-year-old mother.

10           Third, EPIC offered these employees a better deal.  Applicants from Gallagher

11  received higher salaries, signing bonuses, and better benefits, including          **REDACTED**

12  **REDACTED**       See n.7, *supra*.  EPIC gave these employees more generous compensation,

13  whereas

14                                              **REDACTED**

15           Finally, Gallagher attempts to support its conspiracy theory with a second-hand

16  email written by the husband of its former office manager, Laura Wick.  After resigning from

17  Gallagher on November 19, 2007, however, Ms. Wick did not contact any employees to

18  encourage them to come to EPIC.  Wick Decl. ¶29.  Nor did she spend this time secretly setting

19  up a San Ramon office, as her husband's email incorrectly predicted.  Id.  Similarly, while Mr.

20  Wick's email, sent to his mother, could be read to implied that the entire Gallagher sales group

21  was expected to join EPIC, his statement was both incorrect, and misstated his wife's state of

22  mind.  Id. ¶39.  While Ms. Wick expected that some producers and their staff would follow

23  Brown and Quinn if they joined EPIC, there was no plan in place to make that happen.  In short,

24  the suggestion that Ms. Wick acted as the "advance team" for an organized departure of

25  Gallagher's San Ramon office is simply not true.  Id. ¶¶39-41.

26

27  ---
[9] B. Burdock Decl. ¶2; P. Burdock Decl. ¶2; Craven Decl. ¶2; O'Leary Decl. ¶2; Rasmussen

28  Decl. ¶3; Varnica Decl. ¶2; Ward Decl. ¶3.

4150195.4                                      - 11 -      OPPOSITION TO APPLICATION FOR
                                                          TEMPORARY RESTRAINING ORDER;
                                                          CASE NO. 3:07-CV-06418-JSW

b.    EPIC Used No Confidential Information To Attract Gallagher Employees, Who Themselves Willingly Disclosed Information About Their Salaries and Benefits

Gallagher's complaint also imagines a scenario in which Defendants "would use their insider's knowledge . . . to recruit [Gallagher's] most valued employees," Compl. ¶37, and then "would carefully coordinate the timing of the resignations." Id. ¶36. According to Gallagher, the conspirators used this "confidential salary information to solicit away employees." Motion at 13. There is not one shred of evidence, however, that EPIC or its agents took any payroll information, much less that they used it to solicit Gallagher employees. As the declarations accompanying this brief make clear, EPIC made its job offers *based on information that the employees themselves voluntarily provided in their interviews*. The declarations are unequivocal that all of EPIC's employees voluntarily disclosed their previous salaries when they came looking for better jobs, see n.3, *supra*, and EPIC permissibly responded to that information as it saw fit. That is the essence of competition, and California law imposes no liability for it.

2.    Gallagher Cannot Establish a Likelihood of Success on Its Claims for Misappropriation of Trade Secrets

a.    Gallagher Has Not Met Its Burden Of Establishing That Any Particular Information That Was Allegedly Taken By Its Employees To EPIC Constitutes A Trade Secret

Gallagher has not identified with specificity the alleged trade secret information it claims was misappropriated in this case. Instead, it has chosen merely to point to hundreds of files that might have been copied by former Gallagher employees before they left for EPIC, and surmise that some of those documents contained trade secret information. See McFarlane Decl. ¶5. It is Gallagher's burden, however, both to identify the information it claims was taken, and to demonstrate that it is worthy of trade secret protection. Diodes, 260 Cal.App.2d at 252 (1968) ("The plaintiff must nevertheless allege the ultimate facts showing the existence of a trade secret or other confidential data to state such a cause of action").

Although this ambiguity makes it difficult to respond (and thus shows why the law requires a plaintiff to identify the trade secrets allegedly misappropriated), EPIC disputes Gallagher's broad claims that its client lists and contact information constitutes protectable

- 12 -

OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER; CASE NO. 3:07-CV-06418-JSW

1    information.  Indeed, in 1994, after hiring away an employee from one of its competitors,

2    Gallagher used its competitor's "customers and prospects," "expense account records," "risk

3    management materials," and even "copyrighted materials" to pursue its competitor's clients.  (Of

4    course, EPIC did no such thing here.)  When sued, Gallagher successfully argued that such client

5    lists and contacts were *not* trade secrets.  Liberty Mut. Ins. Co. v. Arthur J. Gallagher & Co., 1994

6    WL 715613, at *5 (N.D. Cal. Dec. 19, 1994) (Patel, J.); see also Am. Paper & Packaging Prods.,

7    Inc. v. Kirgan, 183 Cal.App.3d 1318, 1321-22 (1986) (customer list not a protectable trade secret

8    where, as here, such contact information was publicly available).  Gallagher's "confidential'

9    information should receive no greater protection now that Gallagher's shoe is on its other foot.

