# EXHIBIT 5

```
JAMES M. WAGSTAFFE (95535)
ADRIAN J. SAWYER (203712)
```
**KERR & WAGSTAFFE LLP**
100 Spear Street, Suite 1800
San Francisco, CA 94105–1528
Telephone: (415) 371-8500
Fax: (415) 371-0500

Attorneys for Defendants
ANDREW ("WALLY") BROWN, JR.,
BRIAN QUINN, MICHAEL BROWN, and
LAURA WICK

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| ARTHUR J. GALLAGHER & CO., Inc., a Delaware Corporation, ARTHUR J. GALLAGHER & CO., INSURANCE BROKERS OF CALIFORNIA, INC., a California Corporation,<br><br>    Plaintiffs,<br><br>    v.<br><br>EDGEWOOD PARTNERS INSURANCE CENTER, a California Corporation, DAN R. FRANCIS, JOHN G. HAHN, ANDREW ("WALLY") BROWN, JR., BRIAN F. QUINN, NEIL R. COHN, CAROLANN COHN, MICHAEL J. BROWN, STEPHEN HAUSE, LAURA J. WICK, JAMES C. HALBLEIB, LAURINDA ("LAURIE") A. MARTIN, ERIC CHUA, GEORGE J. PETTY, LINDA SOO HOO, ROBERT E. DUTTO, SUSAN M. ENGLISH, DON J. JOHNSON, ALLEN L. AMOS, WILLIAM ("BILL") PHILLIPS, JR., DIRCK ("RICK") R. STINSON, ROBERT ("BOB") D. ELLSWORTH, ROBERT H. WATKINS, PAUL H. WAGENER, and SHANDRANETTE MIDDLETON,<br><br>    Defendants. | Case No. C07-06418 JSW<br><br>**DECLARATION OF MICHAEL BROWN IN SUPPORT OF OPPOSITION TO MOTION FOR A TEMPORARY RESTRAINING ORDER**<br><br>Date:        January 11, 2008<br>Time:        9 a.m.<br>Courtroom:   2, 17th Floor<br><br>Hon. Jeffrey S. White<br><br>**PUBLIC VERSION** |

CASE NO. C 07-06418 JSW                                              DECL. OF MICHAEL BROWN

I, Michael Brown, declare:

1. I am currently an employee of Edgewood Partners Insurance Center ("EPIC"), and am a former employee of Arthur J. Gallagher & Co., Insurance Brokers of California ("Gallagher"). I have personal knowledge of each of the facts set forth in this declaration and if called as a witness could and would testify competently thereto.

2. I am the former Area Vice-President for Gallagher's San Ramon (formerly Pleasanton) Brokerage Services Division. On March 2, 1998 joined Gallagher. At the time I joined, I joined Gallagher/Heffernan in San Francisco, which was a separate office. I transferred to the Pleasanton branch in July 1999.

3. I had previously interned with Gallagher over the summer of 1996 and 1997. Gallagher offered employment 6 months before graduating from college, and I accepted. I graduated from St. Mary's in January 1998.

**My Disillusionment with Gallagher**

4. In late November 2006, my father Wally Brown told me that he had been fired from his position as Area President and demoted to Area Chairman. He told me not to worry about him, and to concentrate on doing my job.

5. In addition, I learned of events that made me believe that I did not have a future at Gallagher.

**REDACTED**

When I heard this, it was after Gallagher had demoted my father, and it made me believe that I did not have a future at Gallagher even though I had a very good book of business that was mainly construction-based. I also felt betrayed, because it appeared that my hard work was not going to be appreciated by Gallagher and that my opportunities at Gallagher were diminished.

**The Process of My Joining EPIC**

6. I first heard about a new opportunity in late June. Wally Brown told me that Gallagher had asked him to contact Dan Francis about being Branch Manager of the San Francisco branch after Dan Francis had resigned from ABD. He told me that Mr. Francis had

told him that there might be an opportunity and had told him to talk to John Hahn if he was interested.

7. In late June or early July, I had a ten minute meeting with John Hahn to see if the new opportunity was something in which I would be interested. No one else was present at that meeting, although I understand that my father was meeting with Mr. Hahn at about the same time. We did not get into specifics, but talked about the culture that Mr. Hahn was trying to foster with the new operation and generally about producer compensation.

8. I left the meeting interested in the opportunity. I told Wally Brown that I was on board if he was interested, but would not pursue the opportunity without him, and I left it to him to explore the opportunity further.

9. Between the late June/early July meeting and early November, I had between three and five informal conversations with Wally about the new opportunity. During those conversations, he generally told me what he thought of the new opportunity, and told me that he was still negotiating the structure of the potential deal. One issue he mentioned to me was that Gallagher was in the middle of an office move, and he did not think it was right to leave in the middle of an office move, for Gallagher's or the client's sake. I told Wally Brown that I had a **REDACTED** and that I did not want to move until after the **REDACTED** I knew that this meant that any commissions on those new policies would stay with Gallagher, but it was important to me that clients not encounter any renewal issues.

10. The next time I met with John Hahn was in early November. I called Mr. Hahn and told him that I would like to meet with Dan Francis and Mr. Hahn. He agreed and set up a lunch for the three of us to meet. The lunch was an opportunity to meet Dan Francis, whom I had not met before, and an opportunity to negotiate my own deal. I knew that there was momentum to the opportunity, but I had not been involved with it up to that point and wanted to negotiate my own deal.

