# EXHIBIT 6

JAMES M. WAGSTAFFE (95535)
ADRIAN J. SAWYER (203712)
**KERR & WAGSTAFFE LLP**
100 Spear Street, Suite 1800
San Francisco, CA 94105–1528
Telephone: (415) 371-8500
Fax: (415) 371-0500

Attorneys for Defendants
ANDREW ("WALLY") BROWN, JR.,
BRIAN QUINN, MICHAEL BROWN, and
LAURA WICK

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ARTHUR J. GALLAGHER & CO., Inc., a Delaware Corporation, ARTHUR J. GALLAGHER & CO., INSURANCE BROKERS OF CALIFORNIA, INC., a California Corporation,<br><br>Plaintiffs,<br><br>v.<br><br>EDGEWOOD PARTNERS INSURANCE CENTER, a California Corporation, DAN R. FRANCIS, JOHN G. HAHN, ANDREW ("WALLY") BROWN, JR., BRIAN F. QUINN, NEIL R. COHN, CAROLANN COHN, MICHAEL J. BROWN, STEPHEN HAUSE, LAURA J. WICK, JAMES C. HALBLEIB, LAURINDA ("LAURIE") A. MARTIN, ERIC CHUA, GEORGE J. PETTY, LINDA SOO HOO, ROBERT E. DUTTO, SUSAN M. ENGLISH, DON J. JOHNSON, ALLEN L. AMOS, WILLIAM ("BILL") PHILLIPS, JR., DIRCK ("RICK") R. STINSON, ROBERT ("BOB") D. ELLSWORTH, ROBERT H. WATKINS, PAUL H. WAGENER, and SHANDRANETTE MIDDLETON,<br><br>Defendants. | Case No. C07-06418 JSW<br><br>**DECLARATION OF ANDREW W. ("WALLY") BROWN, JR. IN SUPPORT OF OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Date:        January 11, 2008<br>Time:        9 a.m.<br>Courtroom:   2, 17th Floor<br><br>Hon. Jeffrey S. White<br><br>**PUBLIC VERSION** |

CASE NO. C 07-06418 JSW                                                    DECL. OF WALLY BROWN

I, Wally Brown, declare:

1. I am currently a principal of Edgewood Partners Insurance Center ("EPIC"), and am a former employee of Arthur J. Gallagher & Co., Insurance Brokers of California ("Gallagher"). I have personal knowledge of each of the facts set forth in this declaration and if called as a witness could and would testify competently thereto.

### My Employment With Gallagher

2. From 1987 to December 7, 2007, I was an employee of Gallagher in its Pleasanton/San Ramon Office. The office had been in Pleasanton for that entire time but was moved to San Ramon in Summer 2007. Prior to January 1, 2007, I had been employed as Area President. At the time of my departure, I was employed as Area Chairman.

### My Business Generally

3. My business is representing clients in securing an insurance program that involves risk transfer and some level of risk assumption, in other words, the design and pricing of a risk transfer program. The clients I work with are in a broad spectrum of industries, but many of them are construction and construction-related companies. I design and implement risk transfer programs for these clients. Risk transfer programs consist of bundles of insurance policies in the property, liability, and workers' compensation areas. The policies generally run for one year.

4. I also handle claims and interpret policies in matters of coverage.

5. In designing a risk transfer program for a client, I use my personal negotiating and analytical abilities. The policies involved in risk transfer programs are all written by the insurance companies. They are generally standard industry forms and filed with the Departments of Insurance in various states, and the policy terms generally do not vary across brokers.

6. For each industry, there are standard industry coverages. For example, every company needs workers' compensation, Comprehensive General Liability, automobile, and umbrella liability policies.

7. Insurance companies will only deal with one broker of record ("BOR"). A change in BOR is signified by a Broker of Record Letter ("BOR Letter").

