# EXHIBIT 14

1   JEROME C. ROTH (SBN 159483)
    MARTIN D. BERN (SBN 153203)
2   MALCOLM A. HEINICKE (SBN 194174)
    MUNGER, TOLLES & OLSON LLP
3   560 Mission Street
    Twenty-Seventh Floor
4   San Francisco, CA 94105-2907
    Telephone:    (415) 512-4000
5   Facsimile:    (415) 512-4077

6   Attorneys for Defendant
    EDGEWOOD PARTNERS INSURANCE CENTER

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11

12  ARTHUR J. GALLAGHER & CO., INC.,          CASE NO.  07-CV-06418-JSW
    a Delaware Corporation, ARTHUR J.
13  GALLAGHER & CO., INSURANCE
    BROKERS OF CALIFORNIA, INC., a
14  California Corporation,

15              Plaintiffs,                    DECLARATION OF NEIL COHN

16          vs.

17  EDGEWOOD PARTNERS INSURANCE          Date:      January 11, 2008
    CENTER, a California corporation; DAN    Time:      9:00 a.m.
18  R. FRANCIS; JOHN G. HAHN;              Dept:      Courtroom 2, 17th Floor
    ANDREW ("WALLY") BROWN, JR.;
19  BRIAN F. QUINN; NEIL R. COHN;
    CAROLANN COHN; MICHAEL J.
20  BROWN; STEPHEN HAUSE; LAURA J.
    WICK; JAMES C. HALBLEIB;                       PUBLIC VERSION
21  LAURINDA ("LAURIE") A. MARTIN;
    ERIC CHUA; GEORGE J. PETTY;
22  LINDA SOO HOO; ROBERT E. DUTTO;
    SUSAN M. ENGLISH; DON J.
23  JOHNSON; ALLEN L. AMOS;
    WILLIAM ("BILL") PHILLIPS, JR.;
24  DIRCK ("RICK") R. STINSON; ROBERT
    ("BOB") D. ELLSWORTH; ROBERT H.
25  WATKINS; PAUL H. WAGENER;
    SHANDRANETTE MIDDLETON,
26
                Defendants.
27

28

    4179776.1
                                                         Neil Cohn Decl.; Gallagher v. EPIC,
                                                         Case No. 07-CV-06418-JSW

1    I, NEIL COHN, hereby declare as follows:

2    1.    I am presently a Principal at Edgewood Partners Insurance Center

3    ("EPIC"). I make this declaration of my own personal knowledge, and if called upon to do so, I

4    could and would testify to the matters set forth herein.

5    2.    I began working in the insurance industry in 1982. I was hired by Arthur J.

6    Gallagher & Co. or one of its related companies ("Gallagher") in 1989, and prior to my

7    resignation from Gallagher on or about December 7, 2007, I worked for Gallagher as an insurance

8    broker.

9    3.    During 2006 and 2007, while I was at Gallagher, I had concerns with the

10    status of Gallagher's operations. For example, Gallagher was                **REDACTED**

11    **REDACTED**                Not only was I troubled by the fact that

12    but also,

13    **REDACTED**

14

15    4.    In October 2007, I received a call from Brian Blakeman who is, as I

16    understand it, an independent recruiter and not an EPIC employee. Mr. Blakeman stated that he

17    was aware of an opportunity for me at EPIC. At this point, I was aware of EPIC to a limited

18    degree through conversations I had with an acquaintance at another brokerage firm. Although I

19    had received other inquiries from recruiters about other firms during 2007, Mr. Blakeman's

20    proposal about EPIC caught my interest because of its financial components. Specifically, I was

21    interested in the equity participation program at EPIC, which differentiated it significantly from

22    other brokerage firms including Gallagher. In the case of Gallagher, for example, I felt that the

23    company provided too much of its profit to the corporation, whereas the package offered by EPIC

24    demonstrated to me that EPIC was willing to share its profits with its brokers. Because I was

25    intrigued by this proposal, I agreed to and did meet with Mr. Blakeman during my off-work

26    hours. At this meeting, Mr. Blakeman provided further details on the financial package that EPIC

27    was offering, and it was very attractive to me. Mr. Blakeman did not suggest to me that anyone

28    else from Gallagher was planning to join EPIC.

