# EXHIBIT 16

```
JEROME C. ROTH (SBN 159483)
MARTIN D. BERN (SBN 153203)
MALCOLM A. HEINICKE (SBN 194174)
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, CA 94105-2907
Telephone:  (415) 512-4000
Facsimile:  (415) 512-4077

Attorneys for Defendant
EDGEWOOD PARTNERS INSURANCE CENTER
```

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ARTHUR J. GALLAGHER & CO., INC., a Delaware Corporation, ARTHUR J. GALLAGHER & CO., INSURANCE BROKERS OF CALIFORNIA, INC., a California Corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>EDGEWOOD PARTNERS INSURANCE CENTER, a California corporation; DAN R. FRANCIS; JOHN G. HAHN; ANDREW ("WALLY") BROWN, JR.; BRIAN F. QUINN; NEIL R. COHN; CAROLANN COHN; MICHAEL J. BROWN; STEPHEN HAUSE; LAURA J. WICK; JAMES C. HALBLEIB; LAURINDA ("LAURIE") A. MARTIN; ERIC CHUA; GEORGE J. PETTY; LINDA SOO HOO; ROBERT E. DUTTO; SUSAN M. ENGLISH; DON J. JOHNSON; ALLEN L. AMOS; WILLIAM ("BILL") PHILLIPS, JR.; DIRCK ("RICK") R. STINSON; ROBERT ("BOB") D. ELLSWORTH; ROBERT H. WATKINS; PAUL H. WAGENER; SHANDRANETTE MIDDLETON,<br><br>Defendants. | CASE NO. 07-CV-06418-JSW<br><br>**DECLARATION OF SANDRA DAUGHTRY-HONDA**<br><br>Date:     January 11, 2008<br>Time:    9:00 a.m.<br>Dept:     Courtroom 2, 17th Floor<br><br>**PUBLIC VERSION** |

I, SANDRA DAUGHTRY-HONDA, hereby declare as follows:

1. I am presently employed at Edgewood Partners Insurance Center ("EPIC") as an Assistant Account Manager. I make this declaration of my own personal knowledge, and if called upon to do so, I could and would testify to the matters set forth herein.

2. In May of 2006, I was hired by Arthur J. Gallagher & Co. ("Gallagher") to work as an Assistant Account Manager. On the morning of Friday, December 7, 2007, I attended a meeting at Gallagher's San Ramon office. In that meeting, I learned for the first time that Wally Brown, Brian Quinn, and Michael Brown had decided to resign their positions at Gallagher. Prior to that meeting, I had heard no rumors of their intent to resign. Nor had I ever heard of EPIC, the company where they were going. Their announcement came as a complete surprise to me.

3. After the meeting, I and several other employees approached Brian Quinn to wish him good luck. Brian and Wally had always been good bosses to me, and I felt a strong bond of loyalty to them. Many others in Gallagher's San Ramon office felt the same way. Because I respected their leadership and wanted to continue to work with them, I asked Brian for more information about the company where he would be working. He told me that he could not speak to me about employment opportunities there, but he gave me a phone number of Mary Smith, Director of Human Resources at EPIC.

4. I contacted Mary Smith and told her that I was interested in a job with EPIC. Ms. Smith arranged for an interview with EPIC the same day, Friday, December 7, 2007.

5. At the interview, I submitted an application for employment, which included my wage and salary information at Gallagher. Ms. Smith gave me information about EPIC and described its position as a new company, including its recent acquisition of another insurance brokerage firm. I was excited about the idea of working at the company, and about the opportunity to continue working with my colleagues, many of whom had by this point already decided to join EPIC. I received an offer that included a significant increase in salary, a signing bonus, and a better benefits package.

6. I did not accept EPIC's job offer immediately. I returned to work at

- 1 -

Daughtry-Honda Decl.; Gallagher v. EPIC,
Case No. 07-CV-06418-JSW

4179372.1

Gallagher the following Monday, December 10, 2007. By that point, I was fairly certain that I would take the new job. In fact, I had already prepared my resignation letter. Still, I wanted to return to the office to evaluate the situation at Gallagher. That morning, I attended a meeting at Gallagher's San Ramon office, led by Gallagher's Western Region Chairman, James McFarland. At the meeting, Mr. McFarland delivered a speech that only confirmed my decision to leave the company. My recollection of that meeting was that       **REDACTED**

**REDACTED**

7.   I submitted my letter resignation to Gallagher that afternoon, Tuesday, December 11, 2007. I packed what I considered my personal belongings and left the office. These items included a Rolodex filled with contact information for insurance carriers, but not for Gallagher clients. Gabrielle Simpson, the manager of the San Ramon office, inspected my box of personal items as I left the office that day, and she specifically approved my taking the Rolodex file. Still, out of an abundance of caution, I have since given that carrier contact information to Dan Crawford, EPIC's general counsel.

