# EXHIBIT 39

JAMES M. WAGSTAFFE (95535)
ADRIAN J. SAWYER (203712)
**KERR & WAGSTAFFE LLP**
100 Spear Street, Suite 1800
San Francisco, CA 94105-1528
Telephone: (415) 371-8500
Fax: (415) 371-0500

Attorneys for Defendants
ANDREW ("WALLY") BROWN, JR.
BRIAN QUINN, MICHAEL BROWN, and
LAURA WICK

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ARTHUR J. GALLAGHER & CO., Inc., a Delaware Corporation, ARTHUR J. GALLAGHER & CO., INSURANCE BROKERS OF CALIFORNIA, INC., a California Corporation,<br><br>Plaintiffs,<br><br>v.<br><br>EDGEWOOD PARTNERS INSURANCE CENTER, a California Corporation, DAN R. FRANCIS, JOHN G. HAHN, ANDREW ("WALLY") BROWN, JR., BRIAN F. QUINN, NEIL R. COHN, CAROLANN COHN, MICHAEL J. BROWN, STEPHEN HAUSE, LAURA J. WICK, JAMES C. HALBLEIB, LAURINDA ("LAURIE") A. MARTIN, ERIC CHUA, GEORGE J. PETTY, LINDA SOO HOO, ROBERT E. DUTTO, SUSAN M. ENGLISH, DON J. JOHNSON, ALLEN L. AMOS, WILLIAM ("BILL") PHILLIPS, JR., DIRCK ("RICK") R. STINSON, ROBERT ("BOB") D. ELLSWORTH, ROBERT H. WATKINS, PAUL H. WAGENER, and SHANDRANETTE MIDDLETON,<br><br>Defendants. | Case No. C07-06418 JSW<br><br>**DECLARATION OF BRIAN QUINN IN SUPPORT OF OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Date:      January 11, 2008<br>Time:      9 a.m.<br>Courtroom: 2, 17th Floor<br><br>Hon. Jeffrey S. White<br><br>**PUBLIC VERSION** |

CASE NO. C 07-06418 JSW

DECL. OF BRIAN QUINN

I, Brian Quinn, declare:

1. I am currently a principal of Edgewood Partners Insurance Center ("EPIC"), and am a former employee of Arthur J. Gallagher & Co., Insurance Brokers of California ("Gallagher"). I have personal knowledge of each of the facts set forth in this declaration and if called as a witness could and would testify competently thereto.

2. I was employed by Gallagher for 9 years. I became the Area President January 1, 2007, and was the Area Executive Vice-President before that. Prior to Gallagher, I had worked on the insurance carrier side of the insurance business, and I came to Gallagher from United States Fidelity & Guarantee. USF&G was purchased by St. Paul in 1998, at which time I decided to join an insurance brokerage. I had previously met Wally Brown at an insurance industry conference, and called him and asked him what to do. He told me that he had room for someone in the "number two" spot at the Gallagher Pleasanton office, and asked me if I would be interested.

**The Process of Joining EPIC**

3. Prior to joining EPIC in 2007, I had been disillusioned for years with Gallagher. The stock price had dropped sharply, and **REDACTED** **REDACTED** At an October branch manager meeting, I was told that we **REDACTED** **REDACTED** I was not happy even in 2006, and made the decision in 2007 to begin looking around for other opportunities.

4. I first heard about the EPIC opportunity in the summer of 2007, perhaps July or August. I also read about EPIC in an insurance periodical in an article about its formation by Dan Francis and John Hahn.

5. Dan Francis contacted me some time in the Summer of 2007, after forming EPIC. We spoke on the phone. I do not recall the exact conversation, but we decided to get together.

6. Subsequent to the phone call I met with Dan Francis in person, and we discussed the possibility of my joining EPIC. We met at the EPIC San Mateo office, and only Dan Francis and I were at that meeting.

7.  Subsequent to that meeting, I had one or two other meetings with Dan Francis. I met John Hahn at one of the meetings. I had not met John Hahn before that time, although I knew of him from business reputation. I do not recall whether Wally was at that meeting.

8.  At some point during the Summer of 2007—I believe it was August—Wally, Dan, John, and I met to discuss the possibility of coming over to EPIC.

9.  After that meeting, in early September, Wally and I played golf with Dan and John. We again discussed EPIC.

10. Over the course of Summer and early Fall 2007 the four of us had perhaps two meetings in addition to the golf game, and then we had dinner the night before Wally and I resigned. In addition to the joint meetings, I had a lunch with John Hahn in October 2007, and a lunch with Wally and John Hahn in October 2007. Also, over the course of the summer I had a couple of meetings with Dan Francis.

