1  JEROME C. ROTH (SBN 159483)
   MARTIN D. BERN (SBN 153203)
2  MALCOLM A. HEINICKE (SBN 194174)
   MUNGER, TOLLES & OLSON LLP
3  560 Mission Street
   Twenty-Seventh Floor
4  San Francisco, CA 94105-2907
   Telephone:  (415) 512-4000
5  Facsimile:  (415) 512-4077

6  Attorneys for Defendants
   EDGEWOOD PARTNERS INSURANCE CENTER,
7  DAN R. FRANCIS, AND JOHN G. HAHN

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                      SAN FRANCISCO DIVISION

11

| | |
|---|---|
| ARTHUR J. GALLAGHER & CO., INC., a Delaware Corporation, ARTHUR J. GALLAGHER & CO., INSURANCE BROKERS OF CALIFORNIA, INC., a California Corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>EDGEWOOD PARTNERS INSURANCE CENTER, a California corporation; DAN R. FRANCIS; JOHN G. HAHN; ANDREW ("WALLY") BROWN, JR.; BRIAN F. QUINN; NEIL R. COHN; CAROLANN COHN; MICHAEL J. BROWN; STEPHEN HAUSE; LAURA J. WICK; JAMES C. HALBLEIB; LAURINDA ("LAURIE") A. MARTIN; ERIC CHUA; GEORGE J. PETTY; LINDA SOO HOO; ROBERT E. DUTTO; SUSAN M. ENGLISH; DON J. JOHNSON; ALLEN L. AMOS; WILLIAM ("BILL") PHILLIPS, JR.; DIRCK ("RICK") R. STINSON; ROBERT ("BOB") D. ELLSWORTH; ROBERT H. WATKINS; PAUL H. WAGENER; SHANDRANETTE MIDDLETON,<br><br>Defendants. | CASE NO. 07-CV-06418-JSW<br><br><br>**DECLARATION OF RYAN D. PITTMAN**<br><br>Judge:  Hon. Jeffrey S. White<br>Date:   January 11, 2008<br>Time:   9:00 a.m.<br>Dept:   Courtroom 2, 17th Floor |

4186582.1

Pittman Decl.; Gallagher v. EPIC,
Case No. 07-CV-06418-JSW

## DECLARATION OF RYAN D. PITTMAN

I, Ryan D. Pittman, declare:

1. I am a Digital Forensic Examiner and Investigator at Stroz Friedberg, LLC ("Stroz Friedberg"). I provide this declaration in support of Defendant Edgewood Partners Insurance Center's ("EPIC") Opposition to Plaintiff Arthur J. Gallagher & Co., Inc.'s ("Gallagher") *Ex Parte* Motion for Temporary Restraining Order, Evidence Preservation Order, Expedited Discovery Order, and Order to Show Cause Re Issuance of Preliminary Injunction (the "TRO Motion"). I have personal knowledge of the facts set forth in this declaration, except where otherwise specified, in which case they are based on the information indicated. I believe the facts herein are true and correct.

### I. INITIATION OF THE ENGAGEMENT

2. On or about December 28, 2007, Munger, Tolles & Olson LLP ("MTO"), counsel for EPIC, retained Stroz Friedberg to provide technical advice and consulting services in connection with the TRO Motion.

3. Stroz Friedberg is a technical services and consulting firm specializing in digital computer forensics; electronic data preservation, analysis, and production; computer fraud and abuse response; and computer security. The firm began operations in 2000 and is managed and run largely by former federal prosecutors and federal law enforcement agents from the Federal Bureau of Investigation, among other federal agencies. Stroz Friedberg maintains offices in New York, Washington, D.C., Los Angeles, Boston, and Minneapolis.

4. I have been given copies of certain pleadings filed in this matter, including the Declarations of Jon A. Berryhill ("Berryhill Decl.") and Warren G. Kruse II ("Kruse Decl.") filed in support of the TRO Motion; the Complaint for Damages and Injunctive Relief filed by Gallagher; and Gallagher's Memorandum of Points and Authorities in support of the TRO Motion. I was asked to review the Berryhill and Kruse Declarations, together with the exhibits attached thereto, in order to assess some of the forensic analysis and findings set forth in those declarations. The purpose of my declaration is to address some of the more critical conclusions set forth in the Berryhill and Kruse Declarations; it is not intended to comment upon each and

4186582.1                                 - 1 -                     Pittman Declaration; Gallagher v. EPIC,
                                                                    Case No. 07-CV-06418-JSW

1 | every finding set forth in the Berryhill and Kruse Declarations.

