JEROME C. ROTH (SBN 159483)
MARTIN D. BERN (SBN 153203)
MALCOLM A. HEINICKE (SBN 194174)
JEFFREY E. ZINSMEISTER (SBN 235516)
Malcolm.Heinicke@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, CA 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

Attorneys for Defendants
EDGEWOOD PARTNERS INSURANCE
CENTER, DAN R. FRANCIS & JOHN G. HAHN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ARTHUR J. GALLAGHER & CO., INC., a Delaware Corporation, ARTHUR J. GALLAGHER & CO., INSURANCE BROKERS OF CALIFORNIA, INC., a California Corporation,<br><br>    Plaintiffs,<br><br>    vs.<br><br>EDGEWOOD PARTNERS INSURANCE CENTER, a California corporation; DAN R. FRANCIS; JOHN G. HAHN; ANDREW ("WALLY") BROWN, JR.; BRIAN F. QUINN; NEIL R. COHN; CAROLANN COHN; MICHAEL J. BROWN; STEPHEN HAUSE; LAURA J. WICK; JAMES C. HALBLEIB; LAURINDA ("LAURIE") A. MARTIN; ERIC CHUA; GEORGE J. PETTY; LINDA SOO HOO; ROBERT E. DUTTO; SUSAN M. ENGLISH; DON J. JOHNSON; ALLEN L. AMOS; WILLIAM ("BILL") PHILLIPS, JR.; DIRCK ("RICK") R. STINSON; ROBERT ("BOB") D. ELLSWORTH; ROBERT H. WATKINS; PAUL H. WAGENER; SHANDRANETTE MIDDLETON,<br><br>    Defendants. | CASE NO. 07-CV-06418-JSW<br><br>**DECLARATION OF JAMES WELLS**<br><br>Judge: Hon. Jeffrey S. White<br>Date: January 11, 2008<br>Time: 9:00 a.m.<br>Dept: Courtroom 2, 17th Floor |

4183192.1

Wells Decl.; <u>Gallagher v. EPIC</u>,
Case No. 07-CV-06418-JSW

I, JAMES WELLS, hereby declare as follows:

1. I am the Managing Principal of the James F. Wells Co. LLC, a professional consulting firm serving the insurance industry.

2. I received my Bachelors of Science degree in Business Administration -- Finance from California State University in 1974, graduating in the top 5% of my class with honors. In 1987, I received my Masters of Business Administration from Golden Gate University in San Francisco, with an emphasis in management. In 1995, I attended the College of Insurance in New York and received a degree in Executive Management. In 1998, I attended Harvard University's Graduate School in Business Administration in Executive Management.

3. I began working in the insurance industry in 1974 as an account executive for Underwriters Service, Inc. (a portion of the time was devoted towards working for Lloyds of London in England). During the period 1974 through 2002, I worked for several insurance brokerages, including Woodruff-Sawyer Co., Pettit-Morry of California, Acordia Northwest, Inc., Acordia of California, Inc., and Acordia Wells Fargo Co. My last position was as Executive Vice-President and Regional Managing Director of Acordia Wells Fargo Co.

4. My company, James F. Wells Co. LLC provides professional consulting and expert testimony services to the insurance industry on topics including mergers/acquisitions, insurance portfolio review, agency/brokerage operational reviews and broker selection, amongst others. It has also served as an outside member of the Board of Directors for Diversified Risk Insurance Brokers, Inc., IBA West (Professional Association), Insurance Industry Charitable Fund (IICF) and Sutter Holdings Company. Attached hereto as Exhibit A is a true and correct copy of my C.V.

5. I have been retained in this matter by Edgewood Partners Insurance Center ("EPIC") to offer expert opinions related to issues raised by Arthur J. Gallagher & Co. ("Gallagher") in their motion for a temporary restraining order. Specifically, my opinions address the movement of personnel between brokerage houses within the insurance industry, and the relevance of confidential client information to a client's decision to change insurance brokerages when the people with whom the business relationship is established change brokerages. The

1  James F. Wells Co. LLC charges $350.00 per hour for the research and preparation of this report,
2  $400.00 per hour for deposition testimony and $450.00 per hour for trial testimony. Attached
3  hereto as Exhibit B is an outline of all cases which I have provided expert testimony during the
4  past four years.
5      6.   In developing my opinions in this matter, I have reviewed the following
6  documents:
7      a.   The Complaint for Injunctive Relief, with exhibits;
8      b.   Plaintiffs' Memorandum of Points and Authorities in Support of
9  EX PARTE Motion for Temporary Restraining Order, with text that were filed under seal
10 redacted;
11     c.   Declaration of James G. McFarlane, with text that was filed under
12 seal redacted;
13     d.   Exhibits A-H, L and GG to the McFarlane Declaration;
14     e.   Declarations of Certain EPIC Employees and EPIC Clients;
15     f.   Certain Business Insurance Publications, Financial Reports and
16 Gallagher Annual Reports.
17     7.   A successful business insurance program requires clients to work closely
18 with their insurance broker. Over time, by working together, a trust develops between both sides.
19 Clients depend on their brokers to perform many kinds of duties involving the risk management
20 needs of their enterprise and risk exposures. Over time, a partnership develops between the client
21 and their broker. The client/broker relationship is a credible example of people doing business
22 with people, not corporations.
23     8.   Throughout my 34 years in the insurance business, I have seen many
24 insurance brokers resign from their employers and join different brokerage firms. After they join
25 their new employer, the broker typically sends an announcement to his or her former clients.
26 Typically, upon learning that their broker has changed companies, a client will contact the broker
27 and request a meeting to learn about the new employer. If the client decides to continue with his
28 broker and move the account to the new brokerage, the broker will prepare what is called a

