1   PAUL, HASTINGS, JANOFSKY & WALKER LLP
    BRADFORD K. NEWMAN (SB# 178902)
2   bradfordnewman@paulhastings.com
    STEPHEN N. YANG (SB# 142474)
3   stephenyang@paulhastings.com
    SARJU A. NARAN (SB# 215410)
4   sarjunaran@paulhastings.com
    SHANNON S. SEVEY (SB# 229319)
5   shannonsevey@paulhastings.com
    1117 S. California Avenue
6   Palo Alto, CA 94304-1106
    Telephone: (650) 320-1800
7   Facsimile: (650) 320-1900

8   Attorneys for Plaintiffs
    Arthur J. Gallagher & Co., Inc. &
9   Arthur J. Gallagher & Co. Insurance Brokers of California, Inc.

10                  UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13
    ARTHUR J. GALLAGHER & CO., INC.,          CASE NO.  C07 06418 JSW
14  a Delaware Corporation, et al.,

15              Plaintiffs,                    **PLAINTIFFS' REPLY BRIEF IN
                                               SUPPORT OF *EX PARTE* MOTION FOR
16      vs.                                    TEMPORARY RESTRAINING ORDER,
                                               EVIDENCE PRESERVATION ORDER,
17  EDGEWOOD PARTNERS INSURANCE                EXPEDITED DISCOVERY ORDER, AND
    CENTER, a California corporation, et al.,  ORDER TO SHOW CAUSE RE ISSUANCE
18                                             OF PRELIMINARY INJUNCTION**

19              Defendants.
                                               Hearing Date:  January 11, 2008
20                                             Time:  9:00 a.m.
                                               Dept:  Courtroom 2, 17th Floor
21                                             The Honorable James S. White

22

23

24

25                                    REDACTED

26

27

28
    Case No.  C07 06418 JSW

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ............................................................................................ 1

II. FACTS ESTABLISHED BY GALLAGHER ................................................ 1

III. DEFENDANTS' EVIDENCE JUSTIFIES A TRO AND DISCOVERY ........................ 7

IV. ARGUMENT .................................................................................................. 12

    A.   Courts Have Restrained Parties In Less Compelling Circumstances ................. 12

    B.   Defendants Continue and Threaten To Misappropriate Trade Secrets............... 14

    C.   Defendants' Neutered Proposed Injunction Should Be Rejected ........................ 15

REPLY ISO MOTION FOR TRO, OSC RE
PRELIM. INJUNC., EVID. PRESERV.,
EXPEDITED DISCOVERY

**TABLE OF AUTHORITIES**

Page

**CASES**

*Clear Channel Outdoor Inc. v. City of Los Angeles*
  340 F.3d 810, (9th Cir. 2003) ................................................................. 12

*CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*
  479 F.3d 1099 (9th Cir. 2007) ............................................................... 13

*Dodge, Warren & Peters Insurance Services, Inc. v. Riley*
  105 Cal. App. 4th 1414 (2003) .............................................................. 13

*GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.*
  83 Cal. App. 4th 409 (2000) .................................................................. 13

*Hub Int'l of Cal. Ins. Services, Inc. v. Kilzer*
  2007 WL 1674355 (N.D. Cal. 2007) .................................................... 1, 13

*Iconix, Inc. v. Tokuda*
  457 F. Supp. 2d 969 (D. Cal. 2006) .................................................. 13, 15

*Liberty Mutual Insurance Co. v. A.J. Gallagher & Co.*
  1994 WL 715613 (N.D. Cal. 1994) ....................................................... 15

**STATUTES**

18 U.S.C. §§ 1030 (a)(4), (a)(5)(A)(i)-(iii) ............................................. 13

Cal. Penal Code § 502(c)(2) ................................................................... 13

REPLY ISO MOTION FOR TRO, OSC RE PRELIM.
INJUNC., EVID. PRESERV., EXPEDITED
DISCOVERY

I.   **INTRODUCTION**

Defendants are engaged in the most important sales pitch of their careers. Through declarations that ignore, miscast and fail to address their own actions, they attempt to sell the Court on a version of events that deviates in material respects from the undisputed evidence.

Gallagher has established that Defendants have and continue to (i) breach their contractual and fiduciary obligations to Gallagher with the aid, knowledge and active participation of EPIC, (ii) engage in unfair competition and deceptive practices with regard to raiding employees and customers, (iii) improperly access, copy, delete, move, retain and otherwise alter unspecified quantities of Gallagher electronic and hard copy data, some of which has been turned over to EPIC; and (iv) use the misappropriated Gallagher data to attempt to and actually steal customers. See Decl. Emergency relief is warranted. See Hub Int'l of Cal. Ins. Services, Inc. v. Kilzer, 2007 WL 1674355 (N.D. Cal. 2007).

There is also a need for expedited discovery so that Gallagher can determine who has its data, where it is located, where it has been stored, from and to where it was moved, and how it is being used to improperly compete. Finally, Defendants' request that the Court issue a neutered injunction should be rejected; Gallagher's proposed injunction is less broad than injunctions issued by this Court under less severe circumstances.

II.   **FACTS ESTABLISHED BY GALLAGHER**

1.    Plaintiffs are insurance brokers in the business of identifying and procuring suitable commercial insurance products for clients. McFarlane Decl., ¶ 3 (a)-(d).

2.    Gallagher gathers and maintains qualitative information to assists clients in obtaining insurance to meet their business needs by acting as a liaison between insurance companies and potential insureds, and Gallagher required the Individual Defendants it formerly employed to obtain and develop this information, and identify and develop prospective customers and service existing customers, for only Gallagher's benefit. McFarlane Decl., ¶¶ 3, 5-6, 5-7.

