1  PAUL, HASTINGS, JANOFSKY & WALKER LLP
   BRADFORD K. NEWMAN (SB# 178902)
2  bradfordnewman@paulhastings.com
   STEPHEN N. YANG (SB# 142474)
3  stephenyang@paulhastings.com
   SARJU A. NARAN (SB# 215410)
4  sarjunaran@paulhastings.com
   SHANNON S. SEVEY (SB# 229319)
5  shannonsevey@paulhastings.com
   1117 S. California Avenue
6  Palo Alto, CA 94304-1106
   Telephone: (650) 320-1800
7  Facsimile: (650) 320-1900

8  Attorneys for Plaintiffs
   Arthur J. Gallagher & Co., Inc. & Arthur J. Gallagher & Co.
9  Insurance Brokers of California, Inc.

10                UNITED STATES DISTRICT COURT
11                NORTHERN DISTRICT OF CALIFORNIA
12                   SAN FRANCISCO DIVISION
13
14 ARTHUR J. GALLAGHER & CO., INC.,        CASE NO. C 07-06418 JSW
   a Delaware Corporation, et al.,
15                                          **DECLARATION OF GREGORY
              Plaintiffs,                   CAMPBELL IN SUPPORT OF PLAINTIFF
16                                          ARTHUR J. GALLAGHER & CO., INC.'S
        vs.                                 MOTION FOR TEMPORARY
17                                          RESTRAINING ORDER, EVIDENCE
   EDGEWOOD PARTNERS INSURANCE             PRESERVATION ORDER, EXPEDITED
18 CENTER, a California corporation; et al., DISCOVERY ORDER, AND ORDER TO
                                            SHOW CAUSE RE ISSUANCE OF
              Defendants.                   PRELIMINARY INJUNCTION**
19
20
21
22
23
24
25                        **REDACTED**
26
27
28
                                                    DECLARATION OF GREGORY
                                                                  CAMPBELL
   Case No. C07 06418 JSW

I, Gregory Campbell, declare:

1. I am currently employed as an Area Executive Vice President and Branch Executive Officer for Arthur J. Gallagher & Co., Insurance Brokers of California, Inc., a division of Arthur J. Gallagher & Co. ("Gallagher"). I have worked for Gallagher for approximately 19 years. I have personal knowledge of the facts set forth in this Declaration, and if called as a witness, I would and could testify to the facts stated herein.

2. I am familiar with the loss control services provided by Gallagher, and with Robert Harrison Watkins' ("Watkins") work in particular, because for a period of approximately 7 years, I performed substantially the same type of work as Watkins and held a similar title (Director of Risk Control) in the San Francisco Branch. Additionally, for a period of time, I provided loss control consulting services to two of the same clients that Watkins did:

3. At Gallagher, Watkins worked as Director of Loss Control Services for the San Ramon branch. This is the department within Gallagher that assists Gallagher's clients in analyzing insurance and self-insurance loss exposures and controls on those exposures as well as claims and loss histories to identify – and then implement measures to improve – those aspects of the clients' business operations which create a significant risk of, or higher frequency of, insurance or self-insurance claims. This service not only helps Gallagher clients reduce the number and cost of insurance claims, but also assists Gallagher in negotiating, and our clients in obtaining, favorable insurance rates when their insurance policies are renewed, since reducing the number and cost of claims often leads to lower insurance premiums and may allow a client access to broader options in the insurance marketplace. In addition, loss control is an important value-added service that creates, solidifies and maintains client relationships.

4. In providing this Declaration, I have been asked to assume the following facts:

   (a) November 27, 2007: Between 3:37 and 4:03 p.m. (26 minutes), 689 AJG-related files/folders were accessed on Watkins' laptop in a manner indicative of copying the files off of the laptop to another computer media.

  (b) December 5, 2007:

    (i) Between 7:31 and 8:51 a.m., 3 documents were created on Watkins laptop containing lists of approximately 370 email addresses belonging to specific individuals within approximately 73 Gallagher customers and 13 insurance companies with whom Gallagher works. These specific individuals include the decision-makers and other key individuals within the Gallagher customers and insurance companies at issue. True and correct copies of these three documents are attached hereto as Exhibits A-C.

    (ii) Between 8:54:11 and 8:55:39 a.m. (1 minute 28 seconds), there was rapid access to 173 AJG-related files on the Gallagher server space for Watkins' home directory, but no activity on the laptop, which indicates that data was moved off of the server to some other computer media.

    (iii) At 8:56 a.m., the 3 documents containing lists of email addresses (Exhibits A-C) were accessed on Watkins' laptop.

  (c) December 12, 2007 (the date of Watkins' resignation):

    (i) At 8:33 a.m., Watkins sent to Gallagher by email (from a Comcast email address) notice of his resignation, "effective immediately."

