JEROME C. ROTH (SBN 159483)
MARTIN D. BERN (SBN 153203)
MALCOLM A. HEINICKE (SBN 194174)
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, CA 94105-2907
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077

Attorneys for Defendant
EDGEWOOD PARTNERS INSURANCE CENTER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ARTHUR J. GALLAGHER & CO., INC., a Delaware Corporation, ARTHUR J. GALLAGHER & CO., INSURANCE BROKERS OF CALIFORNIA, INC., a California Corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>EDGEWOOD PARTNERS INSURANCE CENTER, a California corporation; DAN R. FRANCIS; JOHN G. HAHN; ANDREW ("WALLY") BROWN, JR.; BRIAN F. QUINN; NEIL R. COHN; CAROLANN COHN; MICHAEL J. BROWN; STEPHEN HAUSE; LAURA J. WICK; JAMES C. HALBLEIB; LAURINDA ("LAURIE") A. MARTIN; ERIC CHUA; GEORGE J. PETTY; LINDA SOO HOO; ROBERT E. DUTTO; SUSAN M. ENGLISH; DON J. JOHNSON; ALLEN L. AMOS; WILLIAM ("BILL") PHILLIPS, JR.; DIRCK ("RICK") R. STINSON; ROBERT ("BOB") D. ELLSWORTH; ROBERT H. WATKINS; PAUL H. WAGENER; SHANDRANETTE MIDDLETON,<br><br>Defendants. | CASE NO. 07-CV-06418-JSW<br><br>SUPPLEMENTAL DECLARATION OF JOHN HAHN<br><br>Date:    January 11, 2008<br>Time:    9:00 a.m.<br>Dept:    Courtroom 2, 17th Floor |

I, JOHN HAHN, hereby declare as follows:

1. I am a Co-Founder of Edgewood Partners Insurance Center ("EPIC"). I make this declaration of my own personal knowledge, and if called upon to do so, I could and would testify to the matters set forth herein.

2. As set forth in greater detail in my initial declaration in opposition to Plaintiff Gallagher's motion for a temporary restraining order, I have almost three decades of experience in the insurance industry, and before co-founding EPIC, I worked as the President of BISYS Commercial Insurance Services focusing on the wholesale brokerage business.

3. On January 11, 2008, I attended this Court's hearing on Plaintiff Gallagher's motion for a temporary restraining order in this case. I reviewed a copy of the questions that the Court directed to the parties and their counsel in advance of the hearing. Per the Court's instructions, I am submitting this declaration to confirm the answers provided by my counsel to the questions asked by the Court at the hearing.

**Question 2(a)**

4. On the morning of December 7, 2007, within hours of the time at which I now understand that Wally Brown and Brian Quinn had announced their resignations from Gallagher, EPIC began receiving calls from brokers and other personnel at Gallagher who were inquiring about job opportunities at EPIC. My understanding was that these people were initiating contact with EPIC for a variety of individualized reasons, which generally included (a) a desire to remain with Wally and Brian and follow them right away to their new company; (b) a desire to explore EPIC's distinct compensation and benefits (including the equity opportunities for brokers); and/or (c) a concern that any opportunities at EPIC may not be available for a long time. The nature and timing of the calls as well as my subsequent communications with the applicants suggested to me that many if not most or all of the candidates were eager to explore opportunities right away, and as a general matter, I sensed that these applicants felt an urgent need to determine their own career situations.

5. At this point in time, EPIC was looking to hire qualified brokers (as well as experienced support staff to assist them). Indeed, the business model of EPIC is focused on

attracting quality brokers by providing strong opportunities for them, including financial (equity) participation and workplace autonomy. As such, it generally behooves EPIC to act quickly on inquiries from qualified personnel.

6. Accordingly, consistent with EPIC's desire to hire experienced and talented brokers (and associated staff) and in response to the apparent urgency or eagerness of the applicants themselves, EPIC scheduled interviews with these applicants soon after they contacted EPIC.

**Question 2(b)**

7. The Court asked if, prior to conducting the interviews with Gallagher employees discussed above, *i.e.*, the interviews conducted on December 7, 2007 or the following days, EPIC obtained compensation data or other specified details concerning the applicants' employment at Gallagher from former Gallagher employees who had at that point already joined EPIC. I did not obtain such information about these applicants from former Gallagher employees who had previously come to EPIC, and I am not aware of (and would not have permitted) any effort at EPIC to obtain such information about these applicants in this fashion. When these applicants were interviewed, they were asked for and routinely provided their own salary/compensation information voluntarily, and EPIC reviewed this voluntarily provided information in the course of considering these applicants.

8. The Court also asked about the bases on which EPIC was able to make offers to employees relatively "quickly." Although the interview process was important, the interview itself was not the only basis on which the offers were made. Given the experience and expertise that EPIC co-founder Dan Francis and I have in the insurance industry, I believe that we are able to evaluate the past experiences and affiliations of insurance brokers and administrative staff very well. Accordingly, I felt comfortable making offers to individuals based on their applications because these applications (and the associated interviews) provided significant insight into their experiences, accomplishments and talents. Indeed, given my experience in the wholesale insurance business, where I spent significant amounts of time working with retail brokers in Northern California, I specifically knew, either personally or by reputation, the vast

1  majority of the individual brokers who interviewed with EPIC on or shortly after December 7,
2  2007. This provided yet another basis beyond the interview itself for me to make the offers in
3  question.
4      9.      Not only were Mr. Francis and I able to evaluate the merits of each broker
5  seeking to join EPIC, but we also felt that EPIC's compensation system enabled the company to
6  retain new brokers with relatively limited financial risk to the Company. This is because, under
7  the EPIC compensation system, much of a broker's compensation is paid on the basis of
8  performance, and thus if there is a situation in which a broker does not perform well over time,
9  the company will not be obligated to pay that broker his or her entire possible compensation.
10     10.     In addition, and to a lesser degree, EPIC's decision to make offers to
11 successful applicants soon after they interviewed was motivated by a desire to avoid a situation in
12 which multiple people coming to EPIC would remain at Gallagher for some time after
13 interviewing with, and stating their desire to join, EPIC. Specifically, there was desire to give
14 these many successful applicants the chance to make a clean departure and better avoid the sort of
15 allegations we are now seeing in this case.
16     I declare under penalty of perjury under the laws of the State of California and the
17 United States that the foregoing is true and correct, and that this declaration is executed on
18 January 16, 2007, in San Mateo, California.

By: _____
JOHN HAHN