1  PAUL, HASTINGS, JANOFSKY & WALKER LLP
   BRADFORD K. NEWMAN (SB# 178902)
2  bradfordnewman@paulhastings.com
   STEPHEN N. YANG (SB# 142474)
3  SARJU A. NARAN (SB# 215410)
   SHANNON S. SEVEY (SB# 229319)
4  1117 S. California Avenue
   Palo Alto, CA 94304-1106
5  Telephone: (650) 320-1800
   Facsimile: (650) 320-1900
6
   Attorneys for Plaintiffs
7  Arthur J. Gallagher & Co., Inc. & Arthur J. Gallagher & Co.
   Insurance Brokers of California, Inc.
8
                    UNITED STATES DISTRICT COURT
9
                 NORTHERN DISTRICT OF CALIFORNIA
10
                     SAN FRANCISCO DIVISION
11

12 | ARTHUR J. GALLAGHER & CO., a          | CASE NO. C 07-06418 JSW
   | Delaware Corporation, ARTHUR J.        |
13 | GALLAGHER & CO. INSURANCE             | **FIRST AMENDED COMPLAINT FOR**
   | BROKERS OF CALIFORNIA, INC., a         | **DAMAGES AND INJUNCTIVE RELIEF FOR:**
14 | California Corporation, Plaintiffs,    |
   |                                        | 1. VIOLATION OF THE COMPUTER FRAUD
15 |          vs.                           | AND ABUSE ACT, 18 U.S.C. §1030 ET SEQ.,
   |                                        | 2.  VIOLATION OF CALIFORNIA PENAL
16 | EDGEWOOD PARTNERS INSURANCE           | CODE § 502
   | CENTER, a California corporation; DAN  | 3.  MISAPPROPRIATION OF TRADE
17 | R. FRANCIS; JOHN G. HAHN;              | SECRETS, CAL. CIV. CODE §3426 ET SEQ.,
   | ANDREW ("WALLY") BROWN,                | 4. CONVERSION
18 | JR.; BRIAN F. QUINN; NEIL R. COHN;     | 5.  MISAPPROPRIATION OF EMPLOYER
   | CAROLANN COHN; MICHAEL J.              | PROPERTY, CAL. LABOR CODE §2860,
19 | BROWN; STEPHEN HAUSE; LAURA J.         | 6.   BREACH OF WRITTEN CONTRACT
   | WICK; JAMES C. HALBLEIB;               | 7.   BREACH OF THE COVENANT OF GOOD
20 | STEPHEN HAUSE,                         | FAITH AND FAIR DEALING
   | LAURINDA ("LAURIE") A. MARTIN ;        | 8.   BREACH OF FIDUCIARY DUTY
21 | ERIC CHUA; GEORGE J. PETTY;            | 9.   BREACH OF THE DUTY OF LOYALTY,
   | LINDA SOO HOO; ROBERT E. DUTTO;        | 10.   VIOLATIONS OF THE CALIFORNIA
22 | SUSAN M. ENGLISH; DON J.               | LABOR CODE, CAL. LABOR CODE §§ 2853
   | JOHNSON; ALLEN L.                      | AND 2863,
23 | AMOS; WILLIAM ("BILL") PHILLIPS,       | 11.  TORTIOUS INTERFERENCE WITH
   | JR.; DIRCK ("RICK") R. STINSON;        | CONTRACT
24 | ROBERT ("BOB") D. ELLSWORTH;           | 12. TORTIOUS INTERFERENCE WITH
   | ROBERT H. WATKINS; PAUL H.             | PROSPECTIVE BUSINESS ADVANTAGE
25 | WAGENER, SHANDRANETTE                  | 13. UNFAIR COMPETITION, CAL. BUS. &
   | MIDDLETON; Defendants.                 | PROF. CODE §17200 ET SEQ.,
26 |                                        | 14. UNJUST ENRICHMENT, AND
   |                                        | 15. FRAUD.
27 |                                        |
   |                                        | **JURY TRIAL DEMANDED**
28

Case No. C 07 06418-JSW

FIRST AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR
JURY TRIAL.

1     Plaintiffs Arthur J. Gallagher & Co., a Delaware corporation, and Arthur J. Gallagher &

2  Co. Insurance Brokers of California, Inc., a California corporation (collectively, "Plaintiffs" or

3  the "Company"), for its First Amended Complaint against Defendants Edgewood Partners

4  Insurance Center ("EPIC"), Dan R. Francis, John G. Hahn, Andrew ("Wally") Brown, Jr., Brian

5  F. Quinn, Neil R. Cohn, CarolAnn Cohn, Michael J. Brown, Stephen Hause, Laura J. Wick,

6  George J. Petty, James C. Halbleib, Laurinda ("Laurie") A. Martin, Eric Chua, Linda Soo Hoo,

7  Robert E. Dutto, Susan M. English, Don J. Johnson, Allen L. Amos, Shandranette Middleton

8  (also known as Shandranette Pulliam), William ("Bill") Phillips, Jr., Dirck ("Rick") R. Stinson,

9  Robert ("Bob") D. Ellsworth, Robert H. Watkins, and Paul H. Wagener, (collectively, the

10  "Individual Defendants") (collectively with EPIC, the "Defendants") states as follows:

11                    **I.    NATURE OF ACTION**

12     1.      This action stems from EPIC's illegal raiding of Plaintiffs' employees and the

13  associated theft and use of Plaintiffs' confidential data to unfairly compete and steal millions of

14  dollars of business.  EPIC's actions are ongoing.  This First Amended Complaint seeks remedies,

15  including injunctive and monetary relief, for violation of the Computer Fraud and Abuse Act, 18

16  U.S.C. §1030 *et seq.*, violation of California Penal Code §502, misappropriation of trade secrets,

17  Cal. Civ. Code §3426 *et seq.*, misappropriation of employer property, Cal. Civ. Code §2860,

18  conversion, breach of written contract, breach of the covenant of good faith and fair dealing,

19  breach of fiduciary duty and breach of the duty of loyalty, violations of the California Labor

20  Code, Cal. Labor Code §§2853 and 2863, tortious interference with contract, tortious interference

21  with prospective business advantage, unfair competition, Cal. Bus. & Prof. Code §17200 *et seq.*,

22  unjust enrichment, and fraud.

23     2.      A fundamental premise of the competitive marketplace is that companies must

24  compete in a fair and ethical manner, working to develop their own products, clients, business

25  strategies, revenues and profits using their own efforts and employees, rather than

26  misappropriating proprietary and trade secret data of others and illegally raiding another

27  company's workforce.

28     3.      To the outside world, including its potential clients and partners, Defendant

-1-

FIRST AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR
JURY TRIAL.

1    EPIC touts its purported beliefs in these ethical principles. But EPIC's actions in this case tell a

2    story of a much different company.

3        4.        As a new insurance brokerage firm, EPIC was not content to build its new

4    business the legal way, through proper capitalization of an office, with significant effort placed

5    into hiring lawfully and having its new hires spend the time and effort necessary to build client

6    relationships and client business in an ethical and legal manner. Instead, EPIC and its two most

7    senior executives, Defendants John G. Hahn and Dan R. Francis, proceeded in a manner that

8    violated EPIC's own Code of Ethics which EPIC advertises to the world that it believes in and to

9    which it claims to adhere.

10        5.        The relationship between employer and employee implicitly contains an

11    agreement that the employee will act in good faith and will not act to the detriment of his or her

12    employer. Dishonesty and disloyalty by the employee to his or her employer does great violence

13    to this relationship, and among other harm, deprives the employer of the benefits to which it is

14    entitled in exchange for paying the employee his or her agreed-upon compensation for those

15    periods in which the employee was disloyal.

16        6.        While active officers, senior executives, fiduciaries and/or employees of

17    Plaintiffs, Individual Defendants Wally Brown, Brian Quinn, Michael Brown and Neil Cohn, in

18    concert with EPIC executives Francis and Hahn, surreptitiously carried out their illegal actions in

19    a conscious way so as to cause the utmost damage to Plaintiffs. Among other things, over a period

20    of months and while still actively employed by Plaintiffs, these Defendants – working in close

21    concert with Francis and Hahn – secretly leased spaced and set up EPIC's office in the same

22    complex where Plaintiffs' San Ramon office is located, used their insider's knowledge of

23    employee skills and salaries to illegally solicit and recruit their direct reports away from Plaintiffs

24    and into jobs with Plaintiffs' competitor, and engaged in actions which culminated in the theft

25    and use of Plaintiffs' data to unfairly compete.

26        7.        Defendants purposely chose to announce the first wave of their resignations

27    from Plaintiffs and leave en masse and with no prior notice on Friday, December 7, 2007. They

28    knew that by waiting until the end of the year to resign without notice, they would catch Plaintiffs

-2-

1    off-guard, cause the most disruption to Plaintiffs, and inflict the maximum damage to Plaintiffs'

2    business goodwill and client relationships.

3        8.        Within minutes of walking out with no notice in breach of their contractual

4    and/or fiduciary obligations, the Individual Defendants, working in concert with each other,

5    arrived at the EPIC office, and on information and belief, started contacting Plaintiffs' clients and

6    partners and unfairly competing, including through the use of Plaintiffs' confidential and

7    proprietary information and other means. Defendants engaged in unfair competition by, among

8    other things, on information and belief, attempting to persuade Plaintiffs' customers and clients to

9    switch their business from Plaintiffs to EPIC by falsely representing that EPIC had "purchased"

10   the client's account from Plaintiffs and that Plaintiffs was going to close their San Ramon office

11   in response to the mass departures.

12       9.        At the same time, they actively concealed their actions from Plaintiffs' regional

13   and corporate-level management, making detection of the departures and related actions

14   impossible for Plaintiffs. While Plaintiffs have yet to discover all of the facts, Defendants

15   committed various illegal acts as alleged herein, including theft and use of property and data,

16   and/or unauthorized access to Plaintiffs' servers and computer media, and/or breach of their

17   fiduciary duty and duty of loyalty, and/or breach of their employment agreements, and/or unfair

18   competition.

19       10.       Defendants Wally Brown's and Brian Quinn's actions were particularly

20   egregious, as they accomplished and facilitated the illegal plan, including the employee raiding

21   and theft of data, while holding the most senior management positions within Plaintiffs' San

22   Ramon office.

23       11.       If Defendants are not restrained from further unfair competition through the

24   acts complained of and ordered to identify, return and cease using the stolen data of Plaintiffs,

25   Plaintiffs will be irreparably harmed and will continue to suffer irreparable loss of their employee

26   base, and to their goodwill, reputation and business.

27                   **SUBJECT-MATTER JURISDICTION AND VENUE**

28       12.       Jurisdiction of this First Amended Complaint is proper pursuant to 18 U.S.C. §

-3-
FIRST AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR
JURY TRIAL.

1  1030(g), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

2       13.     Venue is appropriate in this Court pursuant to 28 U.S.C. 1391(a)(2) because a

3  substantial part of the events or omissions giving rise to the claims occurred in this District.

4            **III.    PARTIES AND PERSONAL JURISDICTION**

5       14.     Plaintiff Arthur J. Gallagher & Co. is a Delaware corporation with its principle

6  place of business in Illinois. Arthur J. Gallagher & Co. Insurance Brokers of California, Inc., is a

7  California corporation with its principle place of business in California.

8       15.     Defendant Edgewood Partners Insurance Center ("EPIC") is a California

9  corporation with its corporate headquarters in San Mateo, California, and three other offices in

10  San Ramon, California, Sacramento, California, and Orange, California.

11       16.     Individual Defendants Dan R. Francis and John G. Hahn are co-founders of

12  Defendant EPIC, seasoned and sophisticated industry executives, and on information and belief,

13  residents of the State of California.

14       17.     At all relevant times, Individual Defendants Wally Brown, Brian Quinn, Neil

15  Cohn, Halbleib and Hause were officers and fiduciaries of Plaintiff Arthur J. Gallagher & Co.

16  Insurance Brokers of California, Inc.

17       18.     Individual Defendants are current employees of Defendant EPIC, former

18  employees of Plaintiffs, and on information and belief and the facts currently known, residents of

19  the State of California. Specifically:

20        •    **The Initiators Of The Conspiracy:** In addition to the EPIC Defendants, <u>Wally</u>
21            <u>Brown</u>, <u>Neil Cohn</u>, <u>Brian Quinn</u>, and <u>Michael Brown</u>.

22        •    **The Individual Defendants Tasked With Carrying Out The Conspiracy**: In
          addition to the EPIC Defendants, Wally Brown, Neil Cohn, Brian Quinn, and
23            Michael Brown, and <u>Laura Wick</u>.

24        •    **Individual Defendants Who Misappropriated, Used, And/Or Deleted**
          **Plaintiffs' Confidential and Proprietary Data and/or Engaged in Unfair**
25            **Competition:** In addition to the EPIC Defendants, Wally Brown, Neil Cohn, Brian
          Quinn, Michael Brown, Neil Cohn, and Laura Wick, <u>George Petty</u>, <u>Eric Chua</u>,
26            <u>Shandranette Middleton</u>, <u>Jim Halbleib</u>, <u>Laurie Martin</u>, <u>Stephen Hause Robert</u>
          <u>Watkins</u>, <u>Allen Amos</u>, <u>Rob Dutto</u>, <u>Robert Ellsworth</u>, <u>Don Johnson</u>, and <u>Paul</u>
27            <u>Wagener</u>.

28        •    **Individual Defendants Who Breached Their Contractual And/Or Fiduciary**
          **Obligations And/Or Duty of Loyalty To Plaintiffs:** <u>Wally Brown</u>, <u>Brian Quinn</u>,

FIRST AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR
JURY TRIAL

Neil Cohn, <u>CarolAnn Cohn</u>, <u>Michael Brown</u>, <u>Stephen Hause</u>, <u>Eric Chua</u>, <u>Shandranette Middleton</u>, <u>Allen Amos</u>, <u>Robert Ellsworth</u>, <u>Rob Dutto</u>, <u>Susan English</u>, <u>Jim Halbleib</u>, <u>Don Johnson</u>, <u>Laurie Martin</u>, <u>William Phillips</u>, <u>Rick Stinson</u>, <u>Linda Soo Hoo</u>, <u>Paul Wagener</u>, and <u>Robert Watkins</u>.

19.     Each of the Defendants have willfully aided and abetted each of the other Defendants in the wrongful concerted action described herein, or acted with or in furtherance of that action, or assisted in carrying out its purposes alleged in this First Amended Complaint.

20.     Defendants, and each of them, are individually sued as co-conspirators in the wrongful conduct complained of, and the liability of each arises from the fact that each has engaged in all or part of the improper acts, plans, schemes, conspiracies, or transactions complained of herein.

21.     Defendants, and each of them, are individually sued as agents of one another, and in doing the things alleged herein, each of the Defendants acted within the course and scope of their agency, and with the permission and consent of each of the other Defendants.

