1  PAUL, HASTINGS, JANOFSKY & WALKER LLP
   BRADFORD K. NEWMAN (SB# 178902)
2  bradfordnewman@paulhastings.com
   STEPHEN N. YANG (SB# 142474)
3  SARJU A. NARAN (SB# 215410)
   SHANNON S. SEVEY (SB# 229319)
4  1117 S. California Avenue
   Palo Alto, CA 94304-1106
5  Telephone: (650) 320-1800
   Facsimile: (650) 320-1900
6
   Attorneys for Plaintiffs
7  Arthur J. Gallagher & Co., Inc. & Arthur J. Gallagher & Co.
   Insurance Brokers of California, Inc.
8
                  UNITED STATES DISTRICT COURT
9
                NORTHERN DISTRICT OF CALIFORNIA
10
                    SAN FRANCISCO DIVISION
11

12  ARTHUR J. GALLAGHER & CO., a          CASE NO. C 07-06418 JSW
    Delaware Corporation, ARTHUR J.
13  GALLAGHER & CO. INSURANCE             **SECOND AMENDED COMPLAINT FOR
    BROKERS OF CALIFORNIA, INC., a        DAMAGES AND INJUNCTIVE RELIEF FOR:**
    California Corporation, Plaintiffs,
14                                        1. VIOLATION OF THE COMPUTER FRAUD
            vs.                           AND ABUSE ACT, 18 U.S.C. §1030 ET SEQ.,
15                                        2. VIOLATION OF CALIFORNIA PENAL
    EDGEWOOD PARTNERS INSURANCE           CODE § 502
16  CENTER, a California corporation; DAN  3. MISAPPROPRIATION OF TRADE
    R. FRANCIS; JOHN G. HAHN;             SECRETS, CAL. CIV. CODE §3426 ET SEQ.,
17  ANDREW ("WALLY") BROWN,               4. CONVERSION
    JR.; BRIAN F. QUINN; NEIL R. COHN;    5.  BREACH OF WRITTEN CONTRACT
18  CAROLANN COHN; MICHAEL J.             6.  BREACH OF THE COVENANT OF GOOD
    BROWN; STEPHEN HAUSE; LAURA J.        FAITH AND FAIR DEALING
19  WICK; JAMES C. HALBLEIB;              7.  BREACH OF FIDUCIARY DUTY
    STEPHEN HAUSE,                        8.  BREACH OF DUTY OF LOYALTY
20  LAURINDA ("LAURIE") A. MARTIN ;       9.  TORTIOUS INTERFERENCE WITH
    ERIC CHUA; GEORGE J. PETTY;           CONTRACT
21  LINDA SOO HOO; ROBERT E. DUTTO;       10.  TORTIOUS INTERFERENCE WITH
    SUSAN M. ENGLISH; DON J.              PROSPECTIVE BUSINESS ADVANTAGE
22  JOHNSON; ALLEN L.                     11. UNFAIR COMPETITION, CAL. BUS. &
    AMOS; WILLIAM ("BILL") PHILLIPS,      PROF. CODE §17200 ET SEQ.
23  JR.; DIRCK ("RICK") R. STINSON;       12. UNJUST ENRICHMENT
    ROBERT ("BOB") D. ELLSWORTH;          13. FRAUD.
24  ROBERT H. WATKINS; PAUL H.
    WAGENER, SHANDRANETTE                 **JURY TRIAL DEMANDED**
25  MIDDLETON; Defendants.
26
27
28

1    Plaintiffs Arthur J. Gallagher & Co., a Delaware corporation, and Arthur J. Gallagher &

2   Co. Insurance Brokers of California, Inc., a California corporation (collectively, "Plaintiffs" or

3   the "Company"), for its First Amended Complaint against Defendants Edgewood Partners

4   Insurance Center ("EPIC"), Dan R. Francis, John G. Hahn, Andrew ("Wally") Brown, Jr., Brian

5   F. Quinn, Neil R. Cohn, Carolann Cohn, Michael J. Brown, Stephen Hause, Laura J. Wick,

6   George J. Petty, James C. Halbleib, Laurinda ("Laurie") A. Martin, Eric Chua, Linda Soo Hoo,

7   Robert E. Dutto, Susan M. English, Don J. Johnson, Allen L. Amos, Shandranette Middleton

8   (also known as Shandranette Pulliam), William ("Bill") Phillips, Jr., Dirck ("Rick") R. Stinson,

9   Robert ("Bob") D. Ellsworth, Robert H. Watkins, and Paul H. Wagener, (collectively, the

10  "Individual Defendants") (collectively with EPIC, the "Defendants") states as follows:

## I.   NATURE OF ACTION

12    1.    This action stems from EPIC's illegal raiding of Plaintiffs' employees and the

13  associated theft and use of Plaintiffs' confidential data to unfairly compete and steal millions of

14  dollars of business.  EPIC's actions are ongoing.  This Second Amended Complaint seeks

15  remedies, including injunctive and monetary relief, for violation of the Computer Fraud and

16  Abuse Act, 18 U.S.C. §1030 *et seq.*, violation of California Penal Code §502, misappropriation of

17  trade secrets, Cal. Civ. Code §3426 *et seq.*, misappropriation of employer property, conversion,

18  breach of written contract, breach of the covenant of good faith and fair dealing, breach of

19  fiduciary duty and breach of the duty of loyalty, tortious interference with contract, tortious

20  interference with prospective business advantage, unfair competition, Cal. Bus. & Prof. Code

21  §17200 *et seq.*, unjust enrichment, and fraud.

22    2.    A fundamental premise of the competitive marketplace is that companies must

23  compete in a fair and ethical manner, working to develop their own products, clients, business

24  strategies, revenues and profits using their own efforts and employees, rather than

25  misappropriating proprietary and trade secret data of others and illegally raiding another

26  company's workforce.

27

28

Case No. C 07 06418-JSW

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

1    3.    To the outside world, including its potential clients and partners, Defendant EPIC

2    touts its purported beliefs in these ethical principles. But EPIC's actions in this case tell a story of

3    a much different company.

4    4.    As a new insurance brokerage firm, EPIC was not content to build its new business

5    the legal way, through proper capitalization of an office, with significant effort placed into hiring

6    lawfully and having its new hires spend the time and effort necessary to build client relationships

7    and client business in an ethical and legal manner. Instead, EPIC and its two most senior

8    executives, Defendants John G. Hahn and Dan R. Francis, proceeded in a manner that violated

9    EPIC's own Code of Ethics which EPIC advertises to the world that it believes in and to which it

10    claims to adhere.

11    5.    The relationship between employer and employee implicitly contains an agreement

12    that the employee will act in good faith and will not act to the detriment of his or her employer.

13    Dishonesty and disloyalty by the employee to his or her employer does great violence to this

14    relationship, and among other harm, deprives the employer of the benefits to which it is entitled

15    in exchange for paying the employee his or her agreed-upon compensation for those periods in

16    which the employee was disloyal.

17    6.    While active officers, senior executives, fiduciaries and/or employees of Plaintiffs,

18    Individual Defendants Wally Brown, Brian Quinn, Michael Brown and Neil Cohn, in concert

19    with EPIC executives Francis and Hahn, surreptitiously carried out their illegal actions in a

20    conscious way so as to cause the utmost damage to Plaintiffs. Among other things, over a period

21    of months and while still actively employed by Plaintiffs, these Defendants – working in close

22    concert with Francis and Hahn – secretly leased spaced and set up EPIC's office in the same

23    complex where Plaintiffs' San Ramon office is located, used their insider's knowledge of

24    employee skills and salaries to illegally solicit and recruit their direct reports away from Plaintiffs

25    and into jobs with Plaintiffs' competitor, and engaged in actions which culminated in the theft

26    and use of Plaintiffs' data to unfairly compete.

27    7.    Defendants purposely chose to announce the first wave of their resignations from

28    Plaintiffs and leave en masse and with no prior notice on Friday, December 7, 2007. They knew

-2-

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

1    that by waiting until the end of the year to resign without notice, they would catch Plaintiffs off-

2    guard, cause the most disruption to Plaintiffs, and inflict the maximum damage to Plaintiffs'

3    business goodwill and client relationships.

4         8.    Within minutes of walking out with no notice in breach of their contractual and/or

5    fiduciary obligations, the Individual Defendants, working in concert with each other, arrived at

6    the EPIC office, and on information and belief, started contacting Plaintiffs' clients and partners

7    and unfairly competing, including through the use of Plaintiffs' confidential and proprietary

8    information and other means.  Defendants engaged in unfair competition by, among other things,

9    on information and belief, attempting to persuade Plaintiffs' customers and clients to switch their

10   business from Plaintiffs to EPIC by falsely representing that EPIC had "purchased" the client's

11   account from Plaintiffs and that Plaintiffs was going to close their San Ramon office in response

12   to the mass departures.

13        9.    At the same time, they actively concealed their actions from Plaintiffs' regional

14   and corporate-level management, making detection of the departures and related actions

15   impossible for Plaintiffs.  While Plaintiffs have yet to discover all of the facts, Defendants

16   committed various illegal acts as alleged herein, including theft and use of property and data,

17   and/or unauthorized access to Plaintiffs' servers and computer media, and/or breach of their

18   fiduciary duty and duty of loyalty, and/or breach of their employment agreements, and/or unfair

19   competition.

20        10.   Defendants Wally Brown's and Brian Quinn's actions were particularly egregious,

21   as they accomplished and facilitated the illegal plan, including the employee raiding and theft of

22   data, while holding the most senior management positions within Plaintiffs' San Ramon office.

23        11.   If Defendants are not restrained from further unfair competition through the acts

24   complained of and ordered to identify, return and cease using the stolen data of Plaintiffs,

25   Plaintiffs will be irreparably harmed and will continue to suffer irreparable loss of their employee

26   base, and to their goodwill, reputation and business.

27

28

## II.  SUBJECT-MATTER JURISDICTION AND VENUE

12.     Jurisdiction of this First Amended Complaint is proper pursuant to 18 U.S.C. § 1030(g), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

13.     Venue is appropriate in this Court pursuant to 28 U.S.C. 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## III.  PARTIES AND PERSONAL JURISDICTION

14.     Plaintiff Arthur J. Gallagher & Co. is a Delaware corporation with its principle place of business in Illinois.  Arthur J. Gallagher & Co. Insurance Brokers of California, Inc., is a California corporation with its principle place of business in California.

15.     Defendant Edgewood Partners Insurance Center ("EPIC") is a California corporation with its corporate headquarters in San Mateo, California, and three other offices in San Ramon, California, Sacramento, California, and Orange, California.

16.     Individual Defendants Dan R. Francis and John G. Hahn are co-founders of Defendant EPIC, seasoned and sophisticated industry executives, and on information and belief, residents of the State of California.

17.     At all relevant times, Individual Defendants Wally Brown, Brian Quinn, Neil Cohn, Halbleib and Hause were officers and fiduciaries of Plaintiff Arthur J. Gallagher & Co. Insurance Brokers of California, Inc.

18.     Individual Defendants are current employees of Defendant EPIC, former employees of Plaintiffs, and on information and belief and the facts currently known, residents of the State of California.  Specifically:

- **The Initiators Of The Conspiracy:** In addition to the EPIC Defendants, Wally Brown, Neil Cohn, Brian Quinn, and Michael Brown.

- **The Individual Defendants Tasked With Carrying Out The Conspiracy**: In addition to the EPIC Defendants, Wally Brown, Neil Cohn, Brian Quinn, and Michael Brown, and Laura Wick.

- Individual Defendants Who Misappropriated, Used, And/Or Deleted Plaintiffs' Confidential and Proprietary Data and/or Engaged in Unfair Competition: In addition to the EPIC Defendants, Wally Brown, Neil Cohn, Brian Quinn, Michael Brown, and Laura Wick, George Petty, Eric Chua, Shandranette Middleton, Jim Halbleib, Laurie Martin, Stephen Hause, Robert Watkins, Allen Amos, Rob Dutto, Robert Ellsworth, Don Johnson, and Paul Wagener.

-4-

SECOND AMENDED COMPLAINT OF A.J. GALLAGHER & CO., INC.; DEMAND FOR JURY TRIAL

- **Individual Defendants Who Breached Their Contractual And/Or Fiduciary Obligations And/Or Duty of Loyalty To Plaintiffs:** <u>Wally Brown</u>, <u>Brian Quinn</u>, <u>Neil Cohn</u>, <u>Carolann Cohn</u>, <u>Michael Brown</u>, <u>Stephen Hause</u>, <u>Eric Chua</u>, <u>Shandranette Middleton</u>, <u>Allen Amos</u>, <u>Robert Ellsworth</u>, <u>Rob Dutto</u>, <u>Susan English</u>, <u>Jim Halbleib</u>, <u>Don Johnson</u>, <u>Laurie Martin</u>, <u>William Phillips</u>, <u>Rick Stinson</u>, <u>Linda Soo Hoo</u>, <u>Paul Wagener</u>, and <u>Robert Watkins</u>.

19.     Each of the Defendants have willfully aided and abetted each of the other Defendants in the wrongful concerted action described herein, or acted with or in furtherance of that action, or assisted in carrying out its purposes alleged in this First Amended Complaint.

20.     Defendants, and each of them, are individually sued as co-conspirators in the wrongful conduct complained of, and the liability of each arises from the fact that each has engaged in all or part of the improper acts, plans, schemes, conspiracies, or transactions complained of herein.

21.     Defendants, and each of them, are individually sued as agents of one another, and in doing the things alleged herein, each of the Defendants acted within the course and scope of their agency, and with the permission and consent of each of the other Defendants.

## IV.  FACTUAL ALLEGATIONS

22.     The Individual Defendants, who left *en masse* to join EPIC, consisted of the San Ramon Office Heads, the HR Manager/ Office Manager, the Head of Technology, Producers and key support staff:

(a)     <u>Office Heads, Wally Brown and Brian Quinn</u>, the Area Chairman and Area President of Plaintiffs' San Ramon office, respectively, were responsible for leading Plaintiffs' San Ramon office.  As the heads of the office, Brown and Quinn not only functioned as Producers, maintaining their own client accounts, but also managed and supported the other Gallagher San Ramon sales groups and made executive management decisions on behalf of Plaintiffs' San Ramon office.

(b)     <u>Human Resource and Office Manager Laura Wick</u>, was an approximately 12 year employee of Plaintiffs.  As a long standing employee, Wick had developed relationships with Plaintiffs' employees in the San Ramon office and knowledge of confidential HR

SECOND AMENDED COMPLAINT OF A.J. GALLAGHER & CO., INC.; DEMAND FOR JURY TRIAL

1  information of Plaintiffs, including sensitive data regarding employee skills, responsibilities, and

2  compensation.