10           Moreover, although Gallagher painstakingly filed many of the documents related

11    to its motion under seal, it chose not to seek to seal Exhibit I or Exhibit J of the McFarlane

12    Declaration.  Exhibit I is a comprehensive list of the names and contact information for

13    Gallagher's clients as well as the revenue earned for each client over certain periods of time.  As

14    such, even if such information was somehow entitled to trade secret protection at some point, this

15    is no longer the case.  See Masonite Corp. v. County of Mendocino Air Quality Mgmt. Dist., 42

16    Cal.App.4th 436, 454-55 (1996) (analogizing to the UTSA and finding that a report lost its trade

17    secret status under the Government Code because "[v]oluntary disclosure of information as a

18    public record, even if mistaken, constitutes a valid waiver of trade secret protection"); see also

19    Rita Med. Sys., Inc. v. Resect Med., Inc., No. C 05-03291 WHA, 2007 WL 161049 (N.D. Cal.

20    Jan. 17, 2007) (Alsup, J.) (client name lost any potential trade secret status because it was

21    disclosed in portion of the complaint that was not filed under seal); Computer Econ., Inc. v.

22    Gartner Group, Inc., 50 F. Supp. 2d 980, 988 (S.D. Cal. 1998) ("[i]t is well recognized that

23    inadvertent disclosure of a trade secret to third parties during litigation can destroy the trade

24    secret plaintiff is attempting to protect"); cf. Religious Tech. Ctr. v. Netcom On-Line Commc'n

25    Servs., Inc., 923 F. Supp. 1231, 1254-55 (N.D. Cal. 1995) (trade secrets in unsealed docket for an

26    unrelated case did not automatically lose their trade secret status).

27

28

        b.      EPIC Brokers and Employees Did Not Misappropriate Any
Confidential Gallagher Information

Turning to the heart of the motion, EPIC vehemently denies that its employees

absconded with confidential information before leaving Gallagher, and then used that information

to solicit their former clients. Under the Uniform Trade Secrets Act, as adopted by California

("UTSA"), Cal. Civ. Code § 3426.2(a), only "[a]ctual or threatened misappropriation" of trade

secrets may be enjoined. Thus, in order to demonstrate that misappropriation is threatened, a

plaintiff must prove that the defendant *actually used* the trade secrets at issue, or that there is an

*actual* threat of such use. Bayer Corp. v. Roche Molecular Sys., Inc., 72 F. Supp. 2d 1111, 1120

(N.D. Cal. 1999) ("A trade secrets plaintiff must show an actual use or an actual threat")

(emphasis added). Where there is only trivial evidence[10] of a threatened use or disclosure, and

nothing more than mere "speculation" that misappropriation might occur, the plaintiff is not

entitled to injunctive relief. Id. (California's "protective policy" favoring employee mobility

protects employees until such time as the trade-secret plaintiff can demonstrate an actual violation

of trade secret law). In other words, to obtain the extraordinary relief it seeks, Gallagher must

show that Defendants have actually *taken and used* trade secrets and are likely to do so in the

future. Id.

In an effort to meet this burden, Gallagher presents as the centerpiece of its

argument (at pages 8 and 9 of its motion) a client-by-client grid suggesting that Defendants

copied proprietary data, and then used this information to lure several these clients to EPIC.

These claims simply do not pass muster:

**SRAM Corporation**:

- Gallagher's Claim: Neil Cohn accessed 15 files relating to this client before his departure,
and from this, Gallagher simply assumes that Neil copied files, took them to EPIC, and
used them to woo the client.

---

[10] EPIC acknowledges that on one single occasion, one broker presented a third-party insurance
quote that had been provided to him while he was at Gallagher, to a client in violation of EPIC's
policy. Hause Decl. ¶12. This client did not move to EPIC, and still uses Gallagher as its broker.
Id. Mr. Hause has apologized for this incident, which he concedes ran afoul of EPIC's Code of
Conduct. Id. ¶13.