11. At the lunch, I told Mr. Francis and Mr. Hahn what sort of opportunity and culture I was looking for. I also negotiated the compensation package I would receive if I were to come to EPIC. They explained to me the compensation structure at EPIC. I explained to them that I

did not want a pay cut in the first year and wanted to be guaranteed that I would be paid the same as if I had stayed at Gallagher for that first year. They asked me generally the size of my book of business and how many clients I thought might join me at the new company. I did, however, commit to EPIC that I would leave after Thanksgiving. I later pushed that back a week because I

**REDACTED**

12. At that lunch, Mr. Hahn and Mr. Francis made me sign a document by which I agreed not to tell clients or employees that I was leaving Gallagher for EPIC, and not to take any information from Gallagher on my departure.

13. After that meeting, I was quite certain that I wanted to go to EPIC. In fact, I believe that I would have gone to EPIC even if Wally Brown had stayed.

14. I told Wally Brown that I had had lunch with Mr. Hahn and Mr. Francis, but I did not tell Brian about that lunch

15. I did not see John Hahn or Dan Francis until after I resigned from Gallagher.

16. Following my November lunch, I did not tell anyone at Gallagher that I was going to leave.

17. Following my November lunch, I told three of the accounts I had worked with and whom I considered mentors that there was an opportunity out there that could potentially entail my leaving Gallagher. I asked them their advice. These three contacts were people who own their own businesses, and I wanted their advice because I knew that if I joined EPIC I would have an equity stake. I did not ask them to follow me in the event I left. The three were Chuck Burkard of Progress Glass, Tom Sosine of United Mechanical, and Barry Shames, Shames Construction. The Wednesday before we resigned, I and Wally told our contacts at F. Rodgers at a lunch meeting that they would get an announcement that we were leaving. The meeting had been previously scheduled for an earlier date and had been rescheduled a couple of times, and the meeting was not for the purpose announcing our departure. I did not solicit any of these clients.

18. I did not tell any of these clients, or any other clients, that EPIC was the name of the new opportunity. In short, no clients knew prior to my departure that I would be leaving Gallagher to join EPIC.

19. I did not, prior to my departure, tell any Gallagher employees that I was leaving. Wally was aware that I was leaving. I did not talk to Brian Quinn about leaving for EPIC until the afternoon before our resignations.

20. On Friday, December 7, I arrived at the office at about 7:45 or 8 a.m. I walked into the sales meeting after 9 a.m. late. Wally announced that he and Brian had just told the producers that he, Brian and I were resigning. He asked me whether I wanted to say anything, and I told the group goodbye and that I had enjoyed working with them. After that point, the sales meeting lasted maybe five minutes. It appeared to me that people were in shock.

21. The next meeting was an all-hands meeting. Wally made the announcement. Brian had a short thank you. They asked me if I would like to say anything. I told everyone in the room that I appreciated working with all of them and I wished them well.

22. People were surprised and some were very emotional. Two employees were crying. Some sales people came to me and asked about the opportunity. I told them I could not say anything other than that I was going to EPIC, formerly Calco, and that it was in San Mateo. I gave Mary Smith's phone number to one person.

23. I walked out of the meeting and returned to my office to send my resignation letter to Jim McFarlane, and pack up personal belongings.

24. It took about 20 minutes to pack up. People were coming up to me to wish me well and say goodbye.

25. After departing, I sent out a brief announcement email to clients I had worked with at Gallagher. The email announced that I had left Gallagher and joined EPIC. On Monday I sent out another email to people who had not responded yet. I did not make any other efforts to contact clients beyond the announcement.

**The Allegations of Misuse of Confidential Information**

26. I have not used any information taken from Gallagher in my meetings with EPIC. In fact, I have generally asked clients to borrow their insurance policies so I can recreate the information because I could not take anything with me when I left. I have told clients that there is about a 7 day transition period because of this.

27. I have reviewed the allegation regarding Shandranette Middleton accessing a client list December 7. I have no knowledge of Ms. Middleton ever accessing any client information, I have no knowledge of Ms. Middleton ever working on any of my accounts. Of the clients listed in that section of the motion, only two are clients I work with: F. Rodgers and Can-Am. Ms. Middleton has not worked on either account with me.

28. I have worked with F. Rodgers for just over three years. On 10/1, I did my third renewal with F. Rodgers. At F. Rodgers' invitation, I went to F. Rodgers' corporate Holiday Party on Saturday December 8. I did not solicit any business, but the CFO had received the announcement of my joining EPIC and told me to be in F. Rodgers' office at 8 a.m. on Monday morning. On Monday morning F. Rodgers provided me with a broker of record letter.

29. I have personally worked on the Can-Am account for six to seven years. After I announced my departure from Gallagher, the owner and president of Can-Am dropped off a handwritten note and a bottle of wine at my home that evening. He contacted me that weekend and asked me to come to his office Monday morning. I did so and received a broker of record letter.

30. In short, not only do I not have knowledge concerning alleged access by Middleton, but I have not used any such information to "bid" F. Rodgers or Can-Am. Rather, both F. Rodgers and Can-Am decided to work with EPIC after learning of my departure.

31. I had nothing to do with leasing the EPIC office space and did not even know where it was until after I had resigned from Gallagher.

32. I never told John Hahn or Dan Francis who I thought were key and important producers. Rather I spoke about myself.

33. I have read Lynn Tu's declaration, and in particular note that she says I told her I hoped to work with her again. That is not an accurate statement. Lynn came up to me and gave me a hug, even though I had met her fewer than 10 times in my life. I told her words to the effect of "It's a crazy world, Lynn. Who knows—maybe we'll work together again."

34. I have reviewed the allegation that I deleted Gallagher data. Upon my departure, I deleted all of the emails from my inbox, and then immediately moved all of them back from the deleted items folder into the inbox. The allegation that I deleted the e-mails omits the fact that I restored them immediately.

I declare under penalty of perjury that the foregoing is true and correct and was executed on this __ day of January, 2008, at Pleasanton, California.

_____
Michael Brown