8. When a new BOR Letter is issued, the risk transfer program in place for the client does not immediately change. The policies remain in effect, and, importantly for purposes of this litigation, commissions remain with the originating broker until the policy or policies in the program expire. Accordingly, a new BOR does not receive any commission just for being BOR, and the originating BOR does not lose commission just because a new BOR letter issued.

9. This is a personal service business, and personal relationships are paramount. It is my experience that clients develop personal relationships with brokers and often follow them when they leave. Over the course of my years in this business, I have seen numerous people change jobs. In fact, while I was at Gallagher, I was often charged by my superiors at Gallagher with recruiting producers from other brokerages. Gallagher's intention was that the producers would join Gallagher and get their clients over to Gallagher. Generally, clients followed the producers over, and sometimes they did not.

10. One such employee was Lynn Tu, who submitted a declaration in support of Gallagher's application for a temporary restraining order and other relief.

**REDACTED**

11. Not surprisingly, I received congratulations from Pat Gallagher, James McFarlane, and others in Gallagher for **REDACTED** In addition, at an annual Branch Managers' meeting, Gallagher had me present a videotaped discussion of how **REDACTED** **REDACTED**

12. In keeping with the fact that this is a personal service business, typically brokers working in the industry know which clients work with other brokers. For a large client, the broker's identity is generally common knowledge. For a smaller company, the broker's identity is generally available from a variety of sources, if it is not readily known. Certificates of insurance also have the broker's name, and are widely distributed.

### My Disillusionment with Gallagher

13. In late September 2006, I was demoted from Area President to Area Chairman at an unscheduled breakfast meeting with James McFarlane that had been called by Mr. McFarlane at the last minute. When I asked Mr. McFarlane the purpose of the breakfast meeting, he told me it was nothing important. At the meeting he told me that I was out and Brian Quinn was in as Area President. During that meeting, he also told me "this is a $4 billion company, whatever you do is insignificant." My new title would be Area Chairman, and Mr. Quinn was to have sole responsibility for managing the office. Although my new title had been selected to make the job change not appear to be a demotion, the change was perceived by everyone in the company as that, and it was publicly announced at a meeting that I had stepped down.

14. I told Mr. McFarlane that I would cooperate and wanted to do this in a respectful manner, and I asked Mr. McFarlane if we could jointly announce this to Brian Quinn as my decision to step down. Mr. McFarlane agreed. When I got back to the office, Brian informed me that Mr. McFarlane had called him and told him that I was demoted and that I might be a problem, in direct contradiction to our agreement.

15. This was one of many things that caused my disillusionment with Gallagher. Other factors were

**REDACTED**

### The Process of Joining EPIC

16. I first spoke with Dan Francis, co-founder of EPIC, in Spring 2007. I called Dan Francis at James McFarlane's request. Mr. McFarlane is an executive at Gallagher and was my superior at Gallagher. Mr. McFarlane had heard that Mr. Francis had resigned from his former employer, ABD, where he had been the President. Mr. McFarlane told me he thought there was an opportunity to hire Mr. Francis, who might bring other sales people and clients to Gallagher.

17. I met with Mr. Francis in May 2007. He informed me that he was not interested in going to Gallagher, but actually was in the process of founding a new brokerage company.



18. A couple of weeks after that first meeting, I met with Mr. Francis and EPIC's co-founder, John Hahn, at the Tri-City office in San Francisco. At this meeting, Mr. Francis and Mr. Hahn told me that they were going to form a new insurance company. They informed me that they had raised $100 million to start a new brokerage firm and had purchased CALCO, and told me of their business plan. At some point (I do not recall whether it was at this meeting or not) they informed me that the new company would be called EPIC.

19. Following that meeting, my interest in EPIC developed. I also discussed with Brian Quinn the opportunity that Mr. Francis and Mr. Hahn had discussed with me. I outlined for Mr. Quinn the substance of what I had learned in the meeting with Mr. Francis and Mr. Hahn.