1   5. In response to Mr. Blakeman's proposal, he arranged for a meeting with

2 John Hahn of EPIC to further explore the possibility of my working for Gallagher. I attended a

3 meeting with Mr. Hahn on or about October 15, 2007, and Mr. Hahn confirmed the details of the

4 attractive financial package that EPIC was willing to offer including the equity participation in a

5 new venture (as opposed to the mere stock options on a stagnant stock that I was receiving at

6 Gallagher). On or about October 24, 2007, I received an offer letter from EPIC.

7   6. After receiving the offer letter, I negotiated the terms of the offer with

8 EPIC from late October through mid-to-late November, when I decided to move to EPIC. I

9 decided to wait to resign from Gallagher until December, because of the amount of pressing

10 business I had to complete. I felt that my decision to join EPIC was not final until I resigned from

11 Gallagher and, until then, I was still a Gallagher employee with an obligation to my clients.

12   7. The first time I learned that Jim Halbleib was leaving Gallagher to work for

13 EPIC was on or about November 20, 2007 when Mr. Halbleib announced this decision. I had a

14 great deal of respect for Jim, and his announcement made me more inclined to finally resign my

15 position with Gallagher and move to EPIC. At this point, I told EPIC that I would resign my

16 position with Gallagher on or about December 7, 2007, i.e., the end of the first week in

17 December.

18   8. I ultimately did resign from Gallagher on December 7, 2007, the same day

19 that Wally and Brian announced that they too were leaving for EPIC. At the time I executed my

20 offer letter with EPIC, I was unaware that EPIC was in discussions with Wally Brown and Brian

21 Quinn about their possible hiring at EPIC. I had heard rumors that Wally was dissatisfied and

22 may leave, and I also subsequently learned that Wally and Brian may have had meetings with

23 EPIC as well. While I was at Gallagher, Wally and Brian never encouraged me to join EPIC, and

24 I did not know that Wally and Brian were actually leaving for EPIC until they made

25 announcement to that effect at a staff meeting on December 7, 2007. At that point, I would have

26 still gone to EPIC even if Wally and/or Brian had announced that they were going to another firm

27 or staying at Gallagher. While I did not expect that as many people would follow Wally and

28 Brian to EPIC as did, the fact is that the Sam Ramon office of Gallagher was viewed as Wally

4179776.1     3 - - 2 - -   Neil Cohn Decl.; Gallagher v. EPIC,
                   Case No. 07-CV-06418-JSW

1 and Brian's office, and many of the people there had a great deal of personal loyalty to Wally and

2 Brian.

3       9.       In the days leading up to my departure from Gallagher, I felt it important to

4 address time-sensitive client issues so that my clients would not be left without service when I left

5 Gallagher.  For example, it is my understanding that Gallagher has alleged that I accessed files

6 pertinent to client SRAM Corporation for purposes of copying these files to take with me to

7 EPIC, but in reality, I accessed these files to work on them and provide service to the client.

8 Specifically, SRAM had a claim in 2006, and we were not happy with the manner in which the

9 carrier was responding to this claim.  Per Gallagher policy, I was required to report the status of

10 this claim to Tom Glasser, Esq. at Gallagher, and I did so.  This is why I accessed the SRAM files

11 near the end of my employment with Gallagher; I did not access these files to copy them and take

12 them with me to EPIC.

13       10.     Similarly, in the case of   REDACTED

14

15       **REDACTED**                         account for the purpose of completing these reports.  This is why I

16 accessed the  REDACTED   files near the end of my employment with Gallagher; I did not access

17 these files to copy them and take them with me to EPIC.  I understand that Doug Bowring has

18 declared that                      **REDACTED**

19 REDACTED  This is not true.  I sent REDACTED   a BOR letter on December 11, 2007 in

20 response to his request for such a letter.  A true and correct copy of my email confirming Mr.

21 REDACTED  request is attached hereto as Exhibit A.

22       11.     Similarly, with respect to Town & Country, the client renewed a policy on

23 December 1, 2007.  (Of course, this meant that Gallagher received the commission on the

24 renewal.)  Following this renewal, however, there was additional work to be done on the policy.

25 Accordingly, during the period from December 3, 2007 to December 6, 2007, I accessed files

26 related to this client for the purpose of completing this work.  This is why I accessed the Town &

27 Country files near the end of my employment with Gallagher; I did not access these files to copy

28 them and take them with me to EPIC.

12. I did not use files that I created at Gallagher or Gallagher property to solicit SRAM Corporation, **REDACTED** Town & Country or any other Gallagher clients to use EPIC as its brokerage.