8.   I have not taken or retained any Gallagher materials or property since starting work at EPIC. Before leaving Gallagher, I retrieved some personal e-mails, and then I deleted some of my personal files off the Gallagher computer system. None of the materials that I deleted or took with me contain any information about Gallagher clients, insurance policies, proposals, or other similar materials.

9.   I have not solicited or encouraged any Gallagher employees to seek employment at EPIC.

-- 2 --

Daughtry-Honda Decl. ; Gallagher v. EPIC, Case No. 07-CV-06418-JSW

10. I make this declaration voluntarily. I understand that it was not a condition of my employment at EPIC to provide this declaration, and that I could have declined to do so without suffering any adverse employment consequences.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed January 2, 2008, in San Ramon, California.

By: *Sandra Daughtry-Honda*
SANDRA DAUGHTRY-HONDA

# EXHIBIT 22

JEROME C. ROTH (SBN 159483)
MARTIN D. BERN (SBN 153203)
MALCOLM A. HEINICKE (SBN 194174)
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, CA 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

Attorneys for Defendant
EDGEWOOD PARTNERS INSURANCE CENTER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ARTHUR J. GALLAGHER & CO., INC., a Delaware Corporation, ARTHUR J. GALLAGHER & CO., INSURANCE BROKERS OF CALIFORNIA, INC., a California Corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>EDGEWOOD PARTNERS INSURANCE CENTER, a California corporation; DAN R. FRANCIS; JOHN G. HAHN; ANDREW ("WALLY") BROWN, JR.; BRIAN F. QUINN; NEIL R. COHN; CAROLANN COHN; MICHAEL J. BROWN; STEPHEN HAUSE; LAURA J. WICK; JAMES C. HALBLEIB; LAURINDA ("LAURIE") A. MARTIN; ERIC CHUA; GEORGE J. PETTY; LINDA SOO HOO; ROBERT E. DUTTO; SUSAN M. ENGLISH; DON J. JOHNSON; ALLEN L. AMOS; WILLIAM ("BILL") PHILLIPS, JR.; DIRCK ("RICK") R. STINSON; ROBERT ("BOB") D. ELLSWORTH; ROBERT H. WATKINS; PAUL H. WAGENER; SHANDRANETTE MIDDLETON,<br><br>Defendants. | CASE NO. 07-CV-06418-JSW<br><br>DECLARATION OF DAN R. FRANCIS<br><br>Date: January 11, 2008<br>Time: 9:00 a.m.<br>Dept: Courtroom 2, 17th Floor |

Francis Decl.; Gallagher v. EPIC,
Case No. 07-CV-06418-JSW

I, DAN R. FRANCIS, hereby declare as follows:

1. I am a Co-Founder of Edgewood Partners Insurance Center ("EPIC"). I make this declaration of my own personal knowledge, and if called upon to do so, I could and would testify to the matters set forth herein.

2. I am 53 years old and have worked in the insurance industry for 31 years. I was born on August 18, 1954, and I began working in the insurance industry in 1976, after graduating from Stanford University. In 1976, I joined a company called Rollins, Burdick and Hunter, and I worked my way from a producer to a company Vice President. I left RBH in 1979, and I joined a company called California Casualty Management Company. I spent approximately ten years there. I was hired as the Home Office Sales Manager where I had approximately 40 salespeople under my supervision in California.

3. In 1990, I joined a start-up company called Compro, and my colleagues and I eventually sold this business to an English concern called J.H. Minet & Co., which was then roughly the tenth largest broker in the world with approximately $1 billion in revenues. I remained at the business working for Minet. Eventually, another well-established brokerage firm called ABD Insurance & Financial Services, Inc. bought my unit from Minet, and I began working for ABD in 1997.

4. Over my ten-year career at ABD, I was promoted from President of ABD Technologies to President of Property and Casualty (2000) and then to Chief Operating Officer (2003). In 2006, I was promoted to President and Chief Executive Officer of ABD.

5. On May 11, 2007, I decided to leave ABD after hearing on April 29, 2007 from Byron Scordelis, the CEO of Greater Bay Bank Corp. that they had entered into a definitive agreement with Wells Fargo Bank concerning ABD. This agreement became official and announced on or about May 8, 2007. At the time of this announcement, I was extremely frustrated as were my colleagues that we did not have the autonomy we needed to run our business the way we wanted to. With the sale to Wells Fargo Bank, I knew the concerns I had would not be addressed in the near term and would likely be exacerbated.

///

      6.     After leaving, I worked with others, most notably EPIC Co-Founder John Hahn, to found a new, smaller more autonomous brokerage firm in California. Our basic business plan was to attract the most talented brokers in the market by offering them the combination of relatively standard compensation *and* (something many lacked, which was) significant equity alignment (participation) in our growing company -- in other words, we were offering them partnership, which created equity alignment. In addition, we were offering them the chance to work in an entrepreneurial environment that would be beneficial to both them and EPIC. Specifically, it was our view that what brokers really want is an environment where they feel they can make a difference for themselves, their clients and their organization. In our view, EPIC was and is a unique brokerage firm that offers its principals better opportunities than can be found elsewhere, especially at large, corporate brokerage firms.