11. I was not originally that intrigued by the EPIC opportunity. In September and October, however, I began to consider the EPIC opportunity more seriously. Also in October, however, I met with a recruiter named Gene Bischochi, about an opportunity at Beecher Carlson, another brokerage. He and I met on October 8 at 7 a.m. I thought Beecher might be the right answer and a better option than EPIC for me. Beecher was national in scope, and not a start up. It, like EPIC, offered equity to Producers. But in November, I started to lean towards EPIC because I had become more comfortable with Dan and John. Also, because EPIC was a start up, the stock was a better deal than Beecher.

12. Throughout the course of my meetings with Dan Francis and John Hahn to discuss the possibility of my joining EPIC, the only person at Gallagher with whom I discussed that possibility was Wally Brown.

13. I did not speak with Michael Brown about the EPIC opportunity until the day before I resigned. I was aware from Wally Brown that his son was looking at the EPIC opportunity, but I had no contact with Michael about it. That day was the first day I ever spoke with Michael about EPIC.

14. I recall that on a couple of occasions James McFarlane asked me whether Wally was going to EPIC. I do not remember the exact timing, but I think it was in September or October. At the time, I knew that Wally was discussing the opportunity with EPIC, but I did not know whether Wally was going to go (or, for that matter, whether I was going to go). Accordingly, I told McFarlane "not to my knowledge."

15. Late in the day on the day before I announced my resignation, Shandranette Middleton told me that she was going to be out the following day (I recall that she typically did not work Friday). As a result, I told Ms. Middleton that I planned to resign the next day. I do not remember whether I told Ms. Middleton that Wally Brown was also going to resign. I do not think I told Ms. Middleton that I was going to work for EPIC, and I absolutely did not tell Ms. Middleton that she should join me at EPIC. I asked her to keep the news to herself pending a formal announcement. I recall that Ms. Middleton appeared shocked when I told her this news, and became emotional.

16. Other than those conversations, and conversations with Wally Brown, I did not tell any Gallagher employee that I was going to resign and join EPIC until the day I announced my resignation. I have never solicited any employee to join me prior to or after announcing my resignation.

17. While my deal with EPIC and Wally Brown's deal with EPIC have certain common elements, I negotiated my own deal with EPIC. Wally Brown did not do it for me, and neither did anyone else. The agreement offered to me by EPIC was not contingent on anyone else joining EPIC from Gallagher.

**Laura Wick**

18. Laura Wick gave notice that she was leaving Gallagher in a joint meeting with me and Wally Brown. She handed me her resignation letter. That was the first time I had seen that letter, and Laura had not asked me for any input on what her letter should say.

19. I knew that Laura Wick was taking time off from work to spend time with her family, and that due to frustrations with Gallagher she might look for other work opportunities. I

thought that she might consider EPIC. I also thought that she might come back to Gallagher. But I did, however, speculate that if Wally and I went to EPIC, Laura would probably join us.

20. It is possible that Laura Wick asked me about EPIC, but I do not have a specific recollection of that. Employees routinely asked me about opportunities at various companies when they received a call from a recruiter working for that company. They would typically want to know what I knew about the company.

21. I remember having a conversation with Wally at some point about Laura interviewing with EPIC. I do not recall whether that was before or after Laura left.

22. After Laura resigned, I had some phone contact with Laura Wick. I called her to see how she was doing, as we were friends. I don't recall what exactly was said on that phone call. She called me once or twice asking for advice on whether or not she should join EPIC. I don't remember specifically what I told her, and I don't remember whether she asked me whether I was considering or would consider going to work at EPIC. I remember talking to her about her personal life, and mine, and that she was interviewing with another company.

23. I did not at any time talk with Laura Wick about whether Neil Cohn was going to EPIC.

24. I have read the email attached as Exhibit B to the Complaint. I never had a conversation with Laura Wick where I made any statements similar to the ones made in that e-mail. In fact, at the time Ms. Wick left Gallagher, I was not sure what my future plans were.

25. Laura Wick never called me to tell me that she had joined EPIC. In fact, I did not know that Laura Wick had joined EPIC until late in November. I learned this from Wally Brown. I was surprised when I found out that she was already at EPIC. To this date, I do not know when she joined EPIC.

26. Obviously, I did not consider Laura Wick's plans in making my decision to leave Gallagher. I never communicated with Laura Wick on the subject of setting up, administratively, technically, or otherwise, a San Ramon office for EPIC. I did not have any involvement in the leasing or physical set up of that office.