2 |     5. Stroz Friedberg was also provided some computer media by MTO, which I am told belong to Neil Cohn, including: (a) a Sony Vaio Laptop, model VGN-FS640/W, with service tag number C300G29Y; and (b) a 750 gigabyte Western Digital MyBook external hard drive with serial number WCAPT0147081. MTO asked Stroz Friedberg to image the Cohn media and perform some preliminary forensic analysis on the imaged media.

## II. RELEVANT EXPERTISE

6. I have over eight years of experience in investigations, with five of those years specifically focused on computer forensics and information system security.

7. I have been trained in the use of computer forensic tools and techniques, including tool sets such as EnCase, EnCase Enterprise, Linux, Access Data's FTK, and Paraben. I have also received training in investigation and analysis of networked and stand-alone systems, including Microsoft Windows and Linux operating systems, and portable digital assistants.

8. As a Digital Forensic Examiner and Investigator at Stroz Friedberg, I conduct digital forensic examinations and investigations into varied and complex criminal and civil matters. I perform technical security reviews and recommend appropriate remediation to clients, as well as incident response functions related to network compromise and data breach incidents.

9. Prior to joining Stroz Friedberg, I was a Master Instructor with Guidance Software, Inc. In this role, I performed forensic research and instruction of law enforcement, intelligence officers, and corporate security professionals in the application of forensic methodologies to their digital investigations. I was regularly called upon to consult on computer forensic cases involving complex legal and forensic issues arising from the collection, processing, and application of digital forensic evidence.

10. I hold a Master of Forensic Sciences, a Master of Science in Management in Information System Security, and a Bachelor of Science in Criminal Justice. I attach to this declaration a copy of my current Curriculum Vitae, which sets forth in detail additional aspects of my qualifications and background.

## III. ANALYSIS

11. Both the Kruse and Berryhill Declarations appear to rely solely upon the LNK, or "link" files, as evidence that several former Gallagher employees accessed or copied large numbers of files prior to their departure. (*See* Kruse Decl. ¶¶ 15, 22, Ex. B; Berryhill Decl. ¶ 6(e), (f), Exs. E, F). Consequently, it is useful to understand what these files are and what information they provide.

### A. LINK FILES AS FORENSIC EVIDENCE

12. When a computer user opens a file on recent Windows operating systems, a link file will be created on the computer. This link file acts as a pointer or shortcut to the original file (the "target file"). The link file contains information about the path to the target file, which includes its storage location (such as a local hard drive, network drive, or removable storage device). The link file also contains information about the target file's last written time, last accessed time, and creation time (collectively referred to as "MAC times" for Modified, Accessed, and Created).

13. As the following example illustrates, link files themselves have their own MAC times showing when the link file itself was created, last accessed, or modified. Thus, when analyzing MAC times, it is important to distinguish between MAC times for target files as opposed to MAC times for their associated link files. Consider the following exemplar file:

|             |              |              |              |
| ----------- | ------------ | ------------ | ------------ |
| Example.doc | 1/1/08 12:00 | 1/2/08 09:00 | 1/1/08 12:10 |

In this example, I am assuming that the file "Example.doc" was created at noon on January 1, 2008, last modified (changed and saved) at 12:10 on that same day, and then opened and closed without making any modifications on January 2, 2008 at 09:00. This last user action would update the last accessed time for the target file, as shown in the table above. The MAC times for the *link file* associated with this "Example.doc," however, would look something like the following:

| | | | |
|---|---|---|---|
| Example.doc.lnk | 1/1/08 12:00 | 1/2/08 09:00 | 1/2/08 09:00 |

Because a link file not only points to the target file, but is also itself a file that can contain data about the associated target file, the update that occurred to the last accessed time of the target file may change the data contained in the link file. If that data is indeed changed, then the last written time for the link file would be updated to January 2, 2008 at 09:00 in this hypothetical example.

14.  Link files can be valuable sources of digital evidence, but they are not by themselves definitive sources of evidence for proof of copying or transfer activity. Generally, normal access to a target file by a computer user (*e.g.*, double-clicking to open the file) will update the MAC times for both the target file and the link file, as illustrated in the above example with "Example.doc." When this update occurs, the *last written* date of a link file will generally indicate when its target file was last *opened* by a computer user. However, it will not indicate whether the target file was copied or transferred. And while the *last accessed* date of a link file can also be updated when the target file is actually opened by a computer user, it is not updated when a target file is copied or transferred.