1  Broker of Record letter, which is then sent to notify insurance companies of the change.

2      9.    In my experience, clients who have received excellent service will follow their broker from one brokerage firm to another out of a desire to continue with a trusted relationship that takes years to develop. Thus, clients are usually, but not always, loyal to brokers, and not to brokerages, because it is the broker who is perceived to be providing the personalized service to the client.

    10.    I have reviewed Gallagher's Memorandum of Points and Authorities in Support of EX PARTE Motion for Temporary Restraining Order. Throughout the memorandum, Gallagher states repeatedly that Gallagher documents that it believes could have been stolen by former employees prior to their departure to EPIC greatly enhanced EPIC's ability to secure client Broker of Record letters. Gallagher documents related to specific clients could include, but are not limited to, client expiration runs, summaries of insurance, premium/commission exhibits and client loss runs. In my opinion, brokers at EPIC would not need these or other Gallagher documents to transact a Broker of Record letter. The decision to execute a Broker of Record letter is typically based on an existing relationship of trust, or an anticipation that such a relationship will build in the future. It is not predicated on the possession of information about the client, which the client usually possesses and can readily provide to the broker. This is exemplified by the fact that two former clients of Gallagher in this case (Petersen-Dean and Con Francke Electric) moved their business to a broker other than EPIC or Gallagher without the benefit of any documentation.

    11.    Furthermore, EPIC brokers do not need Gallagher documents to manage the ongoing insurance program of a client. A broker who has changed employment will usually obtain permission from their client to review and copy certain insurance records and documents that the client maintains. Because a new broker will have access to client files, and the client has access to its own information, as well as that provided to it in the past regarding its insurance program by prior brokers, there is no need for a broker changing jobs to take materials with him or her from his prior employer.

    12.    After reviewing the complaint, the ex parte motion for temporary

-- 3 --

Wells Decl.; Gallagher v. EPIC,
Case No. 07-CV-06418-JSW

4183192.1

restraining order and the declarations of certain EPIC employees (formally Gallagher employees), as well as declarations from current EPIC clients (formerly Gallagher clients), I have reached the opinion that the leadership of the San Ramon Gallagher office (Wally Brown and Brian Quinn) conducted themselves properly, ethically and well within the norm for transitions within the insurance industry. They took considerable care regarding the announcement of their resignations to the Gallagher staff and with respect to refraining from soliciting Gallagher employees for positions at EPIC. In addition, EPIC was proactive in advising all potential EPIC employees that they should not take any paper or electronic documents from Gallagher with them to their new job at EPIC. While it is inevitable that some people will inadvertently take, or later find that they possess (in their car, home or on their personal computer equipment), materials from their prior employer in their possession, EPIC instructed its employees to turn in such materials so that they could be returned to Gallagher. Furthermore, it is my opinion that the producers at EPIC employed considerable care in not soliciting Gallagher clients to move to EPIC while those producers were still employed with Gallagher.

13. Through the years, I have witnessed many executive resignations. The executive who resigned usually "lands" with a different company. Many of the former employees of the executive have then sought to rejoin the executive because of his/her leadership skills, production abilities and overall popularity. In the insurance brokerage business, it is common for producers and staff employees to follow a former executive to a new firm. Many great companies have been born this way. I was involved with two firms that were created in this manner. And this is what happened when Brown and Quinn joined EPIC. Both executives were well liked and admired by most of the Gallagher producers and support staff. Therefore, because Brown and Quinn joined EPIC, many of their former colleagues at Gallagher decided to seek employment with EPIC as well. Brokers have, and always will want to work for firms who employ industry leaders and professionals. In my opinion, talented people usually will not stay with employers that do not provide excitement and opportunity for the future if other opportunities are also available.

14. I have read Mr. McFarlane's statement that EPIC's business practice of

1  hiring producers to build a book of business is contrary to the custom and practice of the
2  insurance brokerage industry. To the contrary, it is a routine practice for insurance brokerage
3  firms, including Gallagher, to recruit and hire away producers from other brokerages. Gallagher
4  is well known in the industry for having embarked on a strategy in the past ten years of
5  aggressively targeting scores of top producers from rival brokerages to lure talent to Gallagher
6  and boost revenues. Mr. McFarlane himself is well known for having implemented this strategy
7  on Gallagher's behalf, as demonstrated by two examples in this case -- his attempt to hire Dan R.
8  Francis in May, 2007, and his successful hiring of Lynn Tu and her entire San Jose team, from
9  Aon.

10        I declare under penalty of perjury under the laws of the State of California and the
11  United States that the foregoing is true and correct, and that this declaration is executed this 4th
12  day of January, 2008, in San Francisco, California.

By: _____/s/ James Wells_____
      JAMES WELLS