3.    This information is not generally known to the public or the insurance brokerage industry, nor readily obtainable, is of economic value to Gallagher and gives Gallagher a competitive advantage over competitors. McFarlane Decl., ¶ 7-9.

-1-

REPLY ISO MOTION FOR TRO, OSC RE PRELIM.
INJUNC., EVID. PRESERV., EXPEDITED
DISCOVERY

1       4.      Development and compilation of the information obtained and developed by the

2   former Gallagher employees while they were employed by Gallagher required much time, effort,

3   and cost, including salaries. McFarlane Supp. Decl., ¶¶ 14-17; Campbell Decl., ¶10, 14.

4       5.      Gallagher took reasonable measures to maintain the secrecy of its non-public

5   information and requires employees to protect its data from unauthorized use and disclosure

6   based upon their fiduciary and/or contractual obligations.  McFarlane Decl., ¶ 6-7.

7       6.      EPIC directly competes with Gallagher. Id., ¶¶ 8, 32, 34 and 62.

8       7.      The former Gallagher employees now at EPIC did not have the authority to access

9   Gallagher's computers or Gallagher's non-public, commercially valuable information for their

10  own benefit or for the benefit of a competitor.  McFarlane Supp. Decl., ¶ 17.

11      8.      Defendants W. Brown, Quinn, N. Cohn, Halbleib, and Hause were officers and

12  fiduciaries of Gallagher.  McFarlane Decl., ¶ 31, Ex. J.

13      9.      EPIC was aware that in order to protect its confidential competitive data,

14  Gallagher required Defendants Amos, W. and M. Brown, N. Cohn, Dutto, English, Halbleib,

15  Johnson, Martin, Phillips, Quinn, Stinson, Wagener, and Watkins to execute Executive

16  Agreements prohibiting them, while employed and thereafter, from soliciting Gallagher

17  employees or using Gallagher confidential information to solicit Gallagher customers.  These

18  Agreements mandated return of Gallagher data and in the event of breach, *provide for immediate*

19  *injunctive relief*.  McFarlane Decl., ¶ 6(a), Ex. A; Johnson Decl., ¶ 9.

20      10.     Defendants and former Gallagher employees Amos, Michael Brown, Wally

21  Brown, Carol Cohn, Neil Cohn, Chua, Craven, Dutto, Ellsworth, English, Halbleib, Harvison,

22  Hilgen, Johnson, Lucas, Petty, Quinn, Rodriguez, Soo Hoo, Stinson, Varnica, Voth, Wagener,

23  Watkins, and Wick signed acknowledgements agreeing to follow Gallagher's Code of Ethics,

24  which prohibits soliciting employees or using Gallagher confidential information to solicit

25  customers and requires return of all Gallagher data.  McFarlane Decl., ¶ 6(b), 6(c), Ex. B., Ex. C.

26      11.     Defendants Wally Brown, Quinn, Neil Cohn, Wick, Halbleib, Hause, Carol Cohn,

27  Soo Hoo, Petty and Watkins entered into Stockholder Agreements prohibiting them from

28  soliciting Gallagher employees or using confidential data to solicit Gallagher customers. These

REPLY ISO MOTION FOR TRO, OSC RE
PRELIM. INJUNC., EVID. PRESERV.,
EXPEDITED DISCOVERY

1    Agreements also mandate the return of all Gallagher data. McFarlane Decl., ¶ 6(d), Ex. D.

2          12.    EPIC required former Gallagher employees it hired to execute EPIC employment

3    agreements that contain even stronger non-solicitation restrictions (no solicitation of EPIC

4    customers *regardless* of whether such solicitation requires the use of confidential information)

5    and which also provide for immediate injunctive relief for breach, based on the same rationale –

6    that these covenants are necessary for the protection of proprietary trade secret data which EPIC

7    defines in a substantially identical manner to Gallagher. Dineen Decl., ¶ 4, Ex. B (¶ 12).

8          13.    EPIC required the Individual Defendants to sign agreements to abide by their

9    contractual obligations to Gallagher. EPIC's contracts also state it will not "in any way endorse

10    or permit any Producer to use proprietary or confidential information obtained from his or her

11    former employer, or endorse or permit conduct that unlawfully conflicts with the terms of a

12    Restrictive Agreement." Dineen Decl., Exs. A-C.

13          14.    By July 2007, phone records demonstrate coordination between officers Quinn and

14    W. Brown regarding their discussions with EPIC. Goggio Decl., Exs. A and B.

15          15.    By September 14, 2007, Quinn submitted a "Dominant Priorities 2007 Final"

16    spreadsheet to Gallagher management, identifying 9 specific actions intended to help Gallagher

17    accomplish 07 and 08 Above Financial Targets, and that included employee development and

18    retention, client retention and minimal disruption from the San Ramon office relocation as top

19    priorities; Quinn identified himself and Wally Brown as the owner of 7 of the 9 Dominant

20    Priorities; Wick and Soo Hoo owned the remaining two. McFarlane Supp. Decl., ¶ 20; Ex. F.

21          16.    By October 2007, Defendants, by and through EPIC, Wally Brown and Quinn,

22    solicited Gallagher employees and coordinated their departures with Michael Brown, Wick, Soo

23    Hoo, Middleton and Quinn. McFarlane Decl., Ex. F; Tu Decl., ¶¶ 3-17, 21, 25-41; W. Brown

24    Decl., ¶¶ 19, 24- 25; M. Brown Decl.,¶ 9; Quinn Decl., ¶ 22; Wick Decl., ¶¶ 32-33.

25          17.    By November 2007, EPIC hired Gallagher Human Resource employee Laura

26    Wick to establish operations and process new hires from Gallagher. McFarlane Decl., Ex. G.

27          18.    Before and after Brown and Quinn left Gallagher, EPIC, Brown and Quinn

28    solicited Gallagher employee Lynn Tu to join EPIC. Tu Decl., ¶¶ 3-15, 21, 33-36.