    (ii) At 10:26 a.m. (post-resignation), Watkins' laptop was connected to a computer network other than Gallagher's – this suggests Watkins was somewhere else, with his Gallagher-issued laptop, accessing the Internet through a foreign network.

    (iii) At 10:32 a.m. (post-resignation), a CD burning project, entitled "Harrison Pics 071001," was created on Watkins' laptop. A folder with the same name was located in the "My Pictures" folder on Watkins' laptop, and only contained 2 small .jpeg files. The burning of these 2 .jpeg files alone would not account for the 14 minutes spent on the CD burning project.

    (iv) In the span of 32 minutes, from 10:26 to 10:58 a.m. (post-resignation), 621 files and folders were accessed on Watkins' laptop, including Gallagher client-related folders pertaining to 23 companies whom Gallagher has since lost to EPIC:

      (1) Alameda Hospital;

(2) Anderson Carpet & Linoleum Sales;

(3) Berkeley Cement;

(4) C&L Financial;

(5) Cal West Concrete Cutting;

(6) Can-Am Plumbing;

(7) Casey-Fogli Concrete;

(8) Del Monte Electric;

(9) DiMare Fresh;

(10) DiMare Homestead;

(11) Diversified Personnel Services;

(12) F. Rodgers Corporation;

(13) Floyd Johnston Construction;

(14) Homeguard;

(15) Lilja Corporation;

(16) Pacific Erectors;

(17) Redwood City Electric;

(18) Rosendin Electric;

(19) Town & Country Roofing;

(20) TWE Enterprises;

(21) Vallejo City Unified School District;

(22) Wawona Frozen Foods; and

(23) Western Shower Door.

(v)     At 10:36 a.m. (post-resignation), Citrix, the remote log-in program Gallagher uses to enable its employees to access Gallagher's computer system remotely, was accessed on Watkins' laptop – presumably through the foreign network he accessed at 10:26 a.m.

(vi)    Just before 11:30 a.m., Watkins' laptop was shut down.

**The Gallagher Customers At Issue from Watkins' Computer Access**

5.      Of the approximately 73 clients whose email addresses Watkins compiled into

1 | Word documents, several transferred their business from Gallagher to EPIC in only a matter of
2 | days after Watkins and approximately 48 others left Gallagher to join EPIC. Similarly, of the
3 | customers represented in the Gallagher files accessed by Watkins on Nov 27, 2007, December 5,
4 | 2007, and December 12, 2007, many transferred their business from Gallagher to EPIC shortly
5 | after the employees resigned to join EPIC.

6. In addition, of the clients represented in the files at issue from Watkins' laptop and server access, I am informed that at least three— — were solicited by EPIC –and former Gallagher employees now employed by EPIC – to transfer their business from Gallagher to EPIC, but did not agree to transfer their business from Gallagher to EPIC.

7. Attached hereto as Exhibits D and E are true and correct copies of lists of the referenced files and folders from Watkins' Gallagher-issued laptop computer accessed on November 27, 2007 and December 12, 2007 (Watkins' final day of employment with Gallagher), respectively.

8. I have reviewed Exhibits D and E. Exhibit E reveals that Watkins accessed Gallagher's proprietary compilation and analyses of insurance policy and risk management data of multiple customers. For example,

9. Another folder listed in Exhibit E, entitled

C07 06418 JSW                                    -4-                          DECLARATION OF GREGORY CAMPBELL

10.

11.

12. I am informed that on or around December 10, 2007, F. Rodgers executed a Broker of Record ("BOR") letter naming EPIC as its exclusive insurance broker, in place of Gallagher. This represents a loss of approximately

13. Another Gallagher client file folder at issue relates to former Gallagher client

14.

15. Furthermore, being in possession of this type and quantity of Gallagher data, EPIC and the former Gallagher employees can make confident assurances to Gallagher clients like Rosendin and F. Rogers that transferring their business to EPIC will not result in service issues, since EPIC and this group of employees know that they possess a library of data on these clients that allow them access, at will, to significant quantities of Gallagher information and work product relative to these clients, and therefore, when related issues arise, they can deal with it without having to ask the clients for information or data. At the same time, EPIC and the former Gallagher employees can proactively service these clients through reliance on and use of the

Gallagher data.

16. I am informed that on December 10, 2007, Rosendin executed a Broker of Record letter naming EPIC as its exclusive insurance broker, in place of Gallagher. This represents a loss of approximately $636,000 in revenue to Gallagher.

**Files At Issue From Gallagher's Computer Server**

17. Attached hereto as Exhibit J is a true and correct copy of a list of files I am informed Watkins accessed, in rapid succession and in a manner indicative of copying, on Gallagher's computer server on December 5, 2007 – one week prior to his resignation from Gallagher.