## IV.     FACTUAL ALLEGATIONS

22.     The Individual Defendants, who left *en masse* to join EPIC, consisted of the San Ramon Office Heads, the HR Manager/ Office Manager, the Head of Technology, Producers and key support staff:

(a)     <u>Office Heads, Wally Brown and Brian Quinn</u>, the Area Chairman and Area President of Plaintiffs' San Ramon office, respectively, were responsible for leading Plaintiffs' San Ramon office. As the heads of the office, Brown and Quinn not only functioned as Producers, maintaining their own client accounts, but also managed and supported the other Gallagher San Ramon sales groups and made executive management decisions on behalf of Plaintiffs' San Ramon office.

(b)     <u>Human Resource and Office Manager Laura Wick</u>, was an approximately 12 year employee of Plaintiffs. As a long standing employee, Wick had developed relationships with Plaintiffs' employees in the San Ramon office and knowledge of confidential HR information of Plaintiffs, including sensitive data regarding employee skills, responsibilities, and compensation.

1    (c)    <u>Systems Administrator George Petty</u> was a six-year employee of

2 Plaintiffs and managed all of Plaintiffs' San Ramon technology systems, network, and computers.

3    (d)    <u>Other Management: Linda Soo Hoo</u>, Area VP – Managerial, was a

4 sixteen-year employee and member of Plaintiffs' San Ramon management team.

5    (e)    <u>Producers (some of whom are also Officers of Plaintiff)</u>: Producers

6 <u>Allen Amos, Neil Cohn, Rob Dutto, Robert Ellsworth, Susan English, Jim Halbleib, Steve Hause,</u>

7 <u>Don Johnson, Bill Phillips, Paul Wagener</u> functioned as the head of their sales group.  Producers

8 have the initial and primary contact with actual and prospective clients, and are responsible for

9 procuring and negotiating sales and maintaining client relationships.

10    (f) <u>Account Executives</u>: Account Executives, such as <u>Michael Brown (son of</u>

11 <u>Wally Brown), Eric Chua, Laurie Martin, Rick Stinson, and Robert Watkins</u>, assisted Producers

12 in maintaining the client relationship, attended meetings with actual and prospective clients, and

13 oversaw the performance of work performed on client accounts.

14    **<u>As A Leading Provider Of Insurance Products And Services, Plaintiffs Maintain And</u>**
**<u>Diligently Protect Its Proprietary Information And Employee And Customer Relationships</u>**
15

16    23.    Arthur J. Gallagher & Co., Inc. the parent company of the Gallagher entities,

17 was founded in 1927 to provide services worldwide in the area of risk management and general

18 insurance brokerage services, managing the assets of companies, providing insurance, and

19 furnishing similar services in areas of risk management.

20    24.    Plaintiffs' breadth and depth of experience in selling insurance products sets it

21 apart from its competitors.  Plaintiffs provide a national platform for carriers, which is unique

22 because of their size, expertise, proven track record and accumulated goodwill.  Through their

23 own efforts, Plaintiffs have invested substantial time and money in developing, maintaining, and

24 protecting substantial confidential, proprietary, and/or trade secret information about the

25 insurance brokerage and risk management industry, including, but not limited to:

26    •    lists of clients and prospective clients, including special customer matters like their

27        interests, needs, risk factors, customer purchasing patterns, the structure, conditions and

28        extent of customers' existing insurance coverages, customer renewal or expiration data,

1      customer concerns, customer's history of claims, and key contacts;

2      •   highly sensitive account details regarding existing clients of Plaintiffs, including business

3        records, customer file documents, pricing information, and sales plans;

4      •   special business relationships with vendors, agents and brokers;

5      •   Plaintiffs' financial matters, including pricing and profit margins, commissions and/or

6        fees;

7      •   The existence of any premium accounts, commission rates, and risk management service

8        arrangements, their loss histories, and other data showing the particularized insurance

9        requirements and preferences of the accounts;

10      •   business, management and personnel strategies;

11      •   criteria and formulae used by Plaintiffs in pricing insurance products and claims

12        management, loss control, and information management services;

13      •   the structure and pricing of insurance packages and products that Plaintiffs have

14        negotiated with various underwriters;

15      •   confidential strategies and business plans to market Plaintiffs' services, create new

16        products and bring value to its clients; and

17      •   selective personnel information and data, including compensation structure, performances,

18        relative strengths and weaknesses, assigned customer accounts, and related employee

19        information.

20        25.     Plaintiffs' non-public confidential and proprietary information has independent

21 economic value because it is not known to either its competitors or within the insurance agency

22 and brokerage business.  This information is provided to Plaintiffs, developed by Plaintiffs and

23 utilized by Plaintiffs for the purpose of allowing Plaintiffs employees to effectively and

24 efficiently sell, deliver and manage its services and products.

25        26.     Plaintiffs have spent many years and have invested substantial resources

26 developing their confidential and commercially valuable information and have invested

27 considerable amounts of time, money and effort in developing and maintaining solid relationships

28 with, and the goodwill of, each of their employees, participating clients and potential clients.

1    Plaintiffs enjoy long-standing, prosperous relationships with their clients. If, as happened in this

2    case, Plaintiffs' data was misappropriated and used by a competitor, it would provide the

3    competitor with value and an unfair advantage that would allow the competitor to unfairly raid

4    Plaintiffs' specific employees, immediately identify actual and potential customers and know the

5    history and specific details of the customers' business relationship with Plaintiffs, unfairly bid for

6    business against Plaintiffs, unfairly move business away from Plaintiffs and unfairly gain

7    knowledge of the procedures which result in Plaintiffs' delivery of excellent services and

8    products.

9         27.      In the course of serving Plaintiffs' clients, the Individual Defendants gained

10   access to Plaintiffs' most confidential, proprietary and trade secret information. In his resignation

11   letter, Defendant Neil Cohn conceded what was true for him and the other Individual Defendants

12   – that they were exposed and provided access to Plaintiffs' confidential and proprietary

13   information.

14        28.      Plaintiffs take reasonable and appropriate measures to safeguard their non-

15   public commercially valuable information. For example, through its Handbook, Code for

16   Business Conduct and Ethics, Executive Agreements, Stockholder Agreements, and other

17   corporate policies, Plaintiffs require that their confidential, proprietary, and trade secret

18   information be kept strictly confidential by its current and former employees.

19   • Code for Business Conduct and Ethics: For the purposes of protecting its confidential,
       proprietary, and trade secret information, Plaintiffs require all employees, including the
20     Individual Defendants, to acknowledge its Code for Business Conduct and Ethics
       Agreement, which contained, among others, the following provisions: protection of its
21     confidential, proprietary, and trade secret information; protection and proper use of
       company assets; prohibition against conflicts of interest with Plaintiffs; and prohibition
22     against the theft of corporate opportunities.

23   • Executive Agreements: For the purposes of protecting its confidential, proprietary, and
       trade secret information, Pla required substantially all of its executives, including
24     Defendants Brian Quinn, Neil Cohn, Michael Brown, Jim Halbleib, Laurie Martin, Robert
       Dutto, Rick Stinson, Allen Amos, Don Johnson, Robert Watkins, Susan English, William
25     Phillips, Jr., and Paul Wagener, to sign an Executive Agreement, which contained, among
       others, the following provisions: an express acknowledgement of their fiduciary
26     obligations, protection of confidential, proprietary, and/or trade secret information, a
       fourteen-day notice period upon termination of employment (for the purpose of ensuring a
27     smooth transition and the protection of trade secret information), an obligation to return
       data upon termination of employment, and a post-employment agreement not to solicit

28

1     Gallagher employees and clients.

2     •   <u>Non-Competition Agreement (Pursuant To A Sale of Business)</u>: For the purposes of
3         protecting its confidential, proprietary, and trade secret information and as a part of a sale
        of business, in acquiring Defendant Wally Brown's former company, Gallagher entered
4         into a non-competition agreement with <u>Wally Brown</u>, which included, among others, an
        agreement not to engage in post-employment competition or solicitation for a period of
5         time necessary to protect Gallagher's trade secrets.

6     •   <u>Stockholder Agreement</u>: For the purposes of protecting its confidential, proprietary, and
        trade secret information and for the purposes of retaining key employees, Gallagher
7         entered into Stockholder Agreements with <u>key employees</u>, including <u>Wally Brown, Brian
        Quinn, Neil Cohn, CarolAnn Cohn, Laura Wick, Jim Halbleib, Steve Hause, Carol Cohn,
8         Linda Soo Hoo</u>, and <u>George Petty</u>. The grants were expressly conditioned on Gallagher's
        employees faithfully and loyally carrying out their duties, and not engaging in acts
9         "harmful to the interests of the Company." Such harmful acts defined in the Stock Option
        Plan included soliciting existing and prospective Gallagher clients for whom the
10        employees performed work on behalf of Gallagher within the two-year period preceding
        the employees' termination, if doing so would require the employees to "reveal, make
11        judgments upon, or to otherwise use or divulge any confidential information or trade
        secrets of the Company." The Plan further defines "harmful acts" to include the
12        solicitation and recruitment of Gallagher's employees.

13 **<u>EPIC Requires Its Employees To Execute Producer Agreements Containing Substantially
The Same Prohibitions In the Gallagher Agreements That EPIC Induced The Individual
Defendants To Violate</u>**

15     29.     In hiring Producers from Plaintiffs, EPIC required them to execute EPIC

16 Producer Agreements as a term and condition of their employment. Through its own

17 Agreements, EPIC concedes that: (a) when it comes to EPIC data, EPIC defines and considers

18 the very same categories of data that Defendants misappropriated from Plaintiffs and, in at least

19 some instances, used to unfairly compete to constitute EPIC proprietary, trade secret information;

20 (b) EPIC holds its own employees to the same contractual non-solicitation of employee covenants

21 as Gallagher; (c) EPIC contractually requires its employees to owe their undivided loyalty and

22 efforts to EPIC while employed by EPIC, just as Gallagher did for the Individual Defendants at

23 issue; (d) EPIC contractually binds its own employees to the identical post-employment

24 restrictions on soliciting customers of EPIC as Gallagher does – because such restrictions are

25 necessary and critical to protecting both companies' confidential and proprietary data post-

26 employment; and (e) where these provisions are violated by EPIC employees, EPIC agrees that

27 immediate injunctive relief is warranted.

28

1    **Newly-Established EPIC Seeks To Become A Direct Competitor Of Plaintiffs**

2        30.    In or around June 2007, Trident IV, L.P., a private equity fund managed by

3    Stone Point Capital, invested $100 million dollars to establish EPIC as an insurance brokerage

4    providing retail property, casualty, and employee benefits products and services.

5        31.    In July 2007, EPIC acquired Calco Insurance Brokers & Agents Inc. ("Calco") to

6    serve as its statewide base of operations. With this acquisition, EPIC acquired some of the

7    business relationships with insurance companies it needed to begin functioning as an active

8    brokerage. In this regard, EPIC seeks to compete, and is already directly competing with,

9    Plaintiffs.

10        32.    In June of 2007, EPIC issued a press release announcing it would acquire Calco in

11    July ("Edgewood Partners, a new California Insurance Brokerage Firm Announces Agreement To

12    Acquire Calco Insurance Agents and Brokers, Inc." – June 20, 2007, available at

13    www.calco.com). The Press Release notes that Defendant Dan Francis, who now runs EPIC,

14    spent nearly 10 years at Calco. On Calco's Website, Calco advertises that "Calco shares the

15    Ethics of Michael Josephson, Founder of the Josephson Institutes of Ethics." This Webpage

16    begins with the following quote from Warren Buffet:

17        **In looking for people to hire, look for three qualities: integrity, intelligence and**

18        **energy. And if they don't have the first, the other two will kill you.**

19    The cited commentary from Josephson notes that "Some people do believe that business is

20    basically an amoral survival-of-the-fittest enterprise where traditional ideas of right and wrong

21    are irrelevant and all that really matters is what works….."

22        33.    EPIC's newly-established website, available at http://www.edgewoodins.com,

23    accurately describes its business practices: "**Introducing Edgewood Partners Insurance Center**

24    **(E.P.I.C.). We put no limit on how far, how fast, how close to the edge we go to identify your**

25    **insurance requirements and secure the coverage you need.**"

26    **EPIC Enters Plot To Raid Plaintiffs' Employees And Customers And Enters Into a**
       **Conspiracy With Wally Brown, Michael Brown, Brian Quinn, Neil Cohn and Others**

27

28        34.    Beginning in or around mid-June 2007, EPIC, by and through Defendants Francis

-10-

FIRST AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR
JURY TRIAL

1    and Hahn, began communicating with certain Individual Defendants, including Plaintiffs'

2    Officers and Area Presidents Wally Brown and Brian Quinn, and also Michael Brown, regarding

3    employment with EPIC of not only the Browns and Quinn, but also, Plaintiffs are informed and

4    believe, their direct reports at Gallagher who, Plaintiffs are informed and believe up to this point,

5    had never expressed interest in seeking employment with EPIC and/or leaving Plaintiffs' employ.

6        35.    Plaintiffs are informed and believe, and thereupon allege, that EPIC thereafter

7    entered into an agreement with Defendants Wally Brown, Michael Brown, Brian Quinn and Neil

8    Cohn – and over time additional Individual Defendants including Wick– that they would secretly

9    accept employment with EPIC, with the goal being to wait to announce their resignation for

10   several weeks and/or months.  During this period, working in concert with each other and certain

11   of the other Individual Defendants, they would actively prepare to and actually compete against

12   Plaintiffs, while continuing to work for Plaintiffs.  A key aspect of the plan was that for several

13   important strategic reasons, the Defendants would carefully coordinate the timing of the

14   resignations, and then announce these resignations en masse in waves (for specific tactical

15   reasons), and simultaneously walk out of Plaintiffs.

16       36.    During this period, they would use their insider's knowledge of employee skills,

17   their employment terms and conditions, and other of Plaintiffs' proprietary information to recruit

18   their most valued employees away from Plaintiffs and into directly competing jobs with what

19   would become EPIC's newly established San Ramon office.  Among other things, they would

20   need to convince the targeted employees to leave Plaintiffs' employ while accounting for

21   employee compensation, earning cycles and employees' specific relationships with Plaintiffs and

22   their clients, physically lease space for EPIC, set up its IT systems, Human Resources and other

23   functions, lay the groundwork with Plaintiffs' best clients to convince them to switch their

24   business to EPIC, and take Plaintiffs' data.  Defendants also decided to wait to carry out the mass

25   resignations and walk-outs until the period in the year when these experienced industry

26   executives believed they would inflict the most damage on Plaintiffs and maximize their chances

27   to convince Plaintiffs' clients to switch to EPIC.

28       37.    Plaintiffs are informed and believe that thereafter, Wally Brown, Michael Brown,

-11-

FIRST AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR
JURY TRIAL

1   Brian Quinn and Neil Cohn, with the knowledge, encouragement from and assistance of EPIC

2   executives Francis and Hahn, began to bring other of the Individual Defendants into the plan and

3   conspiracy. This included pre-announcing their departure to specific employees of Plaintiffs, and

4   also included, as Defendant Wally Brown did, identifying for EPIC Plaintiffs' top producers and

5   other key employees Brown wanted to ensure EPIC hired.