3        (c)    Systems Administrator George Petty was a six-year employee of Plaintiffs

4  and managed all of Plaintiffs' San Ramon technology systems, network, and computers.

5  Other Management: Linda Soo Hoo, Area VP – Managerial, was a sixteen-year employee and

6  member of Plaintiffs' San Ramon management team.

7        (d)    Producers (some of whom are also Officers of Plaintiff): Producers Allen

8  Amos, Neil Cohn, Rob Dutto, Robert Ellsworth, Susan English, Jim Halbleib, Steve Hause, Don

9  Johnson, Bill Phillips, Paul Wagener functioned as the head of their sales group.  Producers have

10  the initial and primary contact with actual and prospective clients, and are responsible for

11  procuring and negotiating sales and maintaining client relationships.

12        (e)    Account Executives: Account Executives, such as Michael Brown (son of

13  Wally Brown), Eric Chua, Laurie Martin, Rick Stinson, and Robert Watkins, assisted Producers

14  in maintaining the client relationship, attended meetings with actual and prospective clients, and

15  oversaw the performance of work performed on client accounts.

16  **As A Leading Provider Of Insurance Products And Services, Plaintiffs Maintain And
Diligently Protect Its Proprietary Information And Employee And Customer Relationships**

17

18        23.    Arthur J. Gallagher & Co., Inc. the parent company of the Gallagher entities, was

19  founded in 1927 to provide services worldwide in the area of risk management and general

20  insurance brokerage services, managing the assets of companies, providing insurance, and

21  furnishing similar services in areas of risk management.

22        24.    Plaintiffs' breadth and depth of experience in selling insurance products sets it

23  apart from its competitors.  Plaintiffs provide a national platform for carriers, which is unique

24  because of their size, expertise, proven track record and accumulated goodwill.  Through their

25  own efforts, Plaintiffs have invested substantial time and money in developing, maintaining, and

26  protecting substantial confidential, proprietary, and/or trade secret information about the

27  insurance brokerage and risk management industry, including, but not limited to:

28

- Lists of clients and prospective clients, including special customer matters like their interests, needs, risk factors, customer purchasing patterns, the structure, conditions and extent of customers' existing insurance coverages, customer renewal or expiration data, customer concerns, customer's history of claims, and key contacts;

- Highly sensitive account details regarding existing clients of Plaintiffs, including business records, customer file documents, pricing information, and sales plans;

- Special business relationships with vendors, agents and brokers;

- Plaintiffs' financial matters, including pricing and profit margins, commissions and/or fees;

- The existence of any premium accounts, commission rates, and risk management service arrangements, their loss histories, and other data showing the particularized insurance requirements and preferences of the accounts;

- Business, management and personnel strategies;

- Criteria and formulae used by Plaintiffs in pricing insurance products and claims management, loss control, and information management services;

- The structure and pricing of insurance packages and products that Plaintiffs have negotiated with various underwriters;

- Confidential strategies and business plans to market Plaintiffs' services, create new products and bring value to its clients; and

- Selective personnel information and data, including compensation structure, performances, relative strengths and weaknesses, assigned customer accounts, and related employee information.

25.    Plaintiffs' non-public confidential and proprietary information has independent economic value because it is not known to either its competitors or within the insurance agency and brokerage business. This information is provided to Plaintiffs, developed by Plaintiffs and utilized by Plaintiffs for the purpose of allowing Plaintiffs employees to effectively and efficiently sell, deliver and manage its services and products.

26.    Plaintiffs have spent many years and have invested substantial resources developing their confidential and commercially valuable information and have invested considerable amounts of time, money and effort in developing and maintaining solid relationships with, and the goodwill of, each of their employees, participating clients and potential clients. Plaintiffs enjoy long-standing, prosperous relationships with their clients. If, as happened in this case, Plaintiffs' data was misappropriated and used by a competitor, it would provide the

1  competitor with value and an unfair advantage that would allow the competitor to unfairly raid

2  Plaintiffs' specific employees, immediately identify actual and potential customers and know the

3  history and specific details of the customers' business relationship with Plaintiffs, unfairly bid for

4  business against Plaintiffs, unfairly move business away from Plaintiffs and unfairly gain

5  knowledge of the procedures which result in Plaintiffs' delivery of excellent services and

6  products.

7      27.    In the course of serving Plaintiffs' clients, the Individual Defendants gained access

8  to Plaintiffs' most confidential, proprietary and trade secret information.  In his resignation letter,

9  Defendant Neil Cohn conceded what was true for him and the other Individual Defendants – that

10  they were exposed and provided access to Plaintiffs' confidential and proprietary information.

11      28.    Plaintiffs take reasonable and appropriate measures to safeguard their non-public

12  commercially valuable information.  For example, through its Handbook, Code for Business

13  Conduct and Ethics, Executive Agreements, Stockholder Agreements, and other corporate

14  policies, Plaintiffs require that their confidential, proprietary, and trade secret information be kept

15  strictly confidential by its current and former employees.

16  - Code for Business Conduct and Ethics: For the purposes of protecting its confidential,
      proprietary, and trade secret information, Plaintiffs require all employees, including the
17    Individual Defendants, to acknowledge its Code for Business Conduct and Ethics
      Agreement, which contained, among others, the following provisions: protection of its
18    confidential, proprietary, and trade secret information; protection and proper use of
      company assets; prohibition against conflicts of interest with Plaintiffs; and prohibition
19    against the theft of corporate opportunities.

20  - Executive Agreements:  For the purposes of protecting its confidential, proprietary, and
      trade secret information, Plaintiffs required substantially all of its executives, including
21    Defendants Brian Quinn, Neil Cohn, Michael Brown, Jim Halbleib, Laurie Martin, Robert
      Dutto, Rick Stinson, Allen Amos, Don Johnson, Robert Watkins, Susan English, William
22    Phillips, Jr., and Paul Wagener, to sign an Executive Agreement, which contained, among
      others, the following provisions: an express acknowledgement of their fiduciary
23    obligations, protection of confidential, proprietary, and/or trade secret information, a
      fourteen-day notice period upon termination of employment (for the purpose of ensuring a
24    smooth transition and the protection of trade secret information), an obligation to return
      data upon termination of employment, and a post-employment agreement not to solicit
25    Gallagher employees and clients.

26  - Non-Competition Agreement (Pursuant To A Sale of Business):  For the purposes of
      protecting its confidential, proprietary, and trade secret information and as a part of a sale
27    of business, in acquiring Defendant Wally Brown's former company, Gallagher entered
      into a non-competition agreement with Wally Brown, which included, among others, an
28    agreement not to engage in post-employment competition or solicitation for a period of

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

1    time necessary to protect Gallagher's trade secrets.

2    •  Stockholder Agreement: For the purposes of protecting its confidential, proprietary, and trade secret information and for the purposes of retaining key employees, Gallagher

3    entered into Stockholder Agreements with <u>key employees</u>, including <u>Wally Brown, Brian Quinn, Neil Cohn, Carolann Cohn, Laura Wick, Jim Halbleib, Steve Hause, Carol Cohn,</u>

4    <u>Linda Soo Hoo,</u> and <u>George Petty.</u> The grants were expressly conditioned on Gallagher's employees faithfully and loyally carrying out their duties, and not engaging in acts

5    "harmful to the interests of the Company." Such harmful acts defined in the Stock Option Plan included soliciting existing and prospective Gallagher clients for whom the

6    employees performed work on behalf of Gallagher within the two-year period preceding the employees' termination, if doing so would require the employees to "reveal, make

7    judgments upon, or to otherwise use or divulge any confidential information or trade secrets of the Company." The Plan further defines "harmful acts" to include the

8    solicitation and recruitment of Gallagher's employees.

9
10

    **EPIC Requires Its Employees To Execute Producer Agreements Containing Substantially The Same Prohibitions In the Gallagher Agreements That EPIC Induced The Individual Defendants To Violate**

11    29.    In hiring Producers from Plaintiffs, EPIC required them to execute EPIC Producer

12    Agreements as a term and condition of their employment. Through its own Agreements, EPIC

13    concedes that: (a) when it comes to EPIC data, EPIC defines and considers the very same

14    categories of data that Defendants misappropriated from Plaintiffs and, in at least some instances,

15    used to unfairly compete to constitute EPIC proprietary, trade secret information; (b) EPIC holds

16    its own employees to the same contractual non-solicitation of employee covenants as Gallagher;

17    (c) EPIC contractually requires its employees to owe their undivided loyalty and efforts to EPIC

18    while employed by EPIC, just as Gallagher did for the Individual Defendants at issue; (d) EPIC

19    contractually binds its own employees to the identical post-employment restrictions on soliciting

20    customers of EPIC as Gallagher does – because such restrictions are necessary and critical to

21    protecting both companies' confidential and proprietary data post-employment; and (e) where

22    these provisions are violated by EPIC employees, EPIC agrees that immediate injunctive relief is

23    warranted.

24    **Newly-Established EPIC Seeks To Become A Direct Competitor Of Plaintiffs**

25    30.    In or around June 2007, Trident IV, L.P., a private equity fund managed by Stone

26    Point Capital, invested $100 million dollars to establish EPIC as an insurance brokerage

27    providing retail property, casualty, and employee benefits products and services.

28

1    31.     In July 2007, EPIC acquired Calco Insurance Brokers & Agents Inc. ("Calco") to

2    serve as its statewide base of operations. With this acquisition, EPIC acquired some of the

3    business relationships with insurance companies it needed to begin functioning as an active

4    brokerage. In this regard, EPIC seeks to compete, and is already directly competing with,

5    Plaintiffs.

6    32.     In June of 2007, EPIC issued a press release announcing it would acquire Calco in

7    July ("Edgewood Partners, a new California Insurance Brokerage Firm Announces Agreement To

8    Acquire Calco Insurance Agents and Brokers, Inc." – June 20, 2007, available at

9    www.calco.com). The Press Release notes that Defendant Dan Francis, who now runs EPIC,

10   spent nearly 10 years at Calco. On Calco's Website, Calco advertises that "Calco shares the

11   Ethics of Michael Josephson, Founder of the Josephson Institutes of Ethics." This Webpage

12   begins with the following quote from Warren Buffet:

13   **In looking for people to hire, look for three qualities: integrity,
     intelligence and energy.  And if they don't have the first, the**
14   **other two will kill you.**

15   The cited commentary from Josephson notes that "Some people do believe that business is

16   basically an amoral survival-of-the-fittest enterprise where traditional ideas of right and wrong

17   are irrelevant and all that really matters is what works....."

18   33.     EPIC's newly-established website, available at http://www.edgewoodins.com,

19   accurately describes its business practices: "Introducing Edgewood Partners Insurance Center

20   (E.P.I.C.). We put no limit on how far, how fast, how close to the edge we go to identify your

21   insurance requirements and secure the coverage you need."

22   **EPIC Enters Plot To Raid Plaintiffs' Employees And Customers And Enters Into a
     Conspiracy With Wally Brown, Michael Brown, Brian Quinn, Neil Cohn and Others**
23

24   34.     Beginning in or around mid-June 2007, EPIC, by and through Defendants Francis

25   and Hahn, began communicating with certain Individual Defendants, including Plaintiffs'

26   Officers and Area Presidents Wally Brown and Brian Quinn, and also Michael Brown, regarding

27   employment with EPIC of not only the Browns and Quinn, but also, Plaintiffs are informed and

28

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

1   believe, their direct reports at Gallagher who, Plaintiffs are informed and believe up to this point,

2   had never expressed interest in seeking employment with EPIC and/or leaving Plaintiffs' employ.

3         35.    Plaintiffs are informed and believe, and thereupon allege, that EPIC thereafter

4   entered into an agreement with Defendants Wally Brown, Michael Brown, Brian Quinn and Neil

5   Cohn – and over time additional Individual Defendants including Wick– that they would secretly

6   accept employment with EPIC, with the goal being to wait to announce their resignation for

7   several weeks and/or months.  During this period, working in concert with each other and certain

8   of the other Individual Defendants, they would actively prepare to and actually compete against

9   Plaintiffs, while continuing to work for Plaintiffs.  A key aspect of the plan was that for several

10   important strategic reasons, the Defendants would carefully coordinate the timing of the

11   resignations, and then announce these resignations en masse in waves (for specific tactical

12   reasons), and simultaneously walk out of Plaintiffs.

13         36.    During this period, they would use their insider's knowledge of employee skills,

14   their employment terms and conditions, and other of Plaintiffs' proprietary information to recruit

15   their most valued employees away from Plaintiffs and into directly competing jobs with what

16   would become EPIC's newly established San Ramon office.  Among other things, they would

17   need to convince the targeted employees to leave Plaintiffs' employ while accounting for

18   employee compensation, earning cycles and employees' specific relationships with Plaintiffs and

19   their clients, physically lease space for EPIC, set up its IT systems, Human Resources and other

20   functions, lay the groundwork with Plaintiffs' best clients to convince them to switch their

21   business to EPIC, and take Plaintiffs' data.  Defendants also decided to wait to carry out the mass

22   resignations and walk-outs until the period in the year when these experienced industry

23   executives believed they would inflict the most damage on Plaintiffs and maximize their chances

24   to convince Plaintiffs' clients to switch to EPIC.

25         37.    Plaintiffs are informed and believe that thereafter, Wally Brown, Michael Brown,

26   Brian Quinn and Neil Cohn, with the knowledge, encouragement from and assistance of EPIC

27   executives Francis and Hahn, began to bring other of the Individual Defendants into the plan and

28   conspiracy.  This included pre-announcing their departure to specific employees of Plaintiffs, and

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

1    also included, as Defendant Wally Brown did, identifying for EPIC Plaintiffs' top producers and

2    other key employees Brown wanted to ensure EPIC hired.

3                                **Anatomy of Illegal Employee Raiding:**
                    **The Case Study of Gallagher Employee Laura Wick Is Instructive**

4

5           38.     For the last ten years, Defendant Laura Wick worked out of Plaintiffs' San Ramon

6    office, most recently serving as the functioning HR and office manager for that office.