OPPOSITION TO APPLICATION FOR
TEMPORARY RESTRAINING ORDER;
CASE NO. 3:07-CV-06418-JSW

- **Reality:** Neil accessed these files before his departure to work on them and provide an internal Gallagher attorney with a report that was needed to service the client. See Cohn Decl. ¶9. He did not copy the files or take them to EPIC. Expert forensic analysis confirms that Neil's access was consistent with his *working* on the files at Gallagher. See Pittman Decl. ¶25. Moreover, the client confirms that Neil never used Gallagher materials to solicit him; instead, the client simply responded to Neil's "tombstone" email and followed Neil to EPIC due to their relationship. See Benzer Decl. ¶¶2-4.

**DiMare Fresh, Inc.:**

- **Gallagher's Claim:** Gallagher claims that lower-level employee Shandranette Middleton accessed a client database containing information "Defendants would need to take DiMare's business."

- **Reality:** After learning that Brown and Quinn were leaving, Shandranette thought she might try to follow them, and she was worried if she did, Gallagher would expel her from the office. Concerned that she would lose templates and associated formulas that she had worked on for years, she copied these documents to a memory stick before meeting with anyone at EPIC. Although she had worked at Gallagher for several years, Shandranette believed there would be nothing wrong with her taking this material to her new job. During her initial interview at EPIC, however, a company official admonished her that she could not bring any Gallagher materials to EPIC. Shandranette then returned to her Gallagher desk and threw the memory stick in the garbage. Middleton Decl. ¶¶4, 8-9. Of course, the producer responsible for the DiMare account never used the information accessed (and discarded) by Middleton. See Quinn Decl. ¶¶34-35. Again, the client confirms this was the case, and that he followed Brian Quinn to EPIC because of their broker-client relationship -- in other words, EPIC did not use or "need" Gallagher's data to "take [the] business." See Folwell Decl. ¶¶3-5.

**Wawona Frozen Foods:**

- **Gallagher's Claim:** Same inferential claim about Middleton and the theory that Defendant would need this information to "underbid and take this business."

- **Reality:** Middleton never took the information because of the admonition she received during her interview at EPIC. The producer responsible for the Wawona account never used the information accessed (and left behind) by Middleton, and the information was not "needed." See Quinn Decl. ¶¶34 & 36 The client confirms this was the case, and that he followed Brian to EPIC because of their broker-client relationship. See Yoshida Decl. ¶¶3-5.

**Lilja Corporation:**

- **Gallagher's Claim:** Same inferential claim about Middleton, and a new claim that Eric Chua accessed and copied a file concerning Workers Compensation accounts.

OPPOSITION TO APPLICATION FOR
TEMPORARY RESTRAINING ORDER;
CASE NO. 3:07-CV-06418-JSW

- <u>Reality</u>: As discussed above, Middleton never took the information. Chua did access the file in question, but only because Gallagher executive Jim McFarlane (the same person who suggests under oath that Chua is a thief) ordered Chua to provide him (McFarlane) with a copy. The producer responsible for the Lilja account never used the information accessed (and left behind) by Middleton and Chua, and the information was not "needed" to woo the client. <u>See</u> Johnson Decl. ¶11. The client confirms that he followed Don Johnson to EPIC because of their broker-client relationship. <u>See</u> Field Decl. ¶¶2-4.

**<u>Center for Employment Training</u>:**

- <u>Gallagher's Claim</u>: Same inferential claims about Middleton and unsupported allegations concerning Chua.

- <u>Reality</u>: The information at issue never left Gallagher and was never used to solicit the client. (Counsel for Defendants were unable to contact this client over the holidays.)

**<u>Can-Am Plumbing</u>:**

- <u>Gallagher's Claim</u>: Same inferential claims about Middleton and unsupported allegations concerning Chua.

- <u>Reality</u>: Middleton never took the information, and with respect to these baseless claims against Chua, Gallagher executive Jim McFarlane is at best forgetful, and at worst attempting to mislead his counsel and the Court. Again, the broker (Michael Brown) never used any Gallagher information to "bid" or otherwise woo this business, and the client confirms that he came over simply because of his relationship with Michael and Wally. <u>See</u> M. Brown Decl. ¶¶27, 29-30; Capilla Decl. ¶¶3-6.

**<u>Rosendin Electric, Inc.</u>:**

- <u>Gallagher's Claim</u>: Same inferential claims about Middleton.

- <u>Reality</u>: The information Middleton copied never left Gallagher and was never used by the producer whom the client followed to EPIC. <u>See</u> W. Brown Decl. ¶¶69-71. Instead, the client came to EPIC simply to follow its broker. <u>See</u> id.