20. Mr. Quinn became interested in the EPIC program. Subsequently, Mr. Hahn and Mr. Quinn met each other. I was not present at their first meeting.

21. Over the course of the next several months, I had a number of meetings with Mr. Francis and Mr. Hahn. Some of these meetings were joint, and some were separate. Mr. Quinn was present at some meetings and not present at others.

22. At no time during any of these meetings did I provide Mr. Francis or Mr. Hahn with any confidential information concerning Gallagher clients. I told them approximately how much revenue I deal with, because it would be linked to my compensation and my value to them. I never showed them any Gallagher customer or employee documents. While I did have general discussions with them concerning who were large producers, I did not give any detailed or specific information to them concerning other producers at Gallagher. Rather, I focused on my own value to EPIC.

23. Over the course of those months, I negotiated a deal whereby I would join EPIC. The deal EPIC offered me was in no way contingent on Mr. Quinn or anyone else joining EPIC, but I would acknowledge that Mr. Quinn and I both had a continued interest in working together. We each negotiated our deals with EPIC up until Tuesday, December 4, 2007, two days before our resignation on December 7. While there are common elements to our deals with EPIC, involving bonus compensation for management of the office, our deals are not identical or dependent on one another.

24. While I was negotiating my arrangement with EPIC, I did discuss my plans to join EPIC with Brian Quinn, my son Michael Brown, and Laura Wick.

25. I also knew that Neil Cohn was talking with EPIC, and he knew that I was meeting with EPIC. I found out that Neil was doing this because he told me, and I told him I was talking to EPIC as well. I did not share details with him, and we each negotiated our own deals.

26. There was in fact considerable "buzz" in the local insurance community and our office regarding EPIC, as an article about EPIC was published in the early Summer of 2007 describing the new venture of John Hahn and Dan Francis, who each were accomplished insurance professionals of over thirty years' experience. Up until immediately prior to my departure, I did not tell anyone at the Gallagher office (other than the persons identified above) that I was considering the opportunity to join EPIC.

27. There also were considerable rumors in the industry that I was going to depart Gallagher. I believe one of the reasons those rumors started was because my first meeting with John Hahn and Dan Francis was at the Tri-City Office in San Francisco and was a visible meeting. Also, I had met with other brokerages to discuss opportunities elsewhere.

28. I acknowledge that the night before or the morning of the day I announced my resignation, I told three persons that I was leaving Gallagher to join EPIC.

29. First, I told Shandranette Middleton the evening before I resigned of my plan was to resign the next morning. I told Ms. Middleton this because I had worked closely with Ms. Middleton and we were friends. I also thought she might miss the meeting. Ms. Middleton had left Gallagher and then returned to Gallagher as a consultant, and had stayed with Gallagher largely, I felt, out of personal loyalty to me. I therefore felt it necessary to alert her to the fact I would be leaving. I did not encourage her to come with me to EPIC or solicit her.

30. I also told Gabriele Simpson that I was departing the evening before announcing my resignation. I did not want Ms. Simpson to be surprised. I did not encourage her to come, and when she informed me that she felt she had to stay and help Gallagher, I told her I agreed with her decision.

31.  I also told Linda Soo Hoo the night before that I was departing. I did not want her to be surprised or to feel like she was being placed in an uncomfortable position.

32.  I was surprised by the number of producers and other employees who expressed interest in joining EPIC after I announced my resignation. When persons came to me and expressed interest in joining EPIC, I told them that I could not talk to them about it but that they could contact Mary Smith at EPIC and provided Ms. Smith's phone number. I did have a longer discussion with Lynn Tu, but her declaration omits several critical facts and I will address it separately below.

33.  Obviously, I hoped that producers and employees would be interested in working at EPIC with me. But any statement that I orchestrated a wholesale departure prior to announcing my resignation, as Gallagher alleges, is categorically untrue. I tried to keep my departure secret.