13. Since leaving Gallagher, I have discovered that I had a few compact discs that I created at Gallagher with client information. I just discovered these discs because they were in a personal desk drawer. I have provided these files to EPIC with the understanding that EPIC will forward them to Gallagher. It is my recollection that I created these files in October 2007 for client service purposes, and I have not accessed these files since then, and I have not used these files to solicit clients to join EPIC.

14. I am aware that Gallagher is alleging that I copied many files from my computer during the days before I left Gallagher, but the files I copied during this time period were personal documents and not documents relating to Gallagher or clients. I did not copy files at Gallagher for the purpose of taking such files with me to EPIC.

15. I am aware that Gallagher has suggested that George Petty and I acted in concert to remove files from, or alter certain aspects of, my computer. This is not true. When I presented my Gallagher and personal computers to George Petty at the time of my departure, I was unaware that he would eventually come to EPIC. When I presented my personal computer to George Petty at the time of my departure from Gallagher, I asked him to delete all Gallagher (as opposed to my personal) files from the computer, and he worked on the computer in front of me and told me that he had indeed deleted all Gallagher (as opposed to my personal) files from the computer.

16. I never asked or in any way encouraged George Petty to take any efforts to conceal my past activities, and I have no reason to believe that George Petty did so.

17. While I worked at Gallagher, I also maintained a backup hard drive at my home that may have contained Gallagher information. I did not access any files on this hard drive after December 7, 2007, and have turned the hard drive over to counsel for EPIC. I also occasionally copied Gallagher files on and off my personal laptop using a thumb drive, but I did not copy any files to or from the thumb drive, or access any files on that drive, after December 7,

1    2007.  I have also turned over the thumb drive to counsel for EPIC.

2         18.    When I began at EPIC, I announced my new position through a

3    "tombstone" announcement.  In response to this tombstone announcement, some clients that I had

4    formerly represented when I was employed at Gallagher contacted me and asked me to continue

5    representing them now that I was at EPIC.  It is my feeling that clients in the insurance industry

6    are often closer and more loyal to the individual who is their broker than they are to the firm

7    where that broker happens to work.

8         19.    During the interview and eventual hiring process at EPIC, EPIC personnel

9    made clear to me that EPIC would not allow me to bring any Gallagher property with me to my

10   new job at EPIC, and I followed these instructions.  With the exception of the facts noted above, I

11   did not knowingly take or retain any Gallagher materials or property with me following my

12   resignation, and I have not used any Gallagher materials or property that I took from Gallagher to

13   EPIC to solicit clients.

14        20.    I make this declaration voluntarily.  I understand that EPIC has not

15   required me to provide this declaration as part of my job, and that I could have declined to do so

16   without suffering any adverse career consequences.

17

18

19        I declare under penalty of perjury under the laws of the State of California and the

20   United States that the foregoing is true and correct, and that this declaration is executed on the

21   _3_ day of January, 2008 in San Ramon, California.

22

23

24                          By: _____

25                                NEIL COHN

26

27

28

4179776.1                              - - 5 - -

Neil Cohn Decl.; Gallagher v. EPIC
Case No. 07-CV-06418-JSW

# EXHIBIT A

## Neil Cohn

| From: | Neil Cohn |
|---|---|
| Sent: | Tuesday, December 11, 2007 2:01 PM |
| To: | 'aromo@petersendean.com'; Dave Van Beek (dvanbeek@petersendean.com) |
| Cc: | Jim Petersen (jpetersen@petersendean.com); Carol Cohn; Stephen Hause |
| Subject: | Broker of Record Change |
| Attachmants: | PD B of R.doc |



Ailene,

I just spoke to Dave Van Beek. He asked that I forward you the attached Broker of Record letter. Please print the letter on Petersen Dean Letterhead, have Dave sign it and return it to me by fax at (925) 901-0244.

Should you have any questions, please contact me immediately at (925) 437-4015.

Best regards,


Neil Cohn

Neil Cohn, Principal
Edgewood Partners Insurance Center
4000 Executive Parkway, Suite 200
San Ramon, CA 94583
(925) 437-4015 - Cell Phone
ncohn@edgewoodins.com - E-mail


1/3/2008

December 10, 2007

RE:   Broker of Record Appointment

Tc Whom It May Concern:

Effective immediately we are appointing Edgewood Partners Insurance Center (E.P.I.C.) as our broker of record for all insurance matters.  Please make available to them all policy detail and loss data necessary for the day to day management of our insurance affairs.

Please waive the traditional ten day waiting period.  Thank you.

Sincerely,


Dave Van Beek
Chief Operating Officer
Petersen Dean, Inc.