      7.     With our business plan designed, Co-Founder John Hahn and I raised a significant amount of private equity from investors who shared our vision for EPIC. Specifically, we obtained a funding commitment from Stonepoint Capital, a private equity firm, for $100 million.

      8.     After acquiring an existing regional brokerage named CALCO, we began operations on July 26, 2007 in the name of EPIC, and our entry into the California insurance market received significant attention within the industry. Over the six-month history of EPIC, we have hired brokers (primarily from publicly traded brokerages) and other employees from eight different other firms besides Gallagher, and many of these people were hired through the assistance of independent recruiter Bryan Blakeman. To the extent anyone has suggested that EPIC was formed to essentially take over a single office of Gallagher, this is simply false. It is my belief that many of the people who have joined EPIC from Gallagher as well as elsewhere did so because of the sharp contrast between the benefits EPIC offers and the lack of such benefits at Gallagher other brokerage firms.

      9.     In all of our hiring activities, John Hahn and I and others at EPIC have made clear that, after decades in this industry, we cannot condone unethical behavior. Specifically, we have made clear that no incoming employees are to bring any materials to EPIC

from their former employers, and they are not to breach any lawful restrictive agreements they may have in their contracts with former employees. Indeed, we have required incoming employees to sign agreements confirming that failure to do so is grounds for termination, and we place each new hire through a specific orientation on guidelines of conduct in this regard.

### JIM HALBLEIB

10. Bryan Blakeman, a professional recruiter in the insurance field that EPIC uses, informed me that Jim Halbleib at Gallagher may be interested in a position with EPIC and the he could help meet a middle market specialty need that EPIC had. Jim Halbleib worked in the San Francisco office of Gallagher (Wally Brown and Brian Quinn worked in the San Ramon office). My recruitment of Jim Halbleib was completely independent of my recruitment of Wally Brown, and it is my belief that Jim did not know we were in discussions with Wally prior to Jim's joining EPIC. I never asked Jim to solicit other Gallagher employees to join EPIC, and I never asked him to take any Gallagher property with him -- instead, I was clear with Jim that we expected him to honor his lawful restrictive covenants with Gallagher. Jim began with EPIC in on or about November 20, 2007 after resigning from Gallagher.

### WALLY BROWN

11. I was approached by Wally Brown shortly after I left ABD in May 2007. Wally told me that he was contacting me because his superior Jim McFarlane wanted to recruit me and other proven producers to Gallagher. I told him that I was not interested in joining Gallagher, but I also told him of my plans to co-found what would become EPIC. Wally was very interested in this idea, and I began working with him to see if he would join EPIC.

12. During my negotiations with Wally, I never asked Wally to solicit other Gallagher employees if and when he left, and I never asked him to take any Gallagher property with him. Subsequently, EPIC and I successfully recruited Wally and negotiated his compensation package.

13. Although I suspected that, given Wally's leadership position, some Gallagher employees may elect to follow Wally to EPIC, his offer to join EPIC was not

1 | conditioned or contingent on anyone else joining EPIC. Wally eventually joined EPIC on or
2 | about December 7, 2007 after leaving Gallagher. Brian Quinn joined EPIC the same day.

### THE EVENTS FOLLOWING WALLY AND BRIAN'S HIRING

14. In my experience in the insurance brokerage industry, it is common for brokers to follow their team leaders to new brokerage firms, and it is common for clients to follow their brokers to new firms. One of the main reasons for this is that both types of relationships are personal in nature.

15. While I thought that some Gallagher employees may follow Wally and Brian Quinn to EPIC, I was surprised by the number of people who did so. I am aware that Gallagher has alleged that our hiring was the product of a months-long conspiracy between EPIC and the people who eventually came to EPIC. This is simply not the case. From what I have gathered from those that followed Wally, they left Gallagher for the most part because EPIC offered a better career opportunity, Gallagher was no longer an attractive option, and they felt a personal loyalty to Brian and Wally.

### INSTRUCTIONS FOLLOWING THE COURT'S ORDER

16. I am aware that the Court in this matter issued a scheduling order on December 21, 2007. In response to this order and the Court's admonition contained in it, I directed that (a) EPIC personnel not act on any Broker of Record Letter from a current Gallagher client received after December 21, 2007; and (b) EPIC suspend hiring activities with all Gallagher San Ramon professionals who had not resigned from Gallagher as of December 21, 2007. Although the order did not require such action and I feel there is no legal reason for EPIC to reject individuals who want to join this firm or clients who want to use this firm, EPIC wanted to make sure to be cautious and allow the resolution of the pending motion.

///
///
///

1    I declare under penalty of perjury under the laws of the State of California and the
2  United States that the foregoing is true and correct, and that this declaration is executed on
3  January 4, 2007, in San Mateo, California.

*[signature]*
DAN R. FRANCIS