**The Resignation Announcement**

27. On Friday morning, December 7, I started a sales meeting at approximately 9:30-9:45. At the beginning of the sales meeting, Wally announced that he and Michael were leaving, and I announced that I was resigning. I would describe the reaction as shock and disbelief.

28. After the sales meeting, we had an all-hands meeting and made the same announcement. I would describe the reaction as emotional, shocked, and in disbelief. It was also very emotional for me. Many people came in to my office to say goodbye, and many, if not all, asked me where I was going and whether they could come with me. I told absolutely every one who asked that I could not discuss the opportunity with them but that they could call EPIC.

29. After that meeting, I did not ask a single employee to join me at EPIC. I only gave Mary Smith's contact information to persons who asked for it. I told each and every one who inquired about an opportunity for themselves that I was not soliciting them and would merely give them the phone number.

30. Well before noon, I had left Gallagher. I took no Gallagher property with me. I handed in my credit card, garage pass, office access card, and left. Gabriele Simpson escorted me out of the office with my personal belongings.

31. I left Gallagher and went to have something to eat at Starbucks. I then proceeded over to EPIC. I don't remember whether Wally was there when I walked in. Dan Francis and Mary Smith were at the office. I remember talking to Wally about how surprised I was by the reaction to our announcement, and I wondered aloud whether any of the people who had said they wanted to come over would call EPIC.

32. I was not involved in any of the interviews and did not see any job application forms or any paperwork relating to the hiring process.

33. That afternoon, I saw many Gallagher employees walking through the office, and I talked to no one about whether or not they should come to work for EPIC.

**Allegations of Misuse of Confidential Information**

34. I have reviewed the allegations on page 8 of the application for a temporary restraining order. Of those clients, I work with DiMare Fresh, Inc., Wawona Frozen Foods, and

Hot Line. I have not seen nor in any way used the information Ms. Middleton is alleged to have downloaded. If Ms. Middleton downloaded that information, it was absolutely not at my instruction.

35. I sent each of these clients a tombstone announcement, and each of them contacted me. The CFO of DiMare, Ron Folwell, called to tell me that Don Tarantino of Gallagher's San Francisco office had called him and asked for an appointment. The CFO informed me that he had told Don Tarantino that a meeting would not be necessary. The CFO then told me he was emailing Don Tarantino and copying me. The email, which I received, attached broker of record letters. In a later phone call, the CFO told me that when he spoke to Don he told Don to mark down on his notes that "Brian did not solicit me."

36. There was also an email response to my tombstone from Takao Yoshida, the CFO or Controller of Wawona, asking me to call Wawona Frozen Foods. I called Wawona and they asked me what they needed to do to continue their relationship with me. I was very careful to tell them that I was not soliciting them. They also told me that persons from Gallagher's Fresno office had visited Wawona. Both the CFO and owner of Wawona told me that they told Gallagher they were continuing their relationship with me. I told them that they would need to send a broker of record letter, and they asked for it immediately. I visited them on Tuesday morning.

37. On October 31, 2007, at lunch, I had told Mr. Yoshida that I was considering other opportunities. I did this because I did not want Mr. Yoshida to be shocked if and when he received an announcement.

38. I also told Mr. Folwell prior to my resigning that I was considering other opportunities. He asked me where, and I told him I was considering EPIC and Beecher Carlson. I did not discuss either one in detail with him, and I did not solicit him to follow me.

39. I also think my account manager received a call from Hot Line after the announcement. The owner of Hot Line is the sister-in-law of that account manager. (The owner's brother is married to one of my account managers.) The account manager told me that the owner of Hot Line wanted me to call her, so I did. When I did, the owner told me she had

1  been approached by Gallagher but had already told them she was staying with me. She asked me
2  what they needed to do, and I told her they needed to send a BOR letter.

3       40.   DiMare, Wawona, and Hot Line all asked me whether there was anything I
4  needed. I told them that I had taken nothing with me, and so there would be policy information
5  that I would need from them. I told them I needed copies of the executive summary of their most
6  recent insurance proposals, because that would tell me where to file the broker of record letter.
7  DiMare and Wawona provided me with that information, and Hot Line sent a certificate of
8  insurance that had policy information on it.

9       41.   I have read Lynn Tu's declaration. She says that I spoke with a client. I spoke
10 with an ex-client with whom I am friends. I wanted his advice on whether I should take the
11 EPIC opportunity.

12      I declare under penalty of perjury that the foregoing is true and correct and was executed
13 on this ___ day of January, 2008, at San Ramon, California.

_____
Brian Quinn