15.  Further, a variety of events on a computer can update the MAC times of a link file without user access to the target file and/or without altering the MAC times of the target file. For instance, innocuous user actions, such as accessing and viewing the "My Recent Documents" area via the Windows XP Start Menu can change the last accessed dates of all the link files listed in that menu. Further, processes such as computer anti-virus scans or backup processes, either of which may occur as a result of an automated function, can change the last accessed dates and times on the link files without the user ever having accessed the target files directly. Thus, based upon my training and experience, I do not consider the last accessed time for a link file, by itself, to be reliable forensic evidence of whether the associated target file was or was not copied or transferred.

16. Based upon my training and experience, there are multiple sources of evidence that should be considered as part of forensic analysis of file copying or transfer activity. Such sources include the computer's Internet history, data in the user-specific registry, the MAC times of the target files to which the link files refer, the MAC times of other similarly located or similarly accessed files, and the MAC times of files associated with automated processes (such as anti-virus programs). None of this information was provided in either the Kruse or Berryhill Declarations, and can only be obtained by examining the original computer media at issue, which I understand to be in Gallagher's exclusive custody.

B. **RAPID FILE ACCESS**

17. Both the Kruse and Berryhill Declarations arrive at similar conclusions regarding "rapid file access" based apparently on link file information. To address those conclusions, I have examined the supporting evidence attached as exhibits to those two declarations.

18. Specifically, I have examined Exhibit B to the Kruse Declaration (the "Kruse Spreadsheet"). The Kruse Spreadsheet appears to be a report generated from the EnCase software program, which Mr. Kruse indicated he used in his forensic examinations of the Neil Cohn computer. I created a sample spreadsheet similar to Exhibit B using EnCase software on a test data set (the "Sample Spreadsheet"). A true and correct copy of the Sample Spreadsheet is attached hereto as Exhibit A.

19. Based upon my training and experience, and after examining and comparing the Kruse and Sample Spreadsheets, I believe that the "Last Accessed" column in the Kruse Spreadsheet refers to the date and time that the respective link files themselves were last accessed. It does not appear that the Kruse Spreadsheet contains any information on whether or when the underlying target files were last accessed. In fact, with the exception of the full path of the file, the Kruse Declaration provides no information on the target files, including the MAC times associated with those files that can be found within the corresponding link files. While the use of EnCase software, which Mr. Kruse indicated he used, can generate such information, an EnCase report containing this information would appear different than the Kruse Spreadsheet.

- 5 -

4186582.1

Pittman Declaration; Gallagher v. EPIC, Case No. 07-CV-06418-JSW

20. I have also examined Exhibits E and F to the Berryhill Declaration (the "Berryhill Spreadsheets"). The Berryhill Spreadsheets do not have sufficient information to determine whether the "Last Accessed" columns contained therein refer to the date and time that the target files were last accessed or when the link files were last accessed, although from the information in the Berryhill Declaration it appears that the "last accessed" columns refer to the link files rather than the associated target files. In addition, if the Berryhill Spreadsheets were generated using EnCase in the same or similar way that the Kruse Spreadsheet was generated, then it would appear that the "last accessed" information pertains only to link files, and not the corresponding target files.

1. **Kruse Declaration**

21. With respect to the Neil Cohn computer, the Kruse Declaration concludes that numerous files were rapidly accessed in a manner consistent with copying at various times of the day on December 6, 2007. (Kruse Decl. ¶ 16(b)(i)-(iii)). This conclusion appears to derive solely from the last accessed times for the link files on the Kruse Spreadsheet, as nothing in the Kruse Declaration suggests reliance upon other sources of digital evidence. For the reasons discussed above relating to the MAC times of link files, I do not believe the conclusion contained in the Kruse Declaration that the target files in question were rapidly accessed and therefore copied is definitive or reliable if the link file information contained in the Kruse Spreadsheet is the only evidence supporting that conclusion.

22. Moreover, common experience suggests a very low probability that a computer user could manually copy 228 files and folders from various different locations that include network server and local hard drive directories to three separate external media, and also burned to a CD, all within 62 seconds, as suggested in paragraph 16(b)(i) of the Kruse Declaration.

23. In addition, as discussed above, copying or transferring a target file will not update the *last accessed* time of the associated link file. Therefore, to the extent that the Kruse Declaration relied solely upon the last accessed times listed on the Kruse Spreadsheet for each of the 228 files in question, those times by themselves are not indicative of whether copying took

place.