-3-

REPLY ISO MOTION FOR TRO, OSC RE
PRELIM. INJUNC., EVID. PRESERV.,
EXPEDITED DISCOVERY

1    19.    Defendant Halbleib solicited Gallagher employee Ken Johnson to resign from

2    Gallagher and join EPIC.   Johnson Decl., ¶ 8-12.

3    20.    Before leaving Gallagher, Quinn, W. Brown, M. Brown, Johnson, Dutto,

4    Rodriguez, Stinson, Wagener, Watkins and N. Cohn used Gallagher funds to develop

5    relationships with Gallagher clients to whom they pre-announced their departure and/or solicited

6    in violation of their contracts with Gallagher; these clients then transferred business to EPIC.

7    McFarlane Decl., ¶ 64, Ex. FF; W. Brown Decl., ¶ 66; M. Brown Decl.,¶ 17 ; Quinn Decl., ¶¶ 37,

8    38; McFarlane Supp. Decl., ¶ 18; Ex. D.

9    21.    December 7-December 14, 2007: 49 employees resigned from Gallagher and

10    immediately joined EPIC.  Amos, W. Brown, M. Brown, Halblieb, Martin, Quinn, Phillips,

11    Stinson, N. Cohn, English, Johnson, Watkins, Wagener and Dutto resigned without complying

12    with their contractual obligation to provide two weeks' notice.  McFarlane Decl., ¶ 28, Ex. H.

13    22.    Defendants Chua, Neil Cohn, Middleton, and Petty connected USB flash drives to

14    their Gallagher computers shortly before resigning to join EPIC, and at times which indicate mass

15    copying of data occurred.  Berryhill Decl., ¶¶ 6(a)-(e); Kruse Decl., ¶ 16(a)-(b).

16    23.    Within close proximity to the dates of their planned resignations, Defendants Neil

17    Cohn, Chua, Middleton, Halbleib, Martin, and Watkins engaged in the rapid access of data on

18    Gallagher's computer systems, in a manner indicative of mass file copying, relative to the specific

19    Gallagher customers they serviced and solicited to transfer their business to EPIC.  Berryhill

20    Decl., ¶ 6; Supp. Berryhill Decl., ¶ 8; Kruse Decl., ¶ 16; McFarlane Decl., ¶ 35-53, Exs. K-CC.

21    24.    Defendant Middleton admitted she in fact attached an unspecified thumb drive to

22    her Gallagher computer and downloaded proprietary files.   Middleton Decl., ¶ 5.

23    25.    Before leaving Gallagher, Defendant Watkins accessed Gallagher's servers and

24    computers, accessed hundreds of proprietary files in rapid succession, and copied at least some of

25    those files to a non-Gallagher computer and CDs.  After leaving, he burned 3 additional CDs of

26    Gallagher data from a computer not issued by Gallagher and retained his Gallagher laptop until

27    Gallagher filed its lawsuit.  Forensic data demonstrates that Gallagher data was stored on non-

28    Gallagher computer media, indicating the strong likelihood that the data is still stored on

1   Watkins' personal computer media; thus it is unclear whether he made copies of, returned all of,

2   used, disseminated or stored the misappropriated Gallagher data in other locations.  Supp.

3   Berryhill Decl., ¶ 10, 11, Ex. R;  Pagliai Decl., ¶ 4(i), Ex. E; Campbell Decl., ¶3.

4       26.    Cohn admits to leaving Gallagher's employ with an unspecified thumb drive and

5   Western Digital External Drive with enormous storage capacity and that both contain Gallagher

6   data; Cohn turned this media over to EPIC, who does not even mention the thumb drive, and is

7   silent about the contents of the Western Digital drive; Cohn Decl., ¶¶ 17; Pittman Decl., *passim*;

8   Cohn also requested 6 blank CDs from Gallagher's IT department on the eve of his departure and

9   the contents and whereabouts of those CDs are unknown. Thorsen Decl, ¶ 2.

10      27.    After joining EPIC, Defendant Chua retained hard copy and electronic Gallagher

11  documents on his personal computer media, which he then made copies of and purported to delete

12  from his personal computer media and returned to Gallagher on the date Gallagher sought

13  emergency injunctive relief; he admits he possesses another memory stick that he used to store

14  Gallagher data, and it is unclear whether he made copies of, returned all of, permanently deleted,

15  used, disseminated or stored the misappropriated Gallagher data in other locations.  Supp.

16  Berryhill Decl., ¶ 6, Ex. G, Pagliai Decl., ¶ 4(i), Ex. E; Chua Decl., ¶¶ 5, 11, 14, 17.

17      28.    Two former Gallagher employees deleted the contents of their Gallagher-issued

18  BlackBerry devices before returning them.  Pagliai Decl., ¶ 4(h); Supp. Berryhill Decl., ¶ 13.

19      29.    Dennis Rodriguez retained emails containing Gallagher data and the business

20  cards of Gallagher clients and industry contacts, and did not purport to return them until

21  Gallagher sought injunctive relief.  Pagliai Decl., ¶ 4(k)(l), Exs. G and, H.

22      30.    Defendant Amos retained hard copy documents containing data regarding the

23  revenues of actual and prospective Gallagher customers and what steps Amos intended while at