18. As reflected in Exhibit J, at 8:54 a.m. on December 5, 2007, I am informed that Watkins accessed approximately 27 documents relating to Gallagher client

19. I am informed that on January 10 or 11, 2008, EPIC and certain of the individual Defendants who formerly worked for Gallagher, have scheduled an in-person meeting with           for the purpose of attempting to convince           to transfer all of their business from Gallagher to EPIC.

20. The only purpose of which I am aware that Watkins, who I assume is working in the same or similar function for EPIC that he served for Gallagher, would have for copying Exhibit K is to enable EPIC and Watkins to acquire the data it would need to unfairly compete against Gallagher for           business. Specifically, this data enables EPIC to use the proprietary analysis developed by Gallagher to make recommendations to

21. As another example, again at 8:54 a.m. on December 5, 2007, I am informed that Watkins accessed the document entitled

22. This information is not publicly available, but rather, was compiled by Gallagher at its expense over time for a specific commercially valuable business purpose – to enable Gallagher to make specific loss control recommendations to its client so that it can help its clients reduce claims, reduce the amount of money spent on claim payouts, insurance premiums and related costs, and strengthen the existing relationship between           and Gallagher. This document is premised on the core type of client-specific knowledge and data to which companies like Gallagher (and its competitors like EPIC) are provided access by their clients, and which Gallagher then spends time and effort to analyze and create recommendations for its clients.

### Watkins' Actions with Respect to Gallagher's Proprietary Data Leading Up To and On The Day of His Resignation Are Very Troubling, Viewed Alone And In Light of The Totality of the Circumstances

23. The proprietary data that Watkins accessed in his final days of employment with

1  Gallagher, including those discussed above, contain sensitive, commercially valuable information
2  which Gallagher does not distribute – and does not authorize its employees to distribute – to
3  competitors. To my knowledge, Watkins did not have permission to copy these files or provide
4  the information contained therein to EPIC, nor am I aware of Watkins having any legitimate
5  business purpose for accessing and copying this data shortly before resigning his employment
6  with Gallagher.

7  24. In comparing Watkins' file access activity and the growing list of Gallagher clients
8  who have, to date, transferred their business from Gallagher to EPIC, I observe a strong
9  correlation which indicates to me that the former Gallagher employees, now at EPIC, are working
10 in unison to focus on stealing business from Gallagher. In other words, it appears that EPIC is
11 spending significant effort trying to obtain business from existing Gallagher clients rather than
12 taking the time to develop relationships with non-Gallagher clients.

13 25. In particular, Exhibits D, E and J reveal that Watkins accessed files relating to
14 Gallagher clients for whom he – as a member of Gallagher's Loss Control Services group may
15 have provided service but did not have overall account responsibility. Instead, these client
16 accounts were the responsibility of and were ultimately managed at Gallagher by sales
17 executives, also known as Producers, who left Gallagher to join EPIC, including Wally Brown,
18 Neil Cohn, Rob Dutto, Robert Ellsworth, Steve Hause, Don Johnson, Brian Quinn, and Paul
19 Wagener. In other words, Watkins took Gallagher proprietary data that would enable his co-
20 Defendants to solicit on behalf of EPIC specific clients they had previously managed, and the
21 data in the documents at issue would be directly relevant to EPIC's ability to service these
22 Gallagher customers without delay, interruption or having to spend the time to re-create from the
23 client's original records all of Gallagher's work product.

24 26. Based on my understanding of Watkins' duties for Gallagher, there are only three
25 reasons why Watkins would have taken Gallagher proprietary data. Watkins either took
26 Gallagher's proprietary data regarding these clients because (1) while still a Gallagher employee,
27 Watkins was working with Producers such as Brown, Cohn, Dutto, Ellsworth, Hause, Johnson,
28 Quinn, and Wagener to help them – and EPIC – steal business from Gallagher, and/or (2) he

1  copied the files he would need to provide uninterrupted loss control services to the clients who
2  transferred their business from Gallagher to EPIC and/or (3) he took the files to use them for the
3  benefit of EPIC without EPIC or Watkins having to invest the time and resources to develop the
4  tools and information in the files. It also indicates to me, based on the pattern of Watkins
5  accessing Gallagher proprietary data relating to specific clients who, at or around the same time
6  as Watkins' file access, transferred their business to EPIC, that the remainder of the clients
7  represented in the files Watkins accessed and presumably copied are at risk of being stolen by
8  EPIC and the former Gallagher employees now employed by EPIC.

9  I declare under penalty of perjury under the laws of the United States and California that
10 the foregoing information is true and correct to the best of my knowledge and belief.

11 Executed this 6th day of January 2008, in  SAN FRANCISCO  California.

Gregory Campbell