6                    **Anatomy of Illegal Employee Raiding:**
        **The Case Study of Gallagher Employee Laura Wick Is Instructive**

7

8       38.    For the last ten years, Defendant Laura Wick worked out of Plaintiffs' San Ramon

9   office, most recently serving as the functioning HR and office manager for that office.

10      39.    Prior to October 17, 2007, Defendant Wally Brown, while still actively employed

11  by and an officer of Plaintiff, informed EPIC about Wick, and did so with the intent that EPIC

12  make her a job offer. Thereafter, on information and belief, based on the tip from Brown, EPIC

13  supplied Wick's name to a recruiter and instructed the recruiter to solicit Wick for employment

14  with EPIC. In the meantime, Brown, while still employed by and serving as an officer of

15  Plaintiff, informed Wick he was discussing employment with EPIC, that he may leave Plaintiffs'

16  employ to join EPIC, and that if he did, he hoped employees of Plaintiffs would join him. Brown

17  told Wick this knowing she was in charge of the Human Resources function for the San Ramon

18  office and would spread the word. From these and other conversations, Brown made clear that he

19  wanted her to be his office manager at EPIC and resign from Plaintiffs for the purpose of setting

20  up the office in advance of the mass resignations that were going to follow.

21      40.    The EPIC Defendants then offered Wick a compensation package which they

22  knew exceeded her current salary level at Gallagher and would have the intended effect of

23  convincing her to leave Plaintiffs' employ. In fact, both Brown and Wick admit they discussed

24  Wick's employment with EPIC while still employees of Plaintiffs, and while Brown was still an

25  officer and fiduciary.

26      41.    As an experienced employee with over a decade at the company, Wick clearly

27  understood the end goal of this plan and scheme was to inflict the maximum damage on Plaintiffs

28  in several ways, with the prize being to take as much of Plaintiffs' business as quickly as possible

1    once the resignations were announced.

2        42.    Thereafter, Wick – while still employed by Plaintiffs – met with certain EPIC

3    employees, and obtained more specific information about the plan that Wally Brown brought her

4    into. She subsequently discussed with Brian Quinn the fact that several current employees of

5    Plaintiffs had secretly signed on to leave with Wally Brown, Brian Quinn, Neil Cohn and the

6    others.

7        43.    Together, Wick, Wally Brown and Brian Quinn concocted a cover story and plan

8    designed to avoid raising Plaintiffs' suspicions as to why Wick, a longstanding and valued

9    employee of Plaintiffs, would simply quit. Part of the plan was that Wick would resign directly to

10    Wally Brown and Brian Quinn – her co-conspirators and the two executives in charge of

11    Plaintiffs' San Ramon office and operations.

12        44.    Thus, on October 17, 2007, after prior meetings with Defendant Hahn and on

13    information and belief other EPIC executives, and pursuant to carefully planned out timing

14    agreed to after consultation with Wally Brown, EPIC, and others, and with no prior notice to

15    Plaintiffs, Wick submitted a written resignation letter, addressed to Wally Brown and Brian

16    Quinn, with a false cover story as follows:

17        Dear Brian and Wally,

18        It is with great reluctance I submit my resignation to the both of you. My last day with
       Gallagher will be Friday, November 2nd. If you feel you need me longer in order to
19        transition my job duties, I will be more than willing to extend my last day until the
       following week.
20
       **I have decided to take some time off until the first of the year to spend time with my**
21        **family.** I am hoping if I decide to return to Gallagher in 2008 that there will be an open
       position for me.
22
       Thank you for everything that both of you have done for me. I can't tell you how
23        wonderful it has been working out of the Pleasanton office for the past ten years. I wish
       you both the best.
24

25    See Exhibit A hereto.

26        45.    Wick's proffered reason for resigning – that she had purportedly decided to take

27    some time off until the first of the year to spend time with her family – was not truthful and

28    designed to allay any suspicions and conceal the fact that she was in fact going to establish

-13-

1   EPIC's competing San Ramon office which she knew would be staffed with Wally Brown, Brian

2   Quinn, Neil Cohn, and many other of Plaintiffs' employees, all of whom were waiting for her to

3   get the office up and running.

4        46.    Thus, Wally Brown and Brian Quinn, who ran the San Ramon office, messaged up

5   the corporate chain the false excuse they concocted with Wick concerning the reasons for her

6   resignation, and succeeded in shielding from Plaintiffs any mention of her joining EPIC.

7        47.    At the time Wick submitted her resignation letter, Wally Brown understood, based

8   on his conversations with Wick and EPIC, as well as his own actions, that Wick was going to

9   work for EPIC in advance of other planned out departures, but concealed his knowledge from the

10   Company for whom he was then serving as an officer.

11        48.    Between October 17, 2007 and November 2, 2007, Wick remained an active

12   employee of Plaintiffs, who continued to work under Wally Brown and Brian Quinn in Plaintiffs'

13   San Ramon office and receive her Gallagher compensation.  Although she was now an active part

14   of the conspiracy, and in fact the first one out of Plaintiffs who was specifically tasked to set up

15   the advance operations for EPIC, at no time did she inform Plaintiffs of the ongoing disloyalty of

16   the Individual Defendants and the fact that they were actively working against Plaintiffs' interests

17   while remaining employed.  In fact, this longstanding employee of Plaintiffs and industry veteran,

18   who clearly understood the goal of the conspiracy was to harm and damage Plaintiffs, now shifted

19   her loyalties from Plaintiffs to EPIC.

20        49.    On Wednesday, October 24, 2007, during work hours and while drawing a salary

21   from Plaintiffs, Wick met with EPIC to discuss her employment with EPIC.

22        50.    Plaintiffs are informed and believe, and thereupon allege, that with the knowledge,

23   consent and participation of Defendant Wally Brown, Quinn, EPIC, Francis and Hahn, Wick, in

24   connection with EPIC and her co-conspirators, secretly was involved in leasing space for EPIC's

25   San Ramon office at Bishop Shop 8 Business Center – located on Executive Parkway in San

26   Ramon – in the same complex as Plaintiffs' San Ramon office, which is located at Bishop Shop 3.

27        51.    Plaintiffs are informed and believed that Wick discussed EPIC with other of

28   Plaintiffs' employees in the context of setting the stage for them to move over to EPIC after she

1  and the officers announced.

2      52.    Wick left Plaintiffs' employ with the best wishes of Plaintiffs' management on

3  November 2, 2007.

4      53.    On November 5, 2007, Wick's husband emailed family members from his private

5  Web email account about family Thanksgiving plans, in relevant part, as follows:

6      Laura's job situation has changed and will make it hard for her to come. **Her boss and the
       rest of the sales people are leaving Gallagher to go to a <u>competitor</u>**. Laura also made the

7      decision to go, and is now home for two weeks before starting with the new company.
       **Essentially, her job is to start the new branch office and set up the computers,**

8      **facilities, and manage HR issues <u>before the rest of the teams quits and joins her</u>**. That
       week of Thanksgiving is when she needs to start her new job... It will be a stressful time for

9      her and trying to manage a cross country trip at the same time would be difficult.

10  See Exhibit B hereto.

11     54.    Wick's mother-in-law responded with a kind email, and unaware Wick had

12  already departed Plaintiffs' employ, added Wick as a recipient to this email at her Gallagher

13  corporate email account.  At the time, there was nobody working at the San Ramon office of

14  Plaintiffs outside the conspiracy who would have seen this email and learned of the conspiracy.

15     55.    These facts underscore how important timing was to the conspiracy.

16     56.    Upon her resignation, nobody in the San Ramon office, including Wick, or

17  Defendants Wally Brown and San Ramon IT Manager George Petty, contacted Plaintiffs'

18  corporate IT Department and requested that her remote access to her corporate email account be

19  deactivated.  Nor did Petty deactivate Wick's access at the San Ramon office level.  Thus, Wick's

20  Gallagher Lotus Notes access, enabling her to remotely log on to her corporate email account,

21  was not disabled until November 9, 2007, despite the fact that her resignation was effective

22  November 2, 2007.

23     57.    Plaintiffs are informed and believe, and thereupon allege, that when Wick

24  discovered that her mother-in-law had sent the email to her Gallagher corporate email account,

25  she panicked, and working alone or in conjunction with other Defendants, gained access to her

26  Gallagher corporate email account, and caused the email at issue to be deleted from her corporate

27  account.

28     58.    In fact, between the date that her mother-in-law sent the email to her Gallagher

1   corporate email account on or about November 5 and November 9, the email was deleted out of

2   Wick's Gallagher email account.

3        59.    On or about December 8, 2007, following the first wave of resignations and walk-

4   outs set forth below, Wick, who had resigned from Plaintiffs effective November 2, 2007, was

5   tipped off that Plaintiffs were looking into the December 7 resignations, and that some of her

6   former coworkers would be present in the San Ramon Gallagher office.

7        60.    Wick attempted to return to Plaintiffs' San Ramon office and gain access for

8   herself and other Defendants. For many reasons, including the fact that Wick had no reason to re-

9   enter Plaintiffs' office or escort anyone else into that office, and because Wick did not contact the

10  appropriate Plaintiffs' management in connection with her attempt to gain access to Plaintiffs'

11  San Ramon office, but rather tried to finesse it through a non-management employee and former

12  coworker, Plaintiffs are informed and believe and thereupon allege that she had an unlawful intent

13  in wanting to gain access to Plaintiffs' San Ramon offices.

14                        **The Overall Illegal Employee Raiding**

15       61.    Plaintiffs are informed and believe, and thereupon allege, that in connection with

16  the illegal employee raiding, the following are some of the actions that the Individual Defendants

17  Wally Brown, Michael Brown, Cohn and Quinn (with the knowledge, aid and encouragement of

18  EPIC, Hahn and Francis) engaged in while they were all still active employees of Plaintiffs and

19  thereafter:

20            (a)    targeted specific employees of Plaintiffs based on their knowledge of the

21  individuals' skills, client involvement, pending deals and current compensation;

22            (b)    informed EPIC of the identity of top producers and other key employees in

23  Plaintiffs' employ;

24            (c)    used private Web accounts, cellular telephones and home telephones to

25  communicate concerning the conspiracy, for the purpose of concealing their actions;

26            (d)    participated in private meetings, on site and outside of Plaintiffs' offices, to

27  discuss various facets of the conspiracy;

28            (e)    pre-announced their decision to resign to certain current employees of

FIRST AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR
JURY TRIAL.

1    Plaintiffs;

2              (f)      met with EPIC employees and other of Plaintiffs' employees to coordinate

3    and discuss the substance and logistics of the hiring and plans to move business from Plaintiffs to

4    EPIC;

5              (g)      during working hours, while being paid by Plaintiffs, performed work for

6    EPIC, including work related to securing office space and equipment;

7              (h)      misled Plaintiffs' employees whom they wanted to join EPIC into

8    believing their employment with Plaintiffs was not secure, when such was not the case;

9              (i)      facilitated mass "interviews" of Plaintiffs' employees with EPIC –

10   including Wick, Francis and Hahn – over the weekend of December 8 and 9, and immediately

11   prepared offer letters knowing and/or facilitating that these employees would accept the offers on

12   the spot and resign without notice to Plaintiffs in violation of their contractual obligations;

13             (j)      arranged for Defendant Wick to actively interview on behalf of EPIC the

14   same employees she managed in the Human Resource capacity of Plaintiffs' San Ramon office

15   weeks earlier;

16             (k)      promised to pay Plaintiffs' employees who left for EPIC in a manner that

17   accounted for their current Gallagher salaries and anticipated increases;

18             (l)      for those employees with two week notice and other contractual provisions,

19   encouraged and facilitated the breach of and interference with these contractual provisions;

20             (m)      instructed and facilitated Plaintiffs' employees' delaying for weeks and

21   months the notice to Plaintiffs of their intent to join EPIC so that Plaintiffs' employees could

22   resign *en masse* without notice.  For example, Defendant Cohn did not announce his resignation

23   until weeks after agreeing to join EPIC and discussing the EPIC situation with his co-officers; and

24             (n)      represented to individual employees of Plaintiffs that their co-workers were

25   already "on board" and had agreed to join EPIC.

26                          **Transformation Into Faithless Servants:**
     **Having Decided To Join EPIC, But Prior To Announcing Their Resignations, The**
27          **Individual Defendants Engage In Acts of Dishonesty and Disloyalty**

28        62.      By on or about November 1, 2007, Plaintiffs are informed and believe that Wally

Case No. C 07 06418-JSW                    -17-        FIRST AMENDED COMPLAINT OF A.J.
                                                       GALLAGHER & CO., INC.; DEMAND FOR
                                                       JURY TRIAL

1  Brown, Michael Brown, Brian Quinn, Neil Cohn, Laura Wick, and others knew, through careful

2  coordination and planning, that each of them and many of the other Individual Defendants and

3  other employees of Plaintiffs would soon be leaving Plaintiffs' San Ramon workforce for EPIC.

4  Nevertheless, not only did Defendants fail to alert Plaintiffs' management outside the office level

5  – which was managed by Defendants Brown and Quinn, but the Individual Defendants engaged

6  in acts of dishonesty, disloyalty and breaches of their fiduciary duty, including, on information

7  and belief, the following:

8  (a)    Wally Brown and Michael Brown pre-announced their departure to EPIC

9  to then-current customers of Plaintiffs;

10  (b)    Wally Brown and Brian Quinn allowed Plaintiffs to proceed with a seven-

11  year above-corporate-guideline deal to lease 19,703 square feet, consisting of two floors and

12  sufficient space for 102 employees, even though the branch only had 76 current employees, for

13  the Pleasanton/San Ramon office, and would be left with only approximately 30 employees post-

14  conspiracy.

15  (c)    Wally Brown and Brian Quinn convinced corporate management to incur

16  substantial renovation costs in the new building, including furniture, improvements, IT and

17  Teledata, insisting on many above-standard items and costs.  On information and belief, these

18  requests were made with malice aforethought and as part of Defendants' conspiracy to harm

19  Plaintiffs, by increasing costs of the move when they knew their plan to raid Plaintiffs' employees

20  and customers.

21  (d)    Several Individual Defendants, including but not limited to, Wally Brown,

22  his son Michael Brown, Neil Cohn, and Brian Quinn, substantially increased their expenses and

23  car allowance expenditures during the period after deciding to join EPIC, but before tendering

24  their resignation to Plaintiffs.  By way of example only:

25  (i)    Wally Brown increased client entertainment expenses in the short

26  month of November by 2.85 times what he spent in October, 2.26 times what he spent in

27  September, and 9.6 times what he spent in August; not surprisingly, these funds were expended

28  entertaining specific clients who in early December, he and his conspirators immediately

-18-

1    attempted to (and in many cases did) transfer over to EPIC following the mass resignations and

2    walk-outs;

3                    (ii)    Neil Cohn increased client entertainment expenses in November

4    by 12.55 times what he spent in October, 31.7 times what he spent in September and 10.5 times

5    what he spent in August.  Cohn also received maintenance and put new tires on what appears to

6    be two separate cars for a total of $3,249.38 in car maintenance expenses in August 2007.