7           39.     Prior to October 17, 2007, Defendant Wally Brown, while still actively employed

8    by and an officer of Plaintiff, informed EPIC about Wick, and did so with the intent that EPIC

9    make her a job offer.  Thereafter, on information and belief, based on the tip from Brown, EPIC

10   supplied Wick's name to a recruiter and instructed the recruiter to solicit Wick for employment

11   with EPIC.  In the meantime, Brown, while still employed by and serving as an officer of

12   Plaintiff, informed Wick he was discussing employment with EPIC, that he may leave Plaintiffs'

13   employ to join EPIC, and that if he did, he hoped employees of Plaintiffs would join him. Brown

14   told Wick this knowing she was in charge of the Human Resources function for the San Ramon

15   office and would spread the word.  From these and other conversations, Brown made clear that he

16   wanted her to be his office manager at EPIC and resign from Plaintiffs for the purpose of setting

17   up the office in advance of the mass resignations that were going to follow.

18          40.     The EPIC Defendants then offered Wick a compensation package which they

19   knew exceeded her current salary level at Gallagher and would have the intended effect of

20   convincing her to leave Plaintiffs' employ.  In fact, both Brown and Wick admit they discussed

21   Wick's employment with EPIC while still employees of Plaintiffs, and while Brown was still an

22   officer and fiduciary.

23          41.     As an experienced employee with over a decade at the company, Wick clearly

24   understood the end goal of this plan and scheme was to inflict the maximum damage on Plaintiffs

25   in several ways, with the prize being to take as much of Plaintiffs' business as quickly as possible

26   once the resignations were announced.

27          42.     Thereafter, Wick – while still employed by Plaintiffs – met with certain EPIC

28   employees, and obtained more specific information about the plan that Wally Brown brought her

-12-

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

1   into.  She subsequently discussed with Brian Quinn the fact that several current employees of

2   Plaintiffs had secretly signed on to leave with Wally Brown, Brian Quinn, Neil Cohn and the

3   others.

4          43.    Together, Wick, Wally Brown and Brian Quinn concocted a cover story and plan

5   designed to avoid raising Plaintiffs' suspicions as to why Wick, a longstanding and valued

6   employee of Plaintiffs, would simply quit.  Part of the plan was that Wick would resign directly to

7   Wally Brown and Brian Quinn – her co-conspirators and the two executives in charge of

8   Plaintiffs' San Ramon office and operations.

9          44.    Thus, on October 17, 2007, after prior meetings with Defendant Hahn and on

10  information and belief other EPIC executives, and pursuant to carefully planned out timing

11  agreed to after consultation with Wally Brown, EPIC, and others, and with no prior notice to

12  Plaintiffs, Wick submitted a written resignation letter, addressed to Wally Brown and Brian

13  Quinn, with a false cover story as follows:

14          Dear Brian and Wally,

15          It is with great reluctance I submit my resignation to the both of you.  My last day with
            Gallagher will be Friday, November 2nd.  If you feel you need me longer in order to
16          transition my job duties, I will be more than willing to extend my last day until the
            following week.
17
            **I have decided to take some time off until the first of the year to spend time with my
18          family.**  I am hoping if I decide to return to Gallagher in 2008 that there will be an open
            position for me.
19
            Thank you for everything that both of you have done for me.  I can't tell you how
20          wonderful it has been working out of the Pleasanton office for the past ten years.  I wish
            you both the best.
21

22  See Exhibit A hereto.

23          45.    Wick's proffered reason for resigning – that she had purportedly decided to take

24  some time off until the first of the year to spend time with her family – was not truthful and

25  designed to allay any suspicions and conceal the fact that she was in fact going to establish

26  EPIC's competing San Ramon office which she knew would be staffed with Wally Brown, Brian

27  Quinn, Neil Cohn, and many other of Plaintiffs' employees, all of whom were waiting for her to

28  get the office up and running.

1    46.    Thus, Wally Brown and Brian Quinn, who ran the San Ramon office, messaged up

2    the corporate chain the false excuse they concocted with Wick concerning the reasons for her

3    resignation, and succeeded in shielding from Plaintiffs any mention of her joining EPIC.

4    47.    At the time Wick submitted her resignation letter, Wally Brown understood, based

5    on his conversations with Wick and EPIC, as well as his own actions, that Wick was going to

6    work for EPIC in advance of other planned out departures, but concealed his knowledge from the

7    Company for whom he was then serving as an officer.

8    48.    Between October 17, 2007 and November 2, 2007, Wick remained an active

9    employee of Plaintiffs, who continued to work under Wally Brown and Brian Quinn in Plaintiffs'

10    San Ramon office and receive her Gallagher compensation.  Although she was now an active part

11    of the conspiracy, and in fact the first one out of Plaintiffs who was specifically tasked to set up

12    the advance operations for EPIC, at no time did she inform Plaintiffs of the ongoing disloyalty of

13    the Individual Defendants and the fact that they were actively working against Plaintiffs' interests

14    while remaining employed.  In fact, this longstanding employee of Plaintiffs and industry veteran,

15    who clearly understood the goal of the conspiracy was to harm and damage Plaintiffs, now shifted

16    her loyalties from Plaintiffs to EPIC.

17    49.    On Wednesday, October 24, 2007, during work hours and while drawing a salary

18    from Plaintiffs, Wick met with EPIC to discuss her employment with EPIC.

19    50.    Plaintiffs are informed and believe, and thereupon allege, that with the knowledge,

20    consent and participation of Defendant Wally Brown, Quinn, EPIC, Francis and Hahn, Wick, in

21    connection with EPIC and her co-conspirators, secretly was involved in leasing space for EPIC's

22    San Ramon office at Bishop Shop 8 Business Center – located on Executive Parkway in San

23    Ramon – in the same complex as Plaintiffs' San Ramon office, which is located at Bishop Shop 3.

24    51.    Plaintiffs are informed and believed that Wick discussed EPIC with other of

25    Plaintiffs' employees in the context of setting the stage for them to move over to EPIC after she

26    and the officers announced.

27    52.    Wick left Plaintiffs' employ with the best wishes of Plaintiffs' management on

28    November 2, 2007.

53.    On November 5, 2007, Wick's husband emailed family members from his private

Web email account about family Thanksgiving plans, in relevant part, as follows:

> Laura's job situation has changed and will make it hard for her to
> come. **Her boss and the rest of the sales people are leaving
> Gallagher to go to a competitor**. Laura also made the decision to
> go, and is now home for two weeks before starting with the new
> company. **Essentially, her job is to start the new branch office
> and set up the computers, facilities, and manage HR issues
> before the rest of the teams quits and joins her.** That week of
> Thanksgiving is when she needs to start her new job… It will be a
> stressful time for her and trying to manage a cross country trip at
> the same time would be difficult.

See Exhibit B hereto.

54.    Wick's mother-in-law responded with a kind email, and unaware Wick had

already departed Plaintiffs' employ, added Wick as a recipient to this email at her Gallagher

corporate email account.  At the time, there was nobody working at the San Ramon office of

Plaintiffs outside the conspiracy who would have seen this email and learned of the conspiracy.

55.    These facts underscore how important timing was to the conspiracy.

56.    Upon her resignation, nobody in the San Ramon office, including Wick, or

Defendants Wally Brown and San Ramon IT Manager George Petty, contacted Plaintiffs'

corporate IT Department and requested that her remote access to her corporate email account be

deactivated.  Nor did Petty deactivate Wick's access at the San Ramon office level.  Thus, Wick's

Gallagher Lotus Notes access, enabling her to remotely log on to her corporate email account,

was not disabled until November 9, 2007, despite the fact that her resignation was effective

November 2, 2007.

57.    When Wick discovered that her mother-in-law had sent the email to her Gallagher

corporate email account, she panicked.  She contacted then-current Gallagher employee and

Defendant Carol Cohn, and instructed Cohn to log into her Gallagher-issued email account using

Wick's login information, locate the email, manually delete it from the In Box, and then manually

delete it from the Trash box.  Wick believed that, by Cohn doing this, the email would be

destroyed, and Plaintiffs would not be able to discover the email or its contents.

1    58.    Defendant Cohn, who did not have the authority to access Gallagher's computer

2    systems in this manner or for the purpose of destroying evidence or otherwise deleting the email

3    at issue, carried out Wick's instruction and in fact logged onto Plaintiffs' computer systems and

4    deleted the email from Wick's In Box and Trash Box.

5    59.    As a result of Wick's and Cohn's actions, Plaintiffs were prevented from

6    discovering Defendants' plans and taking measures to prevent Defendants from inflicting the

7    subsequent harm upon Plaintiffs that occurred.

8    60.    On or about December 8, 2007, following the first wave of resignations and walk-

9    outs set forth below, Wick, who had resigned from Plaintiffs effective November 2, 2007, was

10    tipped off that Plaintiffs were looking into the December 7 resignations, and that some of her

11    former coworkers would be present in the San Ramon Gallagher office.

12    61.    Wick attempted to return to Plaintiffs' San Ramon office and gain access for

13    herself and other Defendants.  For many reasons, including the fact that Wick had no reason to re-

14    enter Plaintiffs' office or escort anyone else into that office, and because Wick did not contact the

15    appropriate Plaintiffs' management in connection with her attempt to gain access to Plaintiffs'

16    San Ramon office, but rather tried to finesse it through a non-management employee and former

17    coworker, Plaintiffs are informed and believe and thereupon allege that she had an unlawful intent

18    in wanting to gain access to Plaintiffs' San Ramon offices.

19    **The Overall Illegal Employee Raiding**

20    62.    Plaintiffs are informed and believe, and thereupon allege, that in connection with

21    the illegal employee raiding, the following are some of the actions that the Individual Defendants

22    Wally Brown, Michael Brown, Cohn and Quinn (with the knowledge, aid and encouragement of

23    EPIC, Hahn and Francis) engaged in while they were all still active employees of Plaintiffs and

24    thereafter:

25    (a)    targeted specific employees of Plaintiffs based on their knowledge of the

26    individuals' skills, client involvement, pending deals and current compensation;

27    (b)    informed EPIC of the identity of top producers and other key employees in

28    Plaintiffs' employ;

-16-

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

1          (c)    used private Web accounts, cellular telephones and home telephones to

2    communicate concerning the conspiracy, for the purpose of concealing their actions;

3          (d)    participated in private meetings, on site and outside of Plaintiffs' offices, to

4    discuss various facets of the conspiracy;

5          (e)    pre-announced their decision to resign to certain current employees of

6    Plaintiffs;

7          (f)    met with EPIC employees and other of Plaintiffs' employees to coordinate

8    and discuss the substance and logistics of the hiring and plans to move business from Plaintiffs to

9    EPIC;

10          (g)    during working hours, while being paid by Plaintiffs, performed work for

11    EPIC, including work related to securing office space and equipment;

12          (h)    misled Plaintiffs' employees whom they wanted to join EPIC into

13    believing their employment with Plaintiffs was not secure, when such was not the case;

14          (i)    facilitated mass "interviews" of Plaintiffs' employees with EPIC –

15    including Wick, Francis and Hahn – over the weekend of December 8 and 9, and immediately

16    prepared offer letters knowing and/or facilitating that these employees would accept the offers on

17    the spot and resign without notice to Plaintiffs in violation of their contractual obligations;

18          (j)    arranged for Defendant Wick to actively interview on behalf of EPIC the

19    same employees she managed in the Human Resource capacity of Plaintiffs' San Ramon office

20    weeks earlier;

21          (k)    promised to pay Plaintiffs' employees who left for EPIC in a manner that

22    accounted for their current Gallagher salaries and anticipated increases;

23          (l)    for those employees with two week notice and other contractual provisions,

24    encouraged and facilitated the breach of and interference with these contractual provisions;

25          (m)    instructed and facilitated Plaintiffs' employees' delaying for weeks and

26    months the notice to Plaintiffs of their intent to join EPIC so that Plaintiffs' employees could

27    resign *en masse* without notice. For example, Defendant Cohn did not announce his resignation

28    until weeks after agreeing to join EPIC and discussing the EPIC situation with his co-officers; and

1    (n)    represented to individual employees of Plaintiffs that their co-workers were

2  already "on board" and had agreed to join EPIC.

3  **Transformation Into Faithless Servants:**

**Having Decided To Join EPIC, But Prior To Announcing Their Resignations, The**

4  **Individual Defendants Engage In Acts of Dishonesty and Disloyalty**

5    63.    By on or about November 1, 2007, Plaintiffs are informed and believe that Wally

6  Brown, Michael Brown, Brian Quinn, Neil Cohn, Laura Wick, and others knew, through careful

7  coordination and planning, that each of them and many of the other Individual Defendants and

8  other employees of Plaintiffs would soon be leaving Plaintiffs' San Ramon workforce for EPIC.

9  Nevertheless, not only did Defendants fail to alert Plaintiffs' management outside the office level

10  – which was managed by Defendants Brown and Quinn, but the Individual Defendants engaged

11  in acts of dishonesty, disloyalty and breaches of their fiduciary duty, including, on information

12  and belief, the following:

13    (a)    Wally Brown and Michael Brown pre-announced their departure to EPIC

14  to then-current customers of Plaintiffs;

15    (b)    Wally Brown and Brian Quinn allowed Plaintiffs to proceed with a seven-

16  year above-corporate-guideline deal to lease 19,703 square feet, consisting of two floors and

17  sufficient space for 102 employees, even though the branch only had 76 current employees, for

18  the Pleasanton/San Ramon office, and would be left with only approximately 30 employees post-

19  conspiracy.

20    (c)    Wally Brown and Brian Quinn convinced corporate management to incur

21  substantial renovation costs in the new building, including furniture, improvements, IT and

22  Teledata, insisting on many above-standard items and costs.  On information and belief, these

23  requests were made with malice aforethought and as part of Defendants' conspiracy to harm

24  Plaintiffs, by increasing costs of the move when they knew their plan to raid Plaintiffs' employees

25  and customers.

26    (d)    Several Individual Defendants, including but not limited to, Wally Brown,

27  his son Michael Brown, Neil Cohn, and Brian Quinn, substantially increased their expenses and

28

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

1   car allowance expenditures during the period after deciding to join EPIC, but before tendering

2   their resignation to Plaintiffs.  By way of example only:

3                        (i)     Wally Brown increased client entertainment expenses in the

4   short month of November by 2.85 times what he spent in October, 2.26 times what he spent in

5   September, and 9.6 times what he spent in August; not surprisingly, these funds were expended

6   entertaining specific clients who in early December, he and his conspirators immediately

7   attempted to (and in many cases did) transfer over to EPIC following the mass resignations and

8   walk-outs;

9                        (ii)    Neil Cohn increased client entertainment expenses in

10  November by 12.55 times what he spent in October, 31.7 times what he spent in September and

11  10.5 times what he spent in August.  Cohn also received maintenance and put new tires on what

12  appears to be two separate cars for a total of $3,249.38 in car maintenance expenses in August

13  2007.  Without Plaintiffs' authorization, Cohn also devoted substantial amounts of the business

14  time he promised to devote to Plaintiffs performing work, through Plaintiffs' computer systems

15  and during working hours, for Hannah Nicole Vineyards, Inc., a family investment for which he

16  appointed himself the President and CEO;

17                       (iii)   Michael Brown made sure to buy and charge Plaintiffs for

18  new tires (for $1,390.36) for his car on October 18, 2007, at which time, on information and

19  belief he had already decided to resign to go to EPIC in December;

20                       (iv)    Brian Quinn charged Plaintiffs for maintenance for his car

21  in November 2007, at which time he knew he would be leaving Plaintiffs' employ in a few

22  weeks.