**<u>F. Rodgers Corporation</u>:**

- <u>Gallagher's Claim</u>: Same inferential claims about Middleton.

- <u>Reality</u>: Middleton never took the information, and the broker on this account never used any Gallagher information to "bid" or otherwise woo this business; instead, the client followed its brokers out of loyalty, and provided a broker of record letter after receiving their tombstone announcement. <u>See</u> M. Brown Decl. ¶¶27-28, 30; Warner Decl. ¶¶5-7.

**<u>Redwood City Electric, Inc.</u>:**

- <u>Gallagher's Claim</u>: Same inferential claims about Middleton.

OPPOSITION TO APPLICATION FOR
TEMPORARY RESTRAINING ORDER;
CASE NO. 3:07-CV-06418-JSW

- • Reality:  Middleton never took the information, and it was never used by the producer, whom the client followed to EPIC. See W. Brown Decl. ¶¶69-70, 72.  Instead, the client confirms he came to EPIC simply to follow his broker. See Castello Decl. ¶¶2-6.

## Western Shower Door, Inc.:

- • Gallagher's Claim:  Same inferential claims about Middleton.

- • Reality:   The information Middleton copied never left Gallagher.  Instead, the client came to EPIC simply to follow its broker; specifically, the client responded to the broker's tombstone in less than two hours declaring his intention to leave Gallagher and follow the broker to EPIC. See Ellsworth Decl. ¶10 and Exh. A.

## Duraflame, Inc.:

- • Gallagher's Claim:  Same inferential claims about Middleton.

- • Reality:   The information Middleton copied never left Gallagher.  Instead, the client came to EPIC simply to follow its broker; specifically, the client responded to the broker's tombstone in less than an hour declaring his intention to leave Gallagher and follow the broker by stating "the relationships I have are with people not an organization." See Amos Decl. ¶¶12 &13 and Exh. A.

## Town & Country:

- • Gallagher's Claim:  Shortly before his resignation, Neil Cohn accessed ten files pertaining to this client "in a manner consistent with copying."

- • Reality:   Neil accessed these files before his departure to work on them and help finish a renewal for the client (the commission for which went to Gallagher); he did not copy the files or take them to EPIC, and the client followed simply because of the broker-client relationship. See Cohn Decl. ¶¶11-12.  Expert forensic analysis confirms that Neil's access was consistent with working on the files. See Pittman Decl. ¶25.

## Hot Line Construction:

- • Gallagher's Claim:  Same purely inferential claims about Middleton.

- • Reality:   The information Middleton copied never left Gallagher.  The producer responsible for the Hot Line account never used the information accessed (and left behind) by Middleton, and the client followed Brian Quinn to EPIC due to their broker-client relationship. See Quinn Decl. ¶¶39 & 40.  (Defendants were unable to reach the client due to a recent family death.)

## Legacy Renovations:

- • Gallagher's Claim:  Same purely inferential claims about Middleton.

4150195.4

OPPOSITION TO APPLICATION FOR
TEMPORARY RESTRAINING ORDER;
CASE NO. 3:07-CV-06418-JSW

1    • __Reality:__   Again, the information Middleton copied never left Gallagher.

2    __U.S. Glass & Aluminum, Inc.:__

3    • __Gallagher's Claim:__  Same purely inferential claims about Middleton.

4    • __Reality:__   Middleton never took the information.  Once again, the producer responsible for
5    the USG&A account never used the information accessed (and left behind) by Middleton,
     and the information was not used to "bid" the client.  The client confirms that he followed
6    the Bob Ellsworth to EPIC simply because of the broker-client relationship.  See Brimmer
7    Decl. ¶¶2-4.

8

9

10

11                                    __REDACTED__

12

13

14

15

16

17          Not only is Gallagher unable to support its main, specified claims, but its

18   additional suppositions of trade secret misappropriation similarly lack support.  For example,

19   Gallagher and its forensic experts have analyzed the computers of its former employees, and have

20   jumped to the conclusion that any file accessed in the days prior to their departure from Gallagher

21   was copied and misappropriated.  See Berryhill Decl. ¶7; Krause Decl. ¶22.  In their effort to rush

22   the Court to judgment, however, Gallagher ignores numerous critical facts.