34.  I am aware that EPIC did not offer a job to every Gallagher employee who interviewed with EPIC in San Ramon following my departure. I am also aware that EPIC made offers to some personnel who did not accept those offers. I was not involved in interviewing Gallagher employees applying to EPIC.

**Laura Wick**

35.  I worked closely with Laura Wick. I knew Laura was looking to leave Gallagher in general during 2007. At some point (I do not recall exactly when it was) I spoke with Ms. Wick about my conversations with EPIC. The conversation was general.

36.  I generally told EPIC about Laura Wick during meetings with Mr. Hahn and Mr. Francis, but I do not remember the circumstances or approximate timing of the meetings. I mentioned Laura to EPIC during meetings with Mr. Hahn and Mr. Francis. I do not remember the circumstances or approximate timing of the meeting. I told them that Laura Wick was a good administrative person who had no insurance background. I further told EPIC that I would not involve myself in the hiring process for Laura.

37.  At a subsequent point, I recall that Ms. Wick told me that she had been contacted by a headhunter retained by EPIC and that she planned to meet with him.

38. Ms. Wick was aware that I was in discussions with EPIC at the time, and was aware that there was the possibility that I would leave Gallagher and join EPIC. In general, I had shared with Ms. Wick whenever I received a call from headhunters or was approached by another opportunity, and I made no exception for EPIC. We were friends and had a close working relationship.

39. I never arranged a meeting between EPIC and Ms. Wick, and was never present in any meeting between EPIC and Ms. Wick. Ms. Wick's discussions with EPIC were her own, and her decision was her own. I did tell her that my discussions were moving along positively.

40. I have reviewed the email attached as Exhibit A. I do not recall describing for Ms. Wick what her job duties at EPIC would be prior to her departure. I am fairly sure that I did share with Ms. Wick my hope that, if I departed, others would also be interested in EPIC. But the notion that there had been a deal struck whereby I and everyone else would leave is fiction.

41. I have reviewed the resignation letter from Ms. Wick that is attached to the McFarlane Declaration. Ms. Wick handed that letter to me on October 17. I did not help her draft it, and did not have input on the contents.

42. At the time Ms. Wick resigned from Gallagher, I understood that Ms. Wick was very likely to go to work for EPIC, but I also understood from talking to her that she was very busy with her family and wanted to take time to ascertain whether she wanted to continue working. It is important to note that at this time I also was not certain that I would go to EPIC. Whether I joined EPIC or not, I was pleased to know that she had found a more positive employment opportunity than she had experienced at Gallagher.

43. I encouraged Ms. Wick to take a couple of weeks to spend time with her family, and I wanted to keep open the possibility that Ms. Wick could return to Gallagher if she decided not to go to EPIC. While I thought there was a possibility that she might take a few weeks off and decide to stop working entirely in order to spend more time with her family, this was remote in my mind.

44. At the time Ms. Wick departed Gallagher, I was still negotiating a contract with EPIC. While my compensation as a producer was set according to a standard formula, I was also

1  negotiating my compensation for management services, which would be based on the
2  performance of the office and for which there was no standard formula.
3      45.    In other words, at the time Ms. Wick left Gallagher, I had not made a final
4  decision to leave Gallagher and join EPIC, a decision that was not final in my mind until certain
5  critical deal terms had been finalized. In fact, in one of my conversations with Ms. Wick after
6  she had left Gallagher, I told her that I might still stay at Gallagher. Ms. Wick told me that she
7  would stay at EPIC regardless of whether or not I came to EPIC.
8  **Lynn Tu**
9      46.    Lynn Tu joined Gallagher in September 2006.
10
11                    **REDACTED**                              **REDACTED**
12
13      47.    Ms. Tu's hiring was a great benefit to Gallagher.    **REDACTED**
14
15  In other words,                    **REDACTED**
16                    **REDACTED**
17      48.    On the day I planned to announce my resignation, I asked Ms. Tu to come to my
18  office before that day's Sales Meeting. I wanted to let Ms. Tu know in person of my resignation.
19  I wanted to tell Ms. Tu in person and before telling the rest of the office because I felt a certain
20  sense of responsibility having recruited her. That sense of responsibility was heightened because
21  Ms. Tu had told me that my employment with Gallagher was a key reason for her accepting the
22  job.
23      49.    Ms. Tu was surprised, and told me words to the effect that I was one of the
24  principal reasons she came to Gallagher.
25      50.    Ms. Tu then proceeded to ask me questions about EPIC and the opportunity there.
26  I told her that I could not discuss that with her, but that she was free to call either Laura Wick or
27  other EPIC personnel in San Ramon. I gave her phone numbers to contact those people.
28