24. Of similar concern is the lack of additional, independent, and consistent evidence to support the conclusion in the Kruse Declaration that three target files located on both the Cohn hard drive and the Gallagher network server were simultaneously accessed in the same second. (Kruse Decl. ¶ 16(b)(ii)). As previously stated, the last accessed times of a link file are not reliable evidence of access to or copying of the target file. This is particularly true for files located on a network server, which are typically accessible by numerous individuals. The conclusion that these three files were simultaneously copied is not defensible if based solely upon the last accessed times of the link files shown in the Kruse Spreadsheet.

25. With respect to the files apparently accessed on the Cohn computer in the evening of December 6, 2007, this file access does not appear to constitute "rapid access." For instance, five files are identified as being accessed during a 24-minute period (from 4:44 pm to 5:08 pm), and another nine during a subsequent 74-minute interval (from 6:52 pm to 8:06 pm). (Kruse Decl. ¶ 16(b)(ii)). The accessing of such a number of files in such time frames is indicative of someone working with the files and tends to counter the possibility of copying. There appears no reasonable basis to conclude that "rapid" copying was taking place, much less that any copying was taking place based solely on the limited data provided in the Kruse spreadsheet. Indeed, the additional finding that 27 files were accessed during a 90-minute period (from 11:02 pm to 12:37 am) (Kruse Decl. ¶ 16(b)(iii)) further belies such an assertion. With respect to the conclusion in the Kruse Declaration that "multiple Removable Disks" were accessed from the Cohn computer at 6:02 a.m. on December 6, 2007 (Kruse Decl. ¶ 16(a)), that conclusion is not reliable if, as it appears to be, it is based solely upon an analysis of the link file information set forth in the Kruse Spreadsheet. The same can be said about the conclusion that a CD-ROM drive was accessed at 6:01 a.m. on December 6, 2007. (Kruse Decl. ¶ 16(b)(i)).

2. **Berryhill Declaration**

26. Conclusions regarding rapid access and "mass copying" appearing at paragraphs 6(e) and (f) in the Berryhill Declaration appear to suffer some of the same shortcomings as the Kruse Declaration. For instance, the Berryhill Declaration's discussion of

link files from the "Recent" folder stored on the local hard drive of the Jim Halbleib computer (Berryhill Decl. ¶ 6(e)) is unclear as to whether the referenced last accessed times pertain to the link files themselves or to the underlying target files. As discussed above, if the last accessed times pertain to the link files, that information -- without more -- is not sufficient to reliably conclude that the underlying target files actually were accessed. In addition, as discussed above, the last accessed times of link files are not an indicator of whether the target files were copied or transferred. For the same reasons, the conclusions in the Berryhill Declaration with respect to the Laurie Martin computer are similarly limited in value. (*See* Berryhill Decl. ¶ 6(f)).

27. Additionally, with respect to the Halbleib and Martin computers, no forensic examination of evidence other than the MAC times of link files appears to have been conducted. (See Berryhill Decl., Exs. E, F). In contrast, for the Shandranette Middleton and Eric Chua media, the MAC times of the underlying target files themselves were presented. (Berryhill Decl. ¶¶ 6(c), (d)). Indeed, Exhibits C and D to the Berryhill Declaration show that the files listed therein refer to actual target files and not to link files. (*Compare* Berryhill Decl., Exs. C, D, *with* Berryhill Decl., Exs. E, F, *and* Kruse Decl., Ex. B). As pointed out earlier, examination of the MAC times of the target files themselves is one of many important forensic steps that should be undertaken to determine reliably whether and/or when a particular target file was actually accessed.

28. With respect to the files apparently accessed on the Chua computer on December 10, 2007, I disagree with the conclusion in the Berryhill Declaration that accessing 9 files in approximately 8 minutes is indicative of "mass copying." (Berryhill Decl. ¶ 6(d)). Indeed, one of the 9 files referenced is a link file to the Microsoft Excel application used to create or open spreadsheets such as the .xls files listed in Exhibit D to the Berryhill Declaration.