24  Gallagher to take to retain existing business and procure new business.  It is unknown what copies

25  and use were made of this data. Pagliai Decl., ¶ 4(i), Ex. E;

26      31.    Eighteen other departed employees acknowledge accessing Gallagher computer

27  systems to "retrieve," "remove," and/or "delete" unspecified "personal files" from Gallagher

28  computers. Decs. of M. Brown, Burdock, Cohn, Daughtry-Honda, English, Herman, Johnson,

1   Lucas, Petty, Ronzitti, Soo Hoo, Stubbs, Ward, Burdock, Glaaser, O'Leary, Wagener, Rasmussen.

2         32.    After Gallagher instructed Defendant Petty to secure and preserve the computers

3   of all departed employees, and after he confirmed he had done so, computers in Petty's control

4   were defragmented, without Gallagher's knowledge, causing files to be deleted. Additional files

5   were also deliberately deleted. Kimble Decl., ¶¶ 4-5; Kruse Decl., ¶ 16(c); Berryhill Decl., ¶ 6(a).

6         33.    Defendant Petty attempted to conceal the copying of data – after connecting two

7   external hard drives to his Gallagher computers before resigning – by erasing his user profiles,

8   and the data contained therein, and replacing them with an empty profile. Berryhill Decl., ¶ 6(a).

9         34.    After Cohn left Gallagher, EPIC and Defendant Neil Cohn solicited Gallagher

10  client                     causing Gallagher to lose this client's business. Bowring Decl., ¶¶2-5.

11        35.    Prior to Hause resigning from Gallagher, he stole proprietary data, which he

12  immediately used to actively solicit Gallagher client                          – in

13  violation of his contractual obligations – to switch over to EPIC.      · Decl., *passim*;

14  Decl., ¶ 2; Ring Decl., ¶¶ 3-6; Reynolds Decl., ¶ 3-6; Hause Decl., ¶¶ 11-13.

15        36.    EPIC and Chua solicited Gallagher client            by using Gallagher

16  data regarding key client contacts, misrepresenting that the local client had contacted him, and

17  creating confusion as to whether Gallagher sold this account to EPIC. Demaret Decl., ¶¶ 4-11.

18        37.    EPIC and Halbleib solicited Gallagher client                after

19  accessing    files in a manner which denotes copying. Johnson Decl., ¶ 5-7; Berryhill Decl., ¶6.

20        38.    EPIC and Cohn solicited Gallagher client      ——after accessing files in

21  rapid succession in a manner consistent with copying files related to      McFarlane Decl., ¶,

22  36(i), 59.

23        39.    Defendants are soliciting Gallagher client      – about whom Watkins

24  stole 34 Gallagher files. Campbell Decl., ¶¶18-22; Doyle Decl., ¶ 2; Supp. Berryhill Decl., ¶ 9.

25        40.    Defendants solicited business and obtained BORs from several Gallagher

26  customers, including                         , after accessing and

27  copying files relating to these Gallagher customers prior to their departure. *Id.*; McFarlane Decl.,

28  ¶ 36(i), 59, Ex. Q;  Supp. Berryhill Decl., ¶ 8, Exs. H-M, O; Demaret Decl., ¶¶ 4-11.

REPLY ISO MOTION FOR TRO, OSC RE
PRELIM. INJUNC., EVID. PRESERV.,
EXPEDITED DISCOVERY

1     41.    Defendants targeted and continue to target Gallagher's top revenue-generating

2    clients for whom files were stolen. McFarlane Decl., ¶¶ 54-57, Exs. I, J, K, V, Y, BB, DD.

3     42.    As of December 20, the date when Gallagher first sought a TRO, Gallagher was

4    aware 31 customers executed BOR letters transferring $4 million in revenue to EPIC. By January

5    7, this grew to 107 customers and $8 million in revenue. Supp. McFarlane Decl. ¶ 3.

## 6   III.    DEFENDANTS' EVIDENCE JUSTIFIES A TRO AND DISCOVERY[1]

7    **Stephen Hause:** Upon leaving Gallagher for EPIC, Hause stole a hard copy confidential

8    customer proposal he had worked on while employed by Gallagher and presented the stolen quote

9    to the customer on behalf of EPIC in a deliberate attempt to solicit business from Gallagher to

10    EPIC.     Decl., *passim*; Hause Decl., ¶¶ 11-12;    Decl., ¶2; Ring Decl., ¶¶ 3-5.  His

11    possession of the proposal raises the issue as to what other data he stole, who else at EPIC

12    accessed the proposal he stole, how many copies were made, what became of the proposal, etc.

13    **Shandranette Middleton:** On December 6, 2007, Wally Brown and Brian Quinn informed

14    Middleton they were resigning the next day. On December 7, 2007, at 7:30 a.m., Middleton

15    admits downloading to an unspecified thumb drive, with the intent to use them at EPIC, Gallagher

16    proprietary files identified by expert Berryhill as accessed in rapid succession on Gallagher's

17    computer systems. Middleton told EPIC what she had done, and now, after being sued, claims to

18    have thrown away the data. Middleton Decl., ¶¶ 4, 5, 8; Berryhill Decl., ¶6(c), Ex. C.