7    Without Plaintiffs' authorization, Cohn also devoted substantial amounts of the business time he

8    promised to devote to Plaintiffs performing work, through Plaintiffs' computer systems and

9    during working hours, for Hannah Nicole Vineyards, Inc., a family investment for which he

10    appointed himself the President and CEO;

11                    (iii)    Michael Brown made sure to buy and charge Plaintiffs for new

12    tires (for $1,390.36) for his car on October 18, 2007, at which time, on information and belief he

13    had already decided to resign to go to EPIC in December;

14                    (iv)    Brian Quinn charged Plaintiffs for maintenance for his car in

15    November 2007, at which time he knew he would be leaving Plaintiffs' employ in a few weeks.

16        63.    The Individual Defendants continued to wine and dine the specific clientele of

17    Plaintiffs whom they planned to transfer from Plaintiffs to EPIC.  During this period, when they

18    had already decided to leave for EPIC, with regard to at least some of Plaintiffs' customers, the

19    Individual Defendants pre-announced their intention to depart from Plaintiffs, and Plaintiffs are

20    informed and believe Defendants intended that these and other clients would switch their business

21    to EPIC in the immediate wake of their unannounced departure.  For example, prior to departing

22    Plaintiffs' employ, Defendant Brian Quinn expressly told clients he planned to depart and

23    "solicited their feedback."

24        64.    Plaintiffs are informed and believe, and thereupon allege, that Wally Brown, Brian

25    Quinn and others devised this scheme as one of several ways to communicate to top customers of

26    Plaintiffs that they expected the customers to follow them, since, at the time these

27    communications were engaged in, the Individual Defendants who participated in these

28    conversations had in fact already finalized and accepted their employment packages with EPIC.

1    As shrewd executives, officers, and fiduciaries of Plaintiffs, they also believed that if challenged,

2    they could craft a cover story about what they actually told their then current Gallagher clients.

3    **The Former Employees of Plaintiffs Copy, Take Without Permission, and Delete Mass**
     **Amounts Of Plaintiffs' Data, Information, And Documents – And Go To Great Lengths To**
4    **Cover Up Their Actions**

5

6        65.    The facts known to date give rise to the need for injunctive relief.  As of the date

7    this First Amended Complaint was filed, Defendants still possess data and property belonging to

8    Plaintiffs.

9        66.    Plaintiffs are informed and believe, and thereupon allege, that Defendant George

10   Petty, who was in charge of IT and computers systems in Plaintiffs' San Ramon office, was

11   actively involved in the theft of data and related cover up.

12       67.    Plaintiffs are informed and believe, and thereupon allege, that their data was

13   misappropriated by several different Defendants, out of multiple offices of Plaintiffs, through

14   various means, including:

15           (i)    data was stolen off of desktop computers through the use of stand alone

16   external storage devices connected at times when mass access and copying of data occurred;

17           (ii)   data was misappropriated off of desktop computers through the use of

18   burning CDs and through the use of CD-burning software; and

19           (iii)  data was misappropriated by scanning documents into the San Ramon

20   office scanner, which pushed the scanned files to a folder on the San Ramon server, and then the

21   data was removed off of the San Ramon servers;

22   Plaintiffs' investigation continues and Plaintiffs are informed and believe they will discover

23   additional acts of theft as soon as their investigation is complete.

24       68.    To date, Plaintiffs are informed and believe that the following Individual

25   Defendants accessed in a manner consistent with copying and/or copied, and/or subsequently

26   used for EPIC's benefit, Plaintiffs' confidential and proprietary data without Plaintiffs'

27   permission or knowledge:

28       (a) Neil Cohn:  December 7, 2007: In his resignation letter, Cohn set forth various

-20-        FIRST AMENDED COMPLAINT OF A.J.
                                                                   GALLAGHER & CO., INC.; DEMAND FOR
                                                                   JURY TRIAL

1    affirmative measures he claimed to have undertaken with the assistance of Defendant George

2    Petty "[s]o there is no question concerning the retention by me of any confidential or proprietary

3    data of Gallagher."

ARTHUR J. GALLAGHER & CO.
Risk Management Services

INSURANCE BROKERS OF CALIFORNIA, INC.
CALIFORNIA STATE LICENSE NUMBER 0726293

December 7, 2007

Arthur J. Gallagher & Co.
4301 Hacienda Drive
3rd Floor
Pleasanton, CA 94688

To Whom It May Concern:

Effective as of this date I resign my employment with Arthur J. Gallagher & Co. So there is no question concerning the retention by me of any confidential or proprietary information of Gallagher: GEORGE PETTY PERSONALLY REMOVED THE INITIALED ITEMS

GP   • I have removed all business contacts related to my employment from the ACT! Contact Management Program I use as my "Desktop Calendar"; 12/7/0

GP   • I synchronized my personal Blackberry with the ACT! Contact Management Program to remove all Arthur J. Gallagher & Co. clients and prospects from my Blackberry;

GP   • In order to preserve the data, I made a backup copy of the ACT! Database prior to removing the business information and again after removing the business information. I am supplying you with these files;

GP   • I would like to retain a copy of the file containing all my non-business related contacts (All insurers, clients, prospects, employees of Arthur J. Gallagher & Co. and the like have been removed from this list, with the exception of a few personal friends who work for Gallagher;

GP   • I was furnished a laptop computer by Gallagher that was stolen sometime in 2005 along with the laptops of four or five other producers from the Pleasanton Office. After that, I was given a desktop computer and used my own personal laptop for business purposes. I regularly copied Gallagher files onto my laptop so that I would have them available at client meetings. Please acknowledge that I have given you the opportunity to inspect, review or remove this information that is confidential and proprietary and will continue to do so at anytime;

GP   • I am returning the following items:
        ◦ All Customer Documents and electronic files in my possession
        ◦ Access Key and Card for parking, building and office
        ◦ Company Credit Card
     • Please provide me with a summary of:
        ◦ Unused Vacation Time (This should include prior periods where my vacation time was not used for a period 10 years). I currently have 21 days of unused vacation time in the current year;
     • My expense report has been submitted in the amount of $3,156 +/-.

Sincerely,

[signature]

Area Senior Vice President

4301 HACIENDA DRIVE, SUITE 300  •  PLEASANTON, CA 94588
P.O. BOX 9102  •  PLEASANTON, CA 94566-9102
(925) 460-0900  •  FACSIMILE: (925) 847-8831  •  VOICE MAIL: (925) 460-0993

20    (i)  <u>October 17, 2007</u>: Two days after meeting with EPIC regarding his potential

21    employment, Cohn burned 6 CDs consisting of almost 5,000 files of Plaintiffs' proprietary data

22    relating to Plaintiffs' clients, and did not disclose the existence of these 6 CDs or return them to

23    Plaintiffs until January 8, 2008— almost 3 weeks after Plaintiffs filed this action.

24          (ii) <u>November/December 2007</u>: Cohn obtained blank CDs on multiple occasions,

25    on information and belief, to copy to these CDs additional proprietary data of Plaintiffs, although

26    he had already agreed to join EPIC.  These CDs have not been returned.

27          (iii) <u>December 5, 2007</u>: Cohn caused a Geek Squad USB drive to be attached to

28    the hard drive of his work computer; neither the USB drive or the data on it have been returned to

FIRST AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR
JURY TRIAL.

1   Plaintiffs.

2       (v) December 6, 2007: Between 6:01:03 a.m. and 6:02:05 a.m. (1 minute 2

3   seconds), Cohn accessed in a manner consistent with copying approximately 228 files/folders

4   containing confidential and proprietary data of Plaintiffs.  At least one removable disk was

5   accessed from Cohn's work computer during the same timeframe.

6       (vi)  Throughout the rest of the day and into the late night (until 12:57 a.m. on

7   December 7, 2007), there were additional removable disk drives and Plaintiffs' proprietary files

8   accessed in a manner consistent with copying.

9       (vii)  December 7, 2007: The date of Cohn's resignation, at approximately 2:17

10  p.m., a removable disk was accessed on the computer in proximity to 75 files/folders containing

11  confidential and proprietary data belonging to Plaintiffs being accessed in a manner consistent

12  with copying.

13      (viii)  Of the specific files accessed in the fashion described above, many were

14  Plaintiffs' client files and data relating to clients who Cohn would solicit for business in the

15  following days on behalf of EPIC.

16      (ix)  Cohn also left Plaintiffs' employ with a Western Digital external hard drive

17  and a thumb drive containing Plaintiffs' data, which was not disclosed prior to this lawsuit being

18  filed, and neither the external drive, the thumb drive, nor Plaintiffs' data on them have been

19  returned to Plaintiffs.

20      (x)  On his final day of employment, Cohn caused his computer to be

21  defragmented, thereby deleting data.

22      (b)    Jim Halbleib: On November 20, 2007, Halbleib, an officer of Plaintiff, resigned

23  without prior notice, walked out and left to immediately work for EPIC; Plaintiffs are informed

24  and believe Halbleib did so knowing his direct report Martin would soon follow him to EPIC.

25      (i)  November 12, 2007:  Halbleib rapidly accessed, in a manner consistent with

26  copying, 222 proprietary files of Plaintiffs on his computer within 5 seconds.

27      (ii) November 13-20 2007:  Additional access to Plaintiffs' proprietary files

28  occurred.

1    (c)    Laurie Martin: On November 26, 2007, Martin resigned without prior notice,

2    walked out and went to work for EPIC.

3        (i) Between November 1 and November 20, 2007: Martin accessed hundreds of

4    Plaintiffs' proprietary data in rapid succession in a manner consistent with copying.

5        (ii) November 26, 2007: Between 12:17 p.m. and 12:42 p.m. on her resignation

6    date, Martin accessed several hundred files/folders containing Plaintiffs' proprietary data in rapid

7    succession and in a manner consistent with copying.

8    (d)    George Petty: On December 11, 2007, Petty, along with several other Defendants,

9    resigned with no prior notice and departed for EPIC.

10        (i) December 5, 2007: Petty purchased and then installed CD burning software on

11    his Gallagher computer.

12        (iii) Friday December 7, 2007: Petty was specifically instructed by Plaintiffs'

13    corporate management to preserve the computers and data stored on the computers of the

14    Defendants who resigned earlier that day and any others who might depart.

15        (iv) Friday, December 7, 2007: Plaintiffs are informed and believe that Petty

16    participated in and/or facilitated Cohn's theft of data, and the subsequent defragmenting of

17    Cohn's computer.

18        (v) Sunday December 10-11, 2007: Despite being instructed that management

19    wanted to preserve the data stored on Plaintiffs' computers of any employee who resigned for

20    EPIC, on the date of his resignation and the day before, Petty attached two separate large capacity

21    external hard drives to his Gallagher computer.

22        (vi) Plaintiffs are informed and believe, and thereupon allege, that Petty then

23    engaged in the taking and deletion of Plaintiffs' proprietary data off his company computers.

24        (vii) Petty admitted in a declaration signed January 3, 2008 that he does in fact

25    possess two large capacity external hard drives and that in connection with his resignation, he did

26    in fact delete his user profiles from the computers assigned to him by Plaintiffs, thereby

27    permanently deleting all data from those computers.

28

1    (e)    Defendant Eric Chua: On December 10, 2007, Chua resigned without notice along

2    with several other Defendants and immediately went to EPIC and started contacting customers.

3    (i) December 3, 2007: Chua attached to his work computer for the first time an

4    external USB flash drive.

5    (ii) December 10, 2007: The morning of his resignation, Chua accessed in a

6    manner consistent with copying approximately 8 files containing Plaintiffs' proprietary data.

7    Among the files accessed that morning, Chua accessed and copied specific of Plaintiffs' customer

8    files and data relating to customers that Chua would immediately solicit for business that same

9    day on behalf of EPIC.

10    (iii) The files contain highly confidential data of Plaintiffs, including the effective

11    dates of each client's policy, premiums, renewal revenues, producers, account managers, types of

12    programs, the carriers, "Specs Out" dates, and dates by which quotes are due.

13    (iv) Chua left Plaintiff' employ in possession of Plaintiffs' data on personal

14    electronic media – a fact he did not disclose to Plaintiffs until after this lawsuit was filed.

15    (v)  After leaving Plaintiffs' employ, Chua deleted Plaintiffs' data from his

16    personal electronic media thereby destroying meta-data related to the taking of the Gallagher data

17    at issue.

18    (f)    Defendant Shandranette Middleton: On December 11, 2007, Middleton, who

19    supported various Producers, resigned without notice along with several other Defendants and

20    immediately began work for EPIC.

21    (i) December 7, 2007: two business days before her resignation, Middleton

22    attached to her Gallagher computer for the first time an external USB thumb drive.

23    (ii)  In the approximate 53 minutes thereafter, Middleton accessed and

24    downloaded to the thumb drive approximately 238 files containing Plaintiffs' proprietary

25    information.

26    (iii) Middleton engaged in these actions with the intent to use Plaintiffs' data in

27    connection with her employment with EPIC and in furtherance of competing with Plaintiffs.

28    (iv) Middleton did not disclose her access and taking of Plaintiffs' proprietary

Case No. C 07 06418-JSW    -24-    FIRST AMENDED COMPLAINT OF A.J. GALLAGHER & CO., INC.; DEMAND FOR JURY TRIAL.

1    data until after this action commenced.

2         (g)    Robert Watkins: On December 12, 2007 at 8:33 a.m., Watkins sent an email

3    submitting his resignation "effective immediately," with Plaintiffs' laptop still in his possession.

4              (i) November 27, 2007: Two weeks before his resignation, Watkins accessed in

5    rapid succession and in a manner consistent with copying approximately 689 files/folders

6    containing Plaintiffs' proprietary data from his laptop to an external storage device.

7              (ii) December 5, 2007: One week before his resignation, Watkins created and

8    saved onto his laptop 3 Word documents containing approximately 370 email addresses of

9    Plaintiffs' clients.

10            (iii) December 5, 2007: Watkins accessed in rapid succession approximately 173

11   files containing Plaintiffs' proprietary data from Plaintiffs' network server, and copied all of

12   those files, including the 3 Word documents, onto computer media and CDs not belonging to

13   Plaintiffs.

14            (iv) December 12, 2007: Commencing at 10:26 a.m., nearly two hours after his

15   resignation, Watkins connected his Plaintiffs' assigned laptop to a foreign computer network.

16            (v) Subsequently, he accessed in rapid succession approximately 621 files/folders

17   containing Plaintiffs' proprietary data on his laptop.

18            (vi) That same day (December 12), Watkins also burned additional CDs

19   containing Plaintiffs' data.