23       64.    The Individual Defendants continued to wine and dine the specific clientele of

24  Plaintiffs whom they planned to transfer from Plaintiffs to EPIC.  During this period, when they

25  had already decided to leave for EPIC, with regard to at least some of Plaintiffs' customers, the

26  Individual Defendants pre-announced their intention to depart from Plaintiffs, and Plaintiffs are

27  informed and believe Defendants intended that these and other clients would switch their business

28  to EPIC in the immediate wake of their unannounced departure.  For example, prior to departing

-19-

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

1    Plaintiffs' employ, Defendant Brian Quinn expressly told clients he planned to depart and

2    "solicited their feedback."

3         65.    Plaintiffs are informed and believe, and thereupon allege, that Wally Brown, Brian

4    Quinn and others devised this scheme as one of several ways to communicate to top customers of

5    Plaintiffs that they expected the customers to follow them, since, at the time these

6    communications were engaged in, the Individual Defendants who participated in these

7    conversations had in fact already finalized and accepted their employment packages with EPIC.

8    As shrewd executives, officers, and fiduciaries of Plaintiffs, they also believed that if challenged,

9    they could craft a cover story about what they actually told their then current Gallagher clients.

10   **The Former Employees of Plaintiffs Copy, Take Without Permission, and Delete Mass**
     **Amounts Of Plaintiffs' Data, Information, And Documents – And Go To Great Lengths To**
11   **Cover Up Their Actions**

12        66.    The facts known to date give rise to the need for injunctive relief.  As of the date

13   this First Amended Complaint was filed, Defendants still possess data and property belonging to

14   Plaintiffs.

15        67.    Plaintiffs are informed and believe, and thereupon allege, that Defendant George

16   Petty, who was in charge of IT and computers systems in Plaintiffs' San Ramon office, was

17   actively involved in the theft of data and related cover up.

18        68.    Plaintiffs are informed and believe, and thereupon allege, that their data was

19   misappropriated by several different Defendants, out of multiple offices of Plaintiffs, through

20   various means, including:

21             (a)    data was stolen off of desktop computers through the use of stand alone

22   external storage devices connected at times when mass access and copying of data occurred;

23             (b)    data was misappropriated off of desktop computers through the use of

24   burning CDs and through the use of CD-burning software; and

25             (c)    data was misappropriated by scanning documents into the San Ramon

26   office scanner, which pushed the scanned files to a folder on the San Ramon server, and then the

27   data was removed off of the San Ramon servers;

28

1    Plaintiffs' investigation continues and Plaintiffs are informed and believe they will discover

2    additional acts of theft as soon as their investigation is complete.

3        69.    To date, Plaintiffs are informed and believe that the following Individual

4    Defendants accessed in a manner consistent with copying and/or copied, and/or subsequently

5    used for EPIC's benefit, Plaintiffs' confidential and proprietary data without Plaintiffs'

6    permission or knowledge:

7        (a)    <u>Neil Cohn</u>: <u>December 7, 2007</u>: In his resignation letter, Cohn set forth

8    various affirmative measures he claimed to have undertaken with the assistance of Defendant

9    George Petty "[s]o there is no question concerning the retention by me of any confidential or

10    proprietary data of Gallagher."

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

Case No. C 07 06418-JSW

1          (i)     October 17, 2007: Two days after meeting with EPIC

2   regarding his potential employment, Cohn burned 6 CDs consisting of almost 5,000 files of

3   Plaintiffs' proprietary data relating to Plaintiffs' clients, and did not disclose the existence of

4   these 6 CDs or return them to Plaintiffs until January 8, 2008— almost 3 weeks after Plaintiffs

5   filed this action.

6          (ii)     November/December 2007: Cohn obtained blank CDs on

7   multiple occasions, on information and belief, to copy to these CDs additional proprietary data of

8   Plaintiffs, although he had already agreed to join EPIC. These CDs have not been returned.

9          (iii)     December 5, 2007: Cohn caused a Geek Squad USB drive

10   to be attached to the hard drive of his work computer; neither the USB drive or the data on it have

11   been returned to Plaintiffs.

12          (iv)     December 6, 2007: Between 6:01:03 a.m. and 6:02:05 a.m.

13   (1 minute 2 seconds), Cohn accessed in a manner consistent with copying approximately 228

14   files/folders containing confidential and proprietary data of Plaintiffs. At least one removable

15   disk was accessed from Cohn's work computer during the same timeframe.

16          (v)     Throughout the rest of the day and into the late night (until

17   12:57 a.m. on December 7, 2007), there were additional removable disk drives and Plaintiffs'

18   proprietary files accessed in a manner consistent with copying.

19          (vi)     December 7, 2007: The date of Cohn's resignation, at

20   approximately 2:17 p.m., a removable disk was accessed on the computer in proximity to 75

21   files/folders containing confidential and proprietary data belonging to Plaintiffs being accessed in

22   a manner consistent with copying.

23          (vii)     Of the specific files accessed in the fashion described above,

24   many were Plaintiffs' client files and data relating to clients who Cohn would solicit for business

25   in the following days on behalf of EPIC.

26          (viii)     Cohn also left Plaintiffs' employ with a Western Digital

27   external hard drive and a thumb drive containing Plaintiffs' data, which was not disclosed prior to

28

1  this lawsuit being filed, and neither the external drive, the thumb drive, nor Plaintiffs' data on

2  them have been returned to Plaintiffs.

3            (ix)    On his final day of employment, Cohn caused his computer

4  to be defragmented, thereby deleting data.

5        (b)    Jim Halbleib: On November 20, 2007, Halbleib, an officer of Plaintiff,

6  resigned without prior notice, walked out and left to immediately work for EPIC; Plaintiffs are

7  informed and believe Halbleib did so knowing his direct report Martin would soon follow him to

8  EPIC.

9            (i)    November 12, 2007: Halbleib rapidly accessed, in a manner

10  consistent with copying, 222 proprietary files of Plaintiffs on his computer within 5 seconds.

11            (ii)    November 13-20 2007:  Additional access to Plaintiffs'

12  proprietary files occurred.

13        (c)    Laurie Martin: On November 26, 2007, Martin resigned without prior

14  notice, walked out and went to work for EPIC.

15            (i)    Between November 1 and November 20, 2007: Martin

16  accessed hundreds of Plaintiffs' proprietary data in rapid succession in a manner consistent with

17  copying.

18            (ii)    November 26, 2007: Between 12:17 p.m. and 12:42 p.m. on

19  her resignation date, Martin accessed several hundred files/folders containing Plaintiffs'

20  proprietary data in rapid succession and in a manner consistent with copying.

21        (d)    George Petty: On December 11, 2007, Petty, along with several other

22  Defendants, resigned with no prior notice and departed for EPIC.

23            (i)    December 5, 2007: Petty purchased and then installed CD

24  burning software on his Gallagher computer.

25            (ii)    Friday December 7, 2007:  Petty was specifically instructed

26  by Plaintiffs' corporate management to preserve the computers and data stored on the computers

27  of the Defendants who resigned earlier that day and any others who might depart.

28

1    (iii)    Friday, December 7, 2007:  Plaintiffs are informed and

2    believe that Petty participated in and/or facilitated Cohn's theft of data, and the subsequent

3    defragmenting of Cohn's computer.

4    (iv)    Sunday December 10-11, 2007: Despite being instructed

5    that management wanted to preserve the data stored on Plaintiffs' computers of any employee

6    who resigned for EPIC, on the date of his resignation and the day before, Petty attached two

7    separate large capacity external hard drives to his Gallagher computer.

8    (v)    Plaintiffs are informed and believe, and thereupon allege,

9    that Petty then engaged in the taking and deletion of Plaintiffs' proprietary data off his company

10    computers.

11    (vi)    Petty admitted in a declaration signed January 3, 2008 that

12    he does in fact possess two large capacity external hard drives and that in connection with his

13    resignation, he did in fact delete his user profiles from the computers assigned to him by

14    Plaintiffs, thereby permanently deleting all data from those computers.

15    (e)    Defendant Eric Chua: On December 10, 2007, Chua resigned without

16    notice along with several other Defendants and immediately went to EPIC and started contacting

17    customers.

18    (i)    December 3, 2007: Chua attached to his work computer for

19    the first time an external USB flash drive.

20    (ii)    December 10, 2007: The morning of his resignation, Chua

21    accessed in a manner consistent with copying approximately 8 files containing Plaintiffs'

22    proprietary data.  Among the files accessed that morning, Chua accessed and copied specific of

23    Plaintiffs' customer files and data relating to customers that Chua would immediately solicit for

24    business that same day on behalf of EPIC.

25    (iii)    The files contain highly confidential data of Plaintiffs,

26    including the effective dates of each client's policy, premiums, renewal revenues, producers,

27    account managers, types of programs, the carriers, "Specs Out" dates, and dates by which quotes

28    are due.

1          (iv)    Chua left Plaintiff' employ in possession of Plaintiffs' data

2  on personal electronic media – a fact he did not disclose to Plaintiffs until after this lawsuit was

3  filed.

4          (v)    After leaving Plaintiffs' employ, Chua deleted Plaintiffs'

5  data from his personal electronic media thereby destroying meta-data related to the taking of the

6  Gallagher data at issue.

7          (f)    Defendant Shandranette Middleton: On December 11, 2007, Middleton,

8  who supported various Producers, resigned without notice along with several other Defendants

9  and immediately began work for EPIC.

10         (i)    December 7, 2007: two business days before her

11  resignation, Middleton attached to her Gallagher computer for the first time an external USB

12  thumb drive.

13         (ii)    In the approximate 53 minutes thereafter, Middleton

14  accessed and downloaded to the thumb drive approximately 238 files containing Plaintiffs'

15  proprietary information.

16         (iii)    Middleton engaged in these actions with the intent to use

17  Plaintiffs' data in connection with her employment with EPIC and in furtherance of competing

18  with Plaintiffs.

19         (iv)    Middleton did not disclose her access and taking of

20  Plaintiffs' proprietary data until after this action commenced.

21         (g)    Robert Watkins: On December 12, 2007 at 8:33 a.m., Watkins sent an

22  email submitting his resignation "effective immediately," with Plaintiffs' laptop still in his

23  possession.

24         (i)    November 27, 2007: Two weeks before his resignation,

25  Watkins accessed in rapid succession and in a manner consistent with copying approximately 689

26  files/folders containing Plaintiffs' proprietary data from his laptop to an external storage device.

27

28

1            (ii)    December 5, 2007:  One week before his resignation,

2    Watkins created and saved onto his laptop 3 Word documents containing approximately 370

3    email addresses of Plaintiffs' clients.

4            (iii)    December 5, 2007:  Watkins accessed in rapid succession

5    approximately 173 files containing Plaintiffs' proprietary data from Plaintiffs' network server,

6    and copied all of those files, including the 3 Word documents, onto computer media and CDs not

7    belonging to Plaintiffs.

8            (iv)    December 12, 2007:  Commencing at 10:26 a.m., nearly two

9    hours after his resignation, Watkins connected his Plaintiffs' assigned laptop to a foreign

10   computer network.

11           (v)    Subsequently, he accessed in rapid succession

12   approximately 621 files/folders containing Plaintiffs' proprietary data on his laptop.

13           (vi)    That same day (December 12), Watkins also burned

14   additional CDs containing Plaintiffs' data.

15           (vii)    December 20, 2007: After this lawsuit was filed and an

16   injunction sought, Watkins returned, along with the laptop assigned to him by Plaintiffs, 7 CDs

17   containing Plaintiffs' proprietary files that were burned on the following dates: October 9, 2007,

18   November 27, 2007 (when he accessed 689 files/folders from the laptop in rapid succession),

19   December 5, 2007 (when he accessed 173 files/folders and 370 email addresses in rapid

20   succession), and December 12, 2007 (when he accessed 621 files/folders in rapid succession).

21           (viii)    January 18, 2008: More than 4 weeks after this lawsuit was

22   filed, Watkins admitted to retaining a substantial amount of Plaintiffs' proprietary data on his

23   home computer for several weeks after his resignation.

24           (ix)    Weeks after this lawsuit was filed, and while Plaintiffs'

25   request for injunctive relief was pending – a request that included data and evidence preservation,

26   a prohibition against deletion, and return of all of Plaintiffs' data – and after repeated requests by

27   Plaintiffs that data be returned and not destroyed, Watkins deleted Plaintiffs' data off of his home

28   computer, thereby destroying valuable metadata relating to the misappropriated data.

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

Case No. C 07 06418-JSW

1    70.    Prior to the filing of this lawsuit, none of the Defendants and former employees of

2    Plaintiffs disclosed that they were still in possession of Plaintiffs' data.   Nor did EPIC disclose

3    that it was aware that its newly hired employees were in possession of Plaintiffs' data.  It was

4    only after this lawsuit was filed that Defendants acknowledged they were still in possession of

5    Plaintiffs' data, and even as of the date this First Amended Complaint was filed, Defendants'

6    have not returned all of Plaintiffs' misappropriated data and other property despite repeated

7    demands that they do so.

8    71.    Apart from the taking of Plaintiffs' data, Plaintiffs are informed and believe and

9    thereupon allege that Individual Defendants Cohn, Michael Brown, Petty, and Watkins

10   intentionally deleted Plaintiffs' data off of Plaintiffs' computer media without Plaintiffs'

11   knowledge or consent, and other Defendants wrongfully deleted Plaintiffs' data stored on their

12   own personal media.

13                   **The Events Leading Up To The Surprise, Pre-Planned Resignations**

14   72.    On November 20, 2007, Defendant James Halbleib, Area Executive Vice President

15   of Sales, resigned from Plaintiffs' San Francisco office without notice and announced he was

16   going to EPIC.

17   73.    On November 26, 2007, Laurie Martin, Account Executive who had reported

18   directly to Halbleib, resigned from Plaintiffs' San Francisco office without notice and announced

19   she was going to EPIC.