23          In the days prior to the announced resignations from Gallagher, the accused

24   employees were conducting business as usual, which included accessing files related to their

25   clients.  Martin Decl. ¶¶6, 13; Cohn Decl. ¶¶9-11; Chua Decl. ¶¶6, 9-10.  In addition, many

26   employees continued to work at Gallagher after the announced resignations, and did not make up

27   their mind to leave Gallagher until the following week.  One such employee -- Eric Chua -- was

28

4150195.4

OPPOSITION TO APPLICATION FOR
TEMPORARY RESTRAINING ORDER;
CASE NO. 3:07-CV-06418-JSW

1   asked by Gallagher executive James McFarlane to access and print out a client list on Monday

2   morning, December 10, 2007. Chua ¶¶9-10. Chua complied, only to now be the target of

3   accusations that he misappropriated the file. See McFarlane Decl. ¶¶43(c),(d), 44.

4          Similar stories abound. James Halbleib, a respected producer from the San

5   Francisco office with more than 30 years experience in the insurance industry, is accused by

6   McFarlane of copying files from his laptop to a "flash drive." McFarlane Decl. ¶¶39-41. In fact,

7   the file was downloaded by a client to the client's flash drive, so that it could be loaded onto the

8   client's computer for purposes of conducting a PowerPoint presentation. Halbleib Decl. ¶11.

9   Again, no Gallagher information was misappropriated.

10         George Petty -- the office "IT" manager -- is likewise accused of wholesale

11  copying and an associated cover-up. McFarlane Decl. ¶¶6(a), (b), 7. Yet his testimony reveals

12  that he regularly used handheld hard drives to copy and install software programs on computers

13  as part of his work. Petty Decl. ¶7. Petty never touched client materials, and the files that he

14  allegedly deleted before leaving Gallagher were personal and music files, and not Gallagher

15  information. Id. ¶12. Petty is also accused of "defragging" the computer of Neil Cohn after Cohn

16  resigned from Gallagher, an accusation Petty denies. Kimble Decl. ¶¶6-7. Had Gallagher

17  checked the computer before casting aspersions, it likely would have discovered that it had long

18  ago been set by Gallagher staff to "defrag" automatically for maintenance. Petty Decl. ¶11.

19         Given Gallagher's reckless willingness to label its former employees thieves, it is

20  no wonder that morale at the company is low and employees are eager to leave. Indeed, in its

21  zeal to spin its tale of conspiracy, Gallagher accuses numerous other innocent employees of

22  rapidly accessing hundreds of files "in a manner consistent with copying." McFarlane ¶¶35-50;

23  Kruse Decl. ¶¶16(b), 22. Gallagher's insinuations of copying, however, are incorrect. Most of

24  the employees at issue do not even know how to access hundreds of files at once, and had no

25  copying technology connected to their computers. See, e.g., Martin Decl. ¶12; Halbleib Decl.

26  ¶12. EPIC's forensic experts have determined that the supposed evidence of this copying --

27  printouts showing access to "lnk" ( or "link") files, does not prove that any of those files were

28  copied. Pittman Decl. ¶¶12-20. Contrary to the insinuation of Gallagher and its expert, Jon

OPPOSITION TO APPLICATION FOR
TEMPORARY RESTRAINING ORDER;
CASE NO. 3:07-CV-06418-JSW

4150195.4

Berryhill, the information provided by a link file is completely unrelated to whether or not the target file was copied. As forensic expert Ryan Pittman testifies, the last access time for a link file can be updated without the target file ever having been accessed or copied, such as when a link file is scanned by a backup or virus-scanning program. Id. ¶¶21, 26 (concluding that the conclusions reached by Gallagher's experts are "not ... reliable" and "limited in value"). Thus, the sole evidence relied upon by Gallagher's experts is not probative of whether or not mass copying -- or even rapid access of the target files themselves -- occurred. The witnesses themselves, however, have testified that they did not in fact copy files as alleged. Martin Decl. ¶12; Halbleib Decl. ¶12; Cohn Decl. ¶12; Chua Decl. ¶12.

Further, the apparent motive for stealing proprietary information ascribed by Gallagher to its former employees -- most of whom had no idea they would be leaving the employment at Gallagher at the time of their alleged misappropriations -- is that these materials were necessary to obtain Broker of Record letters from clients transferring their accounts to EPIC. McFarlane Decl. ¶¶9, 57. But, the clients identified by Gallagher in its moving papers as having moved to EPIC because of alleged trade secrets "stolen" by Middleton and Chua have submitted sworn declarations affirming what Gallagher itself already knows -- that clients typically choose their insurance brokers on the basis of past professional relationships, and not possession of alleged trade secret information. W. Brown Decl. ¶¶9, 62, Wells Decl. ¶¶9-10. Quite simply, the clients who followed their various brokers from Gallagher to EPIC did so because they have personal and professional relationships with these advisors, and not because the brokers possessed information about their accounts that is readily duplicated. Id.; see also Benzer Decl.; Brimmer Decl.; Capilla Decl.; Castello Decl.; Field Decl.; Folwell Decl.; Yoshida Decl.