51.     I did not, as Ms. Tu suggests, instruct her to contact Laura Wick. Instead, I told her that if she wanted to learn more about EPIC, she could contact Ms. Wick or someone else at EPIC. I told Ms. Tu that she could do this because I could not discuss the opportunity with her.

52.     I did allude to the fact that compensation at EPIC was substantial for me and could be for her depending on the value of the stock she received. I did this after Ms. Tu ruefully recalled turning down **REDACTED**

53.     Ms. Tu then asked me why I was leaving. I told her there were a number of factors. One of the factors I mentioned was that **REDACTED** I did not mention that in an effort to persuade Ms. Tu to leave Gallagher, but rather to explain my own motivations.

54.     I had another meeting with Ms. Tu on Sunday, December 9, which was arranged by another Gallagher employee. I did not contact Ms. Tu to set up the meeting.

55.     Ms. Tu omits a key part of that meeting: At the meeting on December 9, I told Ms. Tu that I thought she was not ready to make a decision on whether to leave Gallagher, and that for that reason she should not leave Gallagher for EPIC.

56.     Ms. Tu was surprised that I said that and wanted to know why I felt that way. It appeared to me that she was upset that I was not trying to persuade her to leave.

57.     During that meeting, Ms. Tu and the other Gallagher employee present expressed to me that they were interested in learning more about EPIC. One or both of them asked me whether EPIC would start a San Jose office if they came over to EPIC. We had a general discussion regarding the possibility of setting up a San Jose office. I did tell them that EPIC could not justify starting an office in San Jose for just one producer.

58.     I do not recall whether Ms. Tu asked whether she could bring her sales team over to EPIC.

59.     I told Ms. Tu that Brian Quinn had sought advice on his decision from a friend who was a _former_ client of Mr. Quinn. Ms. Tu is mistaken when she states that I told her that Brian Quinn had talked to current clients about joining EPIC.

60. Even at the end of the December 9 meeting, Ms. Tu suggested she was still interested in EPIC.

61. In the course of Ms. Tu's discussions with me, I never commented on, analyzed, considered, or shared confidential information of Gallagher.

### The Allegations of Misuse of Confidential Information

62. I have reviewed the allegations regarding use of confidential information. To begin with, much of what Gallagher calls confidential information is material possessed by the client, the broker, and the insurance company and is not in the sole possession of the broker. In fact, the information that is required when working with a client is in the possession of the client and the insurance company. Moreover, I understood, and observed as Gallagher policy, that when a client moved brokers, the client had a right to request any information in its file from Gallagher. As such, there is virtually no information the broker has that is not available to the client upon request. In short, there was no need for me to remove any so-called confidential information or to use it in working with clients.

63. EPIC clearly instructed me not to bring any Gallagher materials or documents with me to EPIC, and I followed that instruction. I did not remove any customer files or customer account information from Gallagher in electronic or paper form upon my departure. While I am aware that Plaintiffs accuse certain persons of accessing and/or copying Gallagher files, I have no knowledge of any such accessing or copying. I did not instruct that any be done. And I did not do any myself.

64. As I said before, I have not shown any client Gallagher material or files. In every case where a client has agreed to work with me, I have had to obtain information from the client's own files to execute BOR letters.