29. Lastly, with respect to the Chua and Halbleib media, the Berryhill Declaration does not provide any evidence indicating that an external storage device, like a thumb drive, was connected to the media at the same time that the asserted mass copying of files took place. For the Chua computer, the Berryhill Declaration only indicates that a Lexar Jump Drive was used on December 3, 2007 -- one week before the alleged mass copying occurred. (Berryhill

Decl. ¶ 6(d)). Likewise, for the Halbleib computer, the Berryhill Declaration only indicates that a SanDisk Cruzer U3 Micro thumb drive was used as recently as November 9, 2007, which was three days before the alleged mass copying took place. (Berryhill Decl. ¶ 6(e)).

**C.   DEFRAGMENTATION**

30.   There are several ways to defragment a hard drive on modern Windows operating systems: (a) manual defragmentation, which is a full defragmentation initiated by the user intentionally choosing to run the defragmentation utility; (b) scheduled defragmentation, which is full defragmentation similar to manual defragmentation but scheduled by the user to run at regular intervals; and (c) automatic defragmentation, a limited defragmentation that recent Windows operating systems perform automatically to optimize the start-up times of both the computer and frequently used applications.

31.   The Kruse Declaration suggests that the Cohn hard drive may have been intentionally defragmented in an effort to over-write deleted files. (Kruse Decl. ¶¶ 17-19). It remains unclear whether any other forensic evidence on the Cohn computer was examined to determine if the defragmentation occurred on an automated, scheduled, or manual basis. No mention is made, for example, of the MAC times related to the Microsoft Management Console application, which, if examined, could offer further proof of a manual defragmentation. There is no discussion of any evidence suggesting the presence or absence of .job files pertaining to the defragmentation application, which, if examined, could indicate that the defragmentation was run as a scheduled task. Finally, no forensic analysis of the Windows Registry settings is presented, which, if conducted, could indicate that there had been changes to the automated defragmentation settings enabled by default on recent Windows operating systems.

**D.   COHN MEDIA**

32.   I have examined the Cohn media provided by MTO and which Stroz Friedberg imaged to determine when they were last accessed. Based on my examination, the Sony Vaio laptop was last accessed on December 7, 2007 at 11:38 a.m. The Western Digital external hard drive was last accessed on December 7, 2007. (Last accessed time is not available for the external hard drive because it uses a FAT32 file system, which records only last accessed

1 | dates but not times.)

2 |     33.   I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief, and that this declaration was executed in Los Angeles, California, on January 3, 2008.

*[signature]*

Ryan D. Pittman

**RYAN D. PITTMAN**
**Stroz Friedberg, LLC**
**Digital Forensic Examiner and Investigator**
310.623.3283
rpittman@strozllc.com

## PROFESSIONAL EXPERIENCE

**STROZ FRIEDBERG, LLC**
**Digital Forensic Examiner and Investigator**
**Los Angeles, CA**
June 2007 to Present

- Conduct digital forensic examinations and investigations into varied and complex criminal and civil matters. Conduct technical security reviews and recommend appropriate remediation to clients. Perform and supervise incident response functions related to network compromise and data breach incidents. Serve as technical adviser to clients engaged in system triage, imaging, and investigation. Conduct electronic discovery and data production operations at client request. Prepare detailed reports of investigation and testify as to their accuracy, when required. Act as technical specialist on all matters involving the use or deployment of EnCase forensic tools.

**GUIDANCE SOFTWARE, INC.**
**Forensic Scientist / Master Instructor**
**Sterling, VA**
June 2005 to June 2007

- Senior instructor involved in forensic research and instruction of law enforcement, intelligence officers, and corporate security professionals in the application of forensic methodologies to their digital investigations. Regularly called upon to consult on computer forensic cases involving complex legal and forensic issues arising from the collection, processing, and application of digital forensic evidence.

**SYTEX, INC. (contracted to US Army Criminal Investigation Command)**
**Senior Forensic Analyst**
**Fort Belvoir, VA**
December 2004 to June 2005

- Performed duties as a computer forensic examiner, investigating compromises of Department of Defense computer systems (by employees and non-affiliated personnel). Worked as a forensic expert utilizing advanced and complex hardware and software in support of criminal investigations and national security infrastructure. Applied advanced forensic principles and methodologies to complex electronic criminal investigations. Exercised attention to detail, logic and sound reasoning to follow subtle, often hidden evidence to affect the positive resolution of cases.