19    **Robert Harrison Watkins:** Watkins represents to the Court: "I have not taken or retained any

20    Gallagher materials or property *since starting work at EPIC*." Watkins Decl., ¶ 9. Watkins omits

21    rapidly accessing and misappropriating significant quantities of Gallagher proprietary data for

22    customers immediately solicited and lost to EPIC, retaining his Gallagher computer and burning

23    CDs of Gallagher data after his resignation. See Pagliai Decl., ¶ 4; Supp Berryhill Decl., ¶¶ 7-11.

24

---

25    [1] The cited examples are illustrative only, not exhaustive. For instance, Defendants own
declarations unwittingly demonstrate just how coordinated their efforts were. Out of the 37 (non-

26    officer) employees who submitted declarations, and who interviewed with EPIC between 12/7-
12/10: 24 received offers on the same day they interviewed, 3 had interviews spanning 2 days and

27    received offers on the second day; 7 received an offer the next day; 1 received an offer 2 days later;
1 received an offer 3 days later. Along with Defendant Wick, who formerly performed the HR

28    function for Gallagher's San Ramon office, EPIC founders Francis and Hahn were
present, waiting and ready to hire Gallagher employees on a weekend.

1    **Jim Halbleib:** Although Gallagher's forensic expert Berryhill correctly identified the rapid

2    accessing and downloading of Gallagher proprietary data by Middleton and Watkins based on the

3    identical type of evidence, Halbleib offers no explanation for certain of his suspect rapid file

4    access on a date and time when he was in possession of his computer. Halbleib Decl., ¶ 12.

5    Halbleib's "close personal friend" Ken Johnson, a Gallagher employee, confirms Halbleib has

6    solicited him on multiple occasions. Ken Johnson Decl., ¶¶ 8-9, 14.

7    **Neil Cohn:** Cohn burned CDs containing Gallagher data *in October* and admits providing them to

8    EPIC, but fails to explain why he did not return them to Gallagher when he resigned or what

9    happened to the six blank CDs he obtained from Gallagher IT in *December 2007*. Thorsen Decl.,

10    ¶ 2; Cohn Decl., ¶ 13. Cohn admits copying unspecified files "before he left Gallagher," claims

11    without foundation that the copied files were "personal," does not describe how or to where he

12    copied these files, and where the files currently reside. Id., ¶ 14. Although he knew of his

13    resignation weeks in advance, he still has not returned to Gallagher the "backup hard drive" with

14    which he left Gallagher and that contains Gallagher data. Id., ¶ 17. EPIC's forensic expert

15    Pittman refers to a **Western Digital External Drive** last accessed on Dec. 7, 2007 – the day Cohn

16    resigned his employment from Gallagher. Cohn and Pittman – who presumably examined the

17    Western Digital Drive that Cohn admits contains Gallagher data – are silent as to the contents of

18    that drive. See Pittman Decl., ¶ 32; Cohn Decl., ¶17.

19    Cohn left Gallagher with **a thumb drive of unspecified make and model** containing

20    Gallagher files and has turned it over to EPIC but not Gallagher. Id., ¶17. EPIC's forensic expert

21    Pittman makes no mention of having examined it, EPIC has not returned it to Gallagher, and

22    Cohn is silent about its make, model, serial number, storage capacity, and contents. Id., ¶17.

23    Cohn claims that on his last day of employment, Defendant Petty deleted all Gallagher files

24    off of **Cohn's personal computer**. Id., ¶ 15. Neither Cohn nor Petty explain the method of

25    deletion used, and Cohn fails to explain why he presented his personal computer to Petty on his

26    last day of employment but failed to return his backup external storage drive or his thumb drive –

27    both of which contain Gallagher data and which he has not provided to Gallagher. Id., ¶ 17.

28    Regarding the **defragmenting of Cohn's Gallagher computer** on December 7, the computer

-8-

1    would need to be active at 5:50 p.m. to be defragmented; yet, prior to that time, Petty was

2    instructed to secure the computer and maintain all data, and Petty confirmed that he had done so.

3    Kimble Decl., ¶¶ 2-8. The defragmenting was not automatic. Supp. Kruse Decl. ¶ 10.

4         Cohn testifies he accessed SRAM files "in the days leading up to his departure" to

5    update Gallagher about a 2006 SRAM claim. Cohn Decl., ¶ 9. The files Cohn accessed on

6    December 6 and 7, and the manner in which he accessed them, have nothing to do with the

7    SRAM 2006 claim. Glasser Decl., ¶¶ 4-11;  Kruse Decl. Ex. B; McFarlane Decl., Ex. K.

8         Cohn purports to explain his rapid access to proprietary files regarding Gallagher customers

9    Town & Country and _____ , by claiming he accessed these files "near the end of my

10   employment" for work purposes.  Cohn accessed these and 226 other files in a 1-minute span at 6

11   a.m. the day before he resigned, could not have worked on 228 files and folders in one minute,

12   and does not claim he <u>did</u> Cohn Decl., ¶¶ 10, 11; Kruse Decl., ¶ 16, Ex. B.  On the night of

13   December 6, and again on December 7, the day he resigned, Cohn rapidly accessed another 121

14   customer files. Kruse Decl., ¶ 16, Ex. (b)(ii) and (b)(iii); Supp. Kruse Decl., ¶ 14, Ex. J.

15   **George Petty:** Petty fails to address that at 5:50 p.m. on December 7, Cohn's Gallagher laptop

16   was defragmented after Petty confirmed he had collected it and preserved the data on it.  Kimble

17   Decl., ¶¶ 4, 5; Cohn Decl., ¶ 15. Even if Petty believed Cohn's computer was set to periodically

18   defrag, (Petty Decl., ¶ 11), and it was not (see Kruse Supp. Decl.), as an IT professional instructed

19   to preserve evidence, if he believed this, he should have affirmatively turned off the computer to

20   preserve evidence. Supp. Kruse Decl., ¶ 11. Although he claims he hadn't yet decided to resign

21   for EPIC although he did so two business days later, he assisted Cohn in deleting data, knowing

22   that Cohn was departing, instead of notifying Gallagher and preserving data. Petty Decl., ¶ 10.

23   He does not identify what steps he took to look at files to determine whether there were Gallagher

24   files on that laptop, what was identified, what was deleted, or how. <u>Id.</u>, ¶ 10.  He deleted

25   unspecified Gallagher files from unspecified personal drives in an unspecified manner and

26   uninstalled Microsoft Office knowing it would lead to deletion of data. <u>Id.</u>, ¶ 6. He deleted his

27   profile for the purported purpose of removing personal data (i.e. passwords) – which he could

28   have done without deleting his entire profile, and, as an IT professional, he should have known

REPLY ISO MOTION FOR TRO, OSC RE
PRELIM. INJUNC., EVID. PRESERV.,
EXPEDITED DISCOVERY

Case No. C07 06418 JSW

1   the consequences of doing so. Id., ¶ 9; Supp. Berryhill Decl., ¶ 5.

2   **Eric Chua**: Chua used a **memory stick** of unspecified make and model to store Gallagher data

3   and retained this device after joining EPIC. Chua Decl., ¶¶ 11, 14. He accessed the memory stick

4   after resigning, purportedly to copy Gallagher materials from the first memory stick and from his

5   personal computer onto a **"second, clean memory stick,"** again of unspecified make, model,

6   storage size, and serial number. Id. He then purports to have deleted (through an unspecified

7   manner so it is unknown whether the data is recoverable) the (unspecified) Gallagher data from

8   the original memory stick and his computer, with no explanation for why he would do so. Id.

9       Deleting the Gallagher data off the **"first memory stick"** and **his personal computer** is a

10  well-known way to destroy meta-data that reflects when the data was originally placed on the

11  "first memory stick" and the personal computer. Supp. Berryhill Decl., ¶ 6(a). He fails to explain

12  what happened to the "first memory stick," or why, when he was purportedly contemplating

13  EPIC's offer, he did not return Gallagher's data prior to resigning or thereafter. Chua Decl., ¶¶ 5,

14  14. He fails to inform the Court that he did not return any memory stick(s) (unknown how many

15  he has) to Gallagher until he returned one stick (presumably the "Second memory stick") on the

16  date this lawsuit was filed, 10 days after he left Gallagher. Id., ¶¶ 11,14. He provided the "second

17  memory stick" to EPIC's counsel, without specifying when or why. Id., ¶ 14. Chua boasts that he

18  has memorized customer's "entire programs," and other information. Id., ¶ 17.

19  **Brian Quinn**: Quinn met with Wally Brown, Francis, and Hahn repeatedly starting in Summer

20  2007 to discuss joining EPIC. Quinn Decl. ¶¶ 4, 7, 10. More than one month before resigning, in

21  October 2007, he told at least two customers who subsequently signed a BOR (Wawona and Di

22  Mare) that he was leaving Gallagher. Id., ¶ 37, 38. He pre-announced to Middleton that he was

23  going to resign. Id.; ¶ 15. His deal with EPIC has common elements with Brown's. Id. ¶ 17.

24  While still an officer of Gallagher, he "had some phone contact with Laura Wick;" she asked for

25  advice on whether she should join EPIC, Quinn does not reveal his response. Id., ¶ 22.

26  **Wally Brown:** Prior to resigning, he discussed and coordinated the plan with six individuals

27  including fellow officer Quinn in June, 2007, and Cohn, M. Brown, Wick, Soo Hoo and

28  Middleton. W. Brown Decl., ¶ 19, 24. He also "gave a couple of (unspecified) clients a heads-up

Case No. C07 06418 JSW

REPLY ISO MOTION FOR TRO, OSC RE
PRELIM. INJUNC., EVID. PRESERV.,
EXPEDITED DISCOVERY

1  that I might be leaving Gallagher." Id., ¶ 66. Brown testifies "I also knew that Neil Cohn was

2  talking with EPIC, and he knew that I was meeting with EPIC. I found out that Neil was doing

3  this because he told me, and I told him I was talking to EPIC as well." Id., ¶ 25. *This is*

4  *inconsistent with N. Cohn's testimony*: "At the time I executed my offer letter with EPIC, I was

5  unaware that EPIC was in discussions with Wally Brown and Brian Quinn about their possible

6  hiring at EPIC." Cohn Decl., ¶ 8. Brown subsequently attended several meetings with Hahn,

7  Francis and Quinn, during which *he told Hahn and Francis the identity of Gallagher's "large*

8  *producers" and about Laura Wick*. W. Brown Decl., ¶¶ 20-22, 36. Wick subsequently told him

9  she had been contacted by a headhunter about employment with EPIC. Id., ¶37.

10  **Laura Wick:** Wick does not deny accessing Gallagher's servers after her departure to delete her

11  mother-in-law's email. She spoke with Wally Brown about the possibility of him going to EPIC

12  prior to his resignation and prior to being contacted by EPIC's recruiter. Wick Decl., ¶ 4, 10. She

13  concedes to at least handling "some minor administrative tasks" for EPIC from Nov. 19 to Dec. 6.

14  Id., ¶ 29.  She knew as of Nov. 26 that Wally Brown, Quinn and Michael Brown were going to

15  resign that Friday. Id., ¶ 32. On Thursday, December 6, the day before Brown, Quinn and five

16  others started the wave of coordinated resignations, she met with Francis, Crawford, Smith,

17  Brown and Quinn at EPIC's offices but does not mention what was discussed Id., ¶ 33.

18  **Laurinda Martin:** Martin retained Gallagher electronic data on her home computer; she did not

19  disclose this to Gallagher and has not returned it to Gallagher. Martin Decl., ¶ 10. She retained

20  (and has not returned) a binder relating to former Gallagher client ·        Id., ¶ 9. Although

21  Gallagher's forensic expert Berryhill correctly identified rapid accessing and copying of

22  Gallagher data by Middleton and Watkins based on identical behavior, Martin does not explain

23  her suspect file access on a date and time when she was in possession of her Gallagher computer.

24  Id., ¶ 12. On Nov. 26, she interviewed and accepted an offer with EPIC, and then worked on her

25  Gallagher computer that same day following the interview. Id., ¶¶ 5-6. There was then additional

26  rapid file access to hundreds of client files. Supp. Berryhill Decl. ¶ 12.

27  **Michael Brown:** He learned about the EPIC opportunity in late June 2007 from Wally Brown.

28  M. Brown Decl., ¶ 6. After meeting with Hahn in June or July for 10 minutes, he told Wally

1   Brown he was "on board" if Wally Brown was and would let him explore the opportunity further.

2   Id., ¶ 7. He discussed the timing of a potential move with W. Brown. Id., ¶ 9. During a

3   November lunch meeting with Francis and Hahn, they discussed the size of his book and how

4   many clients might join him. He agreed to join EPIC after Thanksgiving. Id., ¶ 11. After the

5   lunch meeting he informed 3 clients to "ask their advice" and on the Wednesday before his

6   resignation, he and Wally Brown told F. Rodgers (a client who signed a BOR as soon as they

7   were at EPIC) they were leaving. Id.,¶ 17. Brown "generally" asked clients to borrow their

8   policies because he could not take Gallagher data and told clients that there would be a 7-day

9   transition due to lack of information. Id., ¶ 26. However, Gallagher began receiving BORs within

10  mere days after his departure, underscoring Defendants' coordination and use of Gallagher data to

11  solicit Gallagher customers. McFarlane Decl.,¶ 57. Brown testifies that F. Rodgers (to whom he

12  and his father pre-announced) and Can-Am – two clients whose Gallagher proprietary data

13  Middleton misappropriated – approached him and immediately handed him unsolicited BOR

14  letters. Id., ¶¶ 28-29. He claims he didn't learn *until after he resigned from Gallagher* that

15  EPIC's new office was going to be in the same business complex as Gallagher's offices. Id., ¶ 31.

16  "Upon his departure" from Gallagher, he deleted all emails from his Gallagher inbox, but claims

17  to have immediately moved them back into his inbox from the deleted folder. Id., ¶ 34.

18  **IV.   ARGUMENT**

19      **A.   Courts Have Restrained Parties In Less Compelling Circumstances**

20          Plaintiffs have demonstrated probable success on the merits and the possibility of

21  irreparable harm. Clear Channel Outdoor Inc. v. City of Los Angeles, 340 F.3d 810, 813 (9th Cir.

22  2003). Gallagher has made a *prima facie* showing that: (i) the deletion of user content files from

23  a Gallagher computer, the running of defragmentation utilities to mask computer deletions, and

24  the accessing and taking of data from Gallagher computer systems under the demonstrated

25  circumstance constitute violations of the CFAA proven; (ii) the actions of the former Gallagher

26  officer Defendants constitute an ongoing breach of their fiduciary duty; (iii) the specified

27  Defendants were and are subject to valid and binding confidentiality and non-solicitation

28  agreements which have been and continue to be breached; (iv) that the taking of data constitutes

REPLY ISO MOTION FOR TRO, OSC RE
PRELIM. INJUNC., EVID. PRESERV.,
EXPEDITED DISCOVERY

Case No. C07 06418 JSW

1    unlawful conversion; (v) Gallagher information taken and used to solicit customers constitutes

2    protectable trade secrets; (vi) Defendants' actions constitute unfair competition under Cal. Bus. &

3    Prof. Code § 17200 and (vii) EPIC, Francis and Hahn have and continue to interfere with

4    Gallagher's contractual relationships with its former employees and current customers.

5        The relief Gallagher seeks is warranted. <u>Hub Int'l of Cal. Ins. Services, Inc. v. Kilzer</u>,

6    2007 WL 1674355 (9th Cir. 2007)(court restrained an insurance salesman and his new employer

7    after he accessed and stole non-public information regarding prospective customers and

8    employees, exceeded his authority as an employee by accessing Hub documents on behalf of a

9    competitor, manually deleted files and ran a defragmentation program to permanently erase data,

10   and then resigned without notice to immediately join a competitor; injunction prohibited

11   solicitation of clients, use of Hub's proprietary trade secret data, and required all commissions

12   received from stolen customers to be placed in constructive trust); <u>CRST Van Expedited, Inc. v.</u>

13   <u>Werner Enterprises, Inc.</u>, 479 F.3d 1099 (9th Cir. 2007) (enjoining competitor who hired

14   employees knowing they were bound by employment agreements); <u>Dodge, Warren & Peters</u>

15   <u>Insurance Services, Inc. v. Riley</u>, 105 Cal. App. 4th 1414 (2003) (injunction requiring former

16   employees – who while still employed by Dodge, copied hard copy and electronic files and took

17   other steps to set up a competing insurance brokerage – to preserve electronic data and media and

18   produce them for copying and inspection); <u>GAB Business Services, Inc. v. Lindsey & Newsom</u>

19   <u>Claim Services, Inc.</u>, 83 Cal. App. 4th 409, 420-421 (2000) (TRO and preliminary injunction

20   issued to prevent defendant from using customer lists, pricing information, or other proprietary

21   and confidential information, and from interfering with customer contracts or employment

22   relationships).

23       Defendants' ignore the CFAA and California Penal Code Section 502, which authorize

24   immediate injunctive relief for the ongoing conduct Gallagher has established. Defendants

25   therefore concede that immediate injunctive relief is warranted. 18 U.S.C. §§ 1030 (a)(4),

26   (a)(5)(A)(i)-(iii); <u>Hub International</u>, 2007 WL 1674355; <u>accord</u> Cal. Penal Code § 502(c)(2);

27   <u>Iconix, Inc. v. Tokuda</u>, 457 F. Supp. 2d 969, 998 (D. Cal. 2006) (enjoining defendant based on

28   employer's unfair competition claim predicated on statutes including Section 502).

**B.    Defendants Continue and Threaten To Misappropriate Trade Secrets**

In addition to the facts above, EPIC's Co-founder Defendant Francis testified that in light of the pending hearing on Gallagher's request for emergency injunctive relief, he has voluntarily – but only temporarily – directed EPIC personnel "not to act on any BOR from a current Gallagher client received after [12/21]" and to "suspend all hiring of Gallagher San Ramon professionals who had not resigned from Gallagher as of [12/21] (Francis Decl., ¶ 16). This can only be read as establishing three important facts: (1) additional BORs are being sought by EPIC from Gallagher customers according to the same practices used with Gallagher client ; (2) additional solicitation of employees is in process or planned; and (3) if no injunctive relief is issued, Defendants will pick up where they left off on December 20 and have the Court's imprimatur on the methods used to date.

Francis' Declaration is also carefully crafted to allow EPIC to continue to accept BORs from any client EPIC does not deem to have been a "current Gallagher client" as of December 21. Similarly, Francis' direction to suspend hiring activity only applies to those Gallagher employees who are "San Ramon professionals" despite the fact that Gallagher has hired and presumably continues to solicit Gallagher San Francisco employees, solicited Gallagher San Jose employees, and hired San Ramon employees of all levels and in illegal fashion.

Finally, Francis speaks to EPIC "acting on BORs" – but EPIC is in fact continuing to actively solicit current Gallagher customers. Later this week, EPIC has set up an appointment to pitch business to           – a current Gallagher client for whom 34 proprietary Gallagher server files were accessed and taken on December 5 by Defendant Watkins, and subsequently burned to CDs by Waktins on December 5 and December 12 from another computer where the data was (and may still be) stored. Supp Berryhill Decl., ¶ 10; Doyle Decl., ¶ 2.

Gallagher has made a sufficient showing of both immediate irreparable injury and a significant threat of irreparable harm should injunctive relief not be granted, including deprivation of the use and value of its data, the competitive advantage Gallagher would have continued to enjoy had the data remained confidential, and the ability to further develop business from the customers at issue unencumbered by Defendants' unfair competition and other violations.  The

REPLY ISO MOTION FOR TRO, OSC RE
PRELIM. INJUNC., EVID. PRESERV.,
EXPEDITED DISCOVERY

1  loss of customers, the loss of the use of its data, the fact that its competitor is in possession of the

2  data, the lost of Gallagher's competitive advantage and goodwill, and the lost of the ability to

3  fairly maintain and develop business from customers cannot be reasonably ascertained or

4  compensated by money damages.  Defendants will not suffer cognizable hardship if the Court

5  grants the injunctive relief sought, because the issuance of an injunction will prevent Defendant

6  only from unfairly competing with Gallagher, and will require merely compliance with the

7  CFAA, adherence to the Agreements, and preclude Defendants from taking actions that would be

8  unlawful.   According, the balance of the hardships weighs in favor of granting injunctive relief.[2]

9       **C.     Defendants' Neutered Proposed Injunction Should be Rejected**

10        Defendants ask the Court to issue a neutered injunction which will allow them to continue

11  to engage in unrestrained illegal conduct without fear of being in violation of the Order.  The

12  three main issues are: (1) the return of Gallagher data is limited only to documents Defendants

13  individually took with them when they left Gallagher's employ, and not to data they procure from

14  others;  (2) solicitation is prohibited only by former Gallagher employees now working for EPIC;

15  where Defendants are acting in concert, the injunction should apply to Defendants, EPIC, and its

16  officers, directors, employees, servants, agents, and all persons in active concert and participation

17  with any of them; See Iconix, Inc. v. Tokuda, 457 F. Supp. 2d at 1003, and (3)  Defendants'

18  prohibition on soliciting customers and use of data would apply only if they knowingly and

19  personally have data related to that file; thus, for example, where Watkins misappropriated 34

20  proprietary               client files from Gallagher, any other Defendant would be free to

21  actively solicit            to switch their business to EPIC provided they claim they had no

22  knowledge of Watkins' actions.  Similarly, they would be free to use proprietary data they have

23  committed to memory (see Chua Decl.; he memorized Gallagher proprietary data) or for

24  customers for whom they "unknowingly" received Gallagher confidential data. This would

25  render the injunction meaningless.

26

27  [2] Defendants reliance on Liberty Mutual Insurance Co. v. A.J. Gallagher & Co., 1994 WL 715613 (N.D. Cal. 1994) is misguided.  The data at issue here – including proprietary analysis regarding client insurance needs, loss history, and coverages, (2) particularized client insurance

28  requirements and account preferences, (3) Gallagher financial data, and (4) business, management and personnel strategies and data –rises to the level of trade secrets under the UTSA.

REPLY ISO MOTION FOR TRO, OSC RE
PRELIM. INJUNC., EVID. PRESERV.,
EXPEDITED DISCOVERY

DATED:  January 7, 2008                    PAUL, HASTINGS, JANOFSKY & WALKER LLP

                                           By:  _____
                                                      BRADFORD K. NEWMAN

                                           Attorneys for Plaintiffs