20            (vii) December 20, 2007: After this lawsuit was filed and an injunction sought,

21   Watkins returned, along with the laptop assigned to him by Plaintiffs, 7 CDs containing

22   Plaintiffs' proprietary files that were burned on the following dates: October 9, 2007, November

23   27, 2007 (when he accessed 689 files/folders from the laptop in rapid succession), December 5,

24   2007 (when he accessed 173 files/folders and 370 email addresses in rapid succession), and

25   December 12, 2007 (when he accessed 621 files/folders in rapid succession).

26            (viii) January 18, 2008: More than 4 weeks after this lawsuit was filed, Watkins

27   admitted to retaining a substantial amount of Plaintiffs' proprietary data on his home computer

28   for several weeks after his resignation.

-25-    FIRST AMENDED COMPLAINT OF A.J.
                                                          GALLAGHER & CO., INC.; DEMAND FOR
                                                          JURY TRIAL.

1    (ix) Weeks after this lawsuit was filed, and while Plaintiffs' request for injunctive

2    relief was pending – a request that included data and evidence preservation, a prohibition against

3    deletion, and return of all of Plaintiffs' data – and after repeated requests by Plaintiffs that data be

4    returned and not destroyed, Watkins deleted Plaintiffs' data off of his home computer, thereby

5    destroying valuable metadata relating to the misappropriated data.

6    69.    Prior to the filing of this lawsuit, none of the Defendants and former employees of

7    Plaintiffs disclosed that they were still in possession of Plaintiffs' data.   Nor did EPIC disclose

8    that it was aware that its newly hired employees were in possession of Plaintiffs' data.   It was

9    only after this lawsuit was filed that Defendants acknowledged they were still in possession of

10    Plaintiffs' data, and even as of the date this First Amended Complaint was filed, Defendants'

11    have not returned all of Plaintiffs' misappropriated data and other property despite repeated

12    demands that they do so.

13    70.    Apart from the taking of Plaintiffs' data, Plaintiffs are informed and believe and

14    thereupon allege that Individual Defendants Cohn, Michael Brown, Petty, and Watkins

15    intentionally deleted Plaintiffs' data off of Plaintiffs' computer media without Plaintiffs'

16    knowledge or consent, and other Defendants wrongfully deleted Plaintiffs' data stored on their

17    own personal media.

18    **The Events Leading Up To The Surprise, Pre-Planned Resignations**

19    71.    On November 20, 2007, Defendant James Halbleib, Area Executive Vice President

20    of Sales, resigned from Plaintiffs' San Francisco office without notice and announced he was

21    going to EPIC.

22    72.    On November 26, 2007, Laurie Martin, Account Executive who had reported

23    directly to Halbleib, resigned from Plaintiffs' San Francisco office without notice and announced

24    she was going to EPIC.

25    73.    Unbeknownst to Plaintiffs at the time, Plaintiffs is informed and believes that both

26    Defendants Halbleib and Martin downloaded and copied Plaintiffs' confidential data prior to their

27    unannounced resignations.

28    74.    On November 27, 2007, Defendant Brian Quinn sent an email to various

1    employees of Plaintiffs, including co-conspirators, stating that the "All Hands" sales meeting

2    scheduled for December 4, 2007 had been rescheduled to December 7, 2007 and that attendance

3    was mandatory.

4        75.    During the week of December 3, 2007, EPIC, Brown, Quinn, Cohn, and other

5    Defendants prepared to announce the employees' mass resignation and intention to join EPIC.

6        76.    Prior to their departures, a number of Individual Defendants "pre-announced" to

7    Plaintiffs' clients that they intended to resign.  The Individual Defendants who pre-announced

8    included Quinn, who in or about October 2007, informed at least two clients, who subsequently

9    signed Broker of Record ("BOR") letters with EPIC, that he was resigning his employment with

10   Plaintiffs.  Likewise, in or about November 2007, and prior to his departure from Plaintiffs,

11   Michael Brown informed several clients that he was leaving Plaintiffs.

12       77.    On or about several dates that week including December 5 and December 6, and

13   throughout the ensuing weekend and week of December 10, the Individual Defendants, acting in

14   concert with and as agents of each other and in furtherance of the conspiracy, took without

15   permission Plaintiffs' data.

16       78.    On or about December 6, 2007, and on information and belief, in the days leading

17   up to December 6, 2007, Defendant Neil Cohn, through individually-retained counsel, attempted

18   to negotiate for a stronger promise of indemnification from EPIC's counsel, expressing concern

19   to EPIC that the indemnification provision in EPIC's Producer Agreement would not sufficiently

20   protect Cohn since he and EPIC knew that by accepting employment with EPIC in this fashion,

21   and engaging in the actions complained of herein, he would be violating his contractual

22   obligations to Gallagher.

### December 7, 2007:
### EPIC and Defendants Francis, Hahn, Wally Brown, Brian Quinn, Neil Cohn and Four Confederates Select Friday December 7, 2007 To Execute The Planned First Wave Attack on Plaintiffs

26       79.    On the morning of Friday, December 7, 2007, and without any prior notice to

27   Plaintiffs, Defendants Wally Brown (an officer of Plaintiff), Michael Brown, Neil Cohn (an

28   officer of Plaintiff), Carol Cohn, Stephen Hause (an officer of Plaintiff), Olga Harvison, and

                                                    -27-        FIRST AMENDED COMPLAINT OF A.J.
                                                                GALLAGHER & CO., INC.; DEMAND FOR
                                                                JURY TRIAL

1    Linda Cadinha submitted their resignations to Plaintiffs in various forms (including leaving

2    resignation letters on their desk and notifying each other of their resignations) and immediately

3    walked out to openly work at EPIC immediately and make an immediate and planned grab for

4    Plaintiffs' business using unfair competition and other illegal methods.

5        80.    They acted in this way so Plaintiffs would not have the time or ability to reach out

6    to the clients Defendants planned to solicit and raid.  As part of their plan, and while still

7    employed by Plaintiffs, Defendants set up meetings with Plaintiffs' clients for the week of

8    December 10, 2007, knowing they would be employed by EPIC by that time and would thus use

9    the previously scheduled in-person meetings to solicit Plaintiffs' customers on behalf of EPIC.

10        81.    Plaintiffs are informed and believe, and thereupon allege, that Neil Cohn, Wally

11    Brown, Michael Brown, and Brian Quinn, and other Defendants, began performing work for the

12    benefit of EPIC before formally resigning.

13        82.    As an example of the collusion and planning of the conspirators, on December 7,

14    2007, Defendant Cohn submitted a self-serving resignation letter that purported to contain an alibi

15    against any future claim that he had stolen Plaintiffs' valuable confidential and proprietary data to

16    which he had been exposed in connection with his job duties for Plaintiffs.   His alibi involved

17    enlisting co-defendant, George Petty, who was in charge of Plaintiffs' IT function in the San

18    Ramon office (and who resigned his employment without notice and departede for EPIC the next

19    business day after Cohn resigned), to "sign off" and "verify" that Cohn had not taken data, and

20    returned all data:

Case No. C 07 06418-JSW

FIRST AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR
JURY TRIAL



83.     At the time Defendant Cohn submitted this letter, he omitted the fact that he

possessed and retained a 750 gigabyte Western Digital external hard drive, several CDs, and a

thumb drive of unspecified storage capacity, all of which contain substantial amounts of

Plaintiffs' data.  He did not disclose these facts until after Plaintiffs filed this lawsuit, and has yet

to return the data stored on these devices.

84.     Defendant Petty, who was instructed to preserve Cohn's Gallagher computer and

its contents, defragmented it and failed to inspect, review, or remove Plaintiffs' confidential data

from Cohn's personal laptop computer.

### The Defendants' Conduct on December 7 Is Revealing

85.     What occurred in Plaintiffs' San Ramon office the morning of December 7, 2007 –

before and after the first wave of resignations – is instructive.  Shortly before announcing the

departure of himself and others, Defendant Brown – acting with the knowledge and assistance of

EPIC, directly solicited a top Gallagher San Jose Producer, who he and Defendant Quinn had

FIRST AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR
JURY TRIAL.

1    ensured would be present in the San Ramon office that day, and other San Jose employees to join

2    EPIC.

3        86.    Beginning that day and continuing in the days which followed, Brown's

4    solicitation included:

5            (i)  promising the San Jose Producer and other of Plaintiffs' employees substantial

6    compensation;

7            (ii) noting to the Producer that, thanks to his efforts, she was not contractually

8    prohibited from resigning without notice;

9            (iii) facilitating contact between the Producer and EPIC (through Defendants

10   Laura Wick, Dan Francis, and John Hahn);

11           (iv) encouraging the Producer to pre-announce to top customers (as Defendants

12   Wally and Michael Brown had done) and solicit other of Plaintiffs' San Jose employees to join

13   EPIC.

14           (v) acknowledging that several of Plaintiffs' employees already had plans to resign

15   their employment to join EPIC, and would do so after Brown announced his resignation;

16           (vi) requesting that the San Jose Producer refrain from informing Plaintiffs that he

17   was encouraging her to join EPIC.

18       87.    After the meeting where he solicited the Gallagher producer, Defendant Wally

19   Brown convened the All Hands meeting (which included both Producers and service employees)

20   and announced his and Quinn's resignation to the larger group of employees.  Thereafter, Brown

21   continued his efforts to solicit the San Jose Producer and another producer in Plaintiffs' San Jose

22   office.

23       88.    Quinn also directed approximately fifteen to twenty of Plaintiffs' employees to

24   contact Mary Smith in EPIC's Human Resources department.

25       89.    Defendant Francis also directly solicited the San Jose Producer, having already

26   been informed of the specific dollar value of the Producer's book of business and promisingd to

27   establish an office in San Jose if the Producer and others all agreed to leave Plaintiffs' employ.

28       90.    A second producer in Plaintiffs' San Jose office also told the San Jose Producer

Case No. C 07 06418-JSW                    -30-    FIRST AMENDED COMPLAINT OF A.J.
                                                   GALLAGHER & CO., INC.; DEMAND FOR
                                                   JURY TRIAL.

1   that, like her, he had talked to Dan Francis of EPIC, and that Francis had told him that he

2   (Francis) had been informed of the dollar value of the Gallagher business for which this other

3   producer was responsible, and since his existing book of business was not sufficient to justify

4   opening a San Jose office, EPIC would not open a San Jose office unless she agreed to join EPIC.

5   **The Second Wave of Planned En Masse Resignations The Following Monday Morning And**
    **Continuing Throughout The Week – After Additional Theft of Data**

6

7   91.    Over the weekend of December 8 and 9, 2007, Wick, EPIC, and EPIC founders

8   Francis and Hahn interviewed several of Plaintiffs' employees en masse – at the newly opened

9   EPIC office in the same complex as Plaintiffs' San Ramon offices – and made instantaneous

10  employment offers.

11  92.    The Gallagher employees accepted and simultaneously announced their

12  resignations beginning the following Monday morning, the vast majority doing so without notice,

13  and on information and belief, coordinating this tactic among themselves and with EPIC.

14  93.    Over that weekend, and knowing that they were planning to resign en masse first

15  thing on Monday or Tuesday the following week, several Defendants continued to access

16  Plaintiffs' computer media, including servers.  Plaintiffs are informed and believe, and thereupon

17  allege, that based on the circumstances, such access was not for legitimate business purposes of

18  Plaintiffs.

19  94.    On Saturday, December 8, Plaintiffs' management asked Defendant and Gallagher

20  Vice President Soo Hoo to come into the San Ramon office and help assess the status of customer

21  accounts in the wake of Friday's departures.  Soo Hoo spoke to management, and gave an excuse

22  not to come into the office.

23  95.    She made no mention of the fact that Defendant Wally Brown had pre-announced

24  his resignation to her, failed to mention she had interviewed with EPIC the previous day, and then

25  failed to inform Plaintiffs she had received and decided to accept EPIC's employment offer on

26  December 8, 2007.

27  96.    Understanding the negative impact the December 7, 2007 officer resignations

28  without notice had on Plaintiffs, and knowing the impact her own resignation, coupled with the

-31-

1    other impending resignations, would have on Plaintiffs, Defendant Soo Hoo, a then-current

2    Gallagher Vice President, never let Plaintiffs know what was in the works, nor did she provide

3    Plaintiffs any ability to minimize the damage they were suffering.  In fact, having accepted

4    EPIC's employment offer on December 8, 2007, Soo Hoo did not contact the corporate

5    representative who had sought her help to inform Plaintiffs of her decision, nor did she limit her

6    access to Plaintiffs' computer systems or seek to prevent any of her co-conspirators from doing

7    do.

8        97.    On Monday, December 10, 2007, primarily in the early morning hours (around 7

9    am), Soo Hoo, Molly Armstrong, Eric Chua, Elkie Craven, Robert Ellsworth, Tammy Glaser,

10   Robin Herman, Barbara Hilgen, Don Johnson, Mary Keck, Lisa Lucas, William "Bill" Phillips,

11   Dennis Rodriguez, Amber Ronzitti, Dirck Stinson, Colleen Varnica, Sharon Voth, Paul H.

12   Wagener, and Carol Ward resigned without notice and walked out to work at EPIC.

13       98.    On December 11, 2007, Susan English, Brett Burdock, Kristina Stubbs,

14   Shandranette Middleton (a.k.a. Shandranette Pullian), and George Petty resigned without notice

15   and walked out to work at EPIC.

16       99.    On December 12, 2007, Robert Harrison Watkins, Carolyn ("Ruby") Johnson, and

17   Patricia Burdock, resigned without notice and walked out to work at EPIC.

18       100.   On December 14, 2007, Siobhan O'Leary, Olga Rasmussen, and Louanne

19   Sweeney resigned to work at EPIC.  Rasmussen did not provide notice; Siobhan and Sweeney

20   provided five days of notice.

21       101.   On December 17, 2007, Tiffany Pastorius resigned, having provided six days

22   notice.

23       102.   Plaintiffs are informed and believe, and thereupon allege, that in order to catch

24   Plaintiffs by surprise, certain Individual Defendants and EPIC agreed – after fully vetting the

25   issue with EPIC (who agreed to pay for the legal defense of the Individual Defendants), Francis

26   and Hahn – that they would violate the provision in their Executive Agreements with Gallagher

27   requiring a fourteen-day Notice Period and transition period – a period during which they

28   contractually agreed their fiduciary obligations would continue even if their employment did not.

1    103.    These officers and Defendants understood and agreed by contract that this notice

2    period was intended to satisfy a legitimate business interest: to assist Plaintiffs "in all matters

3    relating to the winding up of any pending work and the orderly transfer to other Company

4    employees of the accounts and prospective accounts for which [the employee] has most recently

5    been responsible."

6    104.    Rather than honoring their contractual obligations, Individual Defendants Amos,

7    Cohn, Brown, Halbleib, Johnson, Martin, Phillips, Jr., Dutto, Quinn, Stinson, English, Wagener,

8    and Watkins all intentionally breached their contractual obligations to Gallagher by resigning

9    without notice.

10    105.    A total of 47 out of 76 employees in the San Ramon facility resigned over a period

11    of one week, all but three without any notice, leaving Plaintiffs' San Ramon essentially crippled.

12    During the same period, two of Plaintiffs' employees (Defendants Halbleib and Martin) in the

13    San Francisco office resigned without notice. As of January 2008, approximately 49 employees

14    of Plaintiffs have resigned their employment to accept positions with EPIC.

15    **Using Plaintiffs' Confidential Data and Other Illegal Tactics, EPIC and the Individual**
**Defendants Immediately Engage in Unfair Competition and Inflict Damage on Plaintiffs'**
16    **Business**

17

18    106.    As of December 7, 2007 and the first resignations, and thanks to careful planning

19    by Wick and her co-conspirators,  EPIC's San Ramon facility was already up and running (EPIC

20    corporate email accounts had been previously created, offices assigned, corporate computer

21    access IDs assigned, Blackberry's issued, etc.) for Defendants Wally Brown, Michael Brown,

22    Brian Quinn and the other departed employees of Plaintiffs.

23    107.    Having operations established, Defendants immediately began unlawfully

24    soliciting Plaintiffs' customers, including through the use of stolen data of Plaintiffs.

25    108.    For example, Defendant Stephen Hause submitted a resignation letter representing:

26    "I am leaving behind all Arthur J. Gallagher property and client information in my possession."

27    109.    Unbeknownst to Plaintiffs, Hause had previously set up a December 10, 2007

28    meeting with a current customer of Plaintiffs that he intended to immediately solicit after

1   resigning to switch business from Plaintiffs to EPIC.

2       110.   Contrary to his representations, Hause took a confidential and proprietary

3   document, created by and for the exclusive use of Plaintiffs, related to a proposal bid for the

4   customer for whom he set up the December 10, 2007 meeting under the guise of conducting

5   Gallagher-related business.

6       111.   Having unauthorized possession of this document and having already resigned

7   from Plaintiffs' employ, Hause then contacted the customer, represented he was still an employee

8   of Plaintiffs, and then proceeded to present the stolen document – which contains Plaintiffs'

9   confidential, proprietary, and trade secret information – to the customer on behalf of EPIC.

10      112.  Hause requested that the customer immediately transfer its business to EPIC,

11  naming EPIC its exclusive broker of record.

12      113.  Hause's actions resulted in damage to Plaintiffs.

13      114.  Plaintiffs are informed and believe that, while still employed by Plaintiffs, some or

14  all of the Individual Defendants spent time during the working day preparing BOR letters

15  designating EPIC in place of Plaintiffs as the exclusive broker of record, for the clients of

16  Plaintiffs that they planned to solicit and/or had already begun soliciting.

17      115.  To date, more than 130 of Plaintiffs' clients, with business totaling several

18  millions of dollars in revenue, have signed BOR letters designating EPIC as their exclusive

19  insurance broker. Plaintiffs are informed and believe that Defendants used various deceptive and

20  unlawful practices, in addition to using Plaintiffs' proprietary and trade secret data, to convince

21  clients to switch their business to EPIC.

22      116.  Defendants have also caused Plaintiffs to lose additional clients and associated

23  business revenues, including at least one client who, while refusing to transfer business to EPIC

24  because it believes EPIC's conduct to be "unethical – or worse," transferred its business to

25  another insurance brokerage out of a belief, based on the optics of the mass departures, that

26  EPIC's conduct has left Plaintiffs unable to service their accounts.

27      117.  Plaintiffs are informed and believe, and thereupon allege, that through

28  misrepresentations and misuse of Plaintiffs' misappropriated data, Defendants are not only

1   targeting Plaintiffs' California customers, but are also going after Plaintiffs' international

2   accounts.

3   **Defendants' Solicitation Of Plaintiffs' Employees And Customers Continues Even After**
    **Gallagher Expressed Concern**

4

5       118.    When Halbleib departed for EPIC, Gallagher demanded that he honor his

6   contractual obligations not to solicit Gallagher's employees and clients – which are the same

7   contractual obligations EPIC has entered into with its new employees.

8       119.    Defendants have continued to solicit Plaintiffs' employees and customers.

9       120.    Plaintiffs are informed and believe, and thereupon allege, that Defendants are also

10  directing recruiters and headhunters to contact Plaintiffs' San Ramon employees in an attempt to

11  completely wipe out Plaintiffs' presence in San Ramon.

12      121.    As part of this practice, Defendants, directly and through these headhunters, have

13  falsely represented that Plaintiffs plan to close their San Ramon office in the wake of the

14  employee departures and loss of business.

15  **Plaintiffs Will Continue To Suffer Irreparable Harm if Defendants Are Not Enjoined**

16      122.    By their actions, the Defendants have caused irreparable harm to Plaintiffs and

17  threaten to cause additional irreparable harm unless enjoined.

18      123.    After this lawsuit was filed, for the first time, Defendants acknowledged they were

19  in possession of Plaintiffs' proprietary data.

20      124.    Only after the lawsuit was filed did Defendant Hause admit taking Plaintiffs'

21  proprietary document and using it to unfairly damage and compete against Plaintiffs.  Hause has

22  never returned the document at issue to Plaintiffs or made any attempt to account for the damage

23  caused.

24      125.    As of the filing of this First Amended Complaint, Defendants admit they still

25  possess Plaintiffs' data, and have refused repeated requests to identify what was taken, in what

26  manner, when it was taken, where it was stored, and related information.

27      126.    Without injunctive relief, Plaintiffs will suffer irreparable harm, as Defendants will

28  have the ability to further unlawfully raid Plaintiffs' employee base, unlawfully and unfairly steal

                                    -35-      FIRST AMENDED COMPLAINT OF A.J.
                                              GALLAGHER & CO., INC.; DEMAND FOR
                                              JURY TRIAL

1   Plaintiffs' customers, and use, disclose, retain, and destroy Plaintiffs' data, causing Plaintiffs

2   irreparable harm.

3       127.    Plaintiffs have a strong likelihood of success on the merits, based on the facts

4   established.  It is difficult, if not impossible, to place a monetary value on the damage that would

5   be done to Plaintiffs if Defendants are not enjoined.  Conversely, EPIC and the Individual

6   Defendants would suffer no prejudice if enjoined under the circumstances, since they have no right

7   to keep or use any of Plaintiffs' data still in their possession or solicit Plaintiffs' clients in violation

8   of their agreements and in an unfair and deceptive manner, and as preserving evidence and

9   allowing the inspection of any computers or Electronic Storage Devices in their possession,

10  pursuant to court ordered protocols, would cause minimal intrusion.

11  **COUNT ONE**

12  **(Violation of Computer Fraud and Abuse Act – 18 U.S.C. §1030 – Against Individual**
    **Defendants Neil Cohn, Halbleib, Martin, Petty, Chua, Middleton, and Watkins)**

13

14      128.    Plaintiffs reallege and reincorporate by reference paragraphs 1 through 127 above.

15      129.    Plaintiffs' computers, computer network, servers and systems have network and

16  Internet capabilities and are used to provide insurance services in interstate commerce throughout

17  the United States and across state lines.  Plaintiffs have servers located outside the State of

18  California.  Defendants' computers routinely accessed or had access to Plaintiffs' computer

19  network, Plaintiffs' out of state servers and Plaintiffs' proprietary information.  Therefore,

20  Plaintiffs' computers are protected computers under the Computer Fraud and Abuse Act.

21      130.    In taking the actions complained of, including accessing Plaintiffs' servers and the

22  network for the purpose of misappropriating data, loading and running defragmentation programs

23  and deleting Plaintiffs' proprietary information from Plaintiffs' computers, Defendants, on behalf

24  of and in furtherance of the conspiracy with EPIC, knowingly and with intent to defraud,

25  improperly accessed Plaintiffs' protected computer without or exceeding authorization, resulting

26  in loss or damage to Plaintiffs in excess of $5,000.

27      131.    By their actions, Defendants, in furtherance of the conspiracy, also caused the

28  transmission of a program, information, code, or command which was designed to erase

-36-    FIRST AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR
JURY TRIAL

1   Plaintiffs' proprietary data contained within Plaintiffs' computers and cover-up their own

2   actions, and those of their co-conspirators, resulting in damage to a protected computer.

3        132.   Defendants' conduct was done knowingly, intentionally, and recklessly, with the

4   intent to cause damage and defraud, and caused actual damage to Plaintiffs, in violation of 18

5   U.S.C. Section 1030, including, without limitation, 18 U.S.C. §§ 1030(a)(4), (a)(5)(A)(i),

6   (a)(5)(A)(ii), and (a)(5)(A)(iii).

7        133.   As a direct, proximate and legal cause of this access and transmission, Plaintiffs

8   have sustained damages in an amount in excess of Five Thousand Dollars ($5,000), in an amount

9   to be proven at trial, but including the costs of investigating Defendants' violations of the CFAA,

10  which themselves exceed $5,000, and is further entitled to injunctive relief.

11       134.   Each of the aforementioned acts was done willfully and maliciously, with the

12  deliberate intent to injure Plaintiffs' business and, on information and belief, for Defendants'

13  financial gain, thereby entitling Plaintiffs to exemplary damages and/or attorneys' fees to be

14  proven at trial.

15  **COUNT TWO**

16  **(Violation of California Penal Code § 502 – Against Individual Defendants Neil Cohn, Halbleib, Martin, Petty, Chua, Middleton and Watkins)**

17

18       135.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 134 above.

19       136.   Plaintiffs maintain and own a computer network, computer programs or software

20  and a computer system as those terms are defined in California Penal Code Section 502

21  (collectively, "Computer System"), and which includes the computers and network provided by

22  Plaintiffs to the Individual Defendants while they were employed by Plaintiffs and while they had

23  lawful access to these computers and network.  On their Computer System, Plaintiffs maintain

24  confidential and proprietary information, including the information described above.

25       137.   Without permission or authorization, and knowingly and without authorization,

26  Defendants, on behalf of and in furtherance of the conspiracy with EPIC:

27          (a)   accessed and/or provided a means of accessing and/or assisted in providing

28              a means of accessing Plaintiffs' Computer System and the data contained

1                therein;

2         (b)     used and/or caused to be used Plaintiffs' Computer System and the data

3                 contained therein;

4         (c)     took, copied, and thereafter made use of data and supporting documentation

5                 from Plaintiffs' Computer System;

6         (d)     altered and deleted data contained in Plaintiffs' Computer System.

7       138.     Defendants engaged in these acts knowingly and intentionally, and on information

8 and belief, for the purpose of defrauding, deceiving, extorting, and wrongfully obtaining and

9 controlling Plaintiffs' money, property, and data.

10       139.     The conduct of the Defendants listed above violates California Penal Code Section

11 502, including, without limitation, California Penal Code § 502(c)(1), (2), (3) (4), (6), and (7).

12       140.     As a direct, proximate and legal cause of each of Defendants' acts alleged herein,

13 Plaintiffs have suffered compensatory damages in an amount to be proven at trial and are entitled

14 to an award of reasonable attorneys' fees, in an amount to be proven at trial.

15       141.     On information and belief, after knowingly accessing Plaintiffs' Computer System

16 and Plaintiffs' confidential and proprietary information without authorization or permission,

17 Defendants retained some or all of the data and other information that they obtained from their

18 unlawful conduct. Accordingly, Plaintiffs are entitled to injunctive relief and other equitable

19 relief, including, without limitation, permanent injunctive relief and restitution and disgorgement

20 of any and all profits or other benefits that Defendants have obtained in connection with their

21 illegal conduct.

22       142.     Each of the aforementioned acts was done willfully and maliciously, with the

23 deliberate intent to injure Plaintiffs and with conscious disregard of Plaintiffs' rights, thus

24 entitling Plaintiffs to an award of punitive damages in an amount commensurate with Defendants'

25 conduct and appropriate to deter others from engaging in similar misconduct.

26

27

28

1

2

3

### COUNT THREE

**(Misappropriation of Trade Secrets – Cal. Civ. Code § 3426 *et. seq.* – Against Defendants EPIC, Neil Cohn, Halbleib, Martin, Petty, Chua, Hause, Watkins, and Middleton, on behalf of and in furtherance of the conspiracy with EPIC)**

4    143.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 142 above.

5    144.    Plaintiffs enjoy an advantage over its existing and would-be competitors in

6    providing insurance brokerage and risk management services.

7    145.    As alleged above, Plaintiffs have developed and maintained valuable trade secret

8    information. Plaintiffs have made reasonable efforts under the circumstances to preserve the

9    confidentiality of their trade secrets.  Such information derives independent economic value from

10    not being generally known to the public or to other persons who can obtain economic value form

11    their disclosure or use.  Accordingly, the above-described information constitutes "trade secrets,"

12    under California's Uniform Trade Secrets Act, Cal. Civ. Code Section 3426 *et. seq.*  EPIC's own

13    agreements and Defendants' resignation letters both acknowledge that the categories of

14    information at issue arise to the level of legally-protected trade secrets.

15    146.    Plaintiffs' current and former employees were and are under a duty both to keep

16    Plaintiffs'  proprietary and confidential information secret, and not to use or disclose such

17    information other than for the benefit of Plaintiffs and with Plaintiffs' authorization.  In taking,

18    retaining, and/or using this information, the Individual Defendants, and EPIC, knew or should

19    have known that they acquired such information under circumstances giving rise to a breach of a

20    duty to maintain its secrecy or limit its use, and/or derived such information from or through a

21    person who has such a duty and/or through improper means.  Nevertheless, Defendants retained

22    this information in unauthorized fashion and on information and belief, have used and/or plan to

23    use this information to benefit themselves, EPIC, and other persons.  They have used and intend

24    to use that information without the express or implied consent of Plaintiffs.

25    147.    As described above, the Individual Defendants and EPIC have misappropriated,

26    retained and/or used Plaintiffs' trade secrets without Plaintiffs' express or implied consent and/or

27    used improper means to acquire knowledge of the trade secrets.

28    148.    Defendants obtained the proprietary and confidential information described above

-39-

Case No. C 07 06418-JSW

FIRST AMENDED COMPLAINT OF A.J. GALLAGHER & CO., INC.; DEMAND FOR JURY TRIAL.

1  directly or indirectly from Plaintiffs and not from generally available information or through their

2  own independent research and efforts.

3      149.    Defendants' actions constitute misappropriation of Plaintiffs' trade secrets under

4  Cal. Civ. Code Section 3426 *et seq.*

5      150.    Defendants' wrongful conduct in misappropriating Plaintiffs' confidential

6  information, unless and until enjoined and restrained by order of this Court will cause great and

7  irreparable harm to Plaintiffs.  Plaintiffs are threatened with losing their confidential and

8  proprietary information, as well as current and potential business.

9      151.    Plaintiffs have no adequate remedy at law for the injuries currently being suffered,

10  and the additional injuries that are threatened, because it would be impossible to quantify in

11  dollars the losses described above when this matter is finally adjudicated, and Defendants will

12  continue to engage in their wrongful conduct and Plaintiffs will continue to suffer irreparable

13  injury that cannot be adequately remedied at law unless Defendants are enjoined from engaging

14  in any further such acts of misappropriation.

15      152.    In addition, as a direct and proximate cause of Defendants' misappropriation of

16  Plaintiffs' trade secrets, Defendants have been unjustly enriched in an amount to be ascertained at

17  trial and Plaintiffs have sustained, and will continue to sustain, actual damages in an amount to be

18  proven at trial.  Plaintiffs have also suffered irreparable harm as a result of Defendants' actions.

19      153.    Each of the acts of misappropriation was done willfully and maliciously by

20  Defendants, with the deliberate intent to injure Plaintiffs' business and improve their own

21  business and for financial gain, thereby entitling Plaintiffs to exemplary damages and/or

22  attorneys' fees to be proven at trial pursuant to Cal. Civ. Code Section 3246.3(c).

23  ## COUNT FOUR

24  **(Misappropriation of Other Employer Property—Cal Labor Code § 2860 – Against
Defendants  Neil Cohn, Halbleib, Martin, Petty, Hause, Chua, Middleton and Watkins, on
25  behalf of and in furtherance of the conspiracy with EPIC)**

26      154.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 153 above.

27      155.    The aforementioned acts of Individual Defendants constitute misappropriation of

28  employer property in violation of California Labor Code section 2860.

Case No. C 07 06418-JSW                           -40-                    FIRST AMENDED COMPLAINT OF A.J.
                                                                          GALLAGHER & CO., INC.; DEMAND FOR
                                                                          JURY TRIAL

1     156.   By engaging in the acts described above, Defendants, in furtherance of the

2   conspiracy, have acquired property belonging to Plaintiffs, including but not limited documents

3   and electronic information relating to Plaintiffs' business and customers, and have unjustly

4   retained and used such property in pursuit of unfair competition against Plaintiffs in violation of

5   the California Labor Code.

6     157.   Everything the Individual Defendants formerly employed by Plaintiffs obtained

7   through their employment with Plaintiffs belongs to Plaintiffs whether acquired lawfully or

8   unlawfully during or after the employment.

9     158.   Defendants' wrongful conduct in misappropriating Plaintiffs' property, unless and

10   until enjoined and restrained by order of this Court will cause great and irreparable harm to

11   Plaintiffs. Plaintiffs are threatened with losing their proprietary information, as well as current

12   and potential business.

13     159.   As a direct and proximate result of Defendants' actions alleged herein, Defendants

14   have caused Plaintiffs to suffer damages in an amount to be proven at trial.

15     160.   In addition, as a direct and proximate cause of Defendants' misappropriation of

16   Plaintiffs' property, Defendants have been unjustly enriched in an amount to be ascertained at

17   trial and Plaintiffs have sustained, and will continue to sustain, actual damages in an amount to be

18   proven at trial. Plaintiffs have also suffered irreparable harm as a result of Defendants' actions.

19                                  **COUNT FIVE**

20   **(Conversion – Against Defendants EPIC, Neil Cohn, Halbleib, Martin, Petty, Hause, Chua,**
     **Middleton and Watkins, on behalf of and in furtherance of the conspiracy with EPIC)**
21

22     161.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 160 above.

23     162.   By engaging in the acts described above, Defendants wrongfully took possession

24   of property belonging to Plaintiffs, without permission or authorization, and retained, altered,

25   damaged and/or destroyed some or all of said property.

26     163.   As a proximate result of Defendants' decision to retain property belonging to

27   Plaintiffs, and to convert it for his own use, benefit and financial gain, Defendants has caused

28   Plaintiffs to suffer damages in an amount to be proven at trial.

1    164.    On information and belief, Defendants continues to retain some or all of said

2    property of Plaintiffs, thereby entitling Plaintiffs to injunctive relief.

3    165.    Each of these acts were done willfully and maliciously by Defendants, with the

4    deliberate intent to injure Plaintiffs' business and for Defendants' own financial gain, thereby

5    entitling Plaintiffs to exemplary damages and/or attorney's fees to be proven at trial.

6                                    **COUNT SIX**

7    **(Breach Of Written Contract – Against Wally Brown, Quinn, N. Cohn, C. Cohn, Hause,**
     **Petty, Chua, Michael Brown, Amos, Dutto, English, Halbleib, Johnson, Martin, Phillips,**
8    **Soo Hoo, Stinson, Wagener, Watkins, and Wick)**

9    166.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 165 above.

10    167.    The Executive Agreements entered into by Individual Defendants Amos, Wally

11    Brown, Michael Brown, Cohn, Dutto, English, Halbleib, Johnson, Martin, Phillips, Quinn,

12    Stinson, Wagener, and Watkins with Plaintiffs required them, among other things, to (a) devote

13    their efforts to Plaintiffs and not to simultaneously engage in competing employment or activities

14    that poses a conflict of interest; (b) maintain the secrecy of Plaintiffs' confidential and proprietary

15    information, (c) return all confidential information, documents and property of Plaintiffs upon

16    termination of their employment with Plaintiffs, (d) provide a Notice Period, (e) in order to

17    protect Plaintiffs' confidential and proprietary trade secret information, refrain from soliciting the

18    specific customers of Plaintiffs with whom the employees worked while employed by Plaintiffs–

19    if such solicitation of customers would involve the use of Plaintiffs' confidential information or

20    otherwise violate any other contractual commitments; and (f) refrain from soliciting Plaintiffs'

21    employees.    EPIC entered into substantially identical contractual covenants with the Individual

22    Defendants vis-à-vis EPIC customers and employees.

23    168.    Additionally, Individual Defendants Amos, Michael Brown, Cohn, Chua, Dutto,

24    English, Halbleib, Johnson, Quinn, Soo Hoo, Stinson, Wagener, Watkins, and Wick executed

25    acknowledgements and agreed to abide by Gallagher's Code of Business Conduct and Ethics and

26    other Corporate Policies, which further required the Individual Defendants formerly employed by

27    Plaintiffs' (a) to be loyal to Gallagher and avoid conflicts of interest, (b) to protect Plaintiffs'

28    confidential and proprietary information and other property, and (c) to make proper use of

1 Plaintiffs' assets, and not use Plaintiffs' assets for their own personal use or gain.

2       169.    For the purposes of protecting its confidential, proprietary, and trade secret

3 information and for the purposes of retaining key employees, Gallagher entered into Stock Option

4 Agreements with key employees, including Defendants Wally Brown, Brian Quinn, Neil Cohn,

5 CarolAnn Cohn, Laura Wick, Jim Halbleib, Steve Hause, Carol Cohn, Linda Soo Hoo, and

6 George Petty. The grants were expressly conditioned on Gallagher's employees faithfully and

7 loyally carrying out their duties, and not engaging in acts "harmful to the interests of the

8 Company." Such harmful acts defined in the Stock Option Plan included soliciting existing and

9 prospective clients of Plaintiffs for whom the employees performed work on behalf of Gallagher

10 within the two-year period preceding the employees' termination, if doing so would require the

11 employees to "reveal, make judgments upon, or to otherwise use or divulge any confidential

12 information or trade secrets of the Company."

13      170.    Gallagher has performed (or was excused from performing) all of its obligations

14 under these contracts except for those, if any, from which it was legally excused, frustrated,

15 waived or excused by the prior material breaches of Defendants.

16      171.    Without excuse or justification, by engaging in the acts alleged, Defendants have

17 and continue to breach their obligations under the contracts through their acts of disloyalty,

18 misappropriation, and unlawful solicitation.

19      172.    As a proximate result of the breaches of contract by these Defendants, Gallagher

20 has suffered, and will continue to suffer, general and special damages in an amount to be proven

21 at trial. Gallagher seeks compensation for all damages and losses proximately caused by the

22 breaches.

23      173.    Gallagher has no adequate remedy at law for the injuries currently being suffered,

24 and the additional injuries that are threatened, because it would be impossible to quantify in

25 dollars the loss sustained pending final adjudication of this matter.

26

27

28

1

## COUNT SEVEN

2

**(Breach of the Covenant of Good Faith and Fair Dealing – Against Amos, Michael Brown, Wally Brown, N. Cohn, C. Cohn, Dutto, Petty, Hause, English, Halbleib, Johnson, Martin, Phillips, Jr., Quinn, Soo Hoo, Stinson, Wagener, Watkins, and Wick)**

3

4      174.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 173 above.

5      175.    Implied in the Executive Agreements, Code of Business Conduct and Ethics, Stock

6      Agreements, and other Corporate Policies executed and acknowledged by Defendants are

7      covenants that each of them would act in good faith and deal fairly with Plaintiffs, and that they

8      would do nothing to deprive Plaintiffs of the benefit of that agreement.

9      176.    Defendants breached the implied covenant of good faith and fair dealing by

10     engaging in some or all of the conduct described herein.

11     177.    Gallagher has duly performed all acts, conditions, covenants and promises to be

12     performed on its part as required by the Executive Agreements and the Code of Business Conduct

13     and Ethics Agreement, except for those, if any, from which it was legally excused, frustrated,

14     waived or excused by the prior material breaches of Defendants.

15     178.    As a direct, proximate and legal cause of the breach by Defendants of the implied

16     covenant of good faith and fair dealing in the Executive Agreements and the Code of Business

17     Conduct and Ethics Agreement, Gallagher has sustained damages in an amount in excess of the

18     minimum jurisdiction of this Court, in an amount to be proven at trial.

19

## COUNT EIGHT

**(Breach of Fiduciary Duty and Breach of the Duty of Loyalty – Against Individual Defendants Wally Brown, N. Cohn, Halbleib, Quinn, Hause, Michael Brown, Alan Amos, Rob Dutto, Susan English, Laurie Martin, William Phillips, Rick Stinson, and Paul Wagener.)**

20

21

22     179.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 178 above.

23     180.    While employed by Plaintiffs, Defendants were executive-level, highly-

24     compensated employees and/or officers.  These defendants occupied positions of trust and

25     authority sufficient to create a duty of good faith and loyalty to Plaintiffs, as well as fiduciary

26     duties to Plaintiffs.  Defendants acknowledged that their "fiduciary duties to [the] Company shall

27     remain in effect" through the notice period they were obligated to – but did not – provide,

28     "whether or not active employment continues during the Notice Period."  Such fiduciary duty

-44-

FIRST AMENDED COMPLAINT OF A.J. GALLAGHER & CO., INC.; DEMAND FOR JURY TRIAL.

Case No. C 07 06418-JSW

1   survived even after their employment terminated.

2       181.    By assisting in the development and execution of, and failing to divulge and take

3   affirmative measures to prevent, the acts alleged herein, Defendants violated their fiduciary duties

4   and their duty of loyalty to Plaintiffs.

5       182.    Defendants' conduct has caused and will continue to cause irreparable harm to

6   Plaintiffs for which there is no adequate monetary remedy.

7       183.    Plaintiffs are entitled to an award for all of the damages they have suffered as a

8   result of Defendants' breach of fiduciary duty and duty of loyalty.  Each of the acts by these

9   defendants was done willfully and maliciously, with the deliberate intent to injure Plaintiffs and,

10  on information and belief, for their benefit and financial gain, as well as the benefit and financial

11  gain of their co-conspirators EPIC and the other Individual Defendants, thereby entitling

12  Plaintiffs to exemplary damages and/or attorneys' fees to be proven at trial.

13                              **COUNT NINE**

14      **(Violation of Cal. Labor Code §§ 2854 And 2859 – Against All Individual Defendants**
                              **Except Francis and Hahn)**
15

16      184.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 183 above.

17      185.    The aforementioned acts of Individual Defendants constitute Breach of the Duty of

18  Loyalty in violation of California Labor Code sections 2854 and 2859.

19      186.    An employment relationship existed between Plaintiffs, as employer, and the

20  Individual Defendants formerly employed by Plaintiffs, as employees.  By virtue of this

21  relationship, the Individual Defendants formerly employed by Plaintiffs had a duty of loyalty to

22  act, at all times, in the best interests of Plaintiffs.

23      187.    The Individual Defendants formerly employed by Plaintiffs breached this duty of

24  loyalty owed to Plaintiffs by the acts complained of herein.

25      188.    As a proximate result of these breaches of the duty of loyalty owed to Plaintiffs,

26  the Individual Defendants formerly employed by Plaintiffs have caused injuries and damages to

27  Plaintiffs, in an amount to be proven at trial, but which are in excess of the minimum

28  jurisdictional amount of this Court.  Plaintiffs are also entitled to restitution and disgorgement of

1    any proceeds Defendants realized during their period of disloyalty.

2         189.    Plaintiffs are informed and believe that at all times relevant to these allegations,

3    the conduct of the Individual Defendants was intentional and done with malice towards Plaintiffs,

4    fraud and oppression. Plaintiffs are further informed and believe that the Individual Defendants

5    knew they were breaching their duty of loyalty owed to Plaintiffs, but in conscious disregard for

6    the rights of Plaintiffs, set upon a course of conduct which placed their own interests, and the

7    interests of their co-conspirators, including EPIC, above Plaintiffs' interests during their

8    employment with Plaintiffs. As a consequence, Plaintiffs are entitled to an award of punitive or

9    exemplary damages in an amount sufficient to punish or set an example of the Individual

10   Defendants.

11                                          **COUNT TEN**

12   **(Tortious Interference with Contract – Against EPIC, Hahn, Francis, Wally Brown, Quinn,**
                                        **and Wick)**
13

14        190.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 189 above.

15        191.    At all relevant times, Defendants were aware of the existence of the valid and

16   binding Gallagher Executive and Stock Agreements entered into by Gallagher employees

17   including Amos, Michael Brown, Cohn, Dutto, English, Halbleib, Johnson, Martin, Phillips,

18   Quinn, Stinson, Wagener, Watkins, and Wick, and the Code of Business Conduct and Ethics

19   Agreements entered into by Gallagher employees. Gallagher is informed and believes and

20   thereupon alleges that EPIC even specifically reviewed the Gallagher contracts at issue in

21   connection with the conspiracy – contracts that contain the same or substantially similar

22   obligations as EPIC expects its own employees to abide by and therefore, provisions which EPIC

23   knew were valid and enforceable.

24        192.    Defendants intentionally induced Plaintiffs' employees to breach their contracts

25   with Gallagher in several ways, including encouraging them to resign without providing

26   Gallagher with the contractual notice and encouraging them to solicit Gallagher employees and

27   customers in violation of their contractual obligations, to prepare and/or actually perform work

28   for EPIC while still actively employed by Plaintiffs, and failing to take reasonable and

1  appropriate measures to ensure that Plaintiffs' employees did not misappropriate Plaintiffs' data –

2  all in direct contravention of the contracts then in existence between Gallagher and its employees.

3       193.    Defendants also were aware at all times that Plaintiffs enjoyed binding contractual

4  relationships with their customers and clients for the provision of services.  Nevertheless, by

5  actively encouraging Plaintiffs' employees to illegally solicit Plaintiffs' customers, and use

6  Plaintiffs' misappropriated data, misrepresentations and unfair practices to do take away

7  Plaintiffs' business, Defendants have interfered with these contracts.

8       194.    These acts by Defendants have caused and continue to cause Plaintiffs to suffer

9  economic damages proximately caused by the intentional interference.

10      195.    These acts by Defendants continue to interfere with Plaintiffs' existing employees

11  and customers contracts, and thus have caused and, unless enjoined, will continue to cause

12  irreparable damage to Plaintiffs in the form of loss of client good will and proprietary knowledge,

13  and loss of relationships with their employees, for which Plaintiffs have no adequate remedy at

14  law.

15      196.    The acts of Defendants were done willfully and maliciously, with the deliberate

16  intent to injure Plaintiffs' business and improve their own business and for financial gain, thereby

17  entitling Plaintiffs to exemplary damages and/or attorneys' fees to be proven at trial.

18                              **COUNT ELEVEN**

19  **(Tortious Interference with Prospective Business Advantage – Against Defendants EPIC,**
   **Hahn, Francis, Wally Brown, Amos, Michael Brown, Cohn, Chua, Dutto, Ellsworth,**
20  **Halbleib, Hause, Johnson, Quinn, and Wagener)**

21      197.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 196 above.

22      198.    Plaintiffs had and have valid business relationships and business expectancies with

23  their employees and customers.

24      199.    Knowing of and about these employee relationships, customer relationships, and

25  business expectancies, Defendants have intentionally intervened and are interfering with and

26  appropriating them, including but not limited to, for the improper purpose of soliciting these

27  employees away from Plaintiffs through unlawful means, diverting their efforts for themselves

28  through improper and illegal means, and otherwise causing termination and disruption of and/or

-47-

FIRST AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR
JURY TRIAL.

1    interference with Plaintiffs' relationships and expectancies with its employees and customers.

2        200.    As a result of Defendants' intentional interference with these relationships and

3    business expectancies, Plaintiffs have been and will continue to be injured irreparably and

4    otherwise, while Defendants are unjustly enriched.

5        201.    If Defendants are not enjoined, Plaintiffs will continue to be injured irreparably

6    and otherwise.

7        202.    Each of these acts was done willfully and maliciously by Defendants, with the

8    deliberate intent to injure Plaintiffs' business and improve their own business and for financial

9    gain, thereby entitling Plaintiffs to exemplary damages and/or attorneys' fees to be proven at trial.

10                                   **COUNT TWELVE**

11    **(Unfair Competition—Cal Bus. & Prof. Code § 17200 *et seq.* – Against All Defendants)**

12        203.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 202 above.

13        204.    The aforementioned acts of Defendants constitute fraudulent and unfair business

14    practices in violation of California Business and Professions Code section 17200 *et seq.*

15        205.    As a direct and proximate result of Defendants' unfair business practices, Plaintiffs

16    have suffered, and will continue to suffer, losses in an amount in excess of the jurisdictional

17    limits of this Court, and in an amount to be proven at trial and has suffered irreparable harm.

18    Pursuant to California Business and Professions Code sections 17203 and 17204, Plaintiffs are

19    entitled to preliminary and permanent injunctive relief enjoining Defendants, and individuals and

20    entities acting in concert with them, from engaging in further conduct constituting unfair

21    competition.

22                                  **COUNT THIRTEEN**

23                    **(Unjust Enrichment – Against All Defendants)**

24        206.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 205 above.

25        207.    By engaging in the acts described above, Defendants have and continue to benefit

26    from their wrongdoing, and have been unjustly enriched by reaping the benefits of their unlawful

27    activities to the damage and irreparable harm of Plaintiffs.

28        208.    The circumstances are such that it would be inequitable for Defendants to retain

-48-

Case No. C 07 06418-JSW

FIRST AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR
JURY TRIAL

1  the benefits received from the actions described without repaying the lost value to Plaintiffs.

2  **COUNT FOURTEEN**

3  **(Fraud — Against Wally Brown, Cohn, Petty, Quinn, Wick, Hause)**

4  209.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 208 above.

5  210.  By engaging in affirmative acts and representation designed to conceal and prevent

6  Plaintiffs from discovering the acts alleged herein, the following Defendants committed

7  fraudulent acts including but not limited to:

8  (a)  Hause affirmatively misrepresented to Plaintiffs that he had returned all

9  property belonging to Plaintiffs and all client information in his possession;

10  (b)  Wally Brown, Brian Quinn and Laura Wick affirmatively misrepresented

11  the circumstances of Wick's resignation to induce Plaintiffs' reliance on the alibi and not arouse

12  suspicion concerning EPIC or otherwise enable Plaintiffs to limit and/or prevent the subsequent

13  harm inflicted on it by Defendants;

14  (c)  Petty committed fraud by asserting that he would preserve the data on the

15  laptop computers of the employees of Plaintiffs who departed for EPIC, and then engaged in

16  deletion of such data;

17  (d)  Cohn made affirmative misrepresentations in his resignation letter, and

18  together with Petty's buy-in, was designed to induce Gallagher's reliance on the representations

19  that he had not retained any, and had returned all of, Plaintiffs' data;

20  (e)  Defendants Brown, Cohn and Quinn, incurred expenses entertaining

21  clients, on the premise that they were attempting to strengthen Plaintiffs' existing and prospective

22  relationship with these customers when in fact, Defendants' intent was to convince these clients

23  to refrain from providing Plaintiffs with additional business, and to give the business to EPIC;

24  (f)  Defendants Brown, Cohn and Quinn incurred auto expenses when they

25  knew they would be leaving Gallagher's employ shortly thereafter, and that Plaintiffs would not

26  enjoy the intended benefits for paying these expenses; and

27  (g)  Defendants Brown, Quinn, Cohn, and Wick affirmatively concealed the

28  fact that Wick was involved in establishing EPIC's new office and that there was solicitation

-49-

FIRST AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR
JURY TRIAL

Case No. C 07 06418-JSW

1    occurring by officers of Plaintiffs.

2        211.    The misrepresentations made by these Individual Defendants were material, in that

3    they were made with the intent to induce Plaintiffs' reliance on them while the Defendants

4    actively engaged in activities which conflicted with their employment with Plaintiffs.

5        212.    Plaintiffs' reliance on these Individual Defendants' fraudulent misrepresentations

6    was reasonable.  The Individual Defendants, intent on doing harm to Plaintiffs, acted in

7    coordinated and surreptitious fashion to carry out their plan, and went to extraordinary lengths to

8    conceal their malfeasance.  Plaintiffs' trust in their officers, managing agents, and longstanding

9    employees was justifiable, as was their belief that their employees were providing their best

10   efforts and working in the best interests of the Company.

11       213.    As a proximate result of the actions alleged herein, Defendants caused Plaintiffs to

12   suffer damages in an amount to be proven at trial.

13       214.    Defendants' acts of fraud were committed with the deliberate intent to injure

14   Plaintiffs' business and improve their own business and for financial gain, thereby entitling

15   Plaintiffs to exemplary damages and/or attorneys' fees to be proven at trial.

16                                  **PRAYER FOR RELIEF**

17           WHEREFORE, Plaintiffs prays that the Court:

18       1.     Enter judgment in favor of Plaintiffs and against Defendants on all Claims for

19   Relief;

20       2.     Preliminarily and permanently enjoin Defendants and all persons or entities acting

21   in concert with them, from directly or indirectly taking the following actions:

22               (a)   Accessing, using, retaining, or disclosing any of Plaintiffs' data, documents

23                     or property taken from or belonging to Plaintiffs;

24               (b)   Retrieving, copying, transmitting or disseminating any copies of Plaintiffs'

25                     data, documents or property taken from or belonging to Plaintiffs;

26               (c)   Destroying, altering, erasing, or otherwise modifying, or causing or

27                     permitting anyone else to destroy, alter, erase, or otherwise modify, any of

28                     Plaintiffs' data, documents or property taken from or belonging to other

Case No. C 07 06418-JSW                    -50-        FIRST AMENDED COMPLAINT OF A.J.
                                                       GALLAGHER & CO., INC.; DEMAND FOR
                                                       JURY TRIAL.

1    evidence relating to this action;

2    (d)    Interfering with Plaintiffs' existing customer contracts or employment

3    relationships, including but not limited to seeking to or actually transacting

4    business with any current customer of Plaintiffs about whom Defendants

5    obtained or removed  data or information from Plaintiffs and/or soliciting

6    any employees of Plaintiffs in violation of any contractual obligation owed

7    to Gallagher by any Defendant;

8    Plaintiffs further pray that the Court, as part of its injunctive order, direct Defendants and

9    all persons or entities acting in concert with them, to do the following:

10    (a)    Identify under oath each and every file and piece of electronic data (by

11    name, hash marks, or other identifying means) they accessed and/or

12    removed/copied off of Plaintiffs' Computers;

13    (b)    Identify under oath the location of all files, and copies of files, they

14    accessed and removed from Plaintiffs' Computers;

15    (c)    Identify under oath with specificity (manufacturer, version number, etc.) the

16    particular type of program they used to delete data off of Plaintiffs'

17    Computers and what data belonging or relating to Plaintiffs has been

18    deleted off of Plaintiffs' or personal computer media, the date of deletions,

19    and the manner of deletions;

20    (d)    Identify all computer media issued to the Individual Defendant by EPIC

21    that they have accessed or used at any time and which has ever contained

22    any of Plaintiffs' data or data that incorporates or reflects Plaintiffs' data;

23    (e)    Identify and provide an accounting of all of Plaintiffs' data or data that

24    incorporates or reflects Plaintiffs' data in their possession, custody and

25    control, including the location of such data;

26    (f)    Identify under oath all Electronic Storage Devices (including but not limited

27    to home computers, thumb drives, CDs, hard drives, private Web email

28    accounts, and other media capable of storing electronic data) in Defendants'

1    possession, custody and control, for purposes of allowing a third party

2    expert to forensically image and preserve the data on these Electronic

3    Storage Devices so that through the discovery process, the Electronic

4    Storage Devices can be inspected;

5    (g)    Identify under oath who has been given access to and what use has been

6    made of the data of Plaintiffs that Defendants removed from Plaintiffs'

7    Computers or otherwise have retained.

8    3.    Order Defendants to account for and pay to Plaintiffs all gains, profits and savings

9    derived from their illegal conduct;

10    4.    Order Defendants to disgorge all monies Plaintiffs paid to Defendants during the

11    time they breached their duties to Plaintiffs and all monies received as a result of those breaches;

12    5.    Order Defendants to pay Plaintiffs the damages sustained by Plaintiffs as a result

13    of Defendants' unlawful acts and all damages provided for by contract;

14    6.    Order the former employees of Plaintiffs to forfeit all improperly obtained

15    remuneration, including equity awards, obtained while acting as the faithless servants of

16    Plaintiffs.

17    7.    Order impoundment and return to Plaintiffs of all stolen property;

18    8.    Order Defendants to pay Plaintiffs punitive and/or treble damages for all claims

19    for relief for which such damages are authorized, including the misappropriation of trade secrets

20    statute;

21    9.    Order Defendants to pay Plaintiffs its attorneys' fees incurred in this action and all

22    other costs of the action;

23    10    Order Defendants to pay Plaintiffs all costs associated with detecting the discovery

24    of violations of the CFAA and California Penal Code section 502;

25    11.    Order Defendants to hold and maintain any commissions received or receivable

26    from any client who has transferred its business from Plaintiffs to EPIC after December 7, 2007

27    in constructive trust and to not disburse or use those funds pending the outcome of the trial in this

28    matter.

1    12.    Order prejudgment and post judgment interest at the maximum legal rate, as

2    provided by the laws of California, as applicable, as an element of damages which Plaintiffs have

3    suffered as a result of the wrongful and illegal acts of Defendants;

4    13.    Order Defendants to pay Plaintiffs restitution for all Claims for Relief for which

5    restitution is authorized; and

6    14.    Order such other relief as the Court deems just and equitable.

7    DATED:  January 25, 2008          BRADFORD K. NEWMAN
                                        PAUL, HASTINGS, JANOFSKY & WALKER LLP
8

9

10                                      By: _____
                                               BRADFORD K. NEWMAN
11
                                        Attorneys for Plaintiffs
12                                      Arthur J. Gallagher & Co. and Arthur J. Gallagher & Co.
                                        Insurance Brokers Of California, Inc.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



October 17, 2007

Dear Brian and Wally,

It is with great reluctance I submit my resignation to the both of you. My last day with Gallagher will be Friday, November 2nd. If you feel you need me longer in order to transition my job duties, I will be more than willing to extend my last day until the following week.

I have decided to take some time off until the first of the year to spend time with my family. I am hoping if I decide to return to Gallagher in 2008 that there will be an open position for me.

Thank you for everything the both of you have done for me. I can't tell you how wonderful it has been working out of the Pleasanton office for the past ten years. I wish you both the best.

Kindest regards,

Laura Wick

# EXHIBIT B

Joan Wick"

12/16/2007 11:32 AM
Please respond to

REDACTED

To
        "Brian Wick" <                          >, "Laura Wick" <laura_wick@ajg.com>
cc

Subject
        RE: Our trip..

Laura:  What a surprise!  We hope the job change will be a wonderful
opportunity for you--heaven knows you're the very best person to set up and
run the new company office.  Just hope the new job doesn't cause you too
much stress.  We sure will miss seeing you, but we understand how important
this is and that there will be more holidays and other times to get
together.

Brian:  We'll look forward to seeing you and the boys, and we'll hope for
nice weather, but don't count on it--folks here say we are overdue for some
cold weather so bring warm jackets for your Wed. sightseeing in DC.

Love to all, Mom


> [Original Message]
> From: Brian Wick <
> To: Tracy Franck <                    ; Thomas wick <                    ;
Joan Wick <
> Date: 11/5/2007 1:50:07 PM
> Subject: Our trip..
>
> Hi Folks,
>
> Want to give you an update on our trip.  Our flight
> out is on Nov 20 (Tuesday) and we land at Wash/Dulles
> at 5:27PM.  Our flight home is on Friday the 23rd at
> 2:30 PM.  Again, some strange flights due to using our
> frequent flyer miles.
>
> Laura's job situation has changed and will make it
> hard for her to come.  Her boss and the rest of the
> sales people are leaving Gallagher to go to a
> competitor.  Laura also made the decision to go, and
> is now home for two weeks before starting with the new
> company.  Essentially, her job is to start the new
> branch office and set up the computers, facilities,
> and manage HR issues before the rest of the team quits
> and joins her.
>
> That week of Thanksgiving is when she needs to start
> the new job, and so we've decided that I will come out
> with the boys.  It will be a stressful time for her
> and trying to manage a cross country trip at the same
> time would be difficult.
>
> We have Wednesday to do some site seeing in DC and we
> are really looking forward to it.  I hope this plan
> works OK for everyone.
>
> Bri
>