20   74.    Unbeknownst to Plaintiffs at the time, Plaintiffs are informed and believe that both

21   Defendants Halbleib and Martin downloaded and copied Plaintiffs' confidential data prior to their

22   unannounced resignations.

23   75.    On November 27, 2007, Defendant Brian Quinn sent an email to various

24   employees of Plaintiffs, including co-conspirators, stating that the "All Hands" sales meeting

25   scheduled for December 4, 2007 had been rescheduled to December 7, 2007 and that attendance

26   was mandatory.

27   76.    During the week of December 3, 2007, EPIC, Brown, Quinn, Cohn, and other

28   Defendants prepared to announce the employees' mass resignation and intention to join EPIC.

1    77.    Prior to their departures, a number of Individual Defendants "pre-announced" to

2    Plaintiffs' clients that they intended to resign. The Individual Defendants who pre-announced

3    included Quinn, who in or about October 2007, informed at least two clients, who subsequently

4    signed Broker of Record ("BOR") letters with EPIC, that he was resigning his employment with

5    Plaintiffs. Likewise, in or about November 2007, and prior to his departure from Plaintiffs,

6    Michael Brown informed several clients that he was leaving Plaintiffs.

7    78.    On or about several dates that week including December 5 and December 6, and

8    throughout the ensuing weekend and week of December 10, the Individual Defendants, acting in

9    concert with and as agents of each other and in furtherance of the conspiracy, took without

10    permission Plaintiffs' data.

11    79.    On or about December 6, 2007, and on information and belief, in the days leading

12    up to December 6, 2007, Defendant Neil Cohn, through individually-retained counsel, attempted

13    to negotiate for a stronger promise of indemnification from EPIC's counsel, expressing concern

14    to EPIC that the indemnification provision in EPIC's Producer Agreement would not sufficiently

15    protect Cohn since he and EPIC knew that by accepting employment with EPIC in this fashion,

16    and engaging in the actions complained of herein, he would be violating his contractual

17    obligations to Gallagher.

18
### December 7, 2007:
### EPIC and Defendants Francis, Hahn, Wally Brown, Brian Quinn, Neil Cohn and Four
19    Confederates Select Friday December 7, 2007 To Execute The Planned First Wave Attack
### on Plaintiffs
20

21    80.    On the morning of Friday, December 7, 2007, and without any prior notice to

22    Plaintiffs, Defendants Wally Brown (an officer of Plaintiff), Michael Brown, Neil Cohn (an

23    officer of Plaintiff), Carol Cohn, Stephen Hause (an officer of Plaintiff), Olga Harvison, and

24    Linda Cadinha submitted their resignations to Plaintiffs in various forms (including leaving

25    resignation letters on their desk and notifying each other of their resignations) and immediately

26    walked out to openly work at EPIC immediately and make an immediate and planned grab for

27    Plaintiffs' business using unfair competition and other illegal methods.

28

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

81.     They acted in this way so Plaintiffs would not have the time or ability to reach out to the clients Defendants planned to solicit and raid.  As part of their plan, and while still employed by Plaintiffs, Defendants set up meetings with Plaintiffs' clients for the week of December 10, 2007, knowing they would be employed by EPIC by that time and would thus use the previously scheduled in-person meetings to solicit Plaintiffs' customers on behalf of EPIC.

82.     Plaintiffs are informed and believe, and thereupon allege, that Neil Cohn, Wally Brown, Michael Brown, and Brian Quinn, and other Defendants, began performing work for the benefit of EPIC before formally resigning.

83.     As an example of the collusion and planning of the conspirators, on December 7, 2007, Defendant Cohn submitted a self-serving resignation letter that purported to contain an alibi against any future claim that he had stolen Plaintiffs' valuable confidential and proprietary data to which he had been exposed in connection with his job duties for Plaintiffs.   His alibi involved enlisting co-defendant, George Petty, who was in charge of Plaintiffs' IT function in the San Ramon office (and who resigned his employment without notice and departed for EPIC the next business day after Cohn resigned), to "sign off" and "verify" that Cohn had not taken data, and returned all data:

//
//
//
//
//
//
//
//
//
//
//
//

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

ARTHUR J. GALLAGHER & CO.
Risk Management Services

INSURANCE BROKERS OF CALIFORNIA, INC.
CALIFORNIA STATE LICENSE NUMBER 0726293

December 7, 2007

Arthur J. Gallagher & Co.
4301 Hacienda Drive
3rd Floor
Pleasanton, CA 94588

To Whom It May Concern:

Effective as of this date I resign my employment with Arthur J. Gallagher & Co. So there is no
question concerning the retention by me of any confidential or proprietary information of
Gallagher:   *GEORGE PETTY, PERSONALLY REMOVED THE INITIALED ITEMS*

GP  • I have removed all business contacts related to my employment from the ACTI Contact
      Management Program I use as my "Desktop Calendar";  *George Pe*
GP  • I synchronized my personal Blackberry with the ACTI Contact Management Program to   12/7/0
      remove all Arthur J. Gallagher & Co. clients and prospects from my Blackberry;
GP  • In order to preserve the data, I made a backup copy of the ACTI Database prior to
      removing the business information and again after removing the business information. I
      am supplying you with these files;
GP  • I would like to retain a copy of the file containing all my non-business related contacts
      (All insurers, clients, prospects, employees of Arthur J. Gallagher & Co. and the like
      have been removed from this list, with the exception of a few personal friends who work
      for Gallagher;
GP  • I was furnished a laptop computer by Gallagher that was stolen sometime in 2005 along
      with the laptops of four or five other producers from the Pleasanton Office. After that, I
      was given a desktop computer and used my own personal laptop for business purposes.
      I regularly copied Gallagher files onto my laptop so that I would have them available at
      client meetings. Please acknowledge that I have given you the opportunity to inspect,
      review or remove this information that is confidential and proprietary and will continue to
      do so at anytime;
    • I am returning the following items:
        ○ All Customer Documents and electronic files in my possession
        ○ Access Key and Card for parking, building and office
        ○ Company Credit Card
    • Please provide me with a summary of:
        ○ Unused Vacation Time (This should include prior periods where my vacation time
          was not used for a period 10 years). I currently have 21 days of unused vacation
          time in the current year;
    • My expense report has been submitted in the amount of $3,150 +/-.

Sincerely,

Neil Cohn
Area Senior Vice President

4301 HACIENDA DRIVE, SUITE 340 • PLEASANTON, CA 94588
P.O. BOX 9102 • PLEASANTON, CA 94566-9102
(925) 460-9000 • FACSIMILE: (925) 147-8831 • VOICE MAIL: (925) 460-9098

84.    At the time Defendant Cohn submitted this letter, he omitted the fact that he
possessed and retained a 750 gigabyte Western Digital external hard drive, several CDs, and a
thumb drive of unspecified storage capacity, all of which contain substantial amounts of
Plaintiffs' data.  He did not disclose these facts until after Plaintiffs filed this lawsuit, and has yet
to return the data stored on these devices.

85.    Defendant Petty, who was instructed to preserve Cohn's Gallagher computer and
its contents, defragmented it and failed to inspect, review, or remove Plaintiffs' confidential data
from Cohn's personal laptop computer.

**The Defendants' Conduct on December 7 Is Revealing**

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

Case No. C 07 06418-JSW

86.    What occurred in Plaintiffs' San Ramon office the morning of December 7, 2007 – before and after the first wave of resignations – is instructive. Shortly before announcing the departure of himself and others, Defendant Brown – acting with the knowledge and assistance of EPIC, directly solicited a top Gallagher San Jose Producer, who he and Defendant Quinn had ensured would be present in the San Ramon office that day, and other San Jose employees to join EPIC.

87.    Beginning that day and continuing in the days which followed, Brown's solicitation included:

(a)    promising the San Jose Producer and other of Plaintiffs' employees substantial compensation;

(b)    noting to the Producer that, thanks to his efforts, she was not contractually prohibited from resigning without notice;

(c)    facilitating contact between the Producer and EPIC (through Defendants Laura Wick, Dan Francis, and John Hahn);

(d)    encouraging the Producer to pre-announce to top customers (as Defendants Wally and Michael Brown had done) and solicit other of Plaintiffs' San Jose employees to join EPIC.

(e)    acknowledging that several of Plaintiffs' employees already had plans to resign their employment to join EPIC, and would do so after Brown announced his resignation;

(f)    requesting that the San Jose Producer refrain from informing Plaintiffs that he was encouraging her to join EPIC.

88.    After the meeting where he solicited the Gallagher producer, Defendant Wally Brown convened the All Hands meeting (which included both Producers and service employees) and announced his and Quinn's resignation to the larger group of employees. Thereafter, Brown continued his efforts to solicit the San Jose Producer and another producer in Plaintiffs' San Jose office.

89.    Quinn also directed approximately fifteen to twenty of Plaintiffs' employees to contact Mary Smith in EPIC's Human Resources department.

90.    Defendant Francis also directly solicited the San Jose Producer, having already been informed of the specific dollar value of the Producer's book of business and promising to establish an office in San Jose if the Producer and others all agreed to leave Plaintiffs' employ.

91.    A second producer in Plaintiffs' San Jose office also told the San Jose Producer that, like her, he had talked to Dan Francis of EPIC, and that Francis had told him that he (Francis) had been informed of the dollar value of the Gallagher business for which this other producer was responsible, and since his existing book of business was not sufficient to justify opening a San Jose office, EPIC would not open a San Jose office unless she agreed to join EPIC.

**The Second Wave of Planned En Masse Resignations The Following Monday Morning And Continuing Throughout The Week – After Additional Theft of Data**

92.    Over the weekend of December 8 and 9, 2007, Wick, EPIC, and EPIC founders Francis and Hahn interviewed several of Plaintiffs' employees en masse – at the newly opened EPIC office in the same complex as Plaintiffs' San Ramon offices – and made instantaneous employment offers.

93.    The Gallagher employees accepted and simultaneously announced their resignations beginning the following Monday morning, the vast majority doing so without notice, and on information and belief, coordinating this tactic among themselves and with EPIC.

94.    Over that weekend, and knowing that they were planning to resign en masse first thing on Monday or Tuesday the following week, several Defendants continued to access Plaintiffs' computer media, including servers. Plaintiffs are informed and believe, and thereupon allege, that based on the circumstances, such access was not for legitimate business purposes of Plaintiffs.

95.    On Saturday, December 8, Plaintiffs' management asked Defendant and Gallagher Vice President Soo Hoo to come into the San Ramon office and help assess the status of customer accounts in the wake of Friday's departures. Soo Hoo spoke to management, and gave an excuse not to come into the office.

96.    She made no mention of the fact that Defendant Wally Brown had pre-announced his resignation to her, failed to mention she had interviewed with EPIC the previous day, and then

1    failed to inform Plaintiffs she had received and decided to accept EPIC's employment offer on

2    December 8, 2007.

3         97.     Understanding the negative impact the December 7, 2007 officer resignations

4    without notice had on Plaintiffs, and knowing the impact her own resignation, coupled with the

5    other impending resignations, would have on Plaintiffs, Defendant Soo Hoo, a then-current

6    Gallagher Vice President, never let Plaintiffs know what was in the works, nor did she provide

7    Plaintiffs any ability to minimize the damage they were suffering. In fact, having accepted

8    EPIC's employment offer on December 8, 2007, Soo Hoo did not contact the corporate

9    representative who had sought her help to inform Plaintiffs of her decision, nor did she limit her

10    access to Plaintiffs' computer systems or seek to prevent any of her co-conspirators from doing

11    do.

12         98.     On Monday, December 10, 2007, primarily in the early morning hours (around 7

13    am), Soo Hoo, Molly Armstrong, Eric Chua, Elkie Craven, Robert Ellsworth, Tammy Glaser,

14    Robin Herman, Barbara Hilgen, Don Johnson, Mary Keck, Lisa Lucas, William "Bill" Phillips,

15    Dennis Rodriguez, Amber Ronzitti, Dirck Stinson, Colleen Varnica, Sharon Voth, Paul H.

16    Wagener, and Carol Ward resigned without notice and walked out to work at EPIC.

17         99.     On December 11, 2007, Susan English, Brett Burdock, Kristina Stubbs,

18    Shandranette Middleton (a.k.a. Shandranette Pullian), and George Petty resigned without notice

19    and walked out to work at EPIC.

20         100.     On December 12, 2007, Robert Harrison Watkins, Carolyn ("Ruby") Johnson, and

21    Patricia Burdock, resigned without notice and walked out to work at EPIC.

22         101.     On December 14, 2007, Siobhan O'Leary, Olga Rasmussen, and Louanne

23    Sweeney resigned to work at EPIC. Rasmussen did not provide notice; Siobhan and Sweeney

24    provided five days of notice.

25         102.     On December 17, 2007, Tiffany Pastorius resigned, having provided six days

26    notice.

27         103.     Plaintiffs are informed and believe, and thereupon allege, that in order to catch

28    Plaintiffs by surprise, certain Individual Defendants and EPIC agreed – after fully vetting the

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

1    issue with EPIC (who agreed to pay for the legal defense of the Individual Defendants), Francis

2    and Hahn – that they would violate the provision in their Executive Agreements with Gallagher

3    requiring a fourteen-day Notice Period and transition period – a period during which they

4    contractually agreed their fiduciary obligations would continue even if their employment did not.

5          104.    These officers and Defendants understood and agreed by contract that this notice

6    period was intended to satisfy a legitimate business interest: to assist Plaintiffs "in all matters

7    relating to the winding up of any pending work and the orderly transfer to other Company

8    employees of the accounts and prospective accounts for which [the employee] has most recently

9    been responsible."

10          105.    Rather than honoring their contractual obligations, Individual Defendants Amos,

11    Cohn, Brown, Halbleib, Johnson, Martin, Phillips, Jr., Dutto, Quinn, Stinson, English, Wagener,

12    and Watkins all intentionally breached their contractual obligations to Gallagher by resigning

13    without notice.

14          106.    A total of 47 out of 76 employees in the San Ramon facility resigned over a period

15    of one week, all but three without any notice, leaving Plaintiffs' San Ramon essentially crippled.

16    During the same period, two of Plaintiffs' employees (Defendants Halbleib and Martin) in the

17    San Francisco office resigned without notice.  As of January 2008, approximately 49 employees

18    of Plaintiffs have resigned their employment to accept positions with EPIC.

19      **Using Plaintiffs' Confidential Data and Other Illegal Tactics, EPIC and the Individual**
  **Defendants Immediately Engage in Unfair Competition and Inflict Damage on Plaintiffs'**

20      **Business**

21

22          107.    As of December 7, 2007 and the first resignations, and thanks to careful planning

23    by Wick and her co-conspirators, EPIC's San Ramon facility was already up and running (EPIC

corporate email accounts had been previously created, offices assigned, corporate computer

24

access IDs assigned, Blackberry's issued, etc.) for Defendants Wally Brown, Michael Brown,

25

Brian Quinn and the other departed employees of Plaintiffs.

26

27          108.    Having operations established, Defendants immediately began unlawfully

soliciting Plaintiffs' customers, including through the use of stolen data of Plaintiffs.

28

-34-    SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

1    109.    For example, Defendant Stephen Hause submitted a resignation letter representing:

2    "I am leaving behind all Arthur J. Gallagher property and client information in my possession."

3    110.    Unbeknownst to Plaintiffs, Hause had previously set up a December 10, 2007

4    meeting with a current customer of Plaintiffs that he intended to immediately solicit after

5    resigning to switch business from Plaintiffs to EPIC.

6    111.    Contrary to his representations, Hause took a confidential and proprietary

7    document, created by and for the exclusive use of Plaintiffs, related to a proposal bid for the

8    customer for whom he set up the December 10, 2007 meeting under the guise of conducting

9    Gallagher-related business.

10    112.    Having unauthorized possession of this document and having already resigned

11    from Plaintiffs' employ, Hause then contacted the customer, represented he was still an employee

12    of Plaintiffs, and then proceeded to present the stolen document – which contains Plaintiffs'

13    confidential, proprietary, and trade secret information – to the customer on behalf of EPIC.

14    113.    Hause requested that the customer immediately transfer its business to EPIC,

15    naming EPIC its exclusive broker of record.

16    114.    Hause's actions resulted in damage to Plaintiffs.

17    115.    Plaintiffs are informed and believe that, while still employed by Plaintiffs, some or

18    all of the Individual Defendants spent time during the working day preparing BOR letters

19    designating EPIC in place of Plaintiffs as the exclusive broker of record, for the clients of

20    Plaintiffs that they planned to solicit and/or had already begun soliciting.

21    116.    To date, more than 130 of Plaintiffs' clients, with business totaling several

22    millions of dollars in revenue, have signed BOR letters designating EPIC as their exclusive

23    insurance broker.  Plaintiffs are informed and believe that Defendants used various deceptive and

24    unlawful practices, in addition to using Plaintiffs' proprietary and trade secret data, to convince

25    clients to switch their business to EPIC.

26    117.    Defendants have also caused Plaintiffs to lose additional clients and associated

27    business revenues, including at least one client who, while refusing to transfer business to EPIC

28    because it believes EPIC's conduct to be "unethical – or worse," transferred its business to

1  another insurance brokerage out of a belief, based on the optics of the mass departures, that

2  EPIC's conduct has left Plaintiffs unable to service their accounts.

3      118.    Plaintiffs are informed and believe, and thereupon allege, that through

4  misrepresentations and misuse of Plaintiffs' misappropriated data, Defendants are not only

5  targeting Plaintiffs' California customers, but are also going after Plaintiffs' international

6  accounts.

7  **Defendants' Solicitation Of Plaintiffs' Employees And Customers Continues Even After**
   **Gallagher Expressed Concern**

8

9      119.    When Halbleib departed for EPIC, Gallagher demanded that he honor his

10 contractual obligations not to solicit Gallagher's employees and clients – which are the same

11 contractual obligations EPIC has entered into with its new employees.

12      120.    Defendants have continued to solicit Plaintiffs' employees and customers.

13      121.    Plaintiffs are informed and believe, and thereupon allege, that Defendants are also

14 directing recruiters and headhunters to contact Plaintiffs' San Ramon employees in an attempt to

15 completely wipe out Plaintiffs' presence in San Ramon.

16      122.    As part of this practice, Defendants, directly and through these headhunters, have

17 falsely represented that Plaintiffs plan to close their San Ramon office in the wake of the

18 employee departures and loss of business.

19 **Plaintiffs Will Continue To Suffer Irreparable Harm if Defendants Are Not Enjoined**

20      123.    By their actions, the Defendants have caused irreparable harm to Plaintiffs and

21 threaten to cause additional irreparable harm unless enjoined.

22      124.    After this lawsuit was filed, for the first time, Defendants acknowledged they were

23 in possession of Plaintiffs' proprietary data.

24      125.    Only after the lawsuit was filed did Defendant Hause admit taking Plaintiffs'

25 proprietary document and using it to unfairly damage and compete against Plaintiffs. Hause has

26 never returned the document at issue to Plaintiffs or made any attempt to account for the damage

27 caused.

28

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

1      126.   As of the filing of this First Amended Complaint, Defendants admit they still

2   possess Plaintiffs' data, and have refused repeated requests to identify what was taken, in what

3   manner, when it was taken, where it was stored, and related information.

4      127.   Without injunctive relief, Plaintiffs will suffer irreparable harm, as Defendants will

5   have the ability to further unlawfully raid Plaintiffs' employee base, unlawfully and unfairly steal

6   Plaintiffs' customers, and use, disclose, retain, and destroy Plaintiffs' data, causing Plaintiffs

7   irreparable harm.

8      128.   Plaintiffs have a strong likelihood of success on the merits, based on the facts

9   established. It is difficult, if not impossible, to place a monetary value on the damage that would

10  be done to Plaintiffs if Defendants are not enjoined. Conversely, EPIC and the Individual

11  Defendants would suffer no prejudice if enjoined under the circumstances, since they have no

12  right to keep or use any of Plaintiffs' data still in their possession or solicit Plaintiffs' clients in

13  violation of their agreements and in an unfair and deceptive manner, and as preserving evidence

14  and allowing the inspection of any computers or Electronic Storage Devices in their possession,

15  pursuant to court ordered protocols, would cause minimal intrusion.

16                              **COUNT ONE**

17  **(Violation of Computer Fraud and Abuse Act – 18 U.S.C. §1030 – Against Individual
    Defendants Neil Cohn, Carolann Cohn, Halbleib, Martin, Petty, Chua, Middleton, Watkins,**
18                                **and Wick)**

19     129.   Plaintiffs reallege and reincorporate by reference paragraphs 1 through 128 above.

20     130.   Plaintiffs' computers, computer network, servers and systems have network and

21  Internet capabilities and are used to provide insurance services in interstate commerce throughout

22  the United States and across state lines. Plaintiffs have servers located outside the State of

23  California. Defendants' computers routinely accessed or had access to Plaintiffs' computer

24  network, Plaintiffs' out of state servers and Plaintiffs' proprietary information. Therefore,

25  Plaintiffs' computers are protected computers under the Computer Fraud and Abuse Act.

26     131.   In taking the actions complained of, including accessing Plaintiffs' servers and the

27  network for the purpose of deleting the November 5, 2007 email to Wick, misappropriating data,

28  loading and running defragmentation programs and deleting Plaintiffs' proprietary information

                                        SECOND AMENDED COMPLAINT OF A.J.
                                        GALLAGHER & CO., INC.; DEMAND FOR JURY
                                        TRIAL
Case No. C 07 06418-JSW

1    from Plaintiffs' computers, Defendants, on behalf of and in furtherance of the conspiracy with

2    EPIC, knowingly and with intent to defraud, improperly accessed Plaintiffs' protected computer

3    without or exceeding authorization, resulting in loss or damage to Plaintiffs in excess of $5,000.

4         132.    By their actions, Defendants, in furtherance of the conspiracy, also caused the

5    transmission of a program, information, code, or command which was designed to erase

6    Plaintiffs' proprietary data contained within Plaintiffs' computers and cover-up their own

7    actions, and those of their co-conspirators, resulting in damage to a protected computer.

8         133.    Defendants' conduct was done knowingly, intentionally, and recklessly, with the

9    intent to cause damage and defraud, and caused actual damage to Plaintiffs, in violation of 18

10   U.S.C. Section 1030, including, without limitation, 18 U.S.C. §§ 1030(a)(4), (a)(5)(A)(i),

11   (a)(5)(A)(ii), and (a)(5)(A)(iii).

12        134.    As a direct, proximate and legal cause of this access and transmission, Plaintiffs

13   have sustained damages in an amount in excess of Five Thousand Dollars ($5,000), in an amount

14   to be proven at trial, but including the costs of investigating Defendants' violations of the CFAA,

15   which themselves exceed $5,000, and is further entitled to injunctive relief.

16        135.    Each of the aforementioned acts was done willfully and maliciously, with the

17   deliberate intent to injure Plaintiffs' business and, on information and belief, for Defendants'

18   financial gain, thereby entitling Plaintiffs to exemplary damages and/or attorneys' fees to be

19   proven at trial.

20                              **COUNT TWO**

21   **(Violation of California Penal Code § 502 – Against Individual Defendants Neil Cohn,
     Carolann Cohn, Halbleib, Martin, Petty, Chua, Middleton, Watkins, and Wick)**

22
         136.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 135 above.
23
         137.    Plaintiffs maintain and own a computer network, computer programs or software
24
     and a computer system as those terms are defined in California Penal Code Section 502
25
     (collectively, "Computer System"), and which includes the computers and network provided by
26
     Plaintiffs to the Individual Defendants while they were employed by Plaintiffs and while they had
27

28

1    lawful access to these computers and network. On their Computer System, Plaintiffs maintain

2    confidential and proprietary information, including the information described above.

3        138.    Without permission or authorization, and knowingly and without authorization,

4    Defendants, on behalf of and in furtherance of the conspiracy with EPIC:

5        (a)    accessed and/or provided a means of accessing and/or assisted in providing

6    a means of accessing Plaintiffs' Computer System and the data contained therein;

7        (b)    used and/or caused to be used Plaintiffs' Computer System and the data

8    contained therein;

9        (c)    took, copied, and thereafter made use of data and supporting

10    documentation from Plaintiffs' Computer System;

11        (d)    altered and deleted data contained in Plaintiffs' Computer System.

12        139.    Defendants engaged in these acts knowingly and intentionally, and on information

13    and belief, for the purpose of defrauding, deceiving, extorting, and wrongfully obtaining and

14    controlling Plaintiffs' money, property, and data.

15        140.    The conduct of the Defendants listed above violates California Penal Code Section

16    502, including, without limitation, California Penal Code § 502(c)(1), (2), (3) (4), (6), and (7).

17        141.    As a direct, proximate and legal cause of each of Defendants' acts alleged herein,

18    Plaintiffs have suffered compensatory damages in an amount to be proven at trial and are entitled

19    to an award of reasonable attorneys' fees, in an amount to be proven at trial.

20        142.    On information and belief, after knowingly accessing Plaintiffs' Computer System

21    and Plaintiffs' confidential and proprietary information without authorization or permission,

22    Defendants retained some or all of the data and other information that they obtained from their

23    unlawful conduct. Accordingly, Plaintiffs are entitled to injunctive relief and other equitable

24    relief, including, without limitation, permanent injunctive relief and restitution and disgorgement

25    of any and all profits or other benefits that Defendants have obtained in connection with their

26    illegal conduct.

27        143.    Each of the aforementioned acts was done willfully and maliciously, with the

28    deliberate intent to injure Plaintiffs and with conscious disregard of Plaintiffs' rights, thus

1    entitling Plaintiffs to an award of punitive damages in an amount commensurate with Defendants'

2    conduct and appropriate to deter others from engaging in similar misconduct.

3                                         **COUNT THREE**
     **(Misappropriation of Trade Secrets – Cal. Civ. Code § 3426 *et. seq.* – Against Defendants**
4    **EPIC, Neil Cohn, Halbleib, Martin, Petty, Chua, Hause, Watkins, and Middleton, on behalf**
                    **of and in furtherance of the conspiracy with EPIC)**
5
             144.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 143 above.
6
             145.    Plaintiffs enjoy an advantage over its existing and would-be competitors in
7
     providing insurance brokerage and risk management services.
8
             146.    As alleged above, Plaintiffs have developed and maintained valuable trade secret
9
     information. Plaintiffs have made reasonable efforts under the circumstances to preserve the
10
     confidentiality of their trade secrets.  Such information derives independent economic value from
11
     not being generally known to the public or to other persons who can obtain economic value from
12
     their disclosure or use.  Accordingly, the above-described information constitutes "trade secrets,"
13
     under California's Uniform Trade Secrets Act, Cal. Civ. Code Section 3426 *et. seq.*  EPIC's own
14
     agreements and Defendants' resignation letters both acknowledge that the categories of
15
     information at issue arise to the level of legally-protected trade secrets.
16
             147.    Plaintiffs' current and former employees were and are under a duty both to keep
17
     Plaintiffs' proprietary and confidential information secret, and not to use or disclose such
18
     information other than for the benefit of Plaintiffs and with Plaintiffs' authorization.  In taking,
19
     retaining, and/or using this information, the Individual Defendants, and EPIC, knew or should
20
     have known that they acquired such information under circumstances giving rise to a breach of a
21
     duty to maintain its secrecy or limit its use, and/or derived such information from or through a
22
     person who has such a duty and/or through improper means.
23
             148.    Pursuant to Labor Code section 2860 "Everything which an employee acquires by
24
     virtue of his employment, except the compensation which is due to him from his employer,
25
     belongs to the employer, whether acquired lawfully or unlawfully, or during or after the
26
     expiration of the term of his employment."  Nevertheless, Defendants retained this information in
27
     unauthorized fashion and on information and belief, have used and/or plan to use this information
28

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

Case No. C 07 06418-JSW

1    to benefit themselves, EPIC, and other persons.  They have used and intend to use that

2    information without the express or implied consent of Plaintiffs.

3        149.    As described above, the Individual Defendants and EPIC have misappropriated,

4    retained and/or used Plaintiffs' trade secrets without Plaintiffs' express or implied consent and/or

5    used improper means to acquire knowledge of the trade secrets.

6        150.    Defendants obtained the proprietary and confidential information described above

7    directly or indirectly from Plaintiffs and not from generally available information or through their

8    own independent research and efforts.

9        151.    Defendants' actions constitute misappropriation of Plaintiffs' trade secrets under

10    Cal. Civ. Code Section 3426 *et seq.*

11        152.    Defendants' wrongful conduct in misappropriating Plaintiffs' confidential

12    information, unless and until enjoined and restrained by order of this Court will cause great and

13    irreparable harm to Plaintiffs.  Plaintiffs are threatened with losing their confidential and

14    proprietary information, as well as current and potential business.

15        153.    Plaintiffs have no adequate remedy at law for the injuries currently being suffered,

16    and the additional injuries that are threatened, because it would be impossible to quantify in

17    dollars the losses described above when this matter is finally adjudicated, and Defendants will

18    continue to engage in their wrongful conduct and Plaintiffs will continue to suffer irreparable

19    injury that cannot be adequately remedied at law unless Defendants are enjoined from engaging

20    in any further such acts of misappropriation.

21        154.    In addition, as a direct and proximate cause of Defendants' misappropriation of

22    Plaintiffs' trade secrets, Defendants have been unjustly enriched in an amount to be ascertained at

23    trial and Plaintiffs have sustained, and will continue to sustain, actual damages in an amount to be

24    proven at trial.  Plaintiffs have also suffered irreparable harm as a result of Defendants' actions.

25        155.    Each of the acts of misappropriation was done willfully and maliciously by

26    Defendants, with the deliberate intent to injure Plaintiffs' business and improve their own

27    business and for financial gain, thereby entitling Plaintiffs to exemplary damages and/or

28    attorneys' fees to be proven at trial pursuant to Cal. Civ. Code Section 3246.3(c).

-41-

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

## COUNT FOUR

**(Conversion – Against Defendants EPIC, Neil Cohn, Halbleib, Martin, Petty, Hause, Chua, Middleton and Watkins, on behalf of and in furtherance of the conspiracy with EPIC)**

156.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 155 above.

157.    By engaging in the acts described above, Defendants wrongfully took possession of property belonging to Plaintiffs, without permission or authorization, and retained, altered damaged and/or destroyed some or all of said property.

158.    By engaging in the acts described above, Defendants violated Labor Code section 2860 which provides that: "Everything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment."

159.    As a proximate result of Defendants' decision to retain property belonging to Plaintiffs, and to convert it for his own use, benefit and financial gain, Defendants has caused Plaintiffs to suffer damages in an amount to be proven at trial.

160.    On information and belief, Defendants continue to retain some or all of said property of Plaintiffs, thereby entitling Plaintiffs to injunctive relief.

161.    Each of these acts were done willfully and maliciously by Defendants, with the deliberate intent to injure Plaintiffs' business and for Defendants' own financial gain, thereby entitling Plaintiffs to exemplary damages and/or attorney's fees to be proven at trial.

## COUNT FIVE

**(Breach Of Written Contract – Against Wally Brown, Quinn, N. Cohn, C. Cohn, Hause, Petty, Chua, Michael Brown, Amos, Dutto, English, Halbleib, Johnson, Martin, Phillips, Soo Hoo, Stinson, Wagener, Watkins, and Wick)**

162.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 161 above.

163.    The Executive Agreements entered into by Individual Defendants Amos, Wally Brown, Michael Brown, Cohn, Dutto, English, Halbleib, Johnson, Martin, Phillips, Quinn, Stinson, Wagener, and Watkins with Plaintiffs required them, among other things, to (a) devote their efforts to Plaintiffs and not to simultaneously engage in competing employment or activities

SECOND AMENDED COMPLAINT OF A.J. GALLAGHER & CO., INC.; DEMAND FOR JURY TRIAL

Case No. C 07 06418-JSW

1   that poses a conflict of interest; (b) maintain the secrecy of Plaintiffs' confidential and proprietary

2   information, (c) return all confidential information, documents and property of Plaintiffs upon

3   termination of their employment with Plaintiffs, (d) provide a Notice Period, (e) in order to

4   protect Plaintiffs' confidential and proprietary trade secret information, refrain from soliciting the

5   specific customers of Plaintiffs with whom the employees worked while employed by Plaintiffs—

6   if such solicitation of customers would involve the use of Plaintiffs' confidential information or

7   otherwise violate any other contractual commitments; and (f) refrain from soliciting Plaintiffs'

8   employees.   EPIC entered into substantially identical contractual covenants with the Individual

9   Defendants vis-à-vis EPIC customers and employees.

10          164.    Additionally, Individual Defendants Amos, Michael Brown, Cohn, Chua, Dutto,

11   English, Halbleib, Johnson, Quinn, Soo Hoo, Stinson, Wagener, Watkins, and Wick executed

12   acknowledgements and agreed to abide by Gallagher's Code of Business Conduct and Ethics and

13   other Corporate Policies, which further required the Individual Defendants formerly employed by

14   Plaintiffs' (a) to be loyal to Gallagher and avoid conflicts of interest, (b) to protect Plaintiffs'

15   confidential and proprietary information and other property, and (c) to make proper use of

16   Plaintiffs' assets, and not use Plaintiffs' assets for their own personal use or gain.

17          165.    For the purposes of protecting its confidential, proprietary, and trade secret

18   information and for the purposes of retaining key employees, Gallagher entered into Stock Option

19   Agreements with key employees, including Defendants Wally Brown, Brian Quinn, Neil Cohn,

20   Carolann Cohn, Laura Wick, Jim Halbleib, Steve Hause, Carol Cohn, Linda Soo Hoo, and

21   George Petty.   The grants were expressly conditioned on Gallagher's employees faithfully and

22   loyally carrying out their duties, and not engaging in acts "harmful to the interests of the

23   Company."   Such harmful acts defined in the Stock Option Plan included soliciting existing and

24   prospective clients of Plaintiffs for whom the employees performed work on behalf of Gallagher

25   within the two-year period preceding the employees' termination, if doing so would require the

26   employees to "reveal, make judgments upon, or to otherwise use or divulge any confidential

27   information or trade secrets of the Company."

28

1       166.   Gallagher has performed (or was excused from performing) all of its obligations

2   under these contracts except for those, if any, from which it was legally excused, frustrated,

3   waived or excused by the prior material breaches of Defendants.

4       167.   Without excuse or justification, by engaging in the acts alleged, Defendants have

5   and continue to breach their obligations under the contracts through their acts of disloyalty,

6   misappropriation, and unlawful solicitation.

7       168.   As a proximate result of the breaches of contract by these Defendants, Gallagher

8   has suffered, and will continue to suffer, general and special damages in an amount to be proven

9   at trial.  Gallagher seeks compensation for all damages and losses proximately caused by the

10   breaches.

11       169.   Gallagher has no adequate remedy at law for the injuries currently being suffered,

12   and the additional injuries that are threatened, because it would be impossible to quantify in

13   dollars the loss sustained pending final adjudication of this matter.

### COUNT SIX

**(Breach of the Covenant of Good Faith and Fair Dealing – Against Amos, Michael Brown, Wally Brown, N. Cohn, C. Cohn, Dutto, Petty, Hause, English, Halbleib, Johnson, Martin, Phillips, Jr., Quinn, Soo Hoo, Stinson, Wagener, Watkins, and Wick)**

17       170.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 169 above.

18       171.   Implied in the Executive Agreements, Code of Business Conduct and Ethics, Stock

19   Agreements, and other Corporate Policies executed and acknowledged by Defendants are

20   covenants that each of them would act in good faith and deal fairly with Plaintiffs, and that they

21   would do nothing to deprive Plaintiffs of the benefit of that agreement.

22       172.   Defendants breached the implied covenant of good faith and fair dealing by

23   engaging in some or all of the conduct described herein.

24       173.   Labor Code section 2854 provides that:  One who, for a good consideration, agrees

25   to serve another, shall perform the service, and shall use ordinary care and diligence therein, so

26   long as he is thus employed."  Similarly, Labor Code section 2863 provides that:  "An employee

27   who has any business to transact on his own account, similar to that intrusted to him by his

28   employer, shall always give the preference to the business of the employer."  By engaging in the

-44-

SECOND AMENDED COMPLAINT OF A.J. GALLAGHER & CO., INC.; DEMAND FOR JURY TRIAL

1    acts described herein, Defendants breached the duty of good faith and fair dealing by violating

2    Labor Code sections 2854 and 2863 in which the duty is also encompassed.

3        174.    Gallagher has duly performed all acts, conditions, covenants and promises to be

4    performed on its part as required by the Executive Agreements and the Code of Business Conduct

5    and Ethics Agreement, except for those, if any, from which it was legally excused, frustrated,

6    waived or excused by the prior material breaches of Defendants.

7        175.    As a direct, proximate and legal cause of the breach by Defendants of the implied

8    covenant of good faith and fair dealing in the Executive Agreements and the Code of Business

9    Conduct and Ethics Agreement, Gallagher has sustained damages in an amount in excess of the

10   minimum jurisdiction of this Court, in an amount to be proven at trial.

11                                  **COUNT SEVEN**

12   **(Breach of Fiduciary Duty – Against Individual Defendants Wally Brown, Neil Cohn,
     Carolann Cohn, Halbleib, Quinn, Hause, Michael Brown, Allen Amos, Rob Dutto, Susan**

13   **English, Laurie Martin, William Phillips, Rick Stinson,  Paul Wagener, and Laura Wick).**

14       176.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 175 above.

15       177.    While employed by Plaintiffs, Defendants were executive-level, highly-

16   compensated employees and/or officers.  These defendants occupied positions of trust and

17   authority sufficient to create a duty of good faith and loyalty to Plaintiffs, as well as fiduciary

18   duties to Plaintiffs.  Defendants acknowledged that their "fiduciary duties to [the] Company shall

19   remain in effect" through the notice period they were obligated to – but did not – provide,

20   "whether or not active employment continues during the Notice Period."  Such fiduciary duty

21   survived even after their employment terminated.

22       178.   By assisting in the development and execution of, and failing to divulge and take

23   affirmative measures to prevent, and actively concealing the acts alleged herein, Defendants

24   violated their fiduciary duties and their duty of loyalty to Plaintiffs.

25       179.    Defendants' conduct has caused and will continue to cause irreparable harm to

26   Plaintiffs for which there is no adequate monetary remedy.

27       180.    Plaintiffs are entitled to an award for all of the damages they have suffered as a

28   result of Defendants' breach of fiduciary duty and duty of loyalty.  Each of the acts by these

1   defendants was done willfully and maliciously, with the deliberate intent to injure Plaintiffs and,

2   on information and belief, for their benefit and financial gain, as well as the benefit and financial

3   gain of their co-conspirators EPIC and the other Individual Defendants, thereby entitling

4   Plaintiffs to exemplary damages and/or attorneys' fees to be proven at trial.

5                                           **COUNT EIGHT**

6            **(Breach of Loyalty – Against All Individual Defendants Except Francis and Hahn)**

7        181.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 180 above.

8        182.    The aforementioned acts of Individual Defendants constitute breaches of the duty

9   of loyalty owed to Plaintiffs.

10       183.    An employment relationship existed between Plaintiffs, as employer, and the

11  Individual Defendants formerly employed by Plaintiffs, as employees.  By virtue of this

12  relationship, the Individual Defendants formerly employed by Plaintiffs had a duty of loyalty to

13  act, at all times, in the best interests of Plaintiffs.

14       184.    The Individual Defendants formerly employed by Plaintiffs breached this duty of

15  loyalty owed to Plaintiffs by the acts complained of herein.

16       185.    The Individual Defendants also breached the duty of loyalty owed to Plaintiffs by

17  violating California Labor Code sections 2854 and 2863 in which the duty is also encompassed.

18       186.    As a proximate result of these breaches of the duty of loyalty owed to Plaintiffs,

19  the Individual Defendants formerly employed by Plaintiffs have caused injuries and damages to

20  Plaintiffs, in an amount to be proven at trial, but which are in excess of the minimum

21  jurisdictional amount of this Court.  Plaintiffs are also entitled to restitution and disgorgement of

22  any proceeds Defendants realized during their period of disloyalty.

23       187.    Plaintiffs are informed and believe that at all times relevant to these allegations,

24  the conduct of the Individual Defendants was intentional and done with malice towards Plaintiffs,

25  fraud and oppression.  Plaintiffs are further informed and believe that the Individual Defendants

26  knew they were breaching their duty of loyalty owed to Plaintiffs, but in conscious disregard for

27  the rights of Plaintiffs, set upon a course of conduct which placed their own interests, and the

28  interests of their co-conspirators, including EPIC, above Plaintiffs' interests during their

-46-

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

1    employment with Plaintiffs. As a consequence, Plaintiffs are entitled to an award of punitive or

2    exemplary damages in an amount sufficient to punish or set an example of the Individual

3    Defendants.

4                              **COUNT NINE**

5    **(Tortious Interference with Contract – Against EPIC, Hahn, Francis, Wally Brown, Quinn,**
     **and Wick)**

6

7        188.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 187 above.

8        189.    At all relevant times, Defendants were aware of the existence of the valid and

9    binding Gallagher Executive and Stock Agreements entered into by Gallagher employees

10   including Amos, Michael Brown, Cohn, Dutto, English, Halbleib, Johnson, Martin, Phillips,

11   Quinn, Stinson, Wagener, Watkins, and Wick, and the Code of Business Conduct and Ethics

12   Agreements entered into by Gallagher employees. Gallagher is informed and believes and

13   thereupon alleges that EPIC even specifically reviewed the Gallagher contracts at issue in

14   connection with the conspiracy – contracts that contain the same or substantially similar

15   obligations as EPIC expects its own employees to abide by and therefore, provisions which EPIC

16   knew were valid and enforceable.

17       190.    Defendants intentionally induced Plaintiffs' employees to breach their contracts

18   with Gallagher in several ways, including encouraging them to resign without providing

19   Gallagher with the contractual notice and encouraging them to solicit Gallagher employees and

20   customers in violation of their contractual obligations, to prepare and/or actually perform work

21   for EPIC while still actively employed by Plaintiffs, and failing to take reasonable and

22   appropriate measures to ensure that Plaintiffs' employees did not misappropriate Plaintiffs' data –

23   all in direct contravention of the contracts then in existence between Gallagher and its employees.

24       191.    Defendants also were aware at all times that Plaintiffs enjoyed binding contractual

25   relationships with their customers and clients for the provision of services. Nevertheless, by

26   actively encouraging Plaintiffs' employees to illegally solicit Plaintiffs' customers, and use

27   Plaintiffs' misappropriated data, misrepresentations and unfair practices to do take away

28   Plaintiffs' business, Defendants have interfered with these contracts.

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

1    192.    These acts by Defendants have caused and continue to cause Plaintiffs to suffer

2    economic damages proximately caused by the intentional interference.

3    193.    These acts by Defendants continue to interfere with Plaintiffs' existing employees

4    and customers contracts, and thus have caused and, unless enjoined, will continue to cause

5    irreparable damage to Plaintiffs in the form of loss of client good will and proprietary knowledge,

6    and loss of relationships with their employees, for which Plaintiffs have no adequate remedy at

7    law.

8    194.    The acts of Defendants were done willfully and maliciously, with the deliberate

9    intent to injure Plaintiffs' business and improve their own business and for financial gain, thereby

10    entitling Plaintiffs to exemplary damages and/or attorneys' fees to be proven at trial.

11                                              **COUNT TEN**

12    **(Tortious Interference with Prospective Business Advantage – Against Defendants EPIC,**
     **Hahn, Francis, Wally Brown, Amos, Michael Brown, Neil Cohn, Carolann Cohn, Chua,**
13    **Dutto, Ellsworth, Halbleib, Hause, Johnson, Quinn, Wagener, and Wick)**

14    195.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 194 above.

15    196.    Plaintiffs had and have valid business relationships and business expectancies with

16    their employees and customers.

17    197.    Knowing of and about these employee relationships, customer relationships, and

18    business expectancies, Defendants have intentionally intervened and are interfering with and

19    appropriating them, including but not limited to, for the improper purpose of soliciting these

20    employees away from Plaintiffs through unlawful means, diverting their efforts for themselves

21    through improper and illegal means, and otherwise causing termination and disruption of and/or

22    interference with Plaintiffs' relationships and expectancies with its employees and customers –

23    and took affirmative measures to conceal their actions, destroy relevant evidence, and otherwise

24    prevent Plaintiffs' ability to discover and attempt to stop such interference.

25    198.    As a result of Defendants' intentional interference with these relationships and

26    business expectancies, Plaintiffs have been and will continue to be injured irreparably and

27    otherwise, while Defendants are unjustly enriched.

28

1    199.    If Defendants are not enjoined, Plaintiffs will continue to be injured irreparably

2    and otherwise.

3    200.    Each of these acts was done willfully and maliciously by Defendants, with the

4    deliberate intent to injure Plaintiffs' business and improve their own business and for financial

5    gain, thereby entitling Plaintiffs to exemplary damages and/or attorneys' fees to be proven at trial.

6    **COUNT ELEVEN**

7    **(Unfair Competition—Cal Bus. & Prof. Code § 17200 *et seq.* – Against All Defendants)**

8    201.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 200 above.

9    202.    The aforementioned acts of Defendants constitute fraudulent and unfair business

10    practices in violation of California Business and Professions Code section 17200 *et seq.*

11    203.    As a direct and proximate result of Defendants' unfair business practices, Plaintiffs

12    have suffered, and will continue to suffer, losses in an amount in excess of the jurisdictional

13    limits of this Court, and in an amount to be proven at trial and has suffered irreparable harm.

14    Pursuant to California Business and Professions Code sections 17203 and 17204, Plaintiffs are

15    entitled to preliminary and permanent injunctive relief enjoining Defendants, and individuals and

16    entities acting in concert with them, from engaging in further conduct constituting unfair

17    competition.

18    **COUNT TWELVE**

19    **(Unjust Enrichment – Against All Defendants)**

20    204.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 203 above.

21    205.    By engaging in the acts described above, Defendants have and continue to benefit

22    from their wrongdoing, and have been unjustly enriched by reaping the benefits of their unlawful

23    activities to the damage and irreparable harm of Plaintiffs.

24    206.    The circumstances are such that it would be inequitable for Defendants to retain

25    the benefits received from the actions described without repaying the lost value to Plaintiffs.

26    Accordingly, Plaintiffs are entitled to restitution from Defendants, and each of them, and an order

27    disgorging all profits, benefits, and other compensation obtained by them as a result of their

28    unlawful activities.

## **COUNT THIRTEEN**

### **(Fraud — Against Wally Brown, Cohn, Petty, Quinn, Wick, Hause)**

207.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 206 above.

208.    By engaging in affirmative acts and representation designed to conceal and prevent Plaintiffs from discovering the acts alleged herein, the following Defendants committed fraudulent acts including but not limited to:

(a)    Hause affirmatively misrepresented to Plaintiffs that he had returned all property belonging to Plaintiffs and all client information in his possession;

(b)    Wally Brown, Brian Quinn and Laura Wick affirmatively misrepresented the circumstances of Wick's resignation to induce Plaintiffs' reliance on the alibi and not arouse suspicion concerning EPIC or otherwise enable Plaintiffs to limit and/or prevent the subsequent harm inflicted on it by Defendants;

(c)    Petty committed fraud by asserting that he would preserve the data on the laptop computers of the employees of Plaintiffs who departed for EPIC, and then engaged in deletion of such data;

(d)    Cohn made affirmative misrepresentations in his resignation letter, and together with Petty's buy-in, was designed to induce Gallagher's reliance on the representations that he had not retained any, and had returned all of, Plaintiffs' data;

(e)    Defendants Brown, Cohn and Quinn, incurred expenses entertaining clients, on the premise that they were attempting to strengthen Plaintiffs' existing and prospective relationship with these customers when in fact, Defendants' intent was to convince these clients to refrain from providing Plaintiffs with additional business, and to give the business to EPIC;

(f)    Defendants Brown, Cohn and Quinn incurred auto expenses when they knew they would be leaving Gallagher's employ shortly thereafter, and that Plaintiffs would not enjoy the intended benefits for paying these expenses; and

(g)    Defendants Brown, Quinn, Cohn, and Wick affirmatively concealed the fact that Wick was involved in establishing EPIC's new office and that there was solicitation occurring by officers of Plaintiffs.

1    209.    The misrepresentations made by these Individual Defendants were material, in that

2    they were made with the intent to induce Plaintiffs' reliance on them while the Defendants

3    actively engaged in activities which conflicted with their employment with Plaintiffs.

4    210.    Plaintiffs' reliance on these Individual Defendants' fraudulent misrepresentations

5    was reasonable.  The Individual Defendants, intent on doing harm to Plaintiffs, acted in

6    coordinated and surreptitious fashion to carry out their plan, and went to extraordinary lengths to

7    conceal their malfeasance.  Plaintiffs' trust in their officers, managing agents, and longstanding

8    employees was justifiable, as was their belief that their employees were providing their best

9    efforts and working in the best interests of the Company.

10    211.    As a proximate result of the actions alleged herein, Defendants caused Plaintiffs to

11    suffer damages in an amount to be proven at trial.

12    212.    Defendants' acts of fraud were committed with the deliberate intent to injure

13    Plaintiffs' business and improve their own business and for financial gain, thereby entitling

14    Plaintiffs to exemplary damages and/or attorneys' fees to be proven at trial.

15                                  **PRAYER FOR RELIEF**

16          WHEREFORE, Plaintiffs prays that the Court:

17    1.    Enter judgment in favor of Plaintiffs and against Defendants on all Claims for

18    Relief;

19    2.    Preliminarily and permanently enjoin Defendants and all persons or entities acting

20    in concert with them, from directly or indirectly taking the following actions:

21          (a)    Accessing, using, retaining, or disclosing any of Plaintiffs' data, documents

22                 or property taken from or belonging to Plaintiffs;

23          (b)    Retrieving, copying, transmitting or disseminating any copies of Plaintiffs'

24                 data, documents or property taken from or belonging to Plaintiffs;

25          (c)    Destroying, altering, erasing, or otherwise modifying, or causing or

26                 permitting anyone else to destroy, alter, erase, or otherwise modify, any of

27                 Plaintiffs' data, documents or property taken from or belonging to other

28                 evidence relating to this action;

SECOND AMENDED COMPLAINT OF A.J.
GALLAGHER & CO., INC.; DEMAND FOR JURY
TRIAL

Case No. C 07 06418-JSW

1          (d)   Interfering with Plaintiffs' existing customer contracts or employment

2               relationships, including but not limited to seeking to or actually transacting

3               business with any current customer of Plaintiffs about whom Defendants

4               obtained or removed data or information from Plaintiffs and/or soliciting

5               any employees of Plaintiffs in violation of any contractual obligation owed

6               to Gallagher by any Defendant;

7      Plaintiffs further pray that the Court, as part of its injunctive order, direct Defendants and

8  all persons or entities acting in concert with them, to do the following:

9          (a)   Identify under oath each and every file and piece of electronic data (by

10              name, hash marks, or other identifying means) they accessed and/or

11              removed/copied off of Plaintiffs' Computers;

12          (b)   Identify under oath the location of all files, and copies of files, they

13              accessed and removed from Plaintiffs' Computers;

14          (c)   Identify under oath with specificity (manufacturer, version number, etc.) the

15              particular type of program they used to delete data off of Plaintiffs'

16              Computers and what data belonging or relating to Plaintiffs has been

17              deleted off of Plaintiffs' or personal computer media, the date of deletions,

18              and the manner of deletions;

19          (d)   Identify all computer media issued to the Individual Defendant by EPIC

20              that they have accessed or used at any time and which has ever contained

21              any of Plaintiffs' data or data that incorporates or reflects Plaintiffs' data;

22          (e)   Identify and provide an accounting of all of Plaintiffs' data or data that

23              incorporates or reflects Plaintiffs' data in their possession, custody and

24              control, including the location of such data;

25          (f)   Identify under oath all Electronic Storage Devices (including but not limited

26              to home computers, thumb drives, CDs, hard drives, private Web email

27              accounts, and other media capable of storing electronic data) in Defendants'

28              possession, custody and control, for purposes of allowing a third party

-52-

SECOND AMENDED COMPLAINT OF A.J. GALLAGHER & CO., INC.; DEMAND FOR JURY TRIAL

1    expert to forensically image and preserve the data on these Electronic

2    Storage Devices so that through the discovery process, the Electronic

3    Storage Devices can be inspected;

4    (g)    Identify under oath who has been given access to and what use has been

5    made of the data of Plaintiffs that Defendants removed from Plaintiffs'

6    Computers or otherwise have retained.

7    3.    Order Defendants to account for and pay to Plaintiffs all gains, profits and savings

8    derived from their illegal conduct;

9    4.    Order Defendants to disgorge all monies Plaintiffs paid to Defendants during the

10    time they breached their duties to Plaintiffs and all monies received as a result of those breaches;

11    5.    Order Defendants to pay Plaintiffs the damages sustained by Plaintiffs as a result

12    of Defendants' unlawful acts and all damages provided for by contract;

13    6.    Order the former employees of Plaintiffs to forfeit all improperly obtained

14    remuneration, including equity awards, obtained while acting as the faithless servants of

15    Plaintiffs.

16    7.    Order impoundment and return to Plaintiffs of all stolen property;

17    8.    Order Defendants to pay Plaintiffs punitive and/or treble damages for all claims

18    for relief for which such damages are authorized, including the misappropriation of trade secrets

19    statute;

20    9.    Order Defendants to pay Plaintiffs its attorneys' fees incurred in this action and all

21    other costs of the action;

22    10    Order Defendants to pay Plaintiffs all costs associated with detecting the discovery

23    of violations of the CFAA and California Penal Code section 502;

24    11.    Order Defendants to hold and maintain any commissions received or receivable

25    from any client who has transferred its business from Plaintiffs to EPIC after December 7, 2007

26    in constructive trust and to not disburse or use those funds pending the outcome of the trial in this

27    matter.

28    12.    Order prejudgment and post judgment interest at the maximum legal rate, as

1   provided by the laws of California, as applicable, as an element of damages which Plaintiffs have

2   suffered as a result of the wrongful and illegal acts of Defendants;

3        13.    Order Defendants to pay Plaintiffs restitution for all Claims for Relief for which

4   restitution is authorized; and

5        14.    Order such other relief as the Court deems just and equitable.

6   DATED:  September 5, 2008        BRADFORD K. NEWMAN
                                     PAUL, HASTINGS, JANOFSKY & WALKER LLP
7

8
                                     By: /s/ Bradford K. Newman
9                                         BRADFORD K. NEWMAN

10                                   Attorneys for Plaintiffs
                                     Arthur J. Gallagher & Co. and Arthur J. Gallagher & Co.
11                                   Insurance Brokers Of California, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

October 17, 2007

Dear Brian and Wally,

It is with great reluctance I submit my resignation to the both of you. My last day with Gallagher will be Friday, November 2nd. If you feel you need me longer in order to transition my job duties, I will be more than willing to extend my last day until the following week.

I have decided to take some time off until the first of the year to spend time with my family. I am hoping if I decide to return to Gallagher in 2008 that there will be an open position for me.

Thank you for everything the both of you have done for me. I can't tell you how wonderful it has been working out of the Pleasanton office for the past ten years. I wish you both the best.

Kindest regards,



Laura Wick

# EXHIBIT B

----- Forwarded by Mike Goggio/CORP/AJG on 12/16/2007 11:33 AM -----

'Joan Wick" <joanwick@earthlink.net>

12/16/2007 11:32 AM
Please respond to
joanwick@earthlink.net

To
    "Brian Wick" <btwick@sbcglobal.net>, "Laura Wick" <laura_wick@ajg.com>
cc

Subject
    RE: Our trip..

Laura:  What a surprise!  We hope the job change will be a wonderful
opportunity for you--heaven knows you're the very best person to set up and
run the new company office.  Just hope the new job doesn't cause you too
much stress.  We sure will miss seeing you, but we understand how important
this is and that there will be more holidays and other times to get
together.

Brian:  We'll look forward to seeing you and the boys, and we'll hope for
nice weather, but don't count on it--folks here say we are overdue for some
cold weather so bring warm jackets for your Wed. sightseeing in DC.

Love to all, Mom


> [Original Message]
> From: Brian Wick <btwick@sbcglobal.net>
> To: Tracy Franck <tracy@jbreg.com>; Thomas wick <wickt@earthlink.net>;
Joan Wick <joanwick@earthlink.net>
> Date: 11/5/2007 1:50:07 PM
> Subject: Our trip..
>
> Hi Folks,
>
> Want to give you an update on our trip.  Our flight
> out is on Nov 20 (Tuesday) and we land at Wash/Dulles
> at 5:27PM.  Our flight home is on Friday the 23rd at
> 2:30 PM.  Again, some strange flights due to using our
> frequent flyer miles.
>
> Laura's job situation has changed and will make it
> hard for her to come.  Her boss and the rest of the
> sales people are leaving Gallagher to go to a
> competitor.  Laura also made the decision to go, and
> is now home for two weeks before starting with the new
> company.  Essentially, her job is to start the new
> branch office and set up the computers, facilities,
> and manage HR issues before the rest of the team quits
> and joins her.
>
> That week of Thanksgiving is when she needs to start
> the new job, and so we've decided that I will come out
> with the boys.  It will be a stressful time for her
> and trying to manage a cross country trip at the same
> time would be difficult.
>
> We have Wednesday to do some site seeing in DC and we
> are really looking forward to it.  I hope this plan
> works OK for everyone.
>
> Bri
>