## C.    Gallagher Has Not Established That Injunctive Relief Is Necessary To Avoid Irreparable Injury

In addition to failing to show a likelihood of success on the merits, Gallagher also fails to meet its separate and heavy burden of establishing that, absent the extraordinary relief it seeks, it faces "serious, immediate, and irreparable" injury for which there is no adequate remedy at law. Caribbean Marine Svcs. Co., Inc. v. Baldrige, 844 F.2d 668, 678 (9th Cir. 1988); Los

1    <u>Angeles Mem'l Coliseum Comm'n v. Nat'l Football League</u> (NFL), 634 F.2d 1197, 1202 (9th

2    Cir. 1980) (citing <u>Sampson v. Murray</u>, 415 U.S. 61, 88 (1974)). Having presented no evidence of

3    irreparable harm, Gallagher instead relies upon speculative threats of future injury, which plainly

4    does not suffice. <u>See</u> <u>Goldie's Bookstore v. Superior Court of the State of California</u>, 739 F.2d

5    466, 472 (9th Cir. 1984) (abuse of discretion to issue preliminary injunction based on alleged lost

6    goodwill and customers that is not supported by evidence).

7              Gallagher claims two types of alleged irreparable harm, both of which are

8    insufficient. First, Gallagher complains that it has lost clients to EPIC and is likely to lose more.

9    However, even if Gallagher can somehow establish Defendants' liability for these losses at trial,

10   it can be made whole with money damages or disgorgement of profits as a matter of law. Binding

11   precedent is clear that such disruptions to business constitute economic losses that do not

12   constitute irreparable injury. <u>See</u> <u>Sampson</u>, 415 U.S. at 88-91 ("loss of earnings or damage to

13   reputation" does not "afford a basis for a finding of irreparable injury and provide a basis for

14   temporary injunctive relief"); <u>NFL</u>, 634 F.2d at 1202-03 (9th Cir. 1980) (vacating preliminary

15   injunction order based on alleged lost revenues, goodwill, and market share). Indeed, Gallagher's

16   own papers quantify the damages stemming from allegedly lost client business. Pltfs' <u>Ex Parte</u>

17   Motion ¶4 (claiming "30 lost customers and several millions of dollars of [lost] business");

18   McFarlane Decl. ¶57. Even if Gallagher had shown "a strong likelihood" of success on the

19   merits, its failure on this point alone would preclude the relief it seeks. <u>See</u> <u>StonCor Group, Inc.</u>

20   <u>v. Campton</u>, No. C05-1225JLR, 2005 WL 2030832, at *5-6 (W.D. Wash. Aug. 22, 2005) (despite

21   plaintiff's "strong likelihood" of success on trade secret claim, preliminary injunction was not

22   proper because lost goodwill and business revenues constituted a quantifiable "economic loss").

23              Second, Gallagher seeks an injunction against EPIC's alleged misappropriation of

24   trade secrets, which is based on Gallagher's speculation that such trade secrets were copied, and

25   have been used to lure clients to EPIC. Again, however, in order to justify the extraordinary

26   measure of a temporary restraining order, a plaintiff's allegations of misappropriated trade secrets

27   must be supported by solid evidence of threatened "actual use" or "actual disclosure." Bayer, 72

28   F. Supp. 2d at 1119 (denying preliminary injunction where plaintiff had not produced evidence of

- 21 -

OPPOSITION TO APPLICATION FOR
TEMPORARY RESTRAINING ORDER;
CASE NO. 3:07-CV-06418-JSW

1    "actual use" or "actual disclosure" establishing irreparable injury); see also Goldie's Bookstore v.

2    Superior Court of the State of California, 739 F.2d at 472; Whyte v. Schlage Lock Co., 101

3    Cal.App.4th 1443, 1458-64 (2002) (preliminary injunction properly denied where trial court

4    concluded that plaintiff had not proven misappropriation of trade secrets, despite inferential

5    evidence that defendant took trade secrets or destroyed evidence).  Gallagher has offered no

6    evidence that EPIC has actually used or misappropriated trade secrets to lure clients.  In fact, the

7    only direct evidence from clients who left Gallagher for EPIC shows that they did so merely

8    because they were following their brokers and not because of the use of any Gallagher data.

9    Moreover, as a respected industry expert has made clear, none of the alleged trade secret

10   information identified by Gallagher as "stolen" is relevant to a client's decision to do business

11   with a particular broker.  Gallagher's argument is a red herring.  See Wells Decl. ¶¶ 10-11.

12        Although Gallagher's allegations of a conspiracy and rampant theft make for eye-

13   catching reading, the company offers nothing more than rank speculation to suggest threatened

14   trade secret misappropriation.  This speculation has been rebutted by dozens of sworn

15   declarations demonstrating that EPIC has not misappropriated any trade secret information, and

16   that information inadvertently retained from prior employment was, upon its discovery, returned

17   prior to any use or disclosure by EPIC.

18        **D.    The Balance of Hardships Tips Sharply In Favor Of EPIC, Not Gallagher**

19        The balance of hardships tips sharply in favor of EPIC for three reasons.  First, the

20   relief Gallagher is seeking could interfere with the rights of employees to freely seek employment

21   where they choose.  California has a strong public policy against such restraints on trade.  See

22   Cal. Bus. & Prof Code § 16600.  If Gallagher is seeking an order preventing EPIC from hiring

23   interested candidates merely because they presently work at Gallagher, that would interfere with

24   these employees' rights "to engage in a competitive business for [themselves], and to enter into

25   competition with [their] former employer, even for the business of those who had formerly been

26   the customers of [their] former employer."  Continental Car-Na-Var Corp., 24 Cal 2d at 110.

27        Second, issuing a temporary restraining order could interfere with the rights of

28   Gallagher's clients to choose the broker that best serves their needs.  See StonCor Group, Inc.,

OPPOSITION TO APPLICATION FOR
TEMPORARY RESTRAINING ORDER;
CASE NO. 3:07-CV-06418-JSW

2005 WL 2030832, at *6 (holding that enjoining new company from competing with established competitor would squelch customer's rights to "vote with their feet" and change service providers). This harm is especially pronounced in the insurance industry, where the client's relationships are, as one Gallagher-turned-EPIC client stated, "with people [and] not an organization." Amos Decl., Ex. A; see also Wells Decl. ¶9 (clients in the transitory insurance industry often move with their brokers when they switch to a new brokerage).

Third, the "parties' disproportionate positions of financial strength" supports denial of Gallagher's motion. See StonCor Group, Inc., 2005 WL 2030832, at *6. Gallagher is, as its website states, "the world's fourth largest insurance brokerage and risk management services firm."[11] It has scores of offices worldwide, approximately 6400 employees, and generates enormous revenue—$1.253 billion through the first three quarters of 2007 alone.[12] In contrast, EPIC is a new, local company with far fewer offices and employees. Thus, "entering the proposed injunction would have a far greater impact on [Defendants] than not entering it would have on [Plaintiffs]." Id. at *6.

## IV.   THE INJUNCTIVE RELIEF REQUESTED BY GALLAGHER IS UNWARRANTED AND OVERBROAD

For the reasons stated above, Gallagher has not met its significant evidentiary burden of demonstrating that the extraordinary relief it seeks is warranted. The vast majority of its claims find no support in the record, and it appears that some of these allegations against its former employees are reckless. Given the strict requirements for issuance of injunctive relief before a trial on the merits, EPIC respectfully submits that the appropriate result is a denial of the instant motion. And, if Gallagher really wants to pursue its claims and the associated (and ascertainable) damages, if any exist, it can do so in the normal course without interfering with employee mobility or market competition.

---

[11] See Arthur J. Gallagher & Co., Homepage, http://www.ajg.com/portal/server.pt?open=512 &mode=2&objID=201 (last accessed Jan. 4, 2007).

[12] See Arthur J. Gallagher & Co., Arthur J. Gallagher & Co. Announces Third Quarter 2007 Financial Results, Oct. 23, 2007, available at http://library.corporate-ir.net/library/10/104/ 104111/items/266068/AJG_Q3_2007_Earnings_Release.pdf.

1          Nevertheless, to the extent the Court feels it necessary to enter some form of

2  injunction at this early stage, EPIC submits that the relief sought by Gallagher is overbroad, and

3  must be narrowed to avoid stifling permissible competition and employee mobility.  While in no

4  way conceding that any injunctive relief is appropriate here, EPIC submits that an order to the

5  following effect would be more reasonable:

6       (1)    Defendants shall not retain, and will immediately return to Gallagher, any
       Gallagher property, documents, or data, and all copies thereof, that Defendants
7       took with them from Gallagher, if any, when they left to join EPIC; provided,
       however, this shall not preclude Defendants from retaining or using any materials
8       that they obtained directly from clients after joining EPIC.

9       (2)    Defendants shall not access, retrieve, copy, transmit or disseminate, and will
10      immediately return to Gallagher, any Gallagher property, documents, or data, and
       all copies thereof, that Defendants took with them from Gallagher, if any, when
11      they left to join EPIC; provided however, this shall not preclude Defendants from
       retaining or using any materials that Defendants obtained from their clients after
12      joining EPIC.

13      (3)    Defendants shall not destroy, erase, or otherwise modify, or cause or permit
14      anyone else to destroy, erase, or otherwise modify any Gallagher property,
       documents, or data, and all copies thereof, that Defendants took with them from
15      Gallagher, if any, when they left to join EPIC; provided however, this shall not
       preclude Defendants from retaining or using or modifying any materials that
16      Defendants obtained from their clients after joining EPIC.

17    (4)(a)   No former Gallagher employee Defendants shall initiate contact with any current
18      Gallagher employees in an effort to recruit these employees to join EPIC; and

19    (4)(b)   Defendants will not seek to or actually transact business with any current client of
20      Gallagher who was also a client of Gallagher as of December 7, 2007, if, and only
       if, Defendants knowingly possess Gallagher property, documents, or data, or
21      copies thereof, relating to that client that were taken from Gallagher when they left
       to join EPIC; provided however, this shall not preclude Defendants from seeking
22      or transacting business with any current client of Gallagher whose materials
       Defendants obtained from those clients after joining EPIC.
23

24 **V.     IF AN INJUNCTION ISSUES, GALLAGHER SHOULD BE REQUIRED TO POST
    AN APPROPRIATE BOND**

25         In the event the Court grants part or all of Gallagher's requested injunction, it must

26 also require it to post a bond "in an amount that covers [Defendants'] potential incidental and

27 consequential costs as well as either the losses the [Defendants] will suffer … or the

28

            - 24 -          OPPOSITION TO APPLICATION FOR
TEMPORARY RESTRAINING ORDER;
CASE NO. 3:07-CV-06418-JSW

1    complainant's unjust enrichment caused by his adversary being improperly enjoined or

2    restrained." Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 n.3 (4th Cir. 1999)

3    (requiring district court in trade secrets case to require a bond based on that standard upon remand

4    if preliminary injunctive relief is ordered).

5         Factors to consider in fixing the amount of a bond in trade secret cases such as this

6    one are: (1) lost profits due to enjoined business practices; (2) expenses required to restart

7    business operations suspended by the injunction; and (3) interest on these amounts. E.g.,

8    Unisource Worldwide, Inc. v. South Central Ala. Supply, LLC, 199 F. Supp. 2d 1194, 1215-16

9    (M.D. Ala. 2001). To the extent the instant motion is granted, Defendants respectfully request that

10    the Court require Gallagher to post a bond in the amount of $500,000.

11    **VI.    RESPONSE TO REQUEST FOR EXPEDITED DISCOVERY**

12         Gallagher has not even identified with reasonable particularity the trade secrets

13    that it seeks to protect. See Section III.B.2.(a). As such, Plaintiff is not entitled to conduct any

14    discovery, much less expedited discovery. See Cal. Civ. Proc. Code § 2019.210; Computer

15    Economics, 50 F. Supp. 2d at 992 (this requirement applies to state claims in federal court). To

16    the extent some form of injunctive relief is granted, however, EPIC is amenable to expediting

17    discovery, so long as the right to expedited discovery applies to both parties equally. In such a

18    situation, EPIC respectfully suggests that the Court order the parties to meet and confer and either

19    submit a stipulated discovery plan or simultaneous letter briefs addressing the parties' differences.

20    **VII.    CONCLUSION**

21         For all the reasons stated, EPIC respectfully requests that Gallagher's motion for a

22    temporary retraining order be denied.

23

24    DATED: January 4, 2008                    MUNGER, TOLLES & OLSON LLP

25

26                                      By: _____

27                                          MALCOLM A. HEINICKE

28

4150195.4

OPPOSITION TO APPLICATION FOR
TEMPORARY RESTRAINING ORDER;
CASE NO. 3:07-CV-06418-JSW