65. In addition, where a BOR letter has been filed, we have used the client's own information and information from the insurance companies themselves to recreate the client's information for EPIC's file.

### Client Reaction to The E-mail Announcement That I Was Leaving Gallagher

66. Prior to my resignation, I did not solicit any clients to join me at EPIC. I did give a couple of clients a heads-up that I might be leaving Gallagher, because I did not want them to be surprised.

67. Following my departure from Gallagher, announcements were sent out that simply announced that I had left Gallagher and joined EPIC. Beyond that announcement I have not affirmatively contacted any Gallagher customers since departing EPIC to tell them that I have left Gallagher and have joined EPIC.

68. Following my "tombstone" announcement, i.e., the simple e-mail announcement described above, I received calls and emails from clients wanting to meet with me. As a general practice, I have returned customer calls and e-mails to me inquiring about my departure and asking for me to contact the customer. At my meetings with these clients, I showed them nothing except for a press release regarding EPIC and a list of personnel at EPIC who would service their account.

69. I have reviewed the allegation concerning Shandranette Middleton accessing client information on Rosendin and Redwood City Electric. Ms. Middleton did not work on those accounts. I have not seen the information she is alleged to have accessed. Ms. Middleton never gave any information to me and never told me that she possessed any information. I have not used the information she is alleged to have taken to solicit clients or for any other purpose.

70. Both Rosendin and Redwood City Electric affirmatively contacted me after receiving my tombstone. First, after receiving the announcement, Tom Sorley of Rosendin contacted me by email and asked me to call him. I called him and we set up a meeting. John Hahn and I met with Mr. Sorley on December 10. I took a list of the people who would be on the account team if they elected to use us as their broker.

71. I understand from Mr. Sorley that later that day, Pat Gallagher called Mr. Sorley and asked him to stay with Gallagher. Mr. Sorley had already issued broker of record letters for EPIC, and asked me to delay filing them while he considered what Mr. Gallagher said. Mr. Sorley contacted us on Wednesday and told me he had considered his decision, had spoken with

an insurance consultant on Rosendin's board, and had decided to go with EPIC. I was later instructed to file the BOR letter by Lorne Rundquist, the CFO of Rosendin.

72. As to Redwood City Electric, I work on that account with Allen Amos. The principal at Redwood City, Vic Costello, contacted me in response to the tombstone announcement. I understand that Mr. Amos visited Redwood City with the account service team list, but I was not there.

73. Not every account has followed, and many have stayed with Gallagher. The reasons given for this are the people servicing the account.

**Other Opportunities I Explored**

74. Throughout my time with Gallagher, I received sporadic calls from headhunters. Although the frequency of these calls was usually 3 or 4 times per year, the frequency increased during this past year.

75. During the time Plaintiffs allege that I was orchestrating a mass departure from Gallagher, I was in fact reviewing opportunities other than EPIC and Gallagher. BB&T, another insurance brokerage, was one opportunity. I first heard about this opportunity around July 2007. I heard about it from Dan Rogan from the Rogan Group, who told me that BB&T had an office in Southern California and wanted to start an office in Northern California. I decided not to explore that opportunity after learning that I would report to a former Gallagher employee.

76. Another opportunity was DeWitt Stearns. I learned about this opportunity on a call from another headhunter at The Rogan Group. I met with a representative from DeWitt Stearns during my last week at Gallagher. I wanted to meet with the representative from DeWitt Stearns to make sure that I had explored every opportunity.


77. I also received a call from Marsh McLennan somewhere around August 2007. It was an opportunity in the San Francisco office, but did not go anywhere.

I declare under penalty of perjury that the foregoing is true and correct and was executed on this 4TH day of January, 2008, at Palm Springs, California.

                                            */s/ Andrew W. ("Wally") Brown, Jr.*
                                            Andrew W. ("Wally) Brown, Jr.