**US ARMY CRIMINAL INVESTIGATION COMMAND**
**Criminal Investigator / Computer Crime Coordinator**
**Fort Hood, TX; Camp Doha, Kuwait; Guantanamo Bay, Cuba**
April 2001 to December 2004

> ➤ Performed duties as a Criminal Investigator, to include investigation of felony crimes, investigation of police misconduct, internal (ethical and criminal) investigations, interview and interrogation, criminal profiling, crime scene processing and collection of evidence, forensic analysis of physical evidence, obtaining warrants, arrests and apprehensions, surveillance, counter-drug operations, personal security, physical security, economic crimes investigation, as well as liaison with other local, state, and federal law enforcement agencies. Managed complex anti-terrorism investigations, interrogation of al-Qaeda and other detainees, and high-level interface with Pentagon officials, representatives of foreign governments, and other members of the federal law enforcement and intelligence communities. Managed cases requiring high levels of initiative, ingenuity, resourcefulness, and judgment in collecting, assembling, and developing facts and other pertinent data; ability to think logically and objectively, to analyze and evaluate facts, evidence and related information; and to arrive at sound conclusions. Demonstrated initiative in planning, developing, and conducting complex investigations. Conducted time-sensitive investigations, resulting in the production of detailed, accurate written reports of investigation used by senior officials and the courts for disciplinary action. Testified at court and provided oral and written case briefs to senior officials. In addition, conducted computer forensic examinations and data recovery in support of felony investigations and administrative inquiries into employee misconduct and misuse of Government computer systems, and served as a subject matter expert on technical matters in support of felony investigations. Responsible for supervising and mentoring younger investigators in the conduct of criminal investigations.

**MILITARY POLICE INVESTIGATIONS, US ARMY**
**Military Police Investigations Supervisor**
**Torii Station, Okinawa, Japan**
November 1998 to April 2001

> ➤ Performed duties as a Military Police Investigator (MPI) Supervisor, including misdemeanor investigations, collection of evidence, investigations of Military Police misconduct, interview and interrogation, evidence collection, and review and case oversight for two other investigators. As a supervisor, involved in initiating, planning, developing, and conducting complex investigations. Further, performed duties as a Military Policeman, including traffic enforcement, force protection, physical security, emergency aid, arrests and apprehensions, and community liaison.

**US ARMY**
**Military Policeman**
**Fort McClellan, AL & Fort Gordon, GA**
September 1996 to November 1998

> ➤ Performed duties as a Military Policeman, including traffic enforcement, force protection, physical security, emergency aid, arrests and apprehensions, and community liaison.

2

**EDUCATION**

**NORTH CENTRAL UNIVERSITY**
Ph.D. Candidate in Business Administration in Computer & Information Security

**COLORADO TECHNICAL UNIVERSITY**
Master of Science in Management in Information System Security, 2006

**NATIONAL UNIVERSITY**
Master of Forensic Sciences, Graduated with Distinction, 2003

**UNIVERSITY OF MARYLAND UNIVERSITY COLLEGE**
Bachelor of Science in Criminal Justice, Dean's List, 2000

**PUBLICATIONS**

August 2006: Authored "Network Intrusion Investigation – Phase II", Pasadena, CA: Guidance Software.

August 2006: Authored "Network Intrusion Investigation – Phase I", Pasadena, CA: Guidance Software.

June 2006: Authored "Cold Case Unit Investigations: The Need for Application of Emerging Forensic Techniques to Unresolved US Army Criminal Investigation Cases", San Diego, CA: National University.

**CERTIFICATIONS**

- Information System Security Professional (CISSP).
- EnCase Certified Computer Forensic Examiner (EnCE).
- Accredited CID Special Agent/Criminal Investigator.
- Certified Information System Security Officer.

**TRAINING PROVIDED**

**COMPUTER & ELECTRONIC INVESTIGATION CONFERENCE (CEIC),** May 2006
Las Vegas, NV
Developed and taught course entitled "Computer Forensic Investigations in a Linux Environment." Also taught courses entitled "Forensic Collection of E-mail & Internet Evidence," "Forensic Analysis of the NTFS File System," and "Macintosh Computer Forensic Investigations."

**TRAINING ATTENDED**

EnCase Enterprise Investigations I & II courses
EnCase Advanced Internet Investigations course
EnCase Field Intelligence Model Network Forensics course
EnCase Advanced Computer Forensics course
EnCase Network Intrusion Investigations I & II courses
EnCase Computer Forensics I &II courses
EnCase EnScript Programming course
EnCase NTFS course
Foundstone Ultimate Hacking course
Criminal Investigation Division Special Agent course
Introduction to Computer Search & Seizure course
Protecting Secret